OFFICES OF

PAVONE &  FONNER, LLP

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMBER 181826**
600 WEST BROADWAY, SUITE 700
SAN DIEGO, CALIFORNIA  92101
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR THE PLAINTIFFS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHRISTOPHER GARNER;** **ABUKAR ABDULLE;** **DERRICO AUBREY;** **GARLAND BAKER;** **MICHAEL BLUE;** **FLOYD BOYD;** **KEVIN CALL;** **RICKY CARTER;** **CLIFFORD CHANEY;** **OTHA CLARK;** **KENNETH CORLEY;** **WALTER CORNETHAN;** **ORLANDO CRESWELL;** **DANNY DALLAS;** **GERALD DICKSON;** **ALVIN FLOWERS;** **STEPHEN FRANKLIN;** **AUBREY GALLOWAY;** **JOHN GHOLAR;** **VERNON GRANT;** **ROBERT HARRIS;** **HERMAN HAYNES;** **CLIFFORD HAYTER;** **ELLIS HOLLIS;** **INFINITY;** **KENJI JACKSON;** | **CASE NO:** **COMPLAINT FOR:** **I.   TORTURE, IN VIOLATION OF INTERNATIONAL LAW** **II.  CRUELTY, IN VIOLATION OF INTERNATIONAL LAW** **III. FAILURE TO PROVIDE AN EFFECTIVE LEGAL REMEDY, IN VIOLATION OF INTERNATIONAL LAW** **DEMAND FOR JURY TRIAL** |

PAVONE & FONNER, LLP

**GEORGE JOHNSON;**
**ANTHONY JONES;**
**EDWARD JONES;**
**ASAD LEWIS;**
**CLEOFAS LEWIS;**
**GEORGE LEWIS;**
**JOE LEWIS;**
**ROBERT MAESCHACK;**
**MICHAEL MANNING;**
**FRANK MANUEL;**
**ELLIS MCCLOUD;**
**JEFFERY MCDONALD;**
**CHARLES MCQUARN;**
**THOMAS MILFORD;**
**HERSCHEL MITCHELL;**
**GRADY MONTGOMERY;**
**ANDRE MOODY;**
**FREDDY NEAL;**
**RAYMOND NEWSON;**
**MARVIN PIERCE;**
**HARVEY RAYBURN;**
**PAUL RICHARDSON;**
**TYRONE SANDERS;**
**ALBERT SHERROD;**
**COREY LAMAR SMITH;**
**WILLIE STEELS;**
**TRACY STEWART;**
**MAURICE THOMAS;**
**TYRONE THOMPSON;**
**AARON TILLIS;**
**VANCE UTLEY;**
**PATRICK WALLACE;**
**BYRON WEST;**
**BERTRUM WESTBROOK;**
**THOMAS WILEY;**
**DARREN WILLIAMS;** *and*
**WAYNE WOODS**,

        **PLAINTIFFS,**
*Versus*

PAVONE & FONNER, LLP

**UNITED STATES OF AMERICA**;

**STATE OF CALIFORNIA**;

**JEFFREY BEARD**, FORMER SECRETARY, CALIFORNIA DEPT. OF CORRECTIONS AND REHABILITATION;

**ESTATE OF PAUL BRAZELTON**, FORMER WARDEN, PLEASANT VALLEY STATE PRISON;

**MATTHEW CATE**, FORMER SECRETARY OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION;

**JAMES HARTLEY**, FORMER WARDEN AVENAL STATE PRISON;

**SUSAN L. HUBBARD**, FORMER DIRECTOR, DIVISION OF ADULT OPERATIONS;

**DEBORAH HYSEN**, FORMER CHIEF DEPUTY SECRETARY, FACILITIES PLANNING, CONSTRUCTION & MANAGEMENT;

**DR. FELIX IGBINOSA**, FORMER MEDICAL DIRECTOR, PLEASANT VALLEY STATE PRISON;

**SCOTT KERNAN**, FORMER CHIEF DEPUTY SECRETARY OF ADULT INSTITUTIONS;

**CHRIS MEYER**, FORMER SENIOR CHIEF, FACILITIES PLANNING, CONSTRUCTION & MANAGEMENT;

**TANYA ROTHCHILD**, FORMER CHIEF OF THE CLASSIFICATION SERVICES UNIT;

GARNER, *et al.* v. UNITED STATES, *et al.*
COMPLAINT FOR VIOLATION OF HUMAN RIGHTS

**TERESA SCHWARTZ**, FORMER DIRECTOR, DIVISION OF ADULT INSTITUTIONS;

**ARNOLD SCHWARZENEGGER**, FORMER GOVERNER OF THE STATE OF CALIFORNIA;

**JAMES TILTON**, FORMER SECRETARY OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION;

**DWIGHT WINSLOW, M.D.**, FORMER MEDICAL DIRECTOR, CDCR;

**JAMES A. YATES**, FORMER WARDEN OF PLEASANT VALLEY STATE PRISON;

DEFENDANTS.

PAVONE & FONNER, LLP

GARNER, *et al.* v. UNITED STATES, *et al.*
COMPLAINT FOR VIOLATION OF HUMAN RIGHTS

# TABLE OF CONTENTS

INTERNAL / PDF

I.   CAPTION ...........................................................................................0/1

I.   INTRODUCTION ..............................................................................8/12

II.  JURISDICTION AND VENUE .........................................................9/13

III. SUMMARY OF THIS CASE ..........................................................10/14

IV.  ADMINISTRATIVE EXHAUSTION ...............................................12/16

V.   PLAINTIFFS.....................................................................................13/17

1.   Mr. Abukar Abdulle...................................................................13/17
2.   Mr. Derrico Aubrey ..................................................................14/18
3.   Mr. Garland Baker .....................................................................15/19
4.   Mr. Michael Blue .......................................................................16/20
5.   Mr. Floyd Boyd..........................................................................16/20
6.   Mr. Kevin Call ...........................................................................17/21
7.   Mr. Charles Carter .....................................................................18/22
8.   Mr. Clifford Chaney ..................................................................19/23
9.   Mr. Otha Clark...........................................................................20/24
10.  Mr. Kenneth Corley ..................................................................20/24
11.  Mr. Walter Cornethan.................................................................21/25
12.  Mr. Orlando Creswell .................................................................21/25
13.  Mr. Danny Dallas.......................................................................22/26
14.  Mr. Gerald Dickson ...................................................................23/27
15.  Mr. Steve G. Franklin ...............................................................24/28
16.  Mr. Aubrey Galloway .................................................................24/28
17.  Mr. Christopher Garner ..............................................................25/29
18.  Mr. John Gholar........................................................................26/30
19.  Mr. Robert Harris.......................................................................26/30
20,  Mr. Herman Haynes....................................................................26/30
21,  Mr. Clifford Hayter.....................................................................27/31
22.  Mr. Damor Hill ..........................................................................27/31
23.  Mr. Ellis Hollis ..........................................................................28/32

PAVONE & FONNER, LLP

24,    Mr. Infinity (NLN) ....................................................................28/32

25.    Mr. Kenji Jackson .....................................................................29/33

26.    Mr. George Johnson, III.............................................................29/33

27.    Mr. Anthony Jones.....................................................................30/34

28.    Mr. Edward Jones ......................................................................30/34

29.    Mr. Asad Lewis..........................................................................30/34

30.    Mr. Cleofas Lewis......................................................................31/35

31.    Mr. George Lewis ......................................................................31/35

32.    Mr. Joe Lewis ............................................................................32/36

33.    Mr. Robert Maeshack .................................................................32/36

34.    Mr. Michael Manning.................................................................33/37

35.    Mr. Ellis McCloud .....................................................................33/37

36.    Mr. Jeffrey McDonald ...............................................................34/38

37.    Mr. Charles McQuarn.................................................................34/38

38.    Mr. Thomas Milford ..................................................................35/39

39.    Mr. Herschel Mitchell.................................................................35/39

40.    Mr. Grady Montgomery..............................................................36/40

41.    Mr. Andre Moody .......................................................................37/41

42.    Mr. Freddy Neal.........................................................................38/42

43.    Mr. Raymond Newson.................................................................38/42

44.    Mr. Marvin Pierce......................................................................39/43

45.    Mr. Harvey Rayburn ..................................................................40/44

46.    Mr. Paul Richardson ..................................................................40/44

47.    Mr. David Robinson ...................................................................41/45

48.    Mr. Lorenzo Sams......................................................................41/45

49.    Mr. Tyrone Sanders ...................................................................42/46

50.    Mr. Albert Sherrod.....................................................................43/47

51.    Mr. Corey Lamar Smith..............................................................44/48

52.    Mr. Willie Steels ........................................................................44/48

53.    Mr. Tracy Stewart......................................................................45/49

54.    Mr. Maurice Thomas .................................................................46/50

55.    Mr. Tyrone Thompson................................................................47/51

PAVONE & FONNER, LLP

56.    Mr. Aaron Tillis ...................................................................................48/52

57.    Mr. Patrick Wallace .............................................................................49/53

58.    Mr. Kenneth Washington.....................................................................50/54

59.    Mr. Byron West ...................................................................................51/55

60.    Mr. Bertrum Westbrook........................................................................51/55

61.    Mr. Thomas Wiley ...............................................................................52/56

62.    Mr. Darren Williams ...........................................................................52/56

63.    Mr. Wayne Woods ...............................................................................53/57

VI.    **DEFENDANTS**...................................................................................53/57

   A.  United States of America ...................................................................53/57

   B.  The State of California .......................................................................57/61

   C.  Individual Defendants .......................................................................58/62

VII.   **PROCEDURAL HISTORY OF**
       **THE VALLEY FEVER LITIGATION** ......................................................60/64

VIII.  **FACTS OF THE CASE** ........................................................................63/67

   A.    Coccidioidomycosis is a Serious Disease ...........................................64/68

      1.  Origin and History of the Disease...................................................64/68

      2.  Pathology of Coccidioidomycosis ..................................................65/69

      3.  Dangerousness of Cocci..................................................................65/69

      4.  Contraction Frequency....................................................................66/70

      5.  Special Vulnerability to the Disease ...............................................67/71

      6.  Treatment and Expense of Cases .....................................................68/72

      7.  Scientific and Governmental Response to Cocci..............................69/73

      8.  Societal Expectations for Management of a Cocci Epidemic ..........70/74

   B.    The 2004-2014 Coccidioidomycosis Epidemic ..................................74/78

      1.   Table 1 - Incidence Rate ................................................................83/87

      2.   Chart 1 – VF Incidence Rate / 100K...............................................84/88

PAVONE & FONNER, LLP

C.   Defendants Knew of the Severe Risks to Prisoners, and Especially to African Americans, but Elected to Disregard those Risks. ...................................................................86/90

IX.   ACCRUAL OF CLAIM .................................................................90/94

X.   LIABILITY OF THE UNITED STATES FOR THE ACTIONS OF STATE OFFICIALS ....................................................91/95

XI.   THE QUALIFIED IMMUNITY DOCTRINE'S IMPACT ON INTERNATIONAL LAW......................................................93/97

A.   The Origin of Qualified Immunity....................................................96/100

B.   Qualified Immunity's Legality .........................................................97/101

XII.   SUMMARY OF RACIAL EXPLOITATION......................................111/115

A.   1619-1865 - Review of Slavery Exploitation (Labor).......................115/119

B.   1865-1965 – Sharecropping, Second Class Citizenship, and Other Lucrative Racial Exploitation .........................................118/122

C.   1940-2000 - Racial Exploitation via Medical Experimentation........121/125

D.   1980-2010 – Era of Mass Arrest and Incarceration - Racial Exploitation in the Modern US Law Enforcement System ...............124/128

1.   Racial Exploitation in Stops and Arrests.  ...................................129/133

2.   Racial Exploitation in Pre-Trial Treatment and Detention...........132/136

3.   Racial Exploitation in Sentencing and Prison Commitments.  .......................................................133/137

E.   Racial Exploitation in Black Student Athletes .................................134/138

F.   A Legacy of Never Getting Compensated........................................137/141

1.   Estimate of Uncompensated Torts under Then-Existing Legal Standards.  .............................................138/142

2.   Estimate of Uncompensated Torts under Current Standards.  ........................................................140/144

3.   The Modern California Law Enforcement System Revives Convict Leasing.  ........................................................145/149

PAVONE & FONNER, LLP

    4.    Contrast to State Employee Compensation and State Businesses..........................................................150/154

G.  Allegations against Individual Defendants ...........................................155/159

    1.    Jeffrey Beard ....................................................................155/159

    2.    Estate of Paul Brazelton...................................................158/162

    3.    Matthew Cate ....................................................................162/166

    4.    James Hartley ....................................................................165/169

    5.    Susan L. Hubbard...............................................................169/173

    6.    Deborah Hysen...................................................................172/176

    7.    Felix Igbinosa, M.D. .........................................................175/179

    8.    Scott Kernan......................................................................181/185

    9.    Chris Meyer .......................................................................185/189

    10.  Tanya Rothchild.................................................................188/192

    11.  Teresa Schwartz ................................................................192/196

    12.  Arnold Schwarzenegger.....................................................196/200

    13.  James Tilton ......................................................................200/204

    14.  Dwight Winslow ...............................................................203/207

    15.  James Yates........................................................................207/211

H.  Application to Valley Fever Epidemic ..................................................211/215

XIII. **POLITICAL PROBLEM #1**: "NO ONE CARES ABOUT PRISONERS" .............................................213/217

XIV. **POLITICAL PROBLEM #2**: THE RELUCTANCE OF A GOVERNMENT TO OWN UP TO COMMITTING A MASS TORT .....................................217/221

XV.  **CAUSES OF ACTION** .................................................................219/223

XVI. **CAUSE OF ACTION 1 – TORTURE** ........................................220/224

A.  State Officials' Intentional, Knowing and Reckless Decisions During the Epidemic ..........................................................220/224

B.  Theory of Torture #1 – Customs & Norms ......................................228/232

    1.  Definition of Torture in a Customs-and-Norms Case ...................228/232

    2.  Severe Pain and Suffering Element ............................................230/234

PAVONE & FONNER, LLP

C.  Analysis Governing Proof of Intentionality  ........................................237/241

D.  Racial Exploitation Experienced by Plaintiffs
Themselves in the California Criminal Justice System ......................239/243

E.  Theory of Torture #2 – 1966 Treaty  ................................................245/249

1.  Background and Adoption of the 1966 Treaty.  ...........................245/249

2.  Definition of Torture  ................................................................246/250

3.  Self-Execution: Limitations to Enforcement of the ICCPR
were Memorialized in an Earlier Legal Landscape Where
Domestic Civil Rights were Enforceable.  Subsequent Erosion
of Domestic Law Should Result in more Robust Ability to
Enforce International Law. ........................................................247/251

4.  RUDs Creating those Limitations Cannot Measure Up
to Actual US Legislation and Should not be Coronated
As Such.  ...................................................................................253/257

5.  Senate Reservation Three – Inapplicable to Torture Claims ........262/266

F.  Theory of Torture #3 – 1984 Treaty ..................................................262/266

XVII.  CAUSE OF ACTION 2 – CRUELTY ...................................................263/267

A.  Origin and Definition of Cruelty ......................................................263/267

B.  Theory of Cruelty #1 – Customs & Norms ........................................264/268

1.  Introduction ..............................................................................264/268

2.  "Specific, Universal and Obligatory" Standard for
Recognition of Customs-and-Norms Causes of Action ...............266/270

a.  Treaty Evidence .................................................................267/271

b.  Historical Evidence – US World War II Prisoners..................269/273

c.  International Case Law ........................................................272/276

d.  Practical Consequences of Recognizing Cruelty.  ..................273/277

e.  Article 7 is Viewed by a Number
of Countries to be Non-Derogable.. .....................................274/278

PAVONE & FONNER, LLP

3.   The Erosion of Domestic Civil Rights Warrants Renewed Scrutiny of RUDs and the Expansion of Customs-and-Norms Theories to Include International Causes of Action. ....................275/279

C. Theory of Cruelty #2 – Direct Enforcement of 1966 Treaty .................278/282

D. Theory of Cruelty #3 – Direct Enforcement of 1984 Treaty .................279/283

**XVIII. CAUSE OF ACTION 3 – FAILURE TO PROVIDE AN EFFECTIVE REMEDY** ..............................................279/283

A.   The United States' Various Commitments to Create and Provide a Legal System that Provides an Effective Remedy for the Violation of Civil Rights.  .......................................279/283

B.   The American Legal System's Failure to Provide an Effective Remedy in this Case Given Qualified Immunity.  ..............281/285

C.   The Commitment to an Effective Legal System is a Custom of the International Community at this Point in Time.  ......................286/290

D.   The Court Has a Measure of Doctrinal Flexibility to Fashion a Remedy for Article 2.  ........................................289/290

E.   The Qualified Immunity Doctrine is Not a Reasonable Restriction within US Domestic Law.  ..............................291/295

**XIX.  PRAYER**..............................................................................292/296

**XX    END NOTES**............................................................................295/299

**XXI.  BIBLIOGRAPHY** ...........................................................................297/301

PAVONE & FONNER, LLP

# I.

## **INTRODUCTION**

1.      The State of California, and its vicarious constitutional parent, the United States, discriminatorily ignored an epidemic of the disease coccidioidomycosis from 2004-2014 in contravention of 63 African Americans' international human rights.

2.      From 2001-2003, California officials churned up dangerous soil in the San Joaquin Valley to build a mental hospital, but in the process, they released a swarm of cocci spores into the air, contaminating an entire prison next door.  Then its leaders, despite innumerable health warnings, decided to ignore it for six years, a product of racist attitudes held at all levels of California law enforcement and corrections.

3.      The result was a virulent cocci epidemic that spread among the inmate population, an epidemic the State had itself caused.  Having refused to take any protective measures in response, thousands of minority inmates became infected and suffered debilitating, adverse, permanent effects.

4.      This mass infection event disproportionately impacted African Americans, who suffer the dual adversity of being exceptionally biologically vulnerable to the disease's harshest effects.

5.      Due to racism in the California law enforcement and corrections systems, in conjunction with a series of contradictions and constitutional violations that exist within laws relating to domestic enforcement of civil rights, the United States and its political subdivision the State of California tortured the Plaintiffs with this disease and then denied them all rights, remedies and relief under US domestic law for this 15-year window of tortious activity.

6.      Resort to international law is therefore necessary and appropriate.

PAVONE & FONNER, LLP

7.      Simply, a sovereign may not torture anyone via infliction of diseases, including and perhaps most importantly its own citizens, by engaging in a relentless campaign of racist, tortious activity against them.

## II.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to Title 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  International laws and treaties are expressly part of section 1331's jurisdictional reach.

9.      This Court has also jurisdiction pursuant to Title 28 U.S.C. § 1343(a)(3), which enables private litigants to seek redress for "the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

10.      This Court has also jurisdiction pursuant to Title 28 U.S.C. § 1343(a)(4), which provides that "[t]he district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person … [t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

11.      This Court has also jurisdiction pursuant to 42 U.S.C. § 1983, which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution _and laws_, shall be liable to the party injured… .

PAVONE & FONNER, LLP

12.    The laws referred to in section 1983 include the customs and norms of international law, as well as treaties the United States has entered.

13.    Venue is properly in this Court, pursuant to Title 28 U.S.C §§ 1391(b)(1) and 1391(b)(3), in that both defendants are appropriately subject to suit in Los Angeles, California.

## III.

## SUMMARY OF THIS CASE

14.    The American system of justice requires that correctional authorities carry out the exact sentence determined by the judicial process – no more and no less. Instead, Defendant State of California and its governmental parent, the United States of America, imposed on plaintiffs a lifelong, crippling, and occasionally fatal disease in addition to their judicial sentences in violation of international law that prohibits cruelty and torture.

15.    The disease, called coccidioidomycosis, "valley fever," "Valley Fever" or or "VF," is carried by a fungal organism that lives and reproduces in the soils in California and Arizona.  It produces spores that infect humans.  To those infected, it can be debilitating, disfiguring, intensely painful, and if it is not treated quickly, accurately and indefinitely, may be fatal.  Dozens of prisoners died from the disease and many more live with serious medical complications from it.

16.    For some who come in contact with the spores, the disease rapidly spreads throughout the lungs or to other parts of the body; this is referred to as the "disseminated coccidioidomycosis."

17.    Disseminated coccidioidomycosis attacks multiple organ systems including the skin, lungs, eyes, bones, joints, nervous system and brain. Victims of the disseminated form require lifelong treatment and may lose limbs to amputation, require sections of bone or whole organs to be removed, may suffer disfiguring skin

PAVONE & FONNER, LLP

lesions, and if the disease attacks the brain, victims may suffer permanent brain damage or die from coccidioidal meningitis.

18.    Those in certain ethnic and racial groups, including predominantly African Americans, as well as persons who are immune-compromised or immune-suppressed, are more susceptible to developing the aggressive, disseminated form of valley fever.

19.    Plaintiffs in this action are 63 inmates and former inmates of the state correctional system who contracted valley fever as a result of Defendants' reckless, racist, knowing and intentional decisions.  Plaintiffs were required to serve their lawful sentences. They were not obliged to also manage a life-long debilitating illness.

20.    Defendants knew that building construction in this area posed risk of valley fever, yet they failed to take adequate measures to suppress the effects of a major soil disturbance.

21.    Defendants knew that placing inmates in prisons where the prevalence of spore-laden soils was hazardous – where valley fever was already occurring at epidemic rates – posed an unacceptable risk of irreparable harm.  Yet, they not only placed Plaintiffs in harm's way, they also failed to implement even the few simple measures recommended by the correctional authority's own medical experts to protect them from the disease.

22.    As a result, thousands of inmates were infected, many live with life-altering consequences, and all 63 Plaintiffs suffer from this incurable ailment in varying degrees, including notably, an inability to breathe.

23.    Defendants could have constructed the hospital elsewhere (the entire area is barren) or could have diverted or transferred inmates away from the two most hyper-endemic prisons in order to reduce the rate at which inmates became infected with the virus.  They did nothing.

PAVONE & FONNER, LLP

24.     Defendants could have also implemented simple environmental measures that CDCR's own staff experts repeatedly recommended at the prisons to reduce inmate exposure: basic precautions such as paving, landscaping, and soil stabilization.

25.     California state officials repeatedly recommended that the prison ventilation systems be improved, that the existing ventilation systems be properly maintained to protect inmates against indoor exposure to the spores, and that inmates be offered respiratory protection and cautioned to stay indoors during high wind conditions to avoid outdoor exposure.   Defendants took none of these actions.

26.     Consequently, Defendant State of California, and its vicarious government parent, the United States and various individuals knowingly exposed each Plaintiff to serious health risks and violated their international rights to be free of torture, cruelty and other inhumane punishment, by the overt and latent racial discrimination that unquestionably exists within the California law enforcement and correctional systems.

## IV.

## ADMINISTRATIVE EXHAUSTION

27.     Before filing suit in the original district court actions, each of the Plaintiffs exhausted their internal prison administrative ("602") remedies.

28.     After they filed suit and exhausted their domestic remedies under US law, resulting in the US Supreme Court's denial of their request for it to hear their case, Plaintiff filed administrative actions ("FTCA") with appropriate agencies of the United States.

29.     Plaintiffs' FTCA claim was sent to five federal agencies on or about November 24, 2019 and received by all of them a few days later.  Federal regulations required one to be appointed under 28 CFR 14.2(b) to investigate the claim but no agency was actually appointed to carry out that duty.

PAVONE & FONNER, LLP

30. Contemporaneously, Plaintiffs filed administrative action with the State of California's victim compensation board, under an international theory, on December 2, 2019. The State board rejected the claim on January 28, 2020.

31. Under all theories pursued herein, a plaintiff pursuing an international cause of action must first exhaust his domestic legal rights. The international cause of action does not accrue until these domestic rights are exhausted. This occurred on October 7, 2019, when the US Supreme Court denied review of Plaintiffs' Eighth Amendment action against the underlying officials.

## V.

## PLAINTIFFS

32. Plaintiffs are 63 African Americans who contracted the disease coccidioidomycosis during the 2004-2014 epidemic, and who allege that their exposure to the disease, resulting contraction and subsequent physical debilitation was a violation of their human rights under international law.

33. Many of the plaintiffs have been released, thereby completing the payment of their debt to society, while the incurable disease of valley fever stays with them permanently.

### ABUKAR ABDULLE

34. Abukar Abdulle is a 29-year-old African-American who was born in Somalia. He earned his GED and worked at the House of Blues in downtown San Diego, California.

35. Mr. Abdulle was transferred from Donovan State Prison to Pleasant Valley State Prison on February 14, 2012.

36. Abdulle was assigned to work outside in the grounds crew at PVSP. His tasks included digging in the soil and cleaning and sweeping dusty areas outside.

PAVONE & FONNER, LLP

37. These tasks stirred up large quantities of dust and soil. Abdulle was not offered respiratory protection. If he had refused any of this work, he would have been subject to disciplinary action.

38. Before he became infected with Valley Fever, Abdulle was in excellent health.

39. He reported symptoms in 2013 and was diagnosed that year.

40. Abdulle has experienced night sweats, loss of appetite and weight, a dry cough, chest pains, severe headaches, eye problems, and extensive body pain. Abdulle was prescribed Fluconazole to control the Valley Fever, Naproxen for the pain, and eye drops for eye problems.

41. Abdulle suffers greatly from stress due to his fear of dying as a result of contracting Valley Fever.

### DERRICO AUBREY

42. Derrico Aubrey is a 42-year-old African American.

43. Prior to his incarceration, Mr. Aubrey obtained his GED and was supporting his daughter, her mother and her sister. He is a certified fork lift driver.

44. While incarcerated, Aubrey has taken college classes and continues to further his education.

45. Aubrey was transferred to PVSP in January 2009.

46. Before this, Aubrey was in generally good health and was an avid athlete who enjoyed keeping in shape although he had asthma as Defendants knew.

47. Aubrey initially experienced headache, fatigue, coughing and joint pain. He then developed night sweats and early morning coughing fits which exacerbated his difficulty breathing.

48. Aubrey suffered a thirty-pound weight loss in a matter of three weeks, which took a severe toll on his physical and mental well-being. Because of his lost appetite and severe weight loss, Aubrey must take food supplements.

PAVONE & FONNER, LLP

49. He subsequently developed a lower extremity rash and chronic bone and joint pain. He is no longer is able to enjoy any physical activities as he once did and his asthma has become unmanageable. The lesions on his legs cause severe, continuous itching and discomfort.

50. Aubrey was prescribed Fluconazole which he continues to take.

## GARLAND BAKER

51. Garland Baker is a 58-year-old old African American from Los Angeles.

52. Mr. Baker acquired his GED while in prison and enjoys handy-work including building and fixing things.

53. Baker suffers from asthma, Hepatitis B and chronic renal insufficiency.

54. He was transferred Avenal State Prison on July 7, 2011.

55. He had requested to be transferred to Chino or California Rehabilitation Center but his request was denied.

56. Baker contracted Valley Fever soon after his transfer to ASP.

57. He first noticed something was wrong when he felt cold all the time even though it was July.

58. Baker was diagnosed in late 2011.

59. Baker's Valley Fever is disseminated. His lungs, skin, bones and brain are infected. He has suffered from fever, cough, chest pains, chills, night sweats, headache, fatigue, shortness of breath, joint aches, and a painful rash.

60. Baker's vision has been affected and he has difficulty seeing.

61. His lung condition prevents him from exercising and his bones hurt constantly. After an MRI of his brain, Baker's Coccidioides diagnosis was expanded to include meningitis.

62. Baker is being treated with Diflucan.

63. He had a long-term intravenous shunt placed in his arm in August 2013.

64. As a result of the Valley Fever, Baker will require lifelong antifungal treatment.

PAVONE & FONNER, LLP

**MICHAEL BLUE**

65. Michael Sherman Blue is a 56-year-old African American, born and raised in New York.

66. Mr. Blue has worked in a number of occupations. His skills include machine operator, fork lift operator, skill saws, table saws and welding. He has his GED.

67. Blue contracted Valley Fever after his transfer to PVSP. He was diagnosed in 2012 at Natividad Medical Center.

68. Blue suffers chills, joint pain, severe headaches, difficulty with his eyesight, uncontrollable sweating, and a loss of appetite. At times he feels dizzy and disoriented, and gets short of breath if he tries to exercise. His joint pain prevents him from walking.

69. Blue has been prescribed Fluconazole for Valley Fever and Naproxen for his pain.

70. For identity purposes, his CDCR number is G31172.

**FLOYD BOYD**

71. Floyd Boyd is a 56-year-old African-American.

72. He is married with children.

73. Mr. Boyd was previously employed at various jobs including housekeeping at CMC Hospital in Fresno, California.

74. Boyd was transferred to PVSP from Salinas Valley Prison in 2012 and remained at PVSP until his recent release.

75. Boyd was diagnosed with Valley Fever on September 11, 2013.

76. He suffers persistent coughing, severe headaches, joint pain, night sweats, fevers and chills, loss of appetite and weight loss. He used to be very active but is no longer able to exert himself without severe pain.

PAVONE & FONNER, LLP

77.    While he was incarcerated, Boyd was prescribed and received 200 mg of Fluconazole daily to control the spread of the disease.

78.    He is unable to afford this medication now that he is paroled.

79.    Without appropriate medical care his condition is expected to deteriorate rapidly

**KEVIN CALL**

80.    Kevin Call is a 57-year-old African American male from Vallejo, California.

81.    He was a professional boxer for ten years, training at Olympic Auditorium in Los Angeles.

82.    He also worked for a funeral home and for the Los Angeles Coroner's office.

83.    Prior to his incarceration, Call was in good health.

84.    He was diagnosed with pulmonary coccidioidomycosis in 2012.

85.    Call reports that dust constantly blows around Wasco State Prison.

86.    Call suffers sweating, nausea, joint pain, frequent headaches and back aches, and vomits blood.

87.    As a result of both the Valley Fever and its treatment, Call's kidneys and liver are failing.

88.    He lost significant weight due to the loss of his appetite.  He suffers constant head and body aches.

89.    Call was also diagnosed with pneumonia in his upper lung.

90.    Call was repeatedly misdiagnosed and mistreated.

91.    Call was diagnosed with TB in the 1990's.  Prison doctors simply assumed his TB had become active and treated him accordingly.

92.    However, Call's TB was not active.

93.    These improper diagnoses and medications caused and/or accelerated the damage to his kidneys and liver.

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

94.    At one point, Call was told by Dr. Parks that his aches and pains were simply the result of getting old.

95.    At the time of his diagnosis, Call had an extremely high Valley Fever titer.

96.    Call underwent a long course of Ambisome and was prescribed 400 mg of Fluconazole to be taken twice a day.  Eventually, at Call's request, due to the side effects his prescription was lowered to 600 mg of fluconazole a day.

97.    He was additionally prescribed Ranitidine, and Ibuprofen and Acetaminophen for the pain.

98.    For identity purposes, his CDCR number is AK4361.

## CHARLES CARTER

99.    Charles Carter is a 49-year-old African American from Los Angeles.

100.   He is a high school graduate and has two children.

101.   Carter was transferred to PVSP from CMC State Prison in March 2011.

102.   Before his transfer to PVSP, Carter was in good health.

103.   Carter was diagnosed with Valley Fever in 2012.

104.   Carter suffers severe headaches, incessant coughing, high fever, night sweats, aching in the bones and joints of his hands, feet, legs, and neck, as well as large areas of skin rashes and trouble breathing.

105.   He was repeatedly denied testing for Valley Fever that he requested.

106.   He eventually contracted pneumonia and a 105-degree fever before he was correctly diagnosed.

107.   By the time the Valley Fever was diagnosed, the disease had spread so extensively that Carter was prescribed a massive number of medications including Fluconazole, Itraconzole, Ketoconazole, Guaifenesin, Dextromethorphan, Azithromycin, inhalers and pain medication.

108.   Doctors have informed Carter that he will have to take at least some of these medications for the rest of his life.

109.   For identity purposes, his CDCR number is V44640.

**CLIFFORD CHANEY**

110.   Mr. Clifford Chaney is a 45-year-old African American born in Cleveland, Ohio.

111.   He is the eldest of two boys, raised by his mother in Los Angeles, California.

112.   Corcoran State Prison, where Chaney contracted VF, was well known by Defendants to be a high-risk location for contracting the disease.

113.   Prior to his incarceration, Chaney was in good health.

114.   He was diagnosed with Valley Fever in May, 2011 at San Joaquin Community Hospital in Bakersfield, California.

115.   Chaney believes he contracted VF as a result of strong winds blowing dust, in addition to breathing in the dust created by big trucks driving by and nearby construction.

116.   During the end of April 2011, he began to experience shortness of breath, a hacking cough, fever, night sweats, tiredness, muscle aches and weakness. Mr. Chaney's shortness of breath was so severe that he was unable to complete a sentence without stopping to catch his breath.

117.   When he went to the emergency room on April 25, 2011, it was determined that Mr. Chaney had bilateral pneumonia and a fever.

118.   Due to his shortness of breath, he required high-flow oxygen.

119.   Mr. Chaney was treated with Diflucan, Atrovent, Xopenex, Levaquin, Protonix, and Zosyn.

120.   His cocci case is disseminated. He continues to suffer from tremors, severe asthma and joint pain.  Mr. Chaney fears that the Valley Fever medication will destroy his organs.

121.   Mr. Chaney did not receive any warnings or suggested precautions to minimize his risk of infection.

122.   For identity purposes, his CDCR number is J48650.

## OTHA CLARK

123.   Otha Clark is a 33-year-old African American from Richmond, California.

124.   He earned a high school diploma while incarcerated.

125.   Mr. Clark was transferred to PVSP in 2009.

126.   Before his transfer to PVSP, Clark had asthma and high blood pressure.

127.   Clark repeatedly requested transfer to another prison but his requests were denied.

128.   Clark was diagnosed with Valley Fever in 2011.

129.   Clark suffers from fevers, shortness of breath, burning sensations in his chest and throat, weight loss, night sweats, and severe coughing spells. He coughs up blood, has trouble eating and drinking and struggles to maintain weight.

130.   He has been admitted to the hospital over twenty times in the past year alone and almost died four times from disseminated Valley Fever infections.

131.   He was prescribed Fluconazole and Itraconazole.

132.   Physicians, including the prison physician Dr. Wilson, have informed Clark that he is likely to die within five years if the virus continues to spread in his brain and spine.

133.   Clark suffers severe stress and anxiety from fears that the disease will kill him prematurely.

134.   For identity purposes, his CDCR number is F08904.

## KENNETH CORLEY

135.   Kenneth Glenn Corley is a 69-year-old African American from Nashville, Tennessee.  He has three sisters and two brothers.

136.   Corley worked as a mechanic for many years. He obtained his GED while in prison.

137.   Corley was transferred to PVSP on or about January 10, 2010.

PAVONE & FONNER, LLP

138.   Prior to his incarceration, Corley had no known respiratory issues and was in generally good health.

139.   He was diagnosed with Valley Fever in 2011.

140.   Corley now suffers severe shortness of breath.

141.   Corley was hospitalized at San Joaquin Community Hospital and was prescribed 200 mg of Fluconozale for three months.

142.   Corley was incarcerated for a non-violent drug offense. He was released from prison on November 29, 2011.

143.   For identity purposes, his CDCR number is K23790.

## WALTER CORNETHAN

144.   Walter Cornethan is a 46-year-old African American male.

145.   He was transferred to PVSP on November 19, 2012.

146.   Before he contracted Valley Fever, Mr. Cornethan worked out regularly. He occasionally suffered heartburn but was otherwise in good health.

147.   He was diagnosed with Valley Fever in 2013.

148.   Cornethan suffers extreme fatigue. He has trouble breathing, and his back and knees ache.  He is unable to exercise and has difficulty getting out of bed.

149.   At times the pain is so severe he feels he may pass out.

150.   Cornethan experiences significant stress and worries the disease may spread throughout his body and into his brain.

151.   For identity purposes, his CDCR number is AI2224.

## ORLANDO CRESWELL

152.   Orlando Creswell is a 58-year-old African American who was born in San Francisco, California.

153.   Prior to his incarceration he worked as a hardwood floor installer.

154.   He is a father to twins who he was proud to see graduate from high school.

155.   Mr. Creswell was transferred to PVSP in October 2012.

PAVONE & FONNER, LLP

156. When Creswell arrived at PVSP he had been diagnosed with diabetes but had not yet had to take insulin.

157. Mr. Creswell was diagnosed with Valley Fever in 2013.

158. He suffers extreme fevers, headaches and severe joint pain.

159. He was unable to eat anything and rapidly lost 20 pounds.

160. Creswell reports that he was given an anti-fungal medication but nothing to relieve the pain in his joints, and has experienced severe side effects from the anti-fungal medication.

161. In addition to the other symptoms, Valley Fever exacerbates his diabetic condition by deregulating his blood sugar. His AC-1 diabetes score spikes and the severity of his diabetic condition varies with his coccidioides Titer score.

162. He suffers a variety of other painful and unpleasant symptoms including bleeding in the back of his eyes due to high blood sugar when his Valley Fever worsens.

163. For identity purposes, his CDCR number is AD3678.

**DANNY DALLAS**

164. Danny Dallas is a 61-year-old African-American male from Modesto, California.

165. Mr. Dallas has had chronic medical issues including lower back pain and bowel problems dating back to 1976 when he was assaulted and sustained a stabbing injury that was nearly fatal.

166. Dallas was transferred to PVSP on April 18, 2010.

167. He contracted Valley Fever in 2012.

168. Dallas has suffered chest pains, body aches, severe coughing with sputum, fevers with temperatures of 103-104, and rapid weight loss of 25-30 pounds from Valley Fever.

169. He was hospitalized for six days and prescribed 250mg Azithromycin for Valley Fever and pneumonia.

PAVONE & FONNER, LLP

170. While in the hospital he was also prescribed Diflucan but the medicine proved too toxic for his liver and he was given Itraconazole instead.

171. He continues to take Itraconazole and was informed that he would have to take the medication for the rest of his life. He is also prescribed pain medication and medication for a persistent cough.

172. In 2013, Mr. Dallas requested to be sent back to a level two state prison, but was endorsed to remain at Pleasant Valley despite continuing requests to be transferred.

173. Dallas was released from custody on June 11, 2013.

174. His strength and bodily functions have weakened since contracting Valley Fever and his chronic medical conditions have been exacerbated by the ailment.

175. Dallas suffers chronic stress and anxiety due to the fear that Valley Fever is going to cause his death.

176. For identity purposes, his CDCR number is F44961.

### GERALD DICKSON

177. Gerald Dickson is a 56-year-old African American.

178. Prior to his incarceration he worked in maintenance.

179. He was in excellent health. He was an athlete and exercised on a daily basis.

180. Dickson became infected with Valley Fever in mid-late 2010 at ASP.

181. Dickson experienced extreme pain in his lungs and excessive coughing.

182. Dickson has been prescribed medication on an inconsistent basis.

183. He is prescribed Diflucan and Fluconazole when his symptoms worsen.

184. Dickson continues to suffer chronic lung inflammation and has a weakened immune system.

185. Mr. Dickson can no longer enjoy physical activity.  He suffers extreme pain and difficulty breathing with increased activity.

186. For identity purposes, his CDCR number is C65708.

## STEPHEN FRANKLIN

187. Stephen Franklin is a 68-year-old African American.

188. Prior to his incarceration he was a martial arts teacher and worked at the Humane Society.

189. He had asthma.

190. Franklin was transferred to PSVP in January 2009.

191. Franklin was diagnosed with Valley Fever in August, 2010.

192. He was hospitalized for three weeks and diagnosed with pneumonia and Valley Fever.

193. Franklin was prescribed Fluconazole and Amphotericin B.

194. He suffered an allergic reaction to the Fluconazole resulting in hair loss and an infection in his hands and feet.  The Amphotericin B caused renal toxicity and was discontinued.

195. He was then prescribed Itraconazole and continued this medication for eight months with no improvement in his symptoms.

196. Franklin suffers from chronic coughing fits three to four times during the night, difficulty breathing, high fevers, and lack of appetite.

197. For identity purposes, his CDCR number is K52395.

## AUBREY GALLOWAY

198. Aubrey Galloway is a 65-year-old African American.

199. Prior to his incarceration, Mr. Galloway obtained his GED and was supporting his daughter, her mother and her sister.  He worded as a certified fork lift driver and was an avid athlete who enjoyed keeping in shape.

200. Since he has been incarcerated, Galloway has enrolled in college classes and continues to further his education.

PAVONE & FONNER, LLP

201.   Galloway was transferred to PVSP in January 2009.

202.   Galloway had asthma.

203.   Galloway suffers severe headache, fatigue, coughing and chronic bone and joint pain.  He has night sweats and early morning coughing fits causing an inability to breath.  He suffered a thirty-pound weight loss in three weeks, which took a toll on his physical and mental well-being.

204.   He no longer is able to enjoy physical activities as he once did and his asthma has become unmanageable.  He has lesions on his legs that cause severe itching. He requires food supplements to maintain weight.

205.   Galloway was prescribed Fluconazole and continues to take the medication.

206.   For identity purposes, his CDCR number is F95092.

### CHRISTOPHER GARNER

207.   Mr. Garner is 45-years-old and is part African-American, part Asian.

208.   Garner grew up in Los Angeles and graduated from high school, received an Associates of Arts degree from a junior college and was working on his 4-year degree in graphic arts/design.

209.   Before his transfer to PVSP, Garner enjoyed excellent health and did not take any medications. He exercised and took part in sports and physical work.

210.   Garner was transferred to PVSP in 2010.

211.   He repeatedly requested transfer away from the hyper-endemic prison but was denied.

212.   Garner was diagnosed with Valley Fever in 2011.

213.   He suffers severe coughing, pain in his chest and joints, muscle pain all over, weakness, migraine headaches, chills and sweats, shortness of breath, dizziness, choking and exhaustion.

214. Garner was prescribed Fluconazole, at first 4 pills per day, then reduced to 2 pills per day.

215. He was also prescribed Ibuprofen and Keflex for pain and Calamine lotion for skin sores (a side effect of Fluconazole).

216. The disease has spread into his joints and bones and other body organs including his eyes. He has unremitting sharp pains on his left side under the ribs and has begun to have trouble with his eyesight.

217. Garner is fearful of eventually suffering partial or total blindness.

218. For identity purposes, his CDCR number is F69924.

## JOHN GHOLAR

219. John Gholar is a 67-year-old African-American male.

220. He contracted Valley Fever at Pleasant Valley State Prison.

221. He suffers from the symptoms of Valley Fever including inability to breathe and severe pain in his back.

222. For identity purposes, his CDCR number is T10361.

## ROBERT HARRIS

223. Robert Harris is 55 years old and African American. He grew up in placement homes and boys' homes. He has his GED.

224. He was diagnosed with Valley Fever in 2011 at ASP.

225. Harris suffers from severe fatigue, sometimes passing out, has trouble walking, and has a lesion in his lung.

226. Harris has been prescribed numerous medications which he believes will be required for the rest of his life.

227. Harris' CDCR number is D51645.

## HERMAN HAYNES

228. Herman Haynes is a 44-year-old African-American from Pomona, California.

PAVONE & FONNER, LLP

GARNER, *et al.* v. UNITED STATES, *et al* – 26
COMPLAINT FOR VIOLATIONS OF INTERNATIONAL LAW

229. He was diagnosed in 2011-2012 with Valley Fever, based on contraction of the disease that occurred at Corcoran State Prison.

230. Before being afflicted, he was a body builder and worked out regularly, sometimes on multiple occasions.

231. His health was not compromised before suffering from the disease.

232. In late 2010, he started coughing blood, experienced chest pain and dizziness, sweating, fatigue, he lost weight, had sores on his face and felt like he was dying.

233. He is consistently tired now and sometimes his chest hurts.

234. He also gets nauseous, his joints ache, and he has relapsed to the point of requiring hospitalization.

235. He was treated with 800mg of Fluconazole, which they slowly reduced to 200mg, but he relapsed and his dosage was returned to 800mg.

236. He has a lesion in his lungs.

237. For identity purposes, his CDCR number is J69292.

## CLIFFORD HAYTER

238. Mr. Clifford Hayter is a 62-year-old African American.

239. Mr. Hayter was diagnosed with Valley Fever in May, 2013 at PVSP.

240. He suffers back pain, headaches and skin problems.

241. Mr. Hayter filed a VCB claim May, 2014.

242. Mr. Hayter's CDCR number is J69292

## DAMOR HILL

243. Mr. Damor Hill was born in 1978. He is African American.

244. Before he was incarcerated, Mr. Hill was an auto mechanic and a CDF Firefighter.

245. Hill transferred to PVSP in 2009.

246. He was diagnosed with Valley Fever in in September, 2010.

247. Hill suffers coughing, headaches, weight loss and chest pain,.

248. He has been prescribed numerous medications and is currently taking Diflucan.

249. For identity purposes, his CDCR number is P70320.

## ELLIS HOLLIS

250. Ellis Hollis was born in 1966, 53 years old today.  Mr. Hollis is African-American.

251. Hollis has asthma.

252. Hollis previously worked for Pepsi-Cola.

253. He was transferred to PVSP in 2008.

254. Hollis was diagnosed with Valley Fever in 2011.

255. Hollis suffers joint pain, labored breathing, neck and back pain, night sweats and severe fatigue.  He was hospitalized for pneumonia.

256. Hollis has been prescribed Fluconazole, Itraconazole, and Posaconazole.

257. For identity purposes, his CDCR number is T66261.

## INFINITY

258. Infinity is a 66-year-old African American from Texas.

259. He was transferred to PVSP in May 2011.

260. Before his transfer Infinity suffered from hypertension and renal insufficiency.

261. He was diagnosed with Valley Fever in 2011.

262. The disseminated Valley Fever formed a cocci mass on his left side that required surgery.

263. Disseminated cocci has been detected in his spine.

264. He was prescribed Fluconazole and has been informed he will require this medication for the rest of his life.

265. Physicians have informed Infinity that the infection in his spine will likely continue to worsen.

266.   He is of limited means and cannot afford to purchase the medication required to treat the disease.

267.   He does not know how he will get treatment or survive for long without medical care.

268.   For identity purposes, his CDCR number is C27692.

## KENJI JACKSON

269.   Kenji Jackson is a 47-year-old African-American from Los Angeles County.  He is the father of five and a grandfather to two children.

270.   Mr. Jackson worked as a forklift driver and is a certified forklift operator.

271.   He is pursuing an education and is an aspiring writer.

272.   Jackson was transferred to Pleasant Valley State Prison in 2006.

273.   Prior to his incarceration he was in good health.

274.   In 2013 he was diagnosed with Valley Fever.

275.   Jackson has suffered a complete loss of appetite, constant chills, headache, and fatigue, and lost 90 pounds. A growth was detected in his lung.

276.   For identity purposes, his CDCR number is H26381.

## GEORGE JOHNSON

277.   George Johnson is a 37-year-old African-American from Moreno Valley, California.

278.   Before he was transferred to PVSP to serve a brief sentence, Mr. Johnson was in excellent health.

279.   In 2012 Johnson was diagnosed with Valley Fever.

280.   He was prescribed 200 mg Fluconazole.

281.   Johnson suffers severe fatigue; his bones ache and he is often tired. He has problems breathing and difficulty walking.  Since contracting the disease, he has been afraid to go outside.

282.   Johnson is no longer in custody.

PAVONE & FONNER, LLP

283. For identity purposes, his CDCR number is V57604.

## ANTHONY JONES

284. Anthony Jones is an African American, born in 1959, 69 years old.

285. He obtained his GED while in prison.

286. Mr. Jones was transferred to PVSP in 2011.

287. Before being diagnosed with Valley Fever he was considered disabled due to spinal problems.

288. Jones was diagnosed with Valley Fever in 2011.

289. He suffers fever, chills, fatigue, muscle aches, headaches and weakness and suffered kidney failure as a result of the disease.

290. Jones currently takes hydrochlorothiazide for his Valley Fever.

291. For identity purposes, his CDCR number isD56853.

## EDWARD JONES

292. Edward Jones was born in 1958.  He is African American, 62 years old.

293. Prior to entering prison, Mr. Jones served in the Army.

294. He was transferred to PVSP in 2012.

295. He was diagnosed with Valley Fever in 2012.

296. Mr. Jones suffers joint pain and is severely fatigued.  He has trouble walking.

297. Jones has been prescribed and is currently taking Fluconazole.

298. For identity purposes, his CDCR number is K26983.

## ASAD LEWIS

299. Mr. Asad Lewis was born in 1961, 58 years old.  He is African American.

300. Mr. Lewis graduated from high school, has one year of college, and worked as a manager for several different small businesses.

301. Lewis was first transferred to Wasco from 2008-2009, then to Corcoran until 2011, then to PVSP, where he currently resides.

302.   Lewis contracted Valley Fever in or about September, 2011.

303.   Lewis suffers joint and bone pain, skin lesions, headaches and uncontrollable sweating.

304.   Lewis has been prescribed numerous medications and is currently taking fluconazole.

305.   For identity purposes, his CDCR number is G17886.

### CLEOFAS LEWIS

306.   Cleofas Lewis is a 59-year-old African American, born in 1960.

307.   Lewis was formerly a fork lift driver and had his GED. While in prison, he completed two trade courses, computers and electronics.

308.   Mr. Lewis has diabetes.

309.   Lewis was transferred to PVSP in 2010.

310.   He contracted Valley Fever in 2012.

311.   Lewis suffers fatigue, coughing and night sweats such that he is unable to sleep, loss of appetite and weight loss, and headaches.

312.   Mr. Lewis has been prescribed Fluconazole.

313.   Mr. Lewis's CDCR number is T23096.

### GEORGE LEWIS

314.   George Lewis was born in 1981, 39 years old.  He is African American.

315.   Mr. Lewis has his high school diploma and attended community college.

316.   Before being diagnosed with Valley Fever, Lewis had a medical history that included asthma.

317.   Mr. Lewis first started feeling ill in late 2010 with sweating at night, headaches, loss of appetite, rash, joint pain and muscle pain, and weight loss.

318.   He was diagnosed with Valley Fever in 2012 while at PVSP.

319.   He currently suffers from fatigue, headaches, body pains, weight loss, and night sweats.

320.   Lewis takes Fluconazole for his Valley Fever.

PAVONE & FONNER, LLP

321.  For identity purposes, his CDCR number is P90583.

## JOE LEWIS

322.  Joe Lewis was born in September 1948, 73 years old.

323.  He is African American.

324.  Mr. Lewis worked as a letter carrier, bartender and bouncer.

325.  Lewis resided in Avenal State Prison from January 2013 to July 2013.

326.  Lewis contracted Valley Fever in 2013.

327.  Lewis suffers coughing, headaches, and joint pain.

328.  He has been prescribed numerous medications and is currently taking Fluconazole.

329.  Lewis has been released from custody.

330.  For identity purposes, his CDCR number is AM5760.

## ROBERT MAESHACK

331.  Robert Maeshack is a 58-year-old African-American.

332.  Maeschack was transferred to PVSP in August 2007.

333.  On October 12, 2010, Maeshack was diagnosed with disseminated Valley Fever.

334.  He suffers severe coccidioidal pneumonia, fever, chills, vomiting and head pain, in addition to mediastinal lymphadenopathy. He has pain in his bones, joints, chest, back, neck, leg, and shoulders. He suffers from memory loss and nerve damage.  Maeschack was told he is terminally ill.

335.  Maeschack was prescribed Fluconazole for 12 months, followed serially by four other anti-fungal medications.

336.  He was diagnosed in June 2011 with distal symmetrical peripheral neuropathy due to protracted antifungal treatment.

337.  Mr. Maeshack now takes Noxifil (posaconazole) twice daily which he will have to continue to take for the rest of his life.

338.  For identity purposes, his CDCR number is C15018.

PAVONE & FONNER, LLP

**MICHAEL MANNING**

339.   Michael Manning is a 62-year-old African American.

340.   Mr. Manning was transferred to PVSP in June 2008.

341.   He was diagnosed with disseminated Valley Fever in 2012.

342.   Manning suffers weakness, tightness in his chest, fever, chills, severe coughing, pain, bleeding, and breathing problems.  He has lesions on his chest, shoulder, and torso, and neurological symptoms.

343.   Manning was hospitalized at Montclair Hospital and prescribed 800 mg of Diflucan daily.

344.   For identity purposes, his CDCR number is H95717.

**ELLIS MCCLOUD**

345.   Ellis McCloud is a 59-year-old African American.  He is one of nine children.

346.   Mr. McCloud has worked as a painter, a handyman, and did landscape maintenance.

347.   McCloud was transferred to Avenal in early 2010.

348.   At that time he had Hepatitis C, hypertension and arthritis.

349.   McCloud was since diagnosed with Valley Fever in August, 2010.

350.   He suffers from weakness, profuse sweating, cramps, difficulty walking and standing, and his throat swells shut.

351.   He was hospitalized at Coalinga Regional Medical Center and was given 400 mgs of Diflucan intravenously every 12 hours.

352.   He was discharged with a prescription for 400 mgs of Diflucan daily.

353.   McCloud reports that outdoor activities at the prison during windy conditions exposed him to blowing dust and "dust devils".

354.   McCloud's bones and joints ache severely and constantly. He has difficulty breathing because his lung capacity is greatly diminished and he must use three inhalers daily.  He has developed COPD.

PAVONE & FONNER, LLP

355.   He also suffers from weakness, rashes, and cough.

356.   For identity purposes, his CDCR number is E10771.

### JEFFREY MCDONALD

357.   Jeffrey McDonald is a 53-year-old African American.

358.   Mr. McDonald had Hepatitis C and liver disease.

359.   McDonald was transferred to PVSP in 2010.

360.   McDonald sought medical treatment for eight to ten weeks but was told he just had a cold and was given cold medicine. Then he was told he had pneumonia. Medical staff accused Mr. McDonald of malingering.

361.   His symptoms included deep coughing, vomiting, violent seizures, trouble breathing, dizziness, joint pain, fluid coming out of nose and lungs, and painful crushing headaches.

362.   When he became dehydrated and incoherent, medical staff decided to test him for Valley Fever.

363.   McDonald was diagnosed with Valley Fever in or about 2012.

364.   By that time McDonald had lost 60 pounds, his lungs were infiltrated, and the cocci had disseminated. He had severe chest pains and cardiac problems.

365.   Prison officials sent Mr. McDonald to Mule Creek State Prison for treatment, and later to High Desert State Prison.

366.   McDonald still suffers from intense chest and joint pain, seizures, irregular heartbeats and hypertension.

367.   Among the many medications he must take each day are: 1800 mg. gabapentin, 220 mcg. monetasone, 2400 mg. oxcarbazepine, 100 mg. atonoxetine, 10 mg. amlodipine, 1200 mg. fluconazole, and 40 mg. lisinopril.

368.   For identity purposes, his CDCR number is P05806.

### CHARLES MCQUARN

369.   Charles McQuarn is a 71-year-old African-American from Los Angeles, California.  He has a background in cooking and dentistry.

370.   Mr. McQuarn contracted Valley Fever in 2012 at PVSP.

371.   McQuarn has lumps and swelling, chills, night sweats, has trouble walking and has lost muscle control on one side of his body.

372.   For identity purposes, his CDCR number is P13070.

## THOMAS MILFORD

373.   Thomas Milford is 50 years old and African American.

374.   Mr. Milford has asthma.

375.   Milford was sent to Corcoran State Prison in 2012.

376.   Milford was diagnosed with Valley Fever in 2013.

377.   He was hospitalized at San Joaquin General Hospital for three months, and then placed in the hospital at Corcoran for an additional three months of treatment.

378.   He suffers rapid weight loss, hot flashes, diarrhea, vomiting, fatigue, coughing, choking, body aches and severe pain.

379.   Milford reports he often played sports on bare dirt at CSP and walked the dirt track, and was forced by guards to lie face-down in the yard with his face in bare dirt.

380.   Milford was prescribed Noxafil to treat the cocci.  He will have to take medication for the rest of his life although it may cause brain injury and memory loss.

381.   For identity purposes, his CDCR number is K40081.

## HERSCHEL MITCHELL

382.   Herschel Mitchell is a 68-year-old African American.

383.   He attended Amarillo Junior College on a basketball scholarship and later transferred to the University of California at Berkeley.

384.   Mr. Mitchell had Hepatitis C, was borderline diabetic, and had a positive TB test.

385.   Mitchell he was transferred to Avenal in April 2009.

386.   Mitchell was diagnosed with Valley Fever on October 20, 2010.

387. Mitchell suffers a persistent hacking cough, body aches all over, rapid weight loss, and balance and walking problems. He walks with a limp now and his balance is so bad he has fallen and injured himself three times. He has nerve damage to the right side of his body.

388. Mitchell was first prescribed antibiotics and then prescribed 200 mg. of Fluconazole. In February 2011, his medication was changed to 200 mg. Voriconazole, and in May 2011 to 400 mgs of Posaconozole daily.

389. Mitchell was assigned to an outside yard crew at ASP, picking up debris in bare dirt along the perimeter fences. Prison officials required inmates to clear brush and weeds with electric trimmers which threw large amounts of dust and dirt in the air.

390. Mitchell was not issued face masks and was required to do this work.

391. For identity purposes, his CDCR number is V80584.

### GRADY MONTGOMERY

392. Grady Montgomery is a 56-year-old African American.

393. He is married and has two children.

394. Mr. Montgomery worked in auto sales for most of his career.

395. Prior to his transfer to PVSP, he was housed at CMC State Prison.

396. He asked to be transferred to Folsom State Prison but was instead endorsed for transfer to SOL/WSP III. He appeared before the Institutional Classification Committee (ICC) on November 11, 2011 for transfer to SOL/WSP, but on January 1, 2012 was transferred to PVSP instead. No reason was given.

397. Montgomery protested his transfer to PVSP because he is African-American and has chronic breathing trouble.

398. Before his transfer to PVSP, Montgomery suffered from chronic allergies, high blood pressure and back pain from an old injury.

399. Montgomery became ill in 2012.

400. He was extremely weak and had night sweats, fever, coughing, rashes, pain in his chest, scaling skin, and extreme weight loss. He started throwing up blood.

PAVONE & FONNER, LLP

401.    Despite these symptoms and his repeated requests Montgomery was not tested for Valley Fever at that time.

402.    His symptoms worsened and he sought medical attention but was turned away again, reportedly because he did not have the correct paperwork.

403.    He submitted an emergency request for medical care and was finally diagnosed with Valley Fever in December, 2012.

404.    He was prescribed Fluconazole, antibiotics and Ibuprofen.

405.    He has fluid on his lungs, pain in his body and joints, difficulty breathing, scaling skin, chronic itching and skin rashes.

406.    For identity purposes, his CDCR number is K52660.

## ANDRE MOODY

407.    Andre Moody is a 61-year-old African American.

408.    Mr. Moody had acute asthma, chronic hepatitis C, stage 1-2 liver fibrosis, and was anemic when he was sent to Avenal State Prison on January 6, 2011.

409.    In 2011, Mr. Moody developed a dry cough and his head started to ache. He thought he had a cold. He began getting dizzy spells in which his head would spin for a minute or two.

410.    He also had painful coughing that would continue until he thought he would pass out, along with weight loss, hand cramp pain, boils and loss of strength.

411.    Mr. Moody was not promptly tested for Valley Fever although he sought medical treatment and evaluation. He was told he had an allergic reaction to medication. The only medication he was given was sinus pills.

412.    Moody was diagnosed with Valley Fever later in 2011.

413.    He was prescribed 400 mgs a day of Diflucan.

414.    On December 26, 2011, Mr. Moody's throat became so swollen he was sent to the emergency room, where he was treated for three days.

415.    On August 14, 2012, Mr. Moody was again hospitalized; it was thought he had tuberculosis, but it turned out to be a recurrence of his Valley Fever.

PAVONE & FONNER, LLP

416.    Moody suffers from pulmonary infection, spots on his left lung, lesions in both nostrils, dizzy spells, internal pain, and he is often tired. The bones in both his hands, knees, and his right shoulder are swollen and painful. He has daily dizzy spells, his eyes ache, and he suffers from skin boils.

417.    Moody reports that he believes he became infected shortly after being outside on the bleachers during windy season.

418.    For identity purposes, his CDCR number is J58963.

### FREDDY NEAL

419.    Freddie Neal is 48 years old and is African-American.

420.    Mr. Neal has worked hard hard while incarcerated and has earned numerous college credits with Coastline College.

421.    Neal was transferred to PVSP on January 21, 2011.

422.    Neal was diagnosed with Valley Fever on about January 24, 2012.

423.    Neal suffers from a persistent cough, headache, fever, sweats, fatigue, and loss of appetite. He lost 13 pounds in two weeks.

424.    Neal is being treated with 400 mg of Fluconazole twice a day.

425.    For identity purposes, his CDCR number is H44704.

### RAYMOND NEWSON

426.    Raymond Newson is a 57-year-old African-American from Louisiana.

427.    Before his incarceration, he graduated from high school and was a skilled welder and a laborer.

428.    In 2007, Newsom was sent to RJ Donovan Correctional Facility in San Diego.

429.    In October 2008, doctors performed a decompressive laminectomy on Mr. Newson's spine; the procedure left Mr. Newson with limited mobility and he was transferred to PVSP in May of 2009.

430.    Newson also suffered from hepatitis C, tuberculosis, and asthma.

431. These factors, in addition to Mr. Newson's status as an older African-American, put him at a very high risk of contracting the severe form of Valley Fever.

432. Newson was diagnosed with Valley Fever in 2011.

433. The Fluconazole treatment was discontinued because it caused Mr. Newson's skin to break out in hyper-pigmented macular eruptions.

434. Newson continues to experience the same symptoms.

435. His body breaks out in rashes.

436. He suffers from chest pain, chills, and severe headaches.

437. He can expect these symptoms to recur throughout his life.

438. Newsom is an older African American who had hepatitis C, tuberculosis, and asthma when he was transferred to PVSP.

439. For identity purposes, his CDCR number is E38262.

**MARVIN PIERCE**

440. Marvin Pierce is a 60-year-old Caucasian.

441. Mr. Pierce worked in an oil refinery for twelve years and for six years as a commercial driver operating 18-wheelers.

442. Pierce was transferred to PVSP in 2010.

443. Pierce was told on July 16, 2012, that a spot on his lung was cancer.

444. He was diagnosed with Valley Fever on December 19, 2012 after a lung biopsy.

445. Pierce has suffered constant coughing, congestion, and joint pain, including in his lower back where he now has damaged nerves and discs. He now walks with a cane.

446. Pierce has lost almost 70 pounds after contracting Valley Fever. He has red rashes all over his legs and sores on his face and hands and on his feet.

447. Pierce now also has asthma, which he had not had previously.

448. The disease has made him incontinent.

PAVONE & FONNER, LLP

449. Pierce was given Diflucan four times a day but was later cut back to three times a day.

450. Mr. Pierce's CDCR number is F68477.

## HARVEY RAYBURN

451. Harvey Rayburn is 53 and is from Compton CA. He worked in construction for an oil refinery.

452. Mr. Rayburn is African American and has asthma.

453. Rayburn was convicted of a minor crime as a third strike.

454. Rayburn contracted Valley Fever at PVSP in 2012.

455. He was given Fluconozale starting on March 12, 2014; 400mg for six months but now is on 200mg.

456. Rayburn suffers uncontrollable sweating, fever, loss of weight, weakness, and joint pain. He is unable to exercise because of the swollen joints.

457. Before he contracted Valley Fever, Rayburn's asthma usually only bothered him once a year. Now he suffers 2 attacks a week, with severe coughing that feels like he is coughing up his lungs.

458. For identity purposes, his CDCR number is K42493.

## PAUL RICHARDSON

459. Paul Richardson is a 53-year-old African American.

460. Mr. Richardson was co-founder of a movie production company. After growing up in a ghetto on the East Coast, he moved to California to start a business.

461. Richardson was transferred to Avenal State Prison in 2010 from the Reception Center in Delano.

462. Richardson was a fitness expert and in good health.

463. Richardson was diagnosed in 2012 with pulmonary coccidioidomycosis and in 2013 was diagnosed with the disseminated form.

PAVONE & FONNER, LLP

464. Richardson has suffered night sweats, shakes, body aches, bones hurting anxiety, difficulty in thinking, persistent tiredness, weight and body mass loss, and skin problems.

465. Richardson has been prescribed Fluconazole, pain relievers, and supplements for weight loss.

466. For identity purposes, his CDCR number is J46614.

## DAVID ROBINSON

467. David Robinson was born in San Francisco in 1951, 68 years old. He came from a troubled family background but managed to graduate high school and became a dental technician.

468. Mr. Robinson is African American.

469. Robinson was transferred to Pleasant Valley State Prison in June of 2011 and remained there until December of 2013.

470. Robinson contracted Valley Fever in 2011 at PVSP.

471. Robinson suffered from nose and mouth bleeds, shortness of breath, flu-like symptoms, urinating blood, and pain in his spine.

472. After contracting Valley Fever, Robinson lost 30 pounds.

473. He reports that he is so thin that his ribs protrude and he looks like someone from the concentration camps. The pain in his spine is so bad that he has to warm up before he can take a walk.

474. Robinson was prescribed Diflucan for a few months and then the medication was discontinued.

475. His symptoms worsened in May 2013 and he was again put on Diflucan.

476. For identity purposes, his CDCR number is F13839.

## LORENZO SAMS

477. Lorenzo Sams is a 67-year-old African-American from Moreno Valley, California. He has a large family of siblings, nephews, and nieces.

PAVONE & FONNER, LLP

478. Mr. Sams was a United States Marine and was honorably discharged for medical reasons.

479. Before being incarcerated, Sams had asthma and arthritis which caused his immune system to be compromised.

480. Sams was transferred from North Kern State Prison to PVSP on January 7, 2009.

481. Before his transfer to PVSP Sams had pneumonia in his right lung. He was hospitalized for six weeks and had his spleen removed.

482. When he had his spleen removed, physicians informed Sams that he would become more susceptible to contacting diseases.

483. Sams was diagnosed with Valley Fever at PVSP in 2011.

484. The disease progressed causing him to have chronic pneumonia, rashes on his legs, loss of appetite, and fatigue.

485. Medical records suggest enlargement of the heart and heart disease.

486. He now has asthma attacks more often, his arthritis has worsened, he feels tired all the time, and he has aches and pains throughout his entire body.

487. He was given Erithromycin for his pneumonia and Fluconazole for Valley Fever.

488. He was prescribed various other medications for his cough and asthma.

489. For identity purposes, his CDCR number is G36561.

## TYRONE SANDERS

490. Tyrone Sanders is a 38-year-old Hispanic-American. He has a five-year-old son.

491. Mr. Sanders was born in Boston, Massachusetts, raised in Texas, and his home is Las Vegas, Nevada.

492. Sanders completed some college courses and his job history includes work in construction, docks and warehouses among other things.

493.    Mr. Sanders was transferred to PVSP on August 19, 2011.

494.    While on the yard at PVSP he was forced to sit in the dirt next to exposed construction areas during alarms.

495.    Mr. Sanders first started experiencing symptoms in 2012.

496.    He suffered breathing difficulties, uncontrollable coughing, vomiting with blood, migraines and severe knee pain.

497.    Mr. Sanders was diagnosed with Valley Fever in 2012.

498.    He currently is prescribed fluconazole 200mg and an inhaler.

499.    The disease has caused Sanders walking pneumonia, asthma, high blood pressure, erratic heartbeat, constant joint pain, daily migraines and chest pain.

500.    Aside from the physical toll the disease has taken on Mr. Sanders, he also reports that it has had a large psychological and emotional impact.

501.    For identity purposes, his CDCR number is F20814.

### ALBERT SHERROD

502.    Albert Sherrod is a 63-year-old African American from Michigan.

503.    Mr. Sherrod worked as a cook in his family's business and attended community college for two years.

504.    He also worked at Ford Motor Company.

505.    Sherrod was transferred to PVSP in 2008.

506.    He started feeling sick in 2011, with night sweats, joint pain, coughing, breathing problems, body aches and bleeding but was not diagnosed with Valley Fever until 2012.

507.    Sherrod has been treated with Fluconazole. He continues to suffer coughing, breathing problems, swollen glands, dizziness, lower back pain, extreme fatigue, muscle spasms and constantly aching joints.

508.    Before he contracted Valley Fever, Sherrod was active and healthy.

PAVONE & FONNER, LLP

509. Mr. Sherrod believes he contracted Valley Fever as a result of his job assignment on the yard crew. He worked continuously in the dust and dirt and was not given respiratory protection.

510. For identity purposes, his CDCR number is P18116.

## COREY LAMAR SMITH

511. Corey Lamar Smith is a 44-year-old African American currently serving a sentence at PVSP for a minor burglary.

512. Before his transfer to PVSP, Mr. Smith suffered from asthma but was otherwise in good health.

513. He was diagnosed with Valley Fever in 2011.

514. Smith suffers pain in his joints and chest, night sweats, uncontrollable coughing and loss of appetite.

515. He has also developed pneumonia and skin rashes.

516. Because of the pain, Smith can no longer exercise.

517. Smith has received only intermittent treatment for Valley Fever.

518. Smith requested transfer away from PVSP but was denied.

519. For identity purposes, his CDCR number is G44282.

## WILLIE STEELS

520. Willie Steels is a 47-year-old African-American who grew up in Riverside, California. He is one of six children.

521. Mr. Steels attended college and completed some computer studies.

522. Steels was transferred to PVSP in July, 2010.

523. Prior to his incarceration at PVSP, Steels enjoyed excellent health.

524. He was diagnosed with "a primary coccidioidal infection" in 2010 when a Coccidioidal Serology report at Foundation Laboratories Inc., in Pomona CA, tested positive for precipitin (IgM) antibody.

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

525. At the onset of the disease, Mr. Steels began to experience coughing, night sweats, weight loss, bruising in his hands and feet, headaches, fatigue, shortness of breath and loss of consciousness. He has also experienced significant hair loss, and started experiencing frequent heart burn.

526. Steels was prescribed Fluconazole and antibiotics when he developed pneumonia.

527. For identity purposes, his CDCR number is P14596.

### TRACY STEWART

528. Tracy Stewart is a 53-year-old African-American from Oakland California.

529. He grew up in a single parent home and was a good student.

530. He was incarcerated at Avenal from 2004-2013.

531. Before his incarceration at ASP, Stewart enjoyed excellent health and suffered no immune problems.

532. He first noticed problems in 2011. After 2 weeks of suffering, he was diagnosed with pneumonia.

533. Stewart reports he contracted the illness after breathing dust caused by construction work stirring up the bare dirt.

534. At first, he thought it was a summer cold.

535. But the symptoms continued to get worse – fever, coughing, shortness of breath, and tightness in the lungs.

536. Stewart was prescribed Levaquin (500mg) for the pneumonia but later prescribed Diflucan.

537. Later his blood was tested and he was diagnosed with Valley Fever.

538. Over the next year, there were no further tests given and his condition continued to worsen.

539. In early 2013 he was removed from the prison and hospitalized.

540. By then, the fever had disseminated to his stomach.

541. When his conditioned worsened over the next year he was hospitalized and given an IV treatment for 4 months.

542. There were significant side effects from this treatment.

543. He had 3 blood transfusions.

544. He has been informed that he has a chronic condition and is classified as high risk.

545. He now suffers from back pain, has trouble walking, and is anemic, he believes, from the medication he is taking.

546. Stewart believes the health care is poor; there were mistakes in blood tests that prevented proper medical treatment.

547. This delay in an accurate treatment plan allowed the condition to worsen and allowed the disease to take hold in his body and require a particularly harsh IV treatment which led to many side effects including inability to walk.

548. For identity purposes, his CDCR number is C87900.

### MAURICE THOMAS

549. Maurice Thomas is a 50-year-old African-American from Oakland, CA.

550. Mr. Thomas graduated from high school and completed one year of college. Thomas has been employed as a bus driver.

551. Thomas was transferred to PVSP in December 2012.

552. In May 2013, Thomas began to feel ill with increasing shortness of breath to the point that he could barely walk a few yards on level ground; he had a dry, irritating cough, fever with rigors and chills, night sweats, muscle pain, and loss of weight.

553. On May 21, 2013, after having been rushed to the hospital, Thomas was diagnosed with valley fever.

PAVONE & FONNER, LLP

554. He requires constant medical treatment and daily medications including Fluconazole 400 mg and Naproxen 500 mg each twice per day.

555. Thomas continues to suffer the effects of valley fever.

556. For identity purposes, his CDCR number is AL9879.

**THOMPSON TYRONE**

557. Tyrone Thompson is a 59-year-old African-American man.

558. He grew up in Pomona, California.

559. Thompson has successfully completed Vocational Business Occupations, Level 1 Office Services.

560. In 2010, Thompson was housed at California Men's Colony.

561. During that time, he was transferred to Pleasant Valley State Prison.

562. Thompson began to feel ill after arriving and requested medical attention.

563. He was experiencing fever, coughing, pain, breathing difficulty, and night sweats.

564. Thompson attempted to obtain medical treatment on several occasions but RN Dye dismissed his complaints as non-existent.

565. He was only seen by a doctor when he was able to bypass this nurse.

566. He was told by his doctor that he had become infected with Valley Fever and pneumonia in 2012.

567. In 2012, Defendants had to transport Thompson by gurney to a waiting ambulance for transportation to Twin Cites Community Hospital where he remained for treatment for 10 days.

568. Thompson was discharged from Twin Cities with a treatment plan.

569. However, Dr. Olufemi Owolabi, Dr. Sundarum, and RN Martinez refused to implement the plan.

570. Thompson has been prescribed Fluconazole, Tylenol with codeine, Ipratropium Bromide, Llsinopril, Metoprolol Tartrate, Nitroglycerin, Ranitidine HCL, Citalopram Hydrobromide.

571. However, his doctors neglect to provide the medications on a regular basis.

572. Since the infection, Thompson has not been able to walk more than 10 feet without needing to stop, sit down, and use an inhaler to help him breathe.

573. He uses a wheelchair for transportation.

574. He suffers from a chronic cough.

575. Thompson has a chronic bloody nose, chronic pain, he is incontinent, he cannot eat for days at a time, and he suffers from sleeplessness.

576. Pleasant Valley State Prison does not maintain its air conditioners or ventilation systems, which leaves them filthy and cocci laden.

577. Staff use machines that stir up cocci laden dust.

578. At those times Thompson requested a mask to filter the dust before breathing it; prison staff refused.

579. For identity purposes, his CDCR number is H84131.

### AARON TILLIS

580. Aaron Tillis is a 36-year-old African American from Marin City, California.

581. Mr. Tillis was transferred from High Desert State Prison to PVSP in 2009. Before his transfer to PVSP, he was in good health.

582. In 2012, he was transferred to CSP Solano where he remains today.

583. Tillis reports that his classification score dropped to level two on February 17, 2011.

584. CDCR rules then required him to be transferred from PVSP.

PAVONE & FONNER, LLP

585.   Had Defendants followed CDCR classification rules he would have been transferred away from PVSP before he contracted valley fever.

586.   Tillis was diagnosed with valley fever in 2012.

587.   He suffers generalized body aches, night sweats, skin rashes and skin lesions, chronic fevers, and trouble breathing.

588.   In attempts to treat the valley fever, Tillis has been prescribed Fluconazole, Adacel, Chlorpheniramine, Hydrochlorothiazide, Lisinopril, Mirtazapine, and Naproxen.

589.   For identity purposes, his CDCR number is V68825.

## PATRICK WALLACE

590.   Patrick Wallace is a 53-year-old African-American.

591.   Mr. Wallace grew up in a small town in South Carolina.

592.   Wallace enlisted in the US Navy in 1986.

593.   He was stationed in San Diego when he met his wife.

594.   Wallace has two children who are now grown and have children of their own.

595.   Before his incarceration at Avenal State Prison, Wallace was in excellent health.

596.   Before his diagnosis, he exercised and was on work crews daily while at ASP.

597.   He began to notice something was not right in 2011.

598.   He was diagnosed with Valley Fever later that year.

599.   His health has steadily declined since that time.

600.   His symptoms include high fever, nausea, throwing up, severe fatigue, severe pain in his joints, sores and blisters on his legs.

601.   He was put on a breathing machine and hospitalized for nearly a month.

602.   His eyesight is also diminishing.

603.   Wallace had three different surgeries in a three months period.

604.   Wallace was prescribed Fluconaloze in 2011 to take twice daily through 2013.

605.   His symptoms progressed, and he was then prescribed Prozadeal, Posaconazole, and Morphine tablets.

606.   He has been informed that he is classified as high risk

607.   For identity purposes, his CDCR number is H13381.

**KENNETH WASHINGTON**

608.   Kenneth Washington is a 41-year-old African American from Richmond, California.

609.   Mr. Washington has a GED and attended college.

610.   He is trained as a welder and worked in the auto and airplane mechanic trades.

611.   He was married and has two children.

612.   Mr. Washington was transferred to PVSP in December 2009.

613.   Before his transfer to PVSP, Washington suffered from asthma for which he was hospitalized several times.

614.   Otherwise, he enjoyed good health and was able to run 3 to 5 miles at a time.

615.   Washington was diagnosed with Valley Fever in 2011.

616.   He began treatment in 2012.

617.   After he became infected, Washington's asthma became much worse.

618.   He also suffers from severe headaches, fever, fatigue, very low blood pressure, weight loss, and night sweats.

619.   He has been informed he may have permanently scarred lungs.

620.   Defendants knew that Washington had asthma and was African American.

PAVONE & FONNER, LLP

621. Defendants also knew that he had taken medication for asthma, Flovent, that is known to cause a compromised immune system

622. For identity purposes, his CDCR number is P08412.

## BYRON WEST

623. Byron West is a 54-year-old African-American, raised in California.

624. He was a three-year commercial plumber and a high school graduate.

625. He first noticed uncontrollable and severe coughing, joint and muscle aches, loss of appetite, and nausea.

626. He now suffers from severe coughing and difficulty breathing.

627. Doctors have told him that the upper lobe of his lung is infiltrated with the infection.

628. For identity purposes, his CDCR number is F42431.

## BERTRUM WESTBROOK

629. Bertrum Westbrook is a 44-year-old African-American.

630. He was born in Los Angeles, California. He has one son.

631. Mr. Westbrook was transferred to PVSP in early 2009 and was diagnosed with Valley Fever in 2010.

632. His symptoms include recurrent fevers, chest and back pains.

633. He was prescribed Fluconazole and Noxafix but had to be hospitalized; a specialist concluded that his medication was not strong enough and recommended Voriconazole.

634. The disease is disseminated.

635. Westbrook continues to have physical aches in his joints that limit his movements, fevers, chest pain, nausea and back problems.

636. He now also has cancer; treatment for both conditions is complicated as a result.

637. He is anxious and depressed about whether he is going to die because of his infection with Valley Fever.

PAVONE & FONNER, LLP

638.   After learning about Valley Fever, Mr. Westbrook protested his placement at PVSP and requested an emergency transfer away from the prison but his request was ignored or denied.

639.   Westbrook requested transfer out of PVSP, but on information and belief, Defendants, aware that he was high-risk, ignored or denied his requests, thus evidencing deliberate indifference to his serious health needs.

640.   For identity purposes, his CDCR number is F94023.

**THOMAS WILEY**

641.   Thomas Wiley is a 71-year-old African American from Los Angeles. He worked for the Santa Fe Railroad.

642.   Mr. Wiley was married for twenty years until his wife passed away.

643.   He is close to his five children and his grandchildren.

644.   Wiley was transferred to PVSP from Wasco State Prison in 2010.

645.   It was known at the time that he had Hepatitis C.

646.   Wiley was diagnosed with Valley Fever in 2012.

647.   He is no longer able to exercise or walk any distance without losing his breath.

648.   Wiley suffers from intense stress and anxiety from the disease.

649.   For identity purposes, his CDCR number is AE3370.

**DARREN WILLIAMS**

650.   Darren Williams is a 60-year-old African American who is involved in prison ministries outreach programs.

651.   He has obtained several education certificates and hopes to be able to assist with support of youth at risk.

652.   Mr. Williams was transferred to PVSP; he was generally healthy prior to his incarceration, with moderate asthma.

653.   In 2011 he started experiencing uncontrollable sweating and constant chills.

654. He was informed he had Valley Fever in or about 2011.

655. Williams now suffers from fevers, shortness of breath, burning sensations in his chest and throat, weight loss, night sweats and severe coughing spells.

656. Mr. Williams was not given any treatment for these conditions until after he was diagnosed. He was prescribed Fluconazole but has experienced severe side effects from the medication.

657. For identity purposes, his CDCR number is D62700.

**WAYNE WOODS**

658. Wayne Woods is a 64-year-old African-American from Alabama.

659. He is a veteran and has been employed as a salesman, coal miner, house painter and barber.

660. Woods was transferred from California Men's Colony to ASP on August 8, 2012.

661. Before his transfer to ASP, Woods had high blood pressure but was otherwise in good health.

662. Woods was diagnosed with Valley fever in 2012. He experiences night sweats, chills, fever, rashes and fatigue.

663. Woods was prescribed Fluconazole but due to severe allergic reactions had to be switched first to Voriconazole and then to Posaconazole, second-line drugs.

664. He continues to experience the symptoms of the disease.

665. For identity purposes, his CDCR number is K38629.

**VI.**

**DEFENDANTS**

666. Defendants are identified as the United States and the State of California.

**A. Defendant United States of America**

667. The United States is a sovereign country, which first began as a colony of Great Britain.  Its operations as relevant to this case began in August, 1619 when a

ship arrived in Virginia carrying more than 20 enslaved Africans.  They would later become part of a larger pool of 12.5 million Africans forced into the trans-Atlantic slave trade.

668.    Slavery proceeded in an uninterrupted fashion throughout the pre-incorporation era of the United States, some 150 years, when political events and tensions between the colonies and Great Britain caused the colonies to fight for their independence.

669.    The French and Indian War, or Seven Years' War (1756-1763), brought new territories under the power of the British crown, but the expensive conflict led to unpopular taxes.  The British government attempted to raise revenue by taxing the colonies in the Stamp Act of 1765, the Townshend Acts of 1767 and the Tea Act of 1773.  These laws met with protest, as the colonies were incensed about taxation without representation.

670.    In 1770, tensions heightened when colonists provoked British soldiers, who fired back in what was later termed the Boston Massacre.  The officers were acquitted, and in the process, brought defense counsel John Adams to prominence in American politics.

671.    In 1773, colonists engaged in property terrorism, by dumping 342 crates of British tea into the local harbor, called the Boston Tea Party.  Considered terrorism by the governing power then, it is now widely considered patriotism.

672.    In July, 1776, the colonies declared their independence from Great Britain.  They engaged in war for the next five years, until the Fall of 1781, when General George Washington trapped British General Charles Cornwallis at Yorktown, Virginia between Washington's forces and French naval ships, prompting Cornwallis to surrender.

673.    On September 17, 1787, the United States executed the United States Constitution, which was just four pages long.  At the time, the United States consisted

PAVONE & FONNER, LLP

of 11 states: Connecticut, Delaware, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania. South Carolina, and Virginia.

674.    In 1803, the US expanded its territory with the Louisiana Purchase from the French, by adding as many states as the original union constituted, as pictured below:



675.    The United States purchased the land for $15M.[1]

676.    As of 1860, with the country divided between the North and the South, the map of the United States looked as below.  This critical real estate division would define a cultural civil war, and that would lead to innumerable atrocities.

677.    Slavery, Southern atrocities, and unquestioned white supremacy in general for the first 350 years of the United States' 400-year *de facto* existence

[1]    Today that would be about $340M, for 827,000 square miles. The land is worth about 4,500x as much today (even with the $15M adjusted for inflation to $340M) at $3,000/acre (640 acres = 1 square mile).  This says something about the financial prescience of its primary broker, Thomas Jefferson, then President.  The true history is of course more complicated as it was not so much a real estate grab as it was a battle for logistic control over the Mississippi River, and especially the port at New Orleans.

PAVONE & FONNER, LLP

provides the necessary historical backdrop to understand the presumptive nature of the international discrimination allegations in the present case, as it applies to US law enforcement's view of African Americans for purposes of addressing a customs-and-norms element of racial discrimination.

## Map of the Southern States in 1860

### (in black)



678.    As of today, the United States is the world's leading economic power cranking out $21T of GDP annually.  However, for the first 167 years of its existence up to 1787 incorporation at the signing of the US Constitution, it was powered in large part by the institution of slavery.

679.    Even after the 1787 Constitution was signed, it continued to be powered by legally-sanctioned slavery until 1865 for a total window of 250 years.

680.    For the next 100 years, in all but name, African Americans were second class citizens and were effectively deprived of the full benefit of US citizenship,

although they had paid perhaps the steepest price of all – 12.5 million people toiling away in bondage for 250 years – to provide one of the major pillars of the economic foundation for America's meteoric rise during the Industrial Revolution, to what it is today – the leading global, economic, military and political superpower.

**B. Defendant State of California**

681.   The State of California was originally Indian land and was "discovered" by a Spanish explorer in 1542, Juan Rodriguez Cabrillo, the namesake of Point Loma's Cabrillo Point.

682.   California is so physically beautiful and its weather so exceptionally hospitable that its market value dwarfs that of other parts of the country.  The Louisiana purchase involved 827,000 acres of land with a total market value today of about $1.6 trillion.  However, the total land value of just Beverly Hills, with only 5.7 square miles, is an eight of that, at about $200 billion.

683.   Thus, the land value of just eight Beverly Hills' would be enough to purchase all of the land associated with the Louisiana Purchase.  Even though Beverly Hills represents some of the most coveted coastal real estate in California, the state has some 840 miles of coastline.  If everything within 10 miles represents "coastal" property, this means there is 8,400 square miles of coastal land, or roughly 1,473 parcels equivalent to the size of Beverly Hills.

684.   Sir Francis Drake claimed California for England in 1579.  However, neither country actually colonized or controlled it for the next 200 years.  In 1769, the Spanish began to build missions and settlements.  In 1821, the country of Mexico gained its independence from Spain such that California became a territory of Mexico.

685.   This lasted until the Gold Rush; in 1846, the United States and Mexico went to war.  When it ended in 1848, California was a territory of the United States.  In 1850, California was admitted into the Union as the 31st state.

686.   Since then, California has become a state superpower in its own right. The economy of California is the largest in the United States, producing $3.1T GDP.

PAVONE & FONNER, LLP

If it were a country it would be the world's fifth largest economy, behind the larger United States, then Germany, Japan, and China.

687. The states of this country, including California, are partially independent sovereign powers in relation to the federal government. The federal government's powers are limited by the U.S. Constitution, which include the coining of money, the post office, and the military. Each state has its own legal and judicial system, its own laws, and its own constitution. Each state has its own three branches of government.

688. Conduct of any given person in any given state is governed by a web of interrelated state and federal laws, law enforcement and judicial systems. However, pursuant to Article VI, Paragraph 2 of the U.S. Constitution, commonly referred to as the Supremacy Clause, federal law generally takes precedence over state law.

689. For purposes of the international claims alleged herein, and as more fully explained below, the United States is vicariously liable for the torts committed by law enforcement agents of the State of California, as a matter of the United States Constitution's Supremacy Clause, which requires the United States to assume responsibility for California's commission of international law violations.

### C. Individual Defendants

690. Defendant Jeffrey Beard is the former Secretary of the CDCR. He was appointed as Secretary by Governor Edmond G. Brown, Jr., on December 27, 2012. Beard oversaw prison policy during his appointment.

691. Defendant Estate of Paul D. Brazelton acted as warden of Pleasant Valley State Prison (PVSP) from early 2012 through the Fall of 2013. He presided over PVSP, the most adversely affected prison, during this period.

692. Defendant Matthew Cate was the Secretary of the CDCR from 2008-2012. Secretary Cate supervised and was responsible for the housing of inmates at prisons where they contracted Valley Fever.

PAVONE & FONNER, LLP

693.    ~~Defendant Scott Frauenheim is the former warden of Pleasant Valley State Prison.  He was appointed acting warden during 2013 and became warden in 2014~~.

694.    Defendant James D. Hartley is the former warden of Avenal State Prison.  He acted in that position from 2007-2014.

695.    Defendant Dr. Susan L. Hubbard is the former director of the Division of Adult Operations**.**   She is an author of the 2007 CDCR "exclusion" policy that resulted in highly-susceptible inmates continuing to be housed at hyper-endemic prisons.

696.    Defendant Deborah Hysen is the current Director of CDCR's Office of Facility Planning, Construction and Management (FPCM).   Hysen was the Chief Deputy Secretary of FPCM from at least 2006 until 2014, during which time CDCR failed to implement any of the recommended remedial measures to reduce infection rates.

697.    Defendant Dr. Felix Igbinosa was the medical director of Pleasant Valley State Prison, having served in that capacity from approximately 2005-2014.

698.    Defendant Scott Kernan is the former head of the Department of Adult Institutions (DAI), titled Chief Deputy Secretary at that time, and served in that position until 2014.  He was head of DAI at the time the 2007 exclusion policy was implemented.

699.    Defendant Chris Meyer was the Senior Chief of Facility Planning, Construction and Management from 2009 to 2014, succeeded by Defendant Hysen as head of that office.

700.    Defendant Tanya Rothchild is the former Chief of CDCR's Classification Services Unit (CSU), the agency department in charge of transferring inmates to specific prisons.

701.   Defendant Teresa Schwartz is a former deputy director of Adult Institutions at CDCR.  She was deputy director of DAI at the time the 2007 exclusion policy was initiated.

702.   Defendant Arnold Schwarzenegger is the former Governor of California, having acted in that position from 2003 through 2011.

703.   Defendant James Tilton was the Secretary of the CDCR from approximately 2003-2008.   Secretary Tilton supervised and was responsible for the housing of inmates at prisons where they contracted Valley Fever.

704.   Defendant Dwight Winslow, M.D. is the former Statewide Medical Director for CDCR.  He co-authored the 2007 exclusion policy.

705.   Defendant James A. Yates is the former warden of Pleasant Valley State Prison and is believed to have occupied that position from at least 2005 until 2011. During this time a large number of inmates contracted Valley Fever at PVSP.

706.   The true names and capacities, whether individual, corporate, associate, governmental or otherwise of some of the Defendants herein are presently unknown to Plaintiffs.

707.   Plaintiffs will seek leave of the Court to amend this Complaint to show the true names and capacities of such Defendants if and when these are ascertained by Plaintiffs.

## VII.
## PROCEDURAL HISTORY OF THE
## <u>VALLEY FEVER LITIGATION</u>

708.   An apparent epidemic of the disease valley fever came to the attention of California prison officials in 2004.  Officials observed it get worse, ignoring various recommendations of health and other authorities for the next six years, to the point where the disease was out of control in two prisons by 2013.

709.   In June, 2013, Northern District Judge Thelton Henderson issued an injunctive ruling in the *Plata* case, directing CDCR to move thousands of minority inmates to safer prisons.[2]

710.   Judge Henderson found that they were being exposed and infected with coccidioidomycosis in violation of the Eighth Amendment: "There is no question here that Defendants are aware of the substantial risk of serious harm; indeed, Defendants admit that they 'are aware that Valley Fever presents a serious risk to inmate health,' and it would be impossible to conclude that a disease that, in its severe form, could lead to death does not present a risk of serious harm."[3]

711.   In July, 2013, five inmates filed a class action against the State of California based on contraction of the disease, in *Jackson v. California*, 1:14-cv-1055 (E.D.Cal. 2019) [Dkt 1].

712.   In October, 2013, in this litigation ("*Smith*"), six inmates sued various CDCR officials obligated to protect them from danger in the Northern District of California.[4]   Plaintiffs filed suit on an Eighth Amendment theory and pled a state negligence claim.[5]

---

[2] *Plata v. Brown*, 2013 WL 3200587, *10, Civ.No. 01-cv-1351, Dkt. 2661:17 (N.D.Cal. 2013).

[3] *Plata v. Brown*, 2013 WL 3200587, *10, Civ.No. 01-cv-1351, Dkt. 2661:17 (N.D.Cal. 2013).

[4] *Smith, et al. v. Schwarzenegger, et al.*, 2:13-at-01236 (E.D.Cal. 2013) [Dk1 1, case number later finalized as 1:14-cv-00060].

[5] *See Smith, et al. v. Schwarzenegger, et al.*, 1:14-cv-00060, Dkt. 14 (E.D.Cal. 2013).

PAVONE & FONNER, LLP

713.   In five subsequent complaints over the next year (*Beagle*, *Abukar*, *Adams*, *Morrow* and *Campbell,* respectively[6]) the pool grew to 159 *Smith* plaintiffs culminating in a Master Consolidated Complaint filed on November 10, 2014.[7]

714.   In February, 2015, state officials moved to dismiss on a qualified immunity theory, which was granted in a findings and recommendation opinion by Magistrate Judge Stanley Boone in May, 2015.[8]

715.   In October 2015, the district judge, Hon. Lawrence O'Neill, issued a final opinion in October, 2015 affirming the Magistrate's decision to dismiss the case on qualified immunity in a published opinion.[9]

716.   The *Smith* plaintiffs appealed that dismissal to the Ninth Circuit in October, 2015.[10]

717.   Meanwhile, after the November 2014 Consolidated Complaint, another 109 inmates filed lawsuits in consecutive filings in 2015, in *Bates*, *Altamirano*, *Alaniz*, *Aparicio*, and *Birge*, respectively.[11]

718.   They were stayed pending the outcome of the appellate litigation.

---

[6] *Beagle, et al. v. Schwarzenegger, et al.*, Case No. 1:14-cv−430 (E.D.Cal. 2014).
  *Abukar, et al. v. Schwarzenegger, et al.*, Case No. 1:14-cv-816 (E.D.Cal. 2014).
  *Adams, et al. v. Schwarzenegger, et al.*, Case No. 1:14-cv-1226 (E.D.Cal. 2014).
  *Morrow, et al. v. Schwarzenegger, et al.*, Case No. 1:14-cv-01395 (E.D.Cal. 2014).
  *Campbell, et al. v. Schwarzenegger, et al.,* Case No. 1:14-cv-01559 (E.D.Cal. 2014).
[7] *Smith, et al. v. Schwarzenegger, et al.*, 1:14-cv-00060, Dkt. 113 (E.D.Cal. 2014).
[8] *Smith, et al. v. Schwarzenegger, et al.*, 1:14-cv-00060, Dkt. 138, 164.
[9] *Smith v. Schwarzenegger*, 137 F.Supp.3d 1233 (E.D.Cal. 2015) [*Smith, et al. v. Schwarzenegger, et al.*, 1:14-cv-00060, Dkt. 186 (E.D.Cal. 2015)].
[10] *Smith, et al. v. Schwarzenegger, et al.*, 1:14-cv-00060, Dkt. 192 (E.D.Cal. 2015).
[11] *Bates*:        1:14-cv-2085-LJO-SAB (E.D.Cal. 2015) [filed 12/29/14]
  *Altamirano*:   1:15-cv-0607-LJO-SAB (E.D.Cal. 2015) [filed 04/17/15]
  *Alaniz*:       1:15-cv-1063-LJO-SAB (E.D.Cal. 2015) [filed 07/09/15]
  *Aparicio*:     1:15-cv-1369-LJO-SAB (E.D.Cal. 2015) [filed 09/05/15]
  *Birge*:        1:15-cv-1901-LJO-SAB (E.D.Cal. 2015) [filed 12/09/15]

PAVONE & FONNER, LLP

719.    The *Smith* appeal, governing the first 159 plaintiffs along with a series of related valley fever actions prosecuted by other attorneys, was affirmed by the Ninth Circuit in a published opinion on February 1, 2019.[12]

720.    On April 4, 2019, in the wake of the *Hines* ruling, Magistrate Judge Boone lifted the stay as to the five cases in the lower court.

721.    On July 30, 2019, given *Hines*, the magistrate court issued an order recommending that these five cases be dismissed (covering the 109 plaintiff/appellants named herein).

722.    On September 19, 2019, District Judge O'Neill adopted the magistrate court's recommendation and issued adverse judgments in each of the five matters.

723.    On October 7, 2019, the United States Supreme Court denied review of the *Smith* appellants governed by the *Hines* opinion, in case number 18-1590 (9th Cir. 2019).

724.    On October 11, 2019, VF victims timely appealed each of the five trailing cases, *Bates, Altamirano, Alaniz, Aparicio*, and *Birge*, respectively, by proposing to distinguish *Hines* in some respects, challenge it in others, and present constitutional arguments not previously raised challenging the qualified immunity doctrine.  That action is pending and does not overlap with this one.[13]

### **FACTS OF THE CASE**

725.    The State of California ignored an epidemic of the disease coccidioidomycosis from 2004-2014 in contravention of Plaintiffs' international rights. This results from a series of contradictions and constitutional violations in American law that caused the domestic legal system to summarily and illegally deny them all rights, remedies and relief.

---

[12]  *Hines v. Youssef*, 914 F.3d 1218 (9th Cir. 2019).
[13]  *Bates, et al. v. Schwarzenegger, et al.*, Case No. 19-17049 (9th Cir. 2019).

PAVONE & FONNER, LLP

## A. Coccidioidomycosis is a Serious Disease

### 1. Origin and History of the Disease

726.   Coccidioidomycosis is a parasitic disease caused by exposure to airborne spores of Coccidioides organisms found in the soil in certain locations in the southwestern United States.

727.   Coccidioidomycosis originates in a fungus that mostly exists in arid soil in Arizona and parts of California, especially the San Joaquin Valley, referred to as the endemic or hyperendemic zone.[14]

728.   California health officials have known about the prevalence of Valley Fever in the San Joaquin Valley, where the hyper-endemic prisons are located, for over (50) years.[15]

729.   Valley fever was first detected in humans in 1892.  Given its symptoms, it is often confused with influenza but was determined to be its own kind of ailment.  It was first noticed as a more widespread problem in the 1930's in the Central Valley, where it was studied by a tireless epidemiologist, Dr. Charles E. Smith, who wrote several prescient papers.

730.   Its adverse effects were widely chronicled during World War II when several training airfields were built in California's San Joaquin Valley.  The rate of infections in military personnel was 8-25% per year and it was the most common cause of hospitalization at Southwestern airbases.  Numerous soldiers became sick for an extended period of time.[16]

[14]  Smith, C.E., "*Epidemiology of Acute Coccidioidomycosis with Erythema Nodosum,*" Am.J.Public Health, Vol. 30(6): 600, 602 (1940); Rosenstein, N., "*Risk Factors for Severe Pulmonary and Disseminated Coccidioidomycosis,*" Kern County Dept. of Health, California (1995–1996).

[15]  *See*, *e.g.*, Smith, C. E., "*The Epidemiology of Acute Coccidioidomycosis With Erythema Nodosum ("San Joaquin" or "Valley Fever"),*" 30 American Journal of Public Health 600, 608 (1940).

[16]  Kirkland, Theo, M.D., et al., "*Coccidioidomycosis: A Reemerging Infectious Disease,*" Emerging Infectious Diseases, Vol. 2, No. 3, p. 2 (1996).

## 2. Pathology of Coccidioidomycosis

731.   When a human being inhales the coccidioides fungal spores, those spores may lodge in various locations in the respiratory system. The spores then grow and transform into large tissue-invasive parasitic spherules.  The spherules divide, enlarge, and rupture, each releasing many thousands of new "endospores" that can invade surrounding tissue or can migrate through the blood to other tissues and organs, where they repeat the process and continue to multiply in the body.

732.   The fungus produces spores that lodge in the lungs.  The developing endospores grow on host body tissue starting with the lungs, dissolving some of that tissue in the process.  Depending on the site of the disseminated infection, this may lead to disfiguring skin lesions, destruction of soft tissue, erosion of bones, joints, and eyes, ulcers penetrating into the pleura in the lungs, and the colonization of other organs including the brain.  Lesions may occur in every organ in the body.[17]

## 3. Dangerousness of Cocci

733.   If not successfully treated, the fungal infection spreads in visibly unpleasant ways and can be debilitating, disfiguring, painful, and can result in fatality.[18]

734.   When the disease dangerously spreads from the lungs to other parts of the body, the condition is referred to as disseminated coccidioidomycosis.

735.   Disseminated spores may attack the skin, lungs, eyes, bones, joints, spine, nervous system, and brain.  They may cause disfiguring skin lesions, destruction of soft tissue, erosion of bones and joints, harm to the eyes including blindness, ulcers in the lungs, and colonization of other organs including the spine and brain (meningitis).

[17]  Smith, Pappagianis, et al,, "*Human Coccidioidomycosis*," Bacteriology Reviews, 25(3), p. 311 (September, 1961).

[18]  Filip, David, <u>Valley Fever Epidemic</u>, p. 29 (2008).

736.   Both the spore-provoked pneumonia and the disseminated infection, especially if it reaches the brain and causes meningitis, can be fatal.[19]

737.

### 4.  Contraction Frequency

738.   Dangerous cocci zones can infect 20% to 100% of a vulnerable population depending on the activity in and relationship to dangerous soil.[20]

739.   In the general population, 40% of those exposed will show symptoms of a respiratory illness resembling the flu that lasts for a few weeks up to several months but usually resolves without long-term complications.[21]

740.   In a segment of that 40%, however, which varies depending on the ethnicity and medical status of the individual, the infections will cause severe, life-threatening pneumonia or blood-borne spread of the fungus from the lungs to other parts of the body, which is referred to as a disseminated infection.[22]

741.   There, the condition becomes permanent, incurable, disseminated, and potentially fatal.[23]  This percentage varies based on immunological resistance to the disease, which differs among racial groups.

---

[19]  *Plata v. Newsom*, Case No. 01-cv-1351, Dkt. 2598, Dec. John Galgiani, ¶ 7 (April 25, 2013).

[20]  Schmelzer and Tabershaw, "*Exposure Factors in Occupational Coccidioidomycosis,* 58 American Journal of Public Health and the Nations Health 1, p. 111 (1968); California Department of Health, Letter for "The Record," Infectious Disease Branch, p. 1 (January 11, 2007).

[21]  *Plata v. Newsom*, Case No. 01-cv-1351, Dkt. 2598, Dec. John Galgiani, ¶ 7 (April 25, 2013).

[22]  *Plata v. Newsom*, Case No. 01-cv-1351, Dkt. 2598, Dec. John Galgiani, ¶ 7 (April 25, 2013).

[23]  *Plata v. Newsom*, Case No. 4:01-1351-JST, Dkt. 2598, pp. 2-3 (N.D.Cal.2013) (Corrected Declaration of Dr. John Galgiana, M.D.)

PAVONE & FONNER, LLP

742.   Scores of inmates during the epidemic died.[24]  Many more live with serious medical complications.

743.   Plaintiffs in this case, who have had valley fever for a number of years, have one or more of the following symptoms: skin lesions; fever; shortness of breath and wheezing; chronic and severe coughing including coughing up blood; chest pain; uncontrollable chills and night sweats; nausea; rapid weight loss; rashes; burning sensations in various body parts (feet, joints, etc.); chronic exhaustion; joint and bone pain, stiffness and swelling; swelling of the legs, ankles, and feet; sensitivity to light; vision problems; neurologic symptoms including inability to concentrate; foot drop and partial paralysis; and excruciating head and neck pain

### 5.  Special Vulnerability to the Disease

744.   Certain minorities, particularly African-Americans, Filipinos and Hispanics, have higher rates of contraction and resulting complications.

745.   Individuals whose immune systems are compromised, for whatever reason, are also more vulnerable.

746.   A 1940 study by Dr. Smith indicated that African-Americans were 23 times as likely to die and Filipinos 170 times as likely.[25]

---

[24]  CDCR Memo, "*Coccidioidomycosis (Cocci) Report*," (October 27, 2006).  A cluster of contractions is considered by medical researchers to constitute an "epidemic." This term has been used to describe a situation in 1942 when *(i)* 7 of 14 Stanford students contracted the disease on a field trip, *(ii)* when 4 students from UCLA contracted it during a similar venture, and *(iii)* when 16 of 16 UCLA students caught it in Los Banos during an archeology dig. *Schmelzer*, 107.  Accordingly, contraction events at the two main prison locations, PVSP and ASP, representing thousands of cases of contraction, clearly represents a medical epidemic. *See* Table 1, Chart 1, *infra*.

[25]  Smith, C. E., "*The Epidemiology of Acute Coccidioidomycosis With Erythema Nodosum ("San Joaquin" or "Valley Fever")*," 30 American Journal of Public Health 600, 608 (1940); Crum N, *et al.,* "*A Cluster of Disseminated Coccidioidomycosis Cases at a US Military Hospital,*" 168 Military Medicine 6, pp. 460-464 (2003).

PAVONE & FONNER, LLP

747.   In 1969, both groups above were assessed to be at 10x as much risk for disseminated coccidioidomycosis.[26]  In another study, African-Americans had contracted the disease 47% more frequently.[27]

748.   Dr. Smith's opinion in 1940 was that eventually most of the inhabitants of the San Joaquin Valley region would be exposed to, and undergo, an infection with coccidioides.  According to this logic, for groups that are at high risk, the only truly safe course of action is exclusion.

### 6.  Treatment and Expense of Cases

749.   There is no cure for coccidioidomycosis.[28]  The disease is managed with powerful anti-fungal drugs which have correspondingly serious side effects.[29]

750.   Treatment of Valley Fever is expensive, for the patients and for the public health system.  As of 2006, "The cost of antifungal medication is high, in the range of $5,000 to $20,000 per year of treatment.  For managing critically ill patients with coccidioidomycosis, there are considerable additional costs including intensive care support for many days or weeks."[30]  Some patients require repeated hospitalization for the disseminated disease.  As of 2011, the cost for such treatment was in the range of $55,000 per hospitalization on average.

751.   For those with the chronic version of the disease, the medication must be taken indefinitely.

[26]  Kirkland, Theo, M.D., et al., "*Coccidioidomycosis: a Reemerging Infectious Disease*," Emerging Infectious Diseases, Vol. 2, No. 3, p. 3 (1996).

[27]  Iger M, *et al*., "*Review of 135 Cases of Bone and Joint Coccidioidomycosis*," Proceedings of the 4th International Conference on Coccidioidomycosis, Washington, DC. National Foundation for Infectious Diseases, pp. 379-389 (1985).

[28]  Goodyear, Dana, "*Death Dust*," The New Yorker (January 12, 2014).

[29]  Marois, M.B., "*Deadly Spore in California Dirt Menaces Prison Expansion Plan*, Bloomberg News (October 19, 2007).

[30]  Galgiani, John, "*Practice Guidelines for the Treatment of Coccidioidomycosis*," Infectious Diseases Society of America, Clinical Infectious Diseases 658, 659 (June 1999).

752.   These drugs do not cure the disease, however, since they only reduce but do not eliminate the population of infectious spores.  Continuous treatment with oral anti-fungal medication may keep the disease partially and temporarily at bay, but the disease remains within an infected person for his or her lifetime, and repeated debilitating relapses may be expected.  As many as 75% of patients who stop taking the drugs will relapse into the life-threatening disease within a year.[31]

### 7.  Scientific and Governmental Response to Cocci

753.   Coccidioides replicate so quickly that it is considered the most virulent fungal parasite known to man.[32]

754.   In the 1950's, both the U.S. and the Soviet Union developed bio-warfare programs to deploy cocci on enemy populations.[33]

755.   A 1958 textbook commented for the benefit of African-American and Filipino lab workers that handling coccidioides without proper precautions may be considered suicidal.[34]

756.   Coccidioides fungus was at one time listed as a "Select Agent" – a potential weapon of biological warfare or bioterrorism[35] – in the Antiterrorism and Effective Death Penalty Act of 1996 and the Public Health and Security and Bioterrorism Preparedness and Response Act of 2002.[36]

---

[31] *See, e.g.,* Filip, David, <u>Valley Fever Epidemic</u>, p. 40 (2008); Kanan, Renee, M.D., "*Valley Fever,*" Dept of Corrections Memo to Health Care Managers, p. 4 (November 5, 2004) (hereinafter "Kanan" or "Kanan Memo"); Galgiani, John, et al., *Practice Guidelines for the Treatment of Coccidioidomycosis*, Oxford Journals (2000).

[32] Dixon, "*Coccidioides Immitis as a Select Agent of Bioterrorism,*" Journal of Applied Microbiology, 91(4):602-5 (October 2001).

[33] Goodyear, Dana, "*Death Dust,*" The New Yorker (January 12, 2014).

[34] Fiese M, "*Epidemiology of Coccidioidomycosis,*" pp. 77-91 (1958).

[35] Miller, J, *et al.*, <u>Germs: Biological Weapons and America's Secret War</u>, Simon & Schuster, New York (2001).

[36] Filip & Filip, <u>Valley Fever Epidemic</u>, Golden Phoenix Books (2008), p. 2 (hereinafter "Filip"). Published in 2008, this reference summarized 268 published

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

757. The Center for Disease Control requires scientists handling the spores to use protective protocols comparable to the Ebola virus.[37]

758. By the late 1960s, employers understood that bringing workers into in the San Joaquin Valley carried with it the responsibility to take precautions to minimize the contraction of the disease.[38]

759. They were warned that "the importation of any susceptible labor force into the endemic areas carries with it the responsibility for reducing the rate and severity of infection through whatever dust control measures are possible and for providing a vigorous program of medical surveillance."[39]

### 8. Societal Expectations for Management of Cocci Outbreaks

760. An exponentially higher risk of contracting valley fever in the subject prisons during the epidemic is statistically indisputable. As per the California Department of Health's Infectious Diseases Director in 2013: "We concur that rates of cocci among inmates at Pleasant Valley State Prison (PVSP)and Avenal State Prison (ASP) are higher than rates among the general population," a considerable understatement given the magnitude expressed in the numbers.

761. Valley fever is known as the "silent epidemic" and it appears that people living in, or moving to, the Central Valley were not, and are not, fully aware of just

medical studies, professional journal articles, and other authoritative material concerning Coccidioidomycosis.

[37] Filip, D., Valley Fever Epidemic, p. 2 (2008); *see also* "*Biosafety in Microbiological and Biomedical Laboratories*," U.S. Department of Health and Human Services Public Health Service Centers for Disease Control and Prevention National Institutes of Health (2009, 5th Edition).

[38] Schmelzer and Tabershaw, "*Exposure Factors in Occupational Coccidioidomycosis,*" 58 American Journal of Public Health and the Nations Health 1, pp. 108, 110-111 (1968).

[39] Schmelzer and Tabershaw, "*Exposure Factors in Occupational Coccidioidomycosis,*" 58 American Journal of Public Health and the Nations Health 1, pp. 108, 110-111 (1968).

how much danger they are exposed to, even at the much lower rates attendant to the local non-incarcerated population.

762. The only jury to render a valley fever verdict did not find unmitigated exposure to be societally acceptable. Society certainly does not accept that government may do nothing during epidemic exposure to valley fever at specific places. Rather, it expects government officials to engage in full disclosure of known risks and take every reasonable precaution under the circumstances, including and up to exclusion.

763. In September 2007, the California Department of Transportation (Caltrans) contracted with the Bugler construction company to expand a highway culvert in Kern County. The work involved movement of soil. Bugler workers labored at the project in late June 2008. By early July 2008, seven plaintiffs were diagnosed with coccidioidomycosis, as had several other persons including a Caltrans inspector.

764. The Bugler workers contended that the site was a dangerous condition: that Caltrans had notice and failed to warn the plaintiffs. Plaintiffs proved that Caltrans knew before contracting with Bugler Construction that:

    *(i)*   the construction site was in a hyperendemic area;

    *(ii)*  the project site posed danger to persons engaged in soil moving activities;

    *(iii)* Caltrans' employees were trained to take steps to prevent or mitigate exposure;

    *(iv)* as part of that training, the Caltrans employees received a map which identified areas where the fungus had been isolated in the soil, including the area where plaintiffs were to work;

    *(v)*  Caltrans had received reports of its own employees and contractors' employees contracting valley fever working at construction sites in the highly endemic area;

*(vi)* Caltrans had warned all of its Kern County employees who had email accounts about the risk of exposure to the cocci fungus during excavation or other soil-disturbing work, and informed them how to prevent or mitigate exposure;

*(vii)* Caltrans, however, did not inform Bugler Construction or its employees of the risk, despite multiple opportunities.

765. On these facts, the jury awarded four Bugler employees $11.8 million in damages.

766. To the extent a jury verdict reflects the attitudes and positions of Central Valley society, the Bugler verdict unmistakably rejects the contention that society blindly accepts undisclosed, unmitigated exposure to the risk of contracting valley fever.

767. Society expects state authorities to maximize the protective response to epidemics including to valley fever.

768. The exact definition of the term "epidemic" or "outbreak" varies from disease to disease, but under any definition, the geometric incidence rates and resulting epidemic mortality in this case required health authorities to act immediately and aggressively in order to safeguard the population at specific locations, according to various positions, policies and publications of government authorities.[40]

769. Thus, society as reflected by government policy and scientific research creates a universal expectation for government health authorities to take prompt and serious action in the face of epidemic danger.[41]

---

[40] *See* Freedman, "*Coccidioidomycosis Outbreaks, United States and Worldwide, 1940–2015*," Emerging Infectious Diseases, Vol. 24, No. 3 (March 2018).

[41] *See* Schmelzer, L, "*Exposure Factors in Occupational Coccidioidomycosis*," 58 Am.J.Pub.Health 107, 108-111 (1968); California Department of Public Health, "*Operational Plan for Emergency, Response to Mosquito-Borne Disease Outbreaks*," pp. 3-14 (2013); California CDCP Public Health Emergency Preparedness Cooperative Agreement (PHEP) Program, pp. 1-3 (2018); California Office of Emergency Services, "*Emergency Plan*," Ch. 6.3.13 (2017); Banach, D.

PAVONE & FONNER, LLP

770.    In *Edison v. Geo*, the Ninth Circuit observed that "[i]n most individuals, cocci manifests primarily as a minor fever.  In an unlucky few, however, the disease takes a different, more devastating course – it causes a number of painful conditions, and can be fatal … As prisoners, Plaintiffs were particularly vulnerable to infection: Even if Plaintiffs had been warned of the disease, they were unable to move to a different location, remodel their living quarters, or erect protective structures, such as covered walkways.  Thus, by placing prisoners at Taft, the BOP directly increased Plaintiffs' risk of harm. *Under California law, the United States had a duty to protect Plaintiffs from the risk of contracting cocci*."[42]

771.    The Northern District Federal Court's order in June, 2013 removing inmates from PVSP and ASP is also relevant here, in holding that the controlling question is whether prison officials failed to take reasonable measures to address the cocci problem.   To formally fault them for doing so by moving the inmates out of the hyperendemic prisons includes the predicate assumption that such measures should have been taken earlier.[43]

772.    In contrast, the *Smith/Hines* opinion states that society accepts a heightened risk of valley fever and this implies that it is acceptable for officials to do nothing.  However, its position rests partly on the inaccurate factual premise that the rates of contraction in the prison are the same as the local rates.

773.    The *Smith* position is founded on another fallacy: that migration to the Central Valley means that society accepts the risk of *unmitigated* exposure.  In other

"*Infection Control & Hospital Epidemiology, Outbreak Response and Incident Management, etc.*," Vol. 38, No. 12, 1393-1402 (2017); County of San Diego, "*Hepatitis Outbreak A, After Action Report*," p. 7 (2018); California Dept. of Public Health, "*Occupational Health Branch, Preventing Work-Related Valley Fever (Coccidioidomycosis)*" (2019); California Dept. of Public Health, Department of Industrial Relations, "*Preventing Work-Related Valley Fever (Coccidioidomycosis)*" (2013).

[42] *Edison v. Geo*, 822 F.3d 510, 513, 522 (9th Cir. 2016) [emphasis added].

[43] *Plata v. Newsom*, 427 F.Supp.3d 1211, 1229-1230 (N.D.Cal. 2013).

words, the *Smith* court assumed that persons moving to the Central Valley accept any quantum of elevated and unmitigated risk, when the reality is that local government and business take various and sometimes extensive steps to minimize exposure.

774. Sixty-five (65) years before the epidemic in question, Dr. Smith attested that cocci was causing significant illness among WWII soldiers in training at camps in the endemic areas. His studies revealed that preventive measures, notably dust control, were effective in reducing the rate of infection and thus the seriousness of epidemics. His scientific work from 80 years ago, unchallenged in its continuing relevance today, is another measure of society's expectations.

775. Given the statistical realities, the jury verdict, the positions of business and local government and the scientific literature, *Edison*, *Plata* and related legal cases, the contention that the California Central Valley or any other sector of American society accepts a state authority to be warned about an epidemic risk of valley fever (or any other serious disease, including ones impacting prisoners) and to take no action in response, is to maintain a profoundly inaccurate position about society's view of government accountability.

## B. The 2004-2014 Coccidioidomycosis Epidemic

776. Between 1987 and 1997, CDCR built eight prisons within the hyper-endemic regions of San Joaquin Valley: Avenal State Prison; California Correctional Institution; California State Prison-Corcoran; Wasco State Prison; North Kern State Prison; Pleasant Valley State Prison; California Substance Abuse Treatment Facility and State Prison, both at Corcoran; and Kern Valley State Prison.

777. Locating these prisons in these hyper-endemic region of the Central Valley, significantly overcrowding them, housing inmates at risk or at increased risk from valley fever there, and failing to implement any of the remedial measures

recommended to reduce inmate exposure to cocci has had drastic repercussions on the health and welfare of California's inmate population.[44]

778.    Though all of these prisons presented an elevated risk of exposing inmates to valley fever, there are two – ASP and PVSP – at which these risks were acutely amplified, and one in particular, PVSP, which by 2006 was known to be extraordinarily dangerous.

779.    Pleasant Valley State Prison (PVSP) is located in Coalinga, California. The prison provides long-term housing and services for minimum, medium and maximum custody inmates.  It was opened in November 1994, covers 640 acres and was designed to house 3,000 inmates.  Today, there are approximately 730 staff and 5,188 prisoner beds.  It is located at 24863 West Jayne Avenue, in Coalinga, California, 93210.

780.    Coalinga State Hospital is a hospital for sexually-disordered offenders located literally next door at 24511 West Jayne Aveneu, Coalinga, CA 93210, as depicted by the two facilities next to each other on the satellite image below.

[44] California Correctional Health Care Services, *"Coccidioidomycosis in California's Adult Prisons 2006-2010,"* Report (April 16, 2012).



781.   During the environmental impact phase in 1999-2000, prior to initiation of its construction, the EIRs and the California Department of Health recommended a series of dust suppression measures in order to minimize the risk of contraction of valley fever.

782.   As noted at the time, "The proposed 320-acre project site in Coalinga is immediately east of PVSP … The city of Coalinga proper, which is 2 miles west of the site, reports that soils in the project area contain naturally occurring asbestos and the spore that produces Valley Fever."

783.   In 2001, construction of the hospital immediately adjacent to PVSP was nevertheless approved and construction proceeded over the next four years until the hospital's opening on September 5, 2005.  It is not known whether state agents actually adhered to the seven recommendations for dust suppression for the (main) purpose of minimizing the risk of valley fever contamination, but whatever they did or didn't do, it was profoundly inadequate given the results.

PAVONE & FONNER, LLP

784. The consequences of this tragic planning decision are known. The soil and facilities surrounding CSH, including PVSP, became contaminated with the coccidioides spores and fungus strewn about from the construction.[45]

785. Could the location or mitigation decisions have been intentional? At first one would think rank-and-file state officials would never be so abjectly evil. But revelations about how American state actors, government officials and other parties in power have behaved toward African Americans, including terrorizing them, covering up the terrorist acts and then marking the subject as taboo to discuss – for example, the 1921 Tulsa Massacre – are jarring to process in their depravity.[46]

786. This and other historical evidence opens the door to consideration, investigation and possibility that the construction of Coalinga State Hospital next to PVSP could have been part of a larger plan to monetize and then effectively liquidate the neighboring minority-rich prison population with cocci infection.

787. At a minimum, in order to minimize dust exposure, the State of California could have selected any number of empty plots of land that were not immediately adjacent to PVSP, as shown by the relative barrenness of the surrounding area, per the satellite image below:

[45] *See* Winslow D, Khoury N, Snyder N, Bick J, Hawthorne K, Chapnick R, et al., 2007; "*Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California,*" p. 4 (June, 2007).

[46] Astor, Maggie, "*What to Know about the Tulsa Greenwood Massacre,*" New York Times (June 20, 2020); "*Nancy Feldman, Her Legacy as an Educator…*" Voices of Oklahoma, Interview of Feldman, Website: https://m.voicesofoklahoma.com (2020).



788.   In November, 2004, the California prison system was notified in a report by Dr. Renee Kanan that valley fever was a problem.[47]  Incidence rates for cases of coccidioidomycosis started climbing rapidly at PVSP in particular, especially for minorities.[48]

789.   The Kanan memo advised officials that the risk and incidence of disseminated disease was highest in American Indians, Asians, and Blacks.  "In patients who have developed pneumonia, dissemination occurs in 1 of every 300 patients with pneumonia. In Hispanics and Blacks, it is 1 in 40, and in Filipinos it is 1 in 10."[49]  However, officials took no measures to prevent the spread of disease or otherwise protect any inmates.

[47]  Kanan, Renee, "*Health Care Managers*," CDCR Memorandum, p. 1 (November 5, 2004).

[48]  Kanan, Renee, "*Health Care Managers*," CDCR Memorandum, p. 1 (November 5, 2004).

[49]  Kanan, Renee, "*Health Care Managers*," CDCR Memorandum, p. 3 (November 5, 2004).

790.  The memo noted that prisons located in the Central Valley have cocci spores buried in the soil.  It advised that wind and construction can cause them to be dislodged and blown around in the air, where they may be inhaled.

791.  In 2005, a prisoners' rights group sent a letter and information packet to then-Governor Schwarzenegger describing the threat posed by valley fever and identifying high-risk groups.

792.  In Fall 2005, despite these several warnings, the state prison agency completed construction of Coalinga State Hospital, literally next to PVSP, without taking effective spore suppression precautions.[50] The construction churned cocci spores into the air and distributed them onto surfaces throughout the prison.[51]

793.  In 2006, the California Department of Health Services (CDHS) advised the prison's health department (CCHCS) that the contraction rate at PVSP was 38 times that experienced by residents of Coalinga and 600 times the rate in Fresno County.[52]  CDHS also made safety recommendations.[53]  It suggested moving high risk

---

[50]  California Department of Mental Health, "*Findings of Fact and Statement of Overriding Considerations*," New Mental Health Treatment Facility, Sch #1999061074, p. 17 (October 2000) (Officials were aware of the potential problems upon construction of the hospital: "Generation of PM10 or fugitive dust during excavation and grading is also a concern in the Coalinga area because of the potential presence of Valley Fever spores in local soils," they noted.  Such "fugitive dust" is widely credited as contributing to the epidemic at neighboring PVSP indicating that recommended dust suppression failed.)

[51]  *See* Schmelzer and Tabershaw, "*Exposure Factors in Occupational Coccidioidomycosis,* 58 American Journal of Public Health and the Nations Health 1, p. 110 (1968) ("occupational factors must be considered in relation to the magnitude of probable dust exposure").

[52]  California Department of Health, Letter for "*The Record*," Infectious Disease Branch, pp. 5, 9 (January 11, 2007).

[53]  California Department of Health, Letter for "*The Record*," Infectious Disease Branch, pp. 1, 11-12 (January 11, 2007); Sillen, Robert, "*Prevention and Treatment of Coccidioidomycosis at Pleasant Valley State Prison – Background and Status Report*," CDCR Memo, Office of the California Prison Health Care Receivership, p. 1 (May 21, 2007).

inmates to safer prisons.[54]  It also suggested CDCR take environmental steps to suppress the spread of the spores.[55]

794.   Given the hospital construction, the prison population subsequently experienced a spike in infection rates including multiple deaths.[56]  A CDCR memo dated October 27, 2006 revealed that the prison system had an epidemic on its hands: 1,145 cases of cocci were reported in 2006 as compared to 187 from the year before.[57]

795.   Rates at one point peaked at over 1,000 times the rate seen in the general California population.  Demetrius Pappagianis, an expert in coccidioidomycosis, attributed this to the construction.

796.   In an August 24, 2006 memorandum from Peter Farber-Szerkenyi at CCHCS, to John Dovey, then-director of CDCR's Department of Adult Institutions, Farber-Szerkenyi informed Dovey:

> As you are aware, the California Department ol Corrections and Rehabilitation (CDCR) during 2005 experienced a significant increase in valley fever cases at specific institutions within the Central Region of the State. As a result of this disease the CDCR Division of CcrrectionaI Health Care Services (DCHCS) contacted the Departmert of Health Services (DHS) to conduct a study of this "apparent epidemic." (Underscore added).

[54]  California Department of Health, Letter for "*The Record,*" Infectious Disease Branch, p. 11 (January 11, 2007); Sillen, Robert, "*Prevention and Treatment of Coccidioidomycosis at Pleasant Valley State Prison – Background and Status Report*," CDCR Memo, Office of the California Prison Health Care Receivership, p. 1 (May 21, 2007).

[55]  California Department of Health, Letter for "*The Record,*" Infectious Disease Branch, pp. 11-12 (January 11, 2007); Sillen, Robert, "*Prevention and Treatment of Coccidioidomycosis at Pleasant Valley State Prison – Background and Status Report*," CDCR Memo, Office of the California Prison Health Care Receivership, p. 1 (May 21, 2007).

[56]  CDCR Memo, "*Coccidioidomycosis (Cocci) Report*," (October 27, 2006); McKinley, J., "*Infection Hits a California Prison Hard*," New York Times (December 30, 2007)

[57]  CDCR Memo, "*Coccidioidomycosis (Cocci) Report*," (October 27, 2006);

797.   CDCR documented the dramatically increased risk and the deaths.  Yet the only action taken in CDCR's 2006 policy memorandum was to provide educational material to medical and custody staff, to *consider* planting ground cover, and when digging, to use a protective mask and wet the ground.[58]

798.   When it comes to handling epidemics, health authorities do not have the luxury to take years to monitor a situation.[59]

799.   Emergency action is required to avoid continuing infections.[60]

800.   In 2007, CCHCS issued safety recommendations to CDCR that included environmental mitigation, relocation of high-risk inmates, and abandonment of an expansion project at PVSP proposed by then-Governor Schwarzenegger.  High-risk inmates included persons of African or Filipino descent, and immunosuppressed patients. "Prevention efforts … may mitigate the risk, but physical removal of these highest risk groups from highly endemic regions, if possible, would be the most effective method to decrease risk."[61]

801.   Yet in 2007, Dr. Suzan Hubbard and Dr. Dwight Winslow announced CDCR's amended policy to only exclude an extremely select set of ultra-vulnerable inmates.  They ignored prior recommendations to exclude high risk minority populations.

802.   During a 2007 press conference announcing further prison construction plans, former Governor Schwarzenegger responded to a question asking whether he

---

[58]  Dovey, J, "*Inmate-Patients at High Risk of Valley Fever Excluded from Specific Central Valley Institutions*," CDCR Policy Memorandum, p. 4 (August 3, 2006).

[59]  *Plata v. Newsom*, Case No. 4:01-1351-JST, Dkt. 2598, p. 5 (N.D.Cal.2013) (Corrected Declaration of Dr. John Galgiana, M.D).

[60]  Schmelzer and Tabershaw, "*Exposure Factors in Occupational Coccidioidomycosis,* 58 American Journal of Public Health and the Nations Health 1, pp. 111-112 (1968); California Department of Public Health, "Operational Plan for Emergency Response to Mosquito-Borne Disease Outbreaks," (June 2013).

[61]  California Department of Health, Letter for "*The Record*," Infectious Disease Branch, p. 11 (January 11, 2007).

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

was comfortable exposing more inmates to the disease. He cavalierly announced that the State would "go ahead and build."

803.   Meanwhile, also in 2007, CDCR facility officials developed a plan to implement safety measures to mitigate the epidemic.  But it was vetoed by PVSP's then warden, James Yates, citing its $750,000 cost.

804.   Given this lack of action, unsurprisingly, rates from 2006 to 2010 were 100-1000x greater than the general California population.

805.   Fiscally, during the peak years of the epidemic, California spent over $23 million per year treating infected inmates.

806.   In 2009, CDCR putatively requested federal health agencies to assist them. However, the federal agency resigned due to lack of CDCR's actual interest in receiving assistance.

807.   From 2006-2012, approximately one thousand eight hundred (1,800) inmates became infected at PVSP alone.  Over 30 died.  PVSP's (epidemic) contraction rate was estimated at one point to be 7 out of every 100 hundred inmates.  In other words, all other things being equal, within 5 years, 1/3 of the resident population at PVSP would contract the incurable fungal respiratory disease.

808.   From 2007-2010, the contraction rate at the state hospital next door was six times lower than PVSP, which suggested that its newer, cleaner physical facility impacted the rate of contraction.

809.   In 2012, eight years after the epidemic began, CCHCS released a report which found that CDCR had done nothing of any consequence about the epidemic from 2006-2010.

810.   In 2013, Dr. John Galgiani, a leading expert, pointed out that prisoners comprised 71% of the valley fever deaths between 2006 and 2011.

811.   In 2013, a spokesperson from the Receiver's office stated that the State of California had known since 2006 that certain inmates were at greater risk, but no one had taken any real action in response.

812. From 2004-2012, contraction rates at the prisons were 10-50 times greater than rates in the surrounding (hyperendemic) Central Valley region, as reflected by the following table and chart:

1. **TABLE 1 - INCIDENCE RATE**[62]

| Year | CA State Rate/ 100K | Central Valley Rate/ 100K | PVSP-ASP Rate/ 100K | PVSP-ASP/ State Rate | PVSP-ASP/ Central Valley |
|---|---|---|---|---|---|
| 2003-04 | 6.7 | 88.6 | 936 | **139x** | **11x** |
| 2005 | 8 | 83.5 | 1822 | **228x** | **22x** |
| 2006 | 8.7 | 107.7 | 4784 | **550x** | **44x** |
| 2007 | 8.2 | 104.9 | 3192 | **389x** | **30x** |
| 2008 | 7 | 71.0 | 2397 | **342x** | **34x** |
| 2009 | 6.7 | 70.0 | 3561 | **531x** | **51x** |
| 2010 | 12.4 | 159.7 | 4203 | **338x** | **26x** |
| 2011 | 14.6 | 188.7 | 5306 | **363x** | **28x** |
| 2012 | 11.7 | 131.3 | 3412 | **292x** | **26x** |

[62] *See Bates v. Schwarzenegger*, Case No. 19-17094, Dkt. 20, p. 21, Dkt. 21-13, pp. 2876-2883 [13 AER 2876-2883] (9th Cir. 2019).

Viewed graphically:

### 2.    CHART 1 - VF INCIDENCE RATE / 100K[63]



813.    About 12% of California prisoners suffer disseminated coccidioidomycosis.  They experience some combination of infection of the brain or spine, loss of the ability to walk, loss of use of extremities, have undergone spinal surgery, or live with permanent damage to other organs.

814.    About 25% of California prisoners suffer permanent lung damage. These include masses, lesions, nodules and other impairments that impair their breathing.

---

[63] *Bates v. Schwarzenegger*, Case No. 19-17094, Dkt. 20, p. 21, Dkt. 21-13, pp. 2876-2883 [13 AER 2876-2883] (9th Cir. 2019).

815.   About 25% of California prisoners experience pervasive rashes.  Half reported severe skin lesions.

816.   About 25% of California prisoners require hospitalizization, some numerous times, and some were in bed for 20-30 days at a time.

817.   Slightly less than 25% of California prisoners had or repeatedly had pneumonia.

818.   About 12% of California prisoners experience permanent liver damage or outright failure, including some who require liver transplants.

819.   About 20% of California prisoners experience severe weight loss.

820.   About 12% of California prisoners experience major side effects from the medication, including kidney and liver damage, resulting surgery, infections, and painful skin sores.

821.   About 25% of California prisoners are misdiagnosed or undiagnosed, with predictable exacerbation of the disease.

822.   About 33% of California prisoners experience severe and constant coughing.

823.   About 25% of California prisoners coughed or vomited blood on a regular basis.

824.   About 50% of California prisoners report difficulty breathing

825.   The epidemic prompted a flurry of business activity for medical institutions treating it.  Outside medical care is estimated to have brought in $127M in medical business, plus all of the peripheral goods and services, including in-house medical care, overtime, pharmacology, transportation and medical equipment purchases, with expenses to the California taxpayers in an amount that is presently unknown but is surely many millions of dollars.

PAVONE & FONNER, LLP

**C.    Defendants Knew of the Severe Risks to Prisoners, and Especially to African American, but Elected to Disregard those Risks.**

826.    It is commonly and widely-known among prison officials and medical personnel that certain groups are much more susceptible than others to the aggressive and disseminated form of Valley fever.

827.    The scientific literature acknowledged the exceptional susceptibility of African-Americans and Filipinos over 80 years ago.[64]

828.    An article in the journal *Military Medicine* in June 2003 observed that "Filipinos and African-Americans have been shown to have up to a 200-fold increased risk of disseminated disease and an increased mortality rate."[65]

829.    The 2004 Kanan Memo was circulated to a number of specific health care professionals inside the prison system and was intended to be circulated to all health care managers within the Department of Corrections, for general circulation to all health care professionals in the system.

830.    In 2005, the prisoners' rights group Prison Movement sent an informational briefing packet directly to then-Governor Schwarzenegger describing the threat posed by valley fever, and especially its threat to susceptible groups including African-Americans, Filipinos, elderly inmates and the immune-compromised.

831.    In a letter dated March 16, 2006, Duc Vugia, M.D. of the California Department of Health Services wrote to Bernard Henderson, a prisoner, and

---

[64] *See* Smith, Pappagianis, et al, *Human Coccidioidomycosis*, Bacteriology Reviews (September, 1961), 25(3), pp. 314, 318, fns. 5, 27.

[65] David Filip, Valley Fever Epidemic, (2008) p. 29, citing Crum NF, Lederman ER, Hale BR, Lim ML, Wallace MR. "*A Cluster of Disseminated Coccidioidomycosis Cases at a US Military Hospital*," 168 Mil Med. 6, pp. 460-464 (June 2003).

referenced the exceptionally high-risk groups, by citing an article in a contemporaneous medical journal.[66]

832.   In addition to the higher-risk racial and ethnic groups, anyone with a compromised or suppressed immune system also has an increased risk of developing disseminated Valley fever.[67]

833.   A compromised immune system may be caused by any of several chronic diseases including diabetes, HIV, lung disease, organ transplant, or taking TNF inhibitors as medication for arthritis.

834.   Individuals over the age of 55 have also been found to be at increased risk, if exposed, of developing the severe disseminated disease.[68]

835.   California's Department of Public Health informed the CDCR in its January 11, 2007, "Recommendations for Coccidioidomycosis Mitigation in Prisons in Hyperendemic Areas of California" that "[p]revious studies have suggested that the risk for extrapulmonary complications is increased for persons of African or Filipino descent, [and] the risk is even higher for heavily immunosuppressed patients."

836.   The DPH in 2007 therefore concluded that exclusion of all of these high-risk inmates was "the most effective method to decrease risk [of valley fever infections]."[69]

837.   CDCR's inmate mortality figures bear this out.  In analyzing reports from the Receiver's medical staff, Dr. Galgiani noted that "African-American

---

[66] *See* Vugia, Duc, M.D., Letter, citing Galgiani article (March 16, 2006)]; Galgiani, John *et al.*, *Coccidioidomycosis*, 41 Clinical Infectious Diseases Journal 1217-1218 ["several-fold higher for persons of African or Filipino ancestry (possibly also for persons of Asian, Hispanic, or Native American ancestry), and as high as 30%-50% of infections for heavily immunosuppressed patients"].

[67] *See, e.g.,* American Thoracic Society, "*Patient Information Series*," American Journal of Respiratory Care Medicine, Vol. 184, p. 6.

[68] Clinical Infectious Diseases Journal 1:32(5), 708-15 (March 2001).

[69] CCHCS Report dated April 16, 2012 relating recommendations in Jan, 2007, p. 8, Box 2.

prisoners [in the Central Valley state prisons] died with valley fever at a higher rate than the general inmate population, and at much higher rates than African-American men in California."[70]

838.   In fact, African-American prisoners comprised 71% of the 34 deaths in CDCR prisons between 2006 and 2011.[71]

839.   Beginning in 2007, the Grand Jury issued periodic public reports concerning valley fever incidence at PVSP.   It observed that "[l]ocal prison officials are well aware of this health crisis. . ." and stated that inmates and staff continue to be at risk from valley fever.

840.   The Grand Jury issued these reports, starting in 2007 and continuing each year thereafter, directly to Defendants Brazelton, Yates, and Cate, and to Mr. Kelso of the California Correctional Health Service, as well as to other CDCR officials, while they held office within, and oversaw, the state prison system.

841.   In these reports, the Grand Jury required Defendants Yates, Cate, and Brazelton at a minimum to respond directly to the Grand Jury regarding these findings, under the authority of California Penal Code Section 919(b).  Defendant Yates also sent copies of his response at a minimum to Defendant Cate, to Kelso, and other CDCR officials.

842.   The Grand Jury found, consistent with common medical knowledge regarding the disease, that disease rates for all groups at the prison had increased dramatically since 2004 and that African Americans, Hispanics, Filipinos, and other Asians were at far greater risk from the disease than other ethnicities.

843.   In addition to the other sources of information available to them, some of which are discussed further below, the Fresno Grand Jury findings informed

---

[70]  *Plata v. Newsom*, Case No. 4:01-1351-JST, Dkt. 2598, ¶ 10 (N.D. Cal.2013) (Corrected Declaration of Dr. John Galgiana, M.D.).

[71]  *Plata v. Newsom*, Case No. 4:01-1351-JST, Dkt. 2598, ¶ 10 (N.D. Cal.2013) (Corrected Declaration of Dr. John Galgiana, M.D.).

PAVONE & FONNER, LLP

Defendants Yates, Cate, Brazelton, each year from 2007 on, during the period each Defendant was employed in the state prison system, that inmates like Plaintiffs were at increased risk from valley fever and susceptible to potentially fatal health consequences as a result, if they were housed at or remained at PVSP.

844.   Beginning in 2006, and continuing yearly thereafter, a Fresno County Grand Jury undertook the task of evaluating inmate issues at PVSP and it made a series of recommendations.

845.   Beginning in 2007, the Grand Jury issued periodic public reports concerning valley fever incidence at PVSP.   It observed that "[l]ocal prison officials are well aware of this health crisis. . ." and stated that inmates and staff continue to be at risk from valley fever.

846.   The Grand Jury issued these reports directly to CDCR officials, including former PVSP warden Yates, Matthew Cate, and to Receiver Kelso, as well as to other CDCR officials, while they held offices within, and oversaw, the state prison system.

847.   In these reports, the Grand Jury required Defendants Yates, Cate, and Brazelton at a minimum to respond directly to the Grand Jury regarding these findings, under the authority of California Penal Code Section 919(b).  Defendant Yates also sent copies of his response at a minimum to Defendant Cate, to Kelso, and other CDCR officials.

848.   The Grand Jury found, consistent with common medical knowledge regarding the disease, that disease rates for all groups at the prison had increased dramatically since 2004 and that African Americans, Hispanics, Filipinos, and other Asians were at far greater risk from the disease than other ethnicities.

849.   A 2012 study in the journal Emerging Infectious Diseases found the rate of hospitalization from disseminated cocci among blacks in California was 8.8 times higher than for whites.

850.   After CDCR failed to act to address the risks to the susceptible racial and ethnic groups, the Receiver finally took steps to force CDCR to relocate the omitted higher-risk inmates. Joyce Hayhoe, a spokeswoman for the Receiver's office, disclosed that, "The State of California has known since 2006 that segments of the inmate population were at a greater risk for contracting valley Fever, and mitigation efforts undertaken by CDCR to date have proven ineffective."

851.   She stated that, "as a result, the Receiver has decided that immediate steps are necessary to prevent further loss of life."

## IX.

## ACCRUAL OF CLAIMS

852.   As this is fundamentally a case asserting wrongful contraction of a disease, most of the plaintiffs' contraction dates are in the window of 2008-2013.  By virtue of the two-year traditional FTCA statute of limitations, these claims would have expired by 2015.  However, accrual is of course not merely a calculation based on a two-year extension of the date of injury; it requires a calculation of the proper starting date.

853.   In this case, there was no legal basis to assert an international cause of action until the plaintiffs' domestic remedies were exhausted.  Numerous authorities require exhaustion of domestic remedies before resorting to international law.

854.   As any action brought while domestic remedies are still available would have been premature and invalid, the accrual window against the California officials necessarily did not start until plaintiffs' resort to their forum of last resort asserting domestic theories, their certiorari petition to the US Supreme Court, was denied on October 7, 2019.

855.   Plaintiffs had previously filed 602s outlining their grievances about the epidemic, and after denial of cert, they timely presented an FTCA claim on or about November 26, 2019, which was denied by operation of law on or about May 26, 2020.

856.    In addition, the same accrual logic applies to Defendant State of California.  As discussed below, the United States is vicariously liable for state agents with respect to the assertion of international law claims.  However, if for any reason the United States is not liable or California can be held liable for international law violations, after their domestic remedies were exhausted on October 7, 2019, Plaintiffs timely filed a VCB claim on December 2, 2019, which was rejected in due course on January 28, 2020.

## X.
## LIABILITY OF THE UNITED STATES FOR THE ACTIONS OF STATE OFFICIALS

857.    An issue is the scope of liability of the United States for the actions of California state officials.  On the one hand, the FTCA exhaustion requirement is traditionally considered as enforceable only against federal officers, for claims that later become ones asserted against the federal government.

858.    This limitation, however, presents irreconcilable international issues, because the rule in international law is that a country cannot limit the scope of official liability for international law through its domestic law.

859.    International law considers every official clothed with the power of incarceration in a particular sovereign country as subject to international supervision.  It expects every person who is incarcerated to enjoy the protection of international law.[72]

860.    In the United States, its Constitution generally divides the power of incarceration between two authorities, state and federal.  This demarcation represents a provision of US domestic law under its Constitution.  To the extent that this domestic demarcation proposes to insulate state officers from the obligations of international law, its law contravenes international law and is unenforceable as a defense to an international cause of action.

---

[72] *See, e.g.*, Article 11, 1984 Treaty.

861.   Otherwise, absurdity would result: for example, the United States and the international community would be strangely obligated to additionally require the individual states in the union to join as signatories, and ratify various inter-country treaties, such that all officials clothed with the power to incarcerate in the United States – state and federal – would be subject to the requirements of international law.

862.   Without the US internally imposing ultimate federal responsibility for the actions of the states (and their officers), from an international point of view, the states would effectively be indistinguishable from independent countries, free to commit international law human rights violations as non-signatories to existing US treaties with impunity.

863.   California, Mississippi, Minnesota, New York and all of the other states would need to separately sign treaties with the rest of the world in order for its officials to be obligated to respect international law.

864.   However, such an enterprise would conflict with the US Constitution's Supremacy Clause (Article VI), directly contradict Article 1, Section 10,[73] and create a major problem with the 11th Amendment, which relieves the states of liability for federal violations when brought by citizens of other states.

865.   The text of the 11th Amendment does not foreclose a claim of federal violation by the citizens of a state against that state.

866.   Given these principles, logically speaking, state officials are subject to international law.  Since such officials are not as a general matter personally liable for violations of international law, the vicarious signatory (or other country-level entity otherwise bound to international law) must be liable; here, that is the United States.

867.   According to Article 2, Section 3(a) of the 1966 Treaty, "Each State Party to the present Covenant undertakes: (a) To ensure thet any person whose rights or freedoms as herein recognized are violated sholl have an effective remedy,

---

[73] U.S. Constitution, Article 1, Section 10: "No State shall enter into any Treaty, Alliance or Confederation… ."

notwithstanding that the violation has been committed by persons acting in an official capacity,"

868. There is no known limitation relating to Article 2's "persons acting in an official capacity" in international law; it applies to all persons clothed by the country with official power. That would include both state and federal officers, and here particularly, state officers.

## XI.
## THE QUALIFIED IMMUNITY DOCTRINE'S IMPACT ON INTERNATIONAL LAW

869. Ordinarily, resort to international law to enforce violations of torture or cruelty is not necessary, as state and federal criminal laws along with state and federal civil laws provide an adequate method to police such transgressions.

870. However, when it comes to criminal enforcement of civil rights violations, only the most brutal and vicious transgressions actually get enforced by criminal authorities.

871. A severe beating by police resulted in a criminal acquittal in the Rodney King case. The vast majority of minority shootings in the "Black Lives Matter" era did not result in the filing of criminal charges. In the few that did, such as the Baltimore case involving Freddy Gray, officers were acquitted.

872. Therefore, the enforcement of cruelty and torture situations is often not enforceable in the highly-politicized arena of American criminal law, and more generally, American law enforcement agents do not commonly commit the kind of genocide-caliber wrongs that are typically enforced in successful international law criminal prosecutions.

873. Turning to the effectiveness of state and federal *civil* enforcement laws, they are generally more available but provide such severe limitations in their

enforcement that, at least half the time, they do not represent an effective remedy as the term is used in international circles,[74] and they did not manifest one in this case.[75]

874.   For any state claim against a state official, it must be predicated on a formal grievance filing that is presented within six months of the injury.  This is exceedlying short and unknown to most unsophisticated victims, but still manageable for cases in which the act of cruelty is transparent and palpable: a beating victim knows he is such a victim at the time of the event.

875.   However, in the context of a disease epidemic, where the state engages in a litany of tactics to suppress the magnitude of the problem, filing a claim within six months presents an insurmountable series of obstacles, as detailed below.

876.   First, the vast majority of claimants are unaware of this limitation. Therefore, even when they were notified that they had contracted the ailment, they were not aware that they had to promptly file a state victim compensation claim within six months or be forever barred.

877.   The six-month timeline has never been satisfactorily defended as a policy matter, and exists apparently in the mind of government policy analysis as an act of generosity considering many governments that simply practice absolute sovereign immunity.  It thus opens the door to liability to that select class of victims who experience a wrong severe enough to promptly consult a lawyer.

878.   Second, even for those with immediately severe grievances (or who happened to already have counsel or who were coincidentally knowledgeable about such matters), most cases of contraction do not result in severe health problems.

879.   Therefore, most individual inmates have no immediate damages and have no reason to initiate a litigation process.  Even for those who do, the seriousness

---

[74]  Chung, *et al.*, "*For Cops who Kill, Special Supreme Court Protection*," Reuters News Website ("Reuters Investigates"): www.reuters.com (May 8, 2020).

[75]  *Hines v. Youseff*, 914 F.3d 1218 (9th Cir.), *cert. denied sub nom. Smith v. Schwarzenegger*, 140 S.Ct. 159 (2019).

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

may not be apparent for many months down the line effectively foreclosing their ability to initiate litigation within the harsh timelines of state laws requiring claim filings.

880. Third, even for those intent on pursuing a claim, for the bulk of the epidemic, the State of California suppressed its magnitude. Formal data was not released until October 2012, at least six years after internal data revealed to state officials that they had an epidemic on their hands. In epidemic terms, this is an exceptionally large window of delay.

881. Without having the larger bulk of epidemic data available, it would have been nearly impossible for any individual claimant to truthfully allege that the State committed serious misconduct, as individual cases of cocci contraction are expected to periodically occur.

882. A single case of cocci contraction does not reveal a level of official negligence and deliberate indifference necessary to successfully prosecute such a case; it is only with refusal to act in response to hundreds or thousands of contractions that victims can collectively assert that state officials have made a major, constitutional-caliber mistake.

883. In this case, even with the benefit of counsel, plaintiffs were universally unable to timely file a claim within the six-month limitations period and asserted such a cause of action only on the hope of finding a legal exception to such compliance, an exception that never materialized.

884. On the federal level, US domestic law provides individual claimants the right to file a civil rights action pursuant to 42 U.S.C. § 1983. Section 1983 contains no administrative exhaustion requirement comparable to the state's six-month VCB claim protocol (except a manageable "602" requirement, which was met).[76]

885. Section 1983 would otherwise be an effective remedy for the enforcement of civil rights, including the right to avoid torture and cruelty, were it not

---

[76] *See* 42 U.S.C., § 1997e.

for the draconian and legally-questionably expansion of the qualified immunity doctrine over the last 40 years

886.    Because of this expansion, which foreclosed Plaintiffs' direct Eighth Amendment case on some of the least intellectually meritorious rationales that exist in American law (inherent in the application of the 2019 qualified immunity doctrine), Plaintiffs never got a fair opportunity to test the merits of their case.  Domestic legal systems failed to deliver their implicit promise of a fair and reasonable opportunity, tested by the facts with a jury, for an outcome representing justice.

### A.  The Origin of Qualified Immunity

887.    Before the year 1275, the general legal doctrine of sovereign immunity was recognized from the English monarchical idea that 'the King can do no wrong,' and although this legal concept did not protect all government officials, the common law recognized the necessity of permitting officials to perform their routine functions free of lawsuits seeking to hold them personally liable.[77]

888.    This absolutist insulation was gradually eroded by legislation.[78]

889.    A doctrine of official liability, especially during the times of the Tudors and Stuarts (circa 1500), was thereafter slowly developed.[79]

890.    With the accession of William and Mary to the English throne in the late 1600's, the liability of officers saw a significant extension.[80]

---

[77] *Scheuer v. Rhodes*, 416 U.S. 232, 239 (1974); *see Floyd v. Barker*, 12 Co.Rep. 23, 77 Eng.Rep. 1305 (K.B.1607).

[78] *Scheuer*, 239 fn. 4, citing Statute of Westminster I, 3 Edw. 1, c. 24 (1275); Statute of Westminster II, 13 Edw. 1, c. 13 (1285).

[79] *Scheuer*, 239 fn. 4, citing Public Officers Protection Act, 7 Jac. 1, c. 5 (1609).

[80] *Ashby v. White*, 1 Bro.P.C. 62, 1 Eng.Rep. 417 (H.L.1704), *reversing* 6 Mod. 45, 87 Eng.Rep. 808 (Q.B.1703); Jaffe, "*Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv.L.Rev. 1, 14 (1963); Dicey, A., The Law of the Constitution 193-194 (10th ed. 1959); *see generally Barr v. Gatteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

PAVONE & FONNER, LLP

891.   Good-faith performance of a discretionary executive duty was thereafter adopted as a defense in US law, stemming from the above English laws originating in concepts of sovereign immunity.[81]

## B.  Qualified Immunity's Legality

892.   After the Civil War, the population of the Southern States recoiled in a variety of ways to preserve the institution of slavery.  Slavery was the solution to so many problems in the South that its retraction by Union forces led to a bitter tear in the fabric of Southern white privilege.

893.   In response, a loose collection of militias formed to try to continue subjugation of African Americans: to keep them from revolting, from organizing, from voting, and to generally prevent them from accumulating any amount of wealth or power.

894.   In 1871, in response, Congress passed a statute that was later codified as 42 U.S.C. § 1983, America's general civil rights enforcement statute.

895.   It was passed by Congress during the Reconstruction after the US Civil War as part of the 1871 Ku Klux Klan Act, which was intended to combat lawlessness in the Southern States.  As originally contemplated, section 1983 created a paradigm of strict liability for constitutional violations.[82]

896.   Before section 1983 was enacted, the courts *rejected* the application of any executive immunity for suits brought under it.[83]

---

[81] *Scheuer*, 239 fn. 4, citing Jaffe, 77 Harv.L.Rev. 209, 216; *see also Spalding v. Vilas*, 161 U.S. 483, 493 (1896); Baude, W., "*Sovereign Immunity and the Constitutional Text,*" 103 Virg.L.Rev. 1 (2017).

[82] *See* Rapacz, M., "*Protection of Officers Who Act Under Unconstitutional Statutes*," 11 Minn. L. Rev. 585, 585 (1927).

[83] *Little v. Barreme*, 6 U.S. (2 Cranch) 170, 177-178 (1804); Baude, "*Is Qualified Immunity Unlawful?*," 106 Calif. L. Rev. 45, 57-58 (2018), citing *Myers v. Anderson*, 238 U.S. 368, 378-79 (1915); *Miller v. Horton*, 26 N.E. 100, 100-101 (Mass. 1891).

PAVONE & FONNER, LLP

897.    A review of the extensive legislative history indicates that immunity for state officials was not plausible.  State law enforcement officials were either not enforcing the law out of being intimidated by KKK operatives, were actively electing not to enforce the law due to sympathy for the KKK, were not enforcing it given the will of polite white society public opinion that sanctioned it at the time, or in some cases, were actively committing atrocities in conjunction with the KKK.[84]

898.    Consequently, section 1983 interposed liability for all three branches of state government, for violations of due process inflicted on African-Americans. Immunity was not on the table.

899.    Nor are some of the Supreme Court's dissenting justices correct to claim that the "under color of law" language in the statute restricted its application to official policy-based actions of the state.  It was not state policy to not prosecute a murder case for the lynching of a black man, so the logic goes, so section 1983 is inapplicable to hold law enforcement liable for such an omission.  However, a trace of that language reveals that it was broadly used to refer to any action taken under putative official authority, including all action committed by a rogue officer, policy driven or not.[85]

900.    Eighty (80) years later, in the 1950's, the first mention of possible immunity correspondent to the 1983 legislation was raised, starting with ones that existed at common law in 1871, such as for legislators.[86]

901.    This stemmed from the notion stated by Justice Jackson that "it is not a tort for government to govern."[87]

---

[84]  *See* Poland, Senate Report, "*Affairs in the Late Insurrectionary States*," pp. 1-29 (February 19, 1872) [detailing litany of motivations for collapse of Southern law enforcement]; *Monroe v. Pape*, 365 U.S. 167, 173-176 (1961).
[85]  Winter, S., "*The Meaning of 'Under Color Of' Law*," 91 Mich.L.Rev. 323, 325 (1991) ("The misinterpretation of section 1983 [asserting that it only encompasses official state policy] is not only wrong, but wildly ahistorical.")
[86]  *Tenney v. Brandhove*, 341 U.S. 367, 372-376 (1951).
[87]  *Dalehite v. United States*, 346 U.S. 15, 57 (1953).

PAVONE & FONNER, LLP

902.   This decision was despite the fact that legislation in that era specifically contemplated liability for legislators, in that the 1866 civil rights legislation, similar in some ways to the 1871 legislation, specifically targeted state legislatures that were passing "Black Codes," or laws that would continue the subjugation of African-Americans in conformity with the general desire of the South to perpetuate the cultural and economic advantages of slavery.

903.   The 1866 legislation undergirding the 1871 law in question, one that affirmatively and unusually created tort liability for legislators, can hardly be understood as creating a legislative environment in 1871, just five years later and with countless, additional vicious KKK torts in between, in which immunity for legislators was thought to be a plausible outcome.

904.   Fast forward 100 years after the law was passed, a series of four cases each played a key part in creating an immunity scheme that would prevail for the next 50 years to the present, but whose foundational pillars were, simply, non-existent.

905.   In 1951, the Supreme Court awarded immunity to legislators based on the historical common law immunity available to them, without real regard for the fact that the 1866 and 1871 legislation had broadly and specifically targeted all three branches of government.[88]

906.   In 1967 in *Pierson v. Ray*, the Supreme Court extended the select immunity awarded to legislators in *Tenney v. Brandhove* to judges and police officers, and as to the latter, for what started as an extremely limited form of protection.[89]

907.   "Under the prevailing view in this country a peace officer who arrests someone with probable cause is not liable for false arrest simply because the innocence of the suspect is later proved."[90]  This small protection, for officers carrying out arrest

[88]  *Tenney v. Brandhove*, 341 U.S. 367, 372-376 (1951).
[89]  *Pierson v. Ray*, 386 U.S. 547, 557 (1967).
[90]  *Pierson*, 555 citing Restatement Second, Torts § 121 (1965); 1 Harper & James, The Law of Torts, § 3.18, at 277-278 (1956); *Ward v. Fidelity*, 179 F.2d 327 (8th Cir.

warrants in good faith, never should have morphed into what qualified immunity is today, if the Supreme Court has respected principles of *stare decisis*.

908.   By 1974, the courts untethered the historical requirement of an immunity existing as of the law's 1871 passage to a current immunity defense.[91]

909.   In 1975, in *Wood v. Strickland*, the Supreme Court expanded immunity, when it held that school officials should not be liable for disciplining students who had spiked the punch at a school event.  It argued that what officials had done in response did not raise an inference of bad faith; they did not violate the students' clearly established rights nor was there evidence of an impermissible motivation.[92]

910.   Scant respect for *stare decisis* was afforded to *Pierson*, which had limited immunity to police officers carrying out arrest warrants.  In *Wood*, school educators, and thus all members of the executive branch, suddenly enjoyed immunity from lawsuits if their actions were perceived by the court to be in good faith, rather than just police officers carrying out arrest warrants as established in *Pierson*.

911.   *Wood's* conception of the role of "clearly established law" was limited to the circumstance in which a plaintiff could show, at his option, that the rights in question were so clearly established that the official must have been acting in bad faith when he violated them.

912.   In 1982, the US Supreme Court twisted *Wood's* language on its head by announcing a desire to instead find a "balance" between two competing interests: on the one hand, vindication of constitutional rights; and on the other, fear of litigation by officials which inhibits discharge of their duties.[93]

---

1950).  This marked the genesis of the modern qualified immunity doctrine. *Pierson*, 386 U.S. 547, 553-555 (1967).
[91] *Scheuer v. Rhodes*, 416 U.S. 232, 247 (1974).
[92] *Wood v. Strickland*, 420 US 308, 322 (1975).
[93] *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).

913.    It thus imposed the first installment of a standard that would require litigants to show that their clearly established rights had been violated, even though the statute contained no such verbiage and even though the statute contained no immunity verbiage whatsoever.

914.    In fact, in 1871, the 42nd Congress clearly did not want state officials to enjoy immunity.  Why would Southern State officials deserve immunity for either committing KKK atrocities, looking the other way in their aftermath or affirmatively thwarting justice for victims by a corrupted system?

915.    *Harlow's* plain (and illegal) venture into a putative policy balancing act breached Congress' territory.  It was justified on the basis that *Monroe v. Pape* was decided incorrectly; but in fact it was *Harlow* that was decided incorrectly – the 39th Congress in 1866 directly created liability for all branches, including the legislature, because the Southern States' legal machinery had been contorted into preserving slavery as an institution despite their loss of the Civil War and the 13th Amendment.

916.    There is no reason to think the 42nd Congress, still in control by the "liberal" Northern states, intended to recede from such aggressive legislation, as the atrocities associated with the KKK had only gotten worse in the interim between 1866 and 1871.

917.     The text of section 1983 contains no language suggesting any immunity at all.  Lawlessness in the Southern States was at that point out of control, with local systems collapsing, marginalized or co-opted by the KKK's terrorist campaign.  A Union-controlled Congress continued to impose potential liability on all three branches of state government in order to disincentivize, and create accountability, for the failure of these local legal systems to stop KKK terrorism.

918.    Nevertheless, within *Harlow*, Justice Powell replaced *Pierson's* good faith defense with the clearly established test, which in 2001, was updated and refined

by Justice Kennedy in *Saucier v. Katz*[94] to require an exactly-on-point prior published case.

919.    Commenting on this change, the libertarian Cato Institute has observed that "the Court's qualified immunity jurisprudence has therefore diverged sharply from any plausible legal or historical basis.  Section 1983 provides no textual support, and the relevant history establishes a baseline of strict liability for constitutional violations – at most providing a good-faith defense against claims analogous to some common-law torts."

920.    Yet qualified immunity functions today as an across-the-board defense, based on a 'clearly established law' standard that was unheard of before the late twentieth century."[95]

921.    Conservative scholars view *Harlow's* birth of the modern qualified immunity doctrine, undergirded by its reformulation of *Wood's* different clearly established test, with intellectual scorn: "Since 1982, this doctrine has become a major impediment to the protection of constitutional rights because of three inappropriate words … clearly established law."[96]

922.    The doctrine thus sits at odds with the US Congress's historical judgment in enacting Section 1983 without textual immunities or limitations, and indeed, given the magnitude of atrocities that the legislation was intended to redress, including a near-total breakdown in the effectiveness of Southern State law enforcement to themselves rectify the violence, the modern limitations imposed by today's qualified immunity doctrine bear no resemblance to anything the 42nd Congress would have, or did, vote to approve.

---

[94] *Saucier v. Katz*, 533 U.S. 194, 201 (2001).
[95] *Pauly v. White*, Case No. 17-1078, Cato Institute Amicus Brief, p. 2.
[96] Will, George, "*This Doctrine Has Nullifiled Accountability for Police…*" Washington Post (May 13, 2020).

923. What the 42nd Congress did approve of was universal and unlimited liability for all three branches: as to executive officials for engaging in myriad forms of potential misconduct (ranging from the omission to enforce the law to actively participating in the atrocities), for legislators engaged in resistance to abolition by passing invidious laws (such as in 1866, the Black Codes), and even for judges, to the extent corrupt members of the judiciary violated the due process rights of the victimized at any point in the process.

924. Under the 42nd Congress' thinking, a lynching family's victim could literally sue the state judge if he threw out the murder case to protect KKK criminals.

925. As noted by Baude, apart from being unjustified on this basis, today's qualified immunity cannot be defended on any of its stated bases "leading the Court on the kind of pro-immunity crusade that it normally reserves for legal edicts like the Anti-Terrorism and Effective Death Penalty Act."[97]

926. Today, the qualified immunity doctrine is largely unchanged from its 2001 iteration in *Saucier*, except for language in certain US Supreme Court cases making its invocation by the government even easier.

927. In 2009, in *Pearson v. Callahan*,[98] the doctrine was made even more draconian, because federal judges were relieved of addressing whether the wrong presented a plausible constitutional violation, thus creating a circular paradigm where wrongs are never determined to be wrong because each time one is presented, a court may find that it has not been clearly established.

928. Today it requires that for any assertion of a civil rights claim, the claim must be predicated on an exactly-on-point published (appellate) precedent, that precedent must have previously established the claim at bar to have constitutional plausibility, and as such, the law must be so clearly established that "every reasonable

[97] Baude, W., "*Is Qualified Immunity Unlawful?*", 106 Calif. L. Rev. 45, 61 (2018).
[98] *Pearson v. Callahan*, 555 U.S. 223 (2009).

officer"[99] would consider the wrong asserted to be a violation of the constitutional and the issue must be "beyond debate."[100]

929.   In the context of the 2004-2014 valley fever epidemic, at least 37 victims filed civil rights suits from 2007-2012, only 5 of which resulted in appellate litigation. Of those 5, none were published.[101]

930.   Accordingly, despite several dozen lawsuits, and an epidemic that infected about 10,000 people, scarring them in varying degrees for life, the qualified immunity doctrine summarily prevented any and all viable litigation because there was no prior, published valley fever case – because the courts had repeatedly refused to publish one.

931.   This presents a series of serious constitutional problems.

932.   In its modern iteration, the qualified immunity doctrine requires that the law be clearly established, in other words according to the US Supreme Court "beyond debate" per the viewpoint of "every reasonable official."

933.   But if the courts themselves retain the power to publish cases (or to not publish them), which constitutes the aforesaid requisite "debate" process under the *Saucier* paradigm, the courts can themselves prevent plaintiffs from fulfilling the requirements of any cause of action, by simply declining to publish any case on that topic and thereby thwart the debate the law requires.

934.   The American legal system does not countenance a system where the government can both impose a predicate legal requirement and simultaneously prevent

---

[99]  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012).

[100]  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018); *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016).

[101]  *Smith v. Schwarzenegger*, 393 Fed.Appx. 518 (9th Cir. 2010); *Gray v. Robinson*, 481 Fed.Appx. 380 (9th Cir. 2012); *Johnson v. Pleasant Valley*, 505 Fed.Appx. 631 (9th Cir. 2013); *Samuels v. Ahlin*, 584 Fed.Appx. 636 (9th Cir. 2014); *Gregge v. Cate*, 584 Fed.Appx. 421 (9th Cir. 2014).

PAVONE & FONNER, LLP

plaintiffs from having the ability to satisfy it, by reserving such power to the courts' discretion through an unrelated power (publication).

935.    The publication requirement will be subject to additional problematic scrutiny as plaintiff litigants come to understand the importance of securing a published case antecedent to litigation.

936.    *First*, publication ultimately rests in a physical book publisher.  Courts have great influence over these decisions, but no case is actually "published" until the Thomson West Corporation assigns an official citation.  Therefore, by definition, accountability for civil rights wrongs rests partly in the hands of a private corporation, in violation of a dozen principles of American constitutional law.

937.    This reality is in effect today, when Plaintiffs in April 2020 asked the Thomson West Corporation to publish Judge Henderson's 2013 opinion recognizing exposure to valley fever as a constitutional violation.  Thomson honored the request in May 2020 and published *Plata v. Brown*.[102]

938.    The *Plata* valley fever opinion is a well-written opinion, but is still district level case and therefore not conclusive as an appellate opinion would be; it sits in a muddled publication world with *Hines*[103]*, Edison,*[104] and soon enough, *Bates*[105], which will also likely be published.

939.    This situation continues the reality that after thousands of infections, hundreds of claims, and 14 years of valley fever litigation about the epidemic, with the first case filed in 2006 in *Walker v. United States*[106], the American court system still does not conclusively recognize exposure to valley fever as a valid constitutional

---

[102] *Plata v. Brown,* 427 F. Supp. 3d 1211 (N.D.Cal. 2013).
[103] *Hines v. Youssef*, 914 F.3d 1218 (9th Cir. 2019).
[104] *Edison v. Geo*, 822 F.3d 510, 513, 522 (9th Cir. 2016) [emphasis added].
[105] *Bates, et al. v. Schwarzenegger, et al.*, Case Number 19-17094 (9th Cir. 2019).
[106] *Walker v. United States*, Case No. CV-F-02-5801-AWI-LJO (E.D.Cal. 2006)).

PAVONE & FONNER, LLP

claim, an absurdity that further highlights the dysfunction of the qualified immunity doctrine

940.    But as to publication specifically, Thomson West has now become an actual player in the game, declining in 2013 to publish and then publishing in 2020. Here, on request, they published.  But suppose they had not?  And, thinking ahead, why shouldn't civil rights lawyers similarly move to publish every unpublished civil rights case in order to defeat as many future qualified applications as the current inventory of cases permits?  In fact, Plaintiffs have already prepared a detailed complaint to this effect, which will be filed shortly after this lawsuit is filed.

941.    *Second*, publication as a driver of the ability to overcome, or be defeated by, qualified immunity, means that eventually the publication decision themselves will come under close scrutiny, on tort principles.  Judges will eventually become witnesses to be deposed on the question of why they did or did not publish an earlier case, if their intent can be cast as an intentional action to thwart enforcement of later civil rights cases on the same issue.

942.    Again, this implicates and breaches another dozen principles of American constitutional practice, ones that seem decidedly at odds with a judiciary becoming a logical target of litigation over publication decisions, because judicial officers have stopped acting exclusively as a bystander to disputes and have now become an actor within them, *with tort liability on the table*.

943.    A case could be made for liability.  Imagine if it came out somewhere in a random conversation with a judge – from something as previously private as the normal Thansgiving melee between a conservative federal jurist father and his liberal-minded daughter – that the reason the judge declined to publish a case was for tactical reasons, such as to prevent further claims of a given type of civil rights claim.  There would not only be litigation, there is a reasonable chance there would be liability.

944.    Even in this case, there are lingering questions why the Ninth Circuit panel in the *Hines* action replaced the one liberal judge with a conservative one,

PAVONE & FONNER, LLP

thereby creating a unanimously conservative appellate panel. This occurred immediately prior to its decision to publish a decision rejecting exposure to cocci as a cognizable constitutional violation, even though the liberal judge was not ill and kept turning out work product around the window of the *Hines* published opinion.[107]

945. The decision to replace her with a conservative judge sits as a disturbing example of how qualified immunity's publication paradigm could suddenly result in the normally impenetrable wall of an independent judiciary caving in from credible allegations of misconduct, if that decision to replace her were ever revealed to the public to be nefariously plotted in contravention of plaintiffs' civil rights.

946. For now, the decision stands undisturbed due to Plaintiffs' inability to better understand the basis for the decision in a sort black wall of silence – the AG did not oppose a motion seeking more information and the appellate court denied the motion without comment[108] – but if nothing else, this situation exists as an example of judges brushing up against dangerous lines, because qualified immunity's publication paradigm has suddenly thrust the judiciary into the role of a factual player in civil disputes instead of in their normal role as aerial bystanders and adjudicators.

947. Another serious problem with publication is the underlying theory of notice that acts as its *raison d'être*. Through the *Saucier* era, in 2001, publication of cases within West's hard copy law books was still basically the norm. Indeed, in 1999, Plaintiffs' counsel purchased a set of the federal appellate books to have access to the hard copy published opinions as part of counsel's law library and practice.

948. Unpublished cases were largely not available. To secure an unpublished opinion, a party had to pay for a specific legal database subscription and might even have to travel to the courthouse in question to pull the case file. Today, these ideas are antiquated. Every appellate opinion (indeed, many interim appellate orders) is assigned a case number by Lexis and Westlaw; appellate opinions are widely available

[107] *Hines v. Youssef*, Case No. 15-17155, Dkt. 123 (9th Cir. 2019).
[108] *Hines v. Youssef*, Case No. 15-17155, Dkt. 127 (9th Cir. 2019).

on various public databases, with the quickest way to retrieve any case often being through a two-millisecond Google search.

949.   Yesteryear's resort to hard copy publication as a demarcation between effective forms of notice and ineffective ones has become antiquiated.  Given current technology, law enforcement can and does have access to every appellate coming out, whether it be deemed to be officially published by Thomson West or exists merely on the internet.

950.   As argued above, the judiciary had no fundamental legal right to create this paradigm where it aggregates to itself the power to determine liability in civil rights cases (apart from its adjudicative function) based on its internal publication decisions (or perhaps even worse, that of a responsible but nonetheless private corporation); now there is no practical justification for the practice.

951.   Frankly, wrongful infliction of valley fever on so many people represents arguably the worst mass civil rights violation in American penological history.  Yet despite hundreds of tort cases timely filed and prosecuted in earnest through the full length of the judicial system, today it is still not conclusively established that exposure to cocci presents a plausible constitutional violation – even though clearly it does, it always has, and it always will according to long-standing societal expectations about government's responsibility for managing this disease.[109]

952.   Consequently, there is a remarkable bullet list of constitutional defects associated with the qualified immunity doctrine.  These include:

(1)   the genesis of the modern qualified immunity doctrine emanates without legislation – the statute authorizing this litigation contains no immunities whatsoever – and thus the doctrine's ever-changing formulations continuously invades the legislature's domain and violate the rule of *stare decisis*;

---

[109]  *See Bates, et al. v. Schwarzenegger, et al.*, Ninth Circuit Case Number 19-17094, Dkt. 20:25 (9th Cir. 2019).

PAVONE & FONNER, LLP

(2)  the very idea of conditioning substantive legal rights on the inventory of published legal cases is untenable.  Publication was never intended to be a determinative legal act, in and of itself, and its invocation as a substantive determinant of American civil rights law, given the relatively arbitrary nature of publication, is irresponsible.

(3)  The courts' policy justification for the sweeping nature of qualified immunity is non-existent as an empirical matter.  There is literally no empirical, legislative or other data-based defense of this wholesale elimination of entire swaths of civil rights law.  Its only known academic defense resides in the *stare decisis* doctrine, which is hard to countenance considering how *stare decisis* as a rule of law was continuously violated during the doctrine's various evolutionary steps.

A few judges have admitted that qualified immunity basically exists because of the government's own desire for self-protection from financial exposure.  This is a legitimate issue, for there is no point to having civil rights enforced if the government can afford to pay the claims that are valid, but it is clearly not a decision the judiciary should be making.  Budget choices of this variety are unquestionably a matter for Congress, and as for protection of the states' fisc, the real problem in California seems to be grift by state employees via inflated salaries, double-careers, obscene pensions and other forms of compensation as detailed below – not payment of civil rights claims.

(4)  The courts do not have authority whatsoever to rewrite statutes. The federal statute contains no language authorizing the courts to limit its broad enforcement to only "clearly established" civil rights violations, ones recognized through the pinhole filter of exactly similar prior publication

(5)  The judiciary's arrangement of a paradigm that makes the outcome of civil rights cases dependent on a criterion that was never meant to have substantive legal power – publication – exists as a sort of self-inflicted cancer on the judiciary.

Publication's role in the outcome of disputes should be promptly revoked and its role returned to where it belongs: an issue that was once practically important and therefore existed as limiting the

PAVONE & FONNER, LLP

universe of citation, but with modern technology, is simply irrelevant since there is no evidence that formally published cases versus formally unpublished cases vary in their intellectual quality. Notice principles to law enforcement through appellate opinions should be easily satisfied in light of the laudable development of the internet as a free, immediate and easy case database.[110]

953. Arguments and constitutional challenges to qualified immunity, on all of these fronts, are currently being litigated in various forums. The doctrine is subject to fierce and unrelenting criticism throughout North America's legal and academic communities[111] and indeed has reached mainstream media as a kind of "flash point" in a culture clash between law enforcement and civil rights advocates after the 2020 George Floyd riots.[112]

954. In the Ninth Circuit, certain valley fever victims are also waging a constitutional attack on the doctrine in *Bates, et al. v. Schwarzenegger.*[113] Plaintiffs herein incorporate and adopt those constitutional challenges and arguments as if they were fully set forth herein.

955. In short, invocation of the qualified immunity doctrine as a reason to summarily deny the Plaintiffs discovery, a trial and a jury in their main constitutional action for violation of the Eighth Amendment due to exposure to a cocci epidemic exists as one of the singularly least meritorious invocations of a rule of law, circularly

---

[110] *See* Martineau, Robert, "*Restrictions on Publication and Citation of Judicial Opinions: A Reassessment,*" 28 U. Mich. J. L. Reform 119 (1994); Committee on Use of Appellate Court Energies, Advisory Council for Appellate Justice, "*Standards for Publication of Judicial Opinions,*" (1973).

[111] *See Corbit v. Vickers*, Cato Institute, Amicus Brief to US Supreme Court Petition, Case No. 19-679, "*Brief of Cross-Ideological Groups Dedicated to Ensuring Official Accountability, Restoring the Public's Trust in Law Enforcement, and Promoting the Rule of Law as Amici Curiae in Support of Petitioner,*" Cato Institute (December 20, 2019).

[112] Fuchs, Hailey,*"Qualified Immunity Protection for Police Emerges as FlashPoint Amid Protests,"* New York Times (June 23, 2020).

[113] *Bates, et al. v. Schwarzenegger, et al.*, Ninth Circuit Case Number 19-17094, Dkt. 20 (9th Cir. 2019).

indefensible, applied illegally, subject to national criticism from all private sectors and undergirded by none of the normal constitutional or historical safeguards for the imposition of litigation immunities.

956.    Consequently, resort to international law is necessary and justified in order for the United States to live up to its commitment to the international community to provide victims of civil rights violations with an effective remedy in the domestic legal system, in light of the qualified immunity doctrine's corruption of that system.

957.    This obligation is reflected in a series of common law principles,[114] and exists in a series of treaties it has executed with other countries, ones who are also bound to fulfill the same covenant.[115]

## XII.
## SUMMARY OF RACIAL EXPLOITATION OF AFRICAN AMERICANS

958.    An element of proving certain of Plaintiffs' international claims is proving that the decision that resulted in the wrong was premised in part on "discrimination of any kind."

959.    In order to surpass an *Iqbal/Twombly*[116] plausibility threshold, by proving that racial discrimination via racial exploitation was a driving factor of the decision to subject mass numbers of African-Americans to a disease epidemic,

---

[114]  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 730, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).

[115]  A sampling of the reservations imposed by the 162 countries to the 1966 Treaty, for example, does not reflect any limitations of, or exclusions from, Article 2, Section 3's international promise by all countries to provide an effective legal system. There is also no plausible way to read the US's international commitments as permission for it to provide an effective remedy half the time. *See* Chung, *et al.*, "*For Cops who Kill, Special Supreme Court Protection*," Reuters News Website ("Reuters Investigates"): www.reuters.com (May 8, 2020) [study reflecting that 50% of cases are dismissed because of qualified immunity].

[116]  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007).

Plaintiffs first set forth an economic history of African-Americans' experience in the United States.

960.   This history reveals one consistent practice throughout the process: white authorities exploiting African-Americans for pecuniary benefit.  With this background, it is easy to understand the 2004-2014 incarceration decisions at issue as ones not aberrational of American treatment of black people, but rather, as consistent with, and another installment of, a long history of syllogistic, systematic racial exploitation.

961.   In short, if the question is whether prison officials engaged in racial discrimination in the 2004-2014 decision process by deciding to do nothing to protect inmates from coccidioidomycosis, the question isn't really to wonder whether they were engaged in racial discrimination; it is to wonder why discrimination *wouldn't* be at work.

962.   The historical data points to the fact that racial exploitation has been uniformly and consistently in play, because it feeds a capitalist exploitation system of African-Americans that goes back through 400 years of similar business decisions.

963.   The financial incentives are closely aligned.  Whereas historically, African Americans were exploited as a low-cost labor force, from 2004-2014, exploitation has become even that much more efficient.

964.   Whereas in the plantation era, there was a single beneficiary, the slave owner, today that exploitation serves a supply chain for white businesses and white professionals that redirects income to a long list of beneficiaries.

965.   With the advent of mass incarceration, so too employment in law enforcement necessarily increased to meet that need, by creating an entire economic system of benefit for predominantly white people: shockingly high-paying jobs for otherwise low-skilled professionals in law enforcement; a large number of well-paying jobs in corrections; a massive building and construction business, along with

PAVONE & FONNER, LLP

maintenance of a prison infrastructure that has stocked African Americans like inventory with a Matrix-like efficiency.[117]

966. Eight prisons in the hyperendemic zone were constructed in the 1980's and 1990s, which brought lucrative construction contracts, jobs for prison guards and other officials, and consequent growth to rural white communities.

967. In this case, the cities of Coalinga and Avenal (where PVSP and ASP sit, respectively) and where valley fever was and is most acute, became major beneficiaries, as these cities do not have any other significant business industries apart from these prisons.

968. Pleasant Valley State Prison is itself a $140M/yr business, whose population is a direct function of the money this prison attracts. The more African-Americans that are locked up within it, the more money it can justify as a necessary budget expense. Accordingly, every loss of a black inmate, moved out for his safety, represented a threat to this prison system's local economic model.

969. Similarly, Avenal State Prison is a $135M/yr business.

970. Where prisoners can be exploited as cheap labor, they were. Prison wages are almost invariably less than $1/hr, and usually around 10 cents per hour,[118]

---

[117] *See* "*The Matrix,*" Village Roadshow Pictures (Joel Silver, Director), Website: https://en.wikipedia.org (1999) (information also available on IMBD (website: https://www.imdb.com)).

[118] Perhaps the ultimate insult to this prison slave labor pool is the fire fighter program, where prisoners get double credit for time served and pay of about $2/hr. However, in turn they must literally gamble with their lives. Owen, T., "*Meet the Inmates Risking their Lives to Fight California Wildfires,*" Vice News, Website: https://www.vice.com (October 13, 2017).

In contrast, state fire fighters earn a median hourly wage of about $100/hr. While the California government views such disparity as saving itself as much as $100 million per year, what this really amounts to is a labor wealth transfer from African American, excessively arrested and more severely punished, turned into prison slave labor, that benefits whites by the difference in market value minus the slave

PAVONE & FONNER, LLP

whereas the minimum wage at the time was about $8/hr, so white-dominated capitalist industry could save between $7-7.90/hr by utilizing a prison labor force, which allowed corporations like Geo (formerly Wackenhut), CCA, and CALPIA to become lucrative, multi-million dollar behemoths.

971.   Where prisoners cannot work, the capitalist system found a new and equally lucrative method of exploitation: the natural debilitation of inmates from coccidioidomycosis, which provided a lucrative resource for supportive industries in the form of medical treatment.

972.   Political, legal and moral norms from 2004-2014 no longer permitted slavery, genocide or scientific experimentation, but infection with cocci, which occurs by prison officials' decisions to literally do nothing, thus provided a form of plausible deniability to otherwise morally-unacceptable capitalist appetites.

973.   Medical treatment of cocci drove up requisite, constitutionally-required medical care payments to the surrounding area, subsequently justified a bigger share of the taxpayer budget, and ultimately provided an almost perfect liquidation program for many African Americans.

974.   It created profit and economic activity for an entire ecosystem of white-dominated state-run or state-affiliated medical businesses, all funded at taxpayer expense (and evidently at the expense of higher education budgets).

975.   In terms of the epidemic decisions from 2004-2014, an African American male that has little or no productive value to the white capitalist business model suddenly has great value to interested businesses: incarceration of him at that time in California created about $64,000 worth of annual economic activity per year, of which 1/3 was medical care.

976.   On a per capita basis, African American inmates exposed and infected with cocci generated on average a significantly higher per capita figure due to their

wages paid ($98/hr). This profit, in turn, eventually shows up as the healthy salaries of predominantly white government employees, including firefighters.

extraordinary biological susceptibility.  Those figures are not known with precision but annual care for cocci treatment typically costs about $15K/year for moderate cases.

977.   It was well-known and scientifically established that African Americans suffer cocci infection with greater frequency and severity, such that in some cases, a single African American prisoner would generate economic medical activity in the 6 and 7-figure range, an enormously profitable medical business model feeding and complementary to the co-existing incarceration business model.

978.   The medical business generated by treating prisoners with valley fever, rather than the modest cost of preventing it, earned the surrounding hospitals and medical professionals approximately $127M in fees during the epidemic, with an estimated $70M of that money being singularly attributable to treatment of African Americans suffering from cocci.

979.   With these powerful financial incentives forming a backdrop, it is an easy inference to draw that the decisions during the 2004-2014 cocci epidemic, which uniformly resisted prevention and instead focused on permitting infection and then treating it, were founded in racial discrimination via the economic business model of racial exploitation.  Given black history, the question is not whether racial exploitation was at work during the cocci epidemic, but rather, why there would be any reason to think it was not at work.

980.   Every historical indicator suggests that these decisions were part of a consistent pattern, one that has been practiced for hundreds of years, one that has not abataed but merely changed form, and one whose financial incentives from 2004-2014 were equally if not more perfectly aligned with white capitalist economic opportunism in the days of slavery, sharecropping, convict leasing and other racial exploitation.

## A.  1619-1865 – Summary of Slavery Economics

981.   A review of the business decisions in the history of the United States points to one consistent thread when it comes to African-Americans: racial

PAVONE & FONNER, LLP

exploitation.  The most dramatic of these is no doubt the wildly lucrative institution of slavery.

982.   Slavery served many desirable objectives for leading members of the Southern State establishment.  Not only did it promote for them the feel-good benefit of white supremacy,[119] but beneath the perceived prestige, it fueled a farming industry (and breeding industry) that was so vast and profitable[120] that it assisted the Southern States to become the fourth largest economy in the world.

983.   By 1860, the South produced 75% of the world's cotton, and as mentioned in several accounts in a sort of Silicon Valley parlance, slavery had created "more millionaires per capita in the residential valley surrounding the Mississippi River than anywhere in the nation."[121]

984.   By one statistical estimate, African-American slave labor produced a labor debt valued today, in 2009 dollars with interest, ranging from $6-14 trillion depending on certain assumptions for just the 89 years after the revolution.[122]  Thus, it does not include the colonial period from 1619-1776, which represents an average population of about 1.3 million slaves, slaving away, for 157 years.

985.   The value of slave exploitation during the entire window, from 1619 to 1860 is subject to various models.  One model assesses that in 2016 dollars, over the

[119]  Genovese, E.D., The Political Economy of Slavery, Wesleyan University Press, pp. 3-4 (1989).

[120]  Conrad, A. and Meyer, J. "*The Economics of Slavery in the Ante Bellum South*," Journal of Political Economy, Vol. 66, No. 2, p. 121 (1958).

[121]  Timmons, Greg, "*How Slavery Became the Economic Engine of the South*," p. 2 History.Com (November 19, 2018).

[122]  Craemer, Thomas, "*Estimating Slavery Reparations: Present Value Comparisons of Historical Multigenerational Reparations Policies*," Social Science Quarterly, Vol. 96, Number 2, (2015), pp. 645-655; *see also* Solomon, Danyell, "*Systematic Inequality and Economic Opportunity*," p. 3, Center for American Progress (August 7, 2019)

course of 1804-1860, each slave produced an average of $92,000 in economic value to his owner.[123]

986.    Four million slaves were freed in 1865.  If each of them were producing $92,000 in economic value to their owner for the entire 240 year slave era, this would amount to an industry producing modern economic output worth $368 billion annually. This is roughly equaivalent to the revenue of 11 Microsoft Corporations, each making about $33B/yr in net revenue.

987.    The *gross* economic value of this economic activity, when projected over the 240 year span of slavery, and assuming a smooth influx curve of about 16,500 slaves per year starting at 20,000 slaves and ending at 4,000,000 (resulting in an average slave population of about 2,000,000), at $92,000/yr/slave in modern economic output terms, would produce gross economic value of approximately $43 trillion – or about twice the total annualized output (about $21T GNP/yr) of the modernized United States today.

988.    If the cost of maintaining slaves (feeding, housing, health care, etc) is assigned as 1/4 of that value (about $18,000/year subsistence each, in today's dollars), this returns about $33 trillion worth of net economic value, aka wealth, that the Southern States (and larger United States) extracted from African Americans in 2016 dollars, based on the slave/plantation economy from 1620-1860, or about 1.5 years of total modernized 2019 US GDP, all profit.

989.    Throughout all of this, slaves accumulated almost none of this wealth, and thus by Craemer's model, the theoretical claim for labor reparations ranges between $6-14 trillion for just the 89-year, post-revolution period.[124]

---

[123] Williamson, Samuel, "*Measuring Slavery in 2016 Dollars*," MeasuringWorth, p. 5, Website: www.measuringworth.com (2020).

[124]  Craemer, Thomas, "*Estimating Slavery Reparations: Present Value Comparisons of Historical Multigenerational Reparations Policies*," 96 Social Science Quarterly 2, pp. 645-655 (2015); *see also* Solomon, Danyell, "*Systematic Inequality and Economic Opportunity*," p. 3, Center for American Progress (August 7, 2019).

PAVONE & FONNER, LLP

990.    If the $92K economic output of slaves per year were viewed similar to the law firm business model, where the labor captures 1/3 of the haul, 1/3 goes to overhead and 1/3 is captured by the employer, then a figure for the principal debt would be about $14.3T, or about $900K for each of the 47.4M African-Americans alive today.

991.    For purposes of the argument here, for at least 240 years of the first 400 years, the United States treated, viewed and utilized African Americans as an asset to be exploited indiscriminately and with no more labor expense than the strict survival quantum necessary to optimize slave productivity.

992.    In key industries that involve custody of African Americans, the standard historical American business paradigm is clearly to exploit them.

993.    When California prison officials made their decisions during the 2004-2014 cocci epidemic to not protect inmates, there is no reason to think that this business model had fundamentally changed.  They exploited them for their maximum economic value, which today consists of a combination of their incarceration, labor and medical value to interested white industries.

994.    In short, today the rules of the game have certainly changed, but the nature of the game has not.

995.    Accordingly, an inference of racial discrimination is plausible within the international definition of the term torture and other causes of action asserted herein under the Iqbal/Twombly standard.[125]

**B.    1865-1965 – Sharecropping, Convict Leasing, Chain Gangs, Housing/Lending, and Other Lucrative Racial Exploitation**

996.    For the next 100 years of black existence, various forms of routine racial exploitation in the period after emancipation resulted in similar, but generally less draconian, forms of subjugation.

---

[125] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007).

**Summary Chart**[126]



997.   This included the highly exploitive practice of sharecropping.[127]

---

[126] Delaney, R., "*American History, Race, and Prison*," Vera Institute for Justice, Reimagining Prison, Internet Web Report, Website: www.vera.com (2016).

[127]  Solomon, Danyell, "*Systematic Inequality and Economic Opportunity*," Center for American Progress (August 7, 2019), p. 3; Perry, M., "*No Pensions for Ex-Slaves: How Federal Agencies Suppressed Movement to Aid Freedpeople*," Prologue Magazine, Vol. 42, No. 2 (2010).

998.   It also included convict leasing, the process of passing laws (such as the "Black Codes") targeting African Americans for non-crimes, in order to convict them, incarcerate them, and effectively return them to slave status through penal sanctions.[128]

999.   These non-crimes included lounging while black, walking while black, hunting while black, sleeping while black, or living while black.[129]

1000. Black convicts were then monetized by being leased to private corporations, typically industries profiting from the South's natural resources. Hundreds of thousands of African Americans were returned to manual labor in service to private American corporations, including coal mines, turpentine factories and lumber camp, and lived in conditions that were essentially similar, that is deplorable, to the ones slaves had endured.

1001. By the 1870s, 95% of the people under criminal custody of the Southern states were black.[130]

1002. From 1850 to 1940, racial and ethnic minorities still made up 40 to 50 percent of the national prison population.[131]

1003. Today the industries are different, and the conditions are better, but the same basic paradigm of convict leasing applies: to capture as many African Americans

---

[128]  Forde, K., "*Exploiting Black Labor after the Abolition of Slavery*," The Conversation, p. 3 (February 6, 2017).

[129]  Delaney, R., "*American History, Race, and Prison*," Vera Institute for Justice, Reimagining Prison, Internet Web Report, Website: www.vera.com (2016); Forde, K., "*Exploiting Black Labor after the Abolition of Slavery*," The Conversation (February 6, 2017), p. 3.

[130]  Delaney, R., "*American History, Race, and Prison*," Vera Institute for Justice, Reimagining Prison, Internet Web Report, Website: www.vera.com (2016);

[131]  Delaney, R., "*American History, Race, and Prison*," Vera Institute for Justice, Reimagining Prison, Internet Web Report, Website: www.vera.com (2016), *citing* Cahalan, M., "*Trends in Incarceration in the United States Since 1880: A Summary of Reported Rates and the Distribution of Offenses*," 25 Crime & Delinquency 1, pp. 9-41 (1979).

PAVONE & FONNER, LLP

as the law plausibly permits, to incarcerate them for as much time as the law allows, and to require labor (or extract other economic value) from them.

1004. Back then, the process required the creation of laws that essentially turned criminally non-controversial events, such as existing, into crime. More recently, the tactic has evolved into arresting African Americans *en masse* and then imposing long sentences for minor crimes (typically drug possession and other mistakes of modest criminal ambition).[132]

1005. In both scenarios, the governing dynamic is one of racial exploitation, and thus by definition racial discrimination, by returning African Americans to a situation of forced labor or other exploitation predicated on the loss of rights associated with conviction and incarceration.

1006. To erase any doubt about the intentions of white industries in this period (roughly 1865-1900), one researcher figured out that the inmate population actually fluctuated with the seasonal labor needs of local planters. The police would perform periodic arrest sweeps by targeting African Americans just prior to planting, cutting and harvest, thus diabolically creating the necessary slave labor pool for their businesses during the farming window in which it was most needed.[133]

### C.    1940-2000 - Racial Exploitation via Pharmaceutical/ Medical Experimentation

1007. African Americans also have a long history of being the subjects of American medical experimentation, dating back to the plantation days, as an element of the profit motive in the slave trade.[134]

---

[132]  *See* UN Report, 3, 8, 13; Forde, K., "*Exploiting Black Labor after the Abolition of Slavery*," The Conversation (February 6, 2017), p. 5.

[133]  Smith, Earl, "*Incarceration, A Tool for Racial Segregation and Labor Exploitation*," Race, Gender & Class, Vol. 15, No. 1-2, p. 85 (2008), *citing* Oshinsky, D., "Worse than Slavery: Parchman Farm and the Order of Jim Crow Justice, New York: The Free Press (1997).

[134]  Washington, Harriet, Medical Apartheid, First Anchor Books (2008), pp. 25, 43.

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

1008. American prison officials have a long and troubled history of experimenting on prisoners, and disproportionately African-American prisoners.[135]

1009. From approximately 1940 to approximately the year 2000, African American prisoners have been subjected to medical experimentation, in various and sometimes gruesome ways.[136]

1010. In the 1940s, the United States considered developing biological weapons in that a U.S. Navy contract supported the University of California's tests of airborne fungal spores to spread valley fever.[137]

1011. Thirty years later, in a 1977 congressional hearing, an unnamed Pentagon official admitted that the armed forces spread the fungus in the Norfolk Naval Shipyard in Virginia and on a loading dock in Mechanicsburg, Pennsylvania back in the 1940s.  In both locations, most of the personnel were black.  The Pennsylvania situs was chosen specifically because "negroes are more susceptible to the fungus than whites."

1012. Following the issuance of the Nuremburg Code, biomedical researchers from the 1940s through the 1970s used prisoners as a primary source of research material.[138]

1013. In the early 1960s, Dr. Carl Heller and Dr. C. Alvin Paulsen received $1.6 million in funding from the U.S. Atomic Energy Commission to perform radiation

---

[135] Washington, Harriet, Medical Apartheid, First Anchor Books (2008), p. 244.

[136] Washington, Harriet, Medical Apartheid, First Anchor Books (2008), p. 244; Hornblum, Allen, Sentenced to Science: One Black Man's Story of Imprisonment in America, The Pennsylvania State University Press, pp. ix, 52 (2007); Richardson, Theresa, "Acres of Skin: Human Experiments at Holmesburg Prison," Canadian Journal of History (2001).

[137] Department of Defense's Senate Select Committee on Health and Scientific Research, "Biological Testing Involving Human Testing" (1970s).

[138] Dober, Gregory, "Cheaper Than Chimpanzees," Prison Legal News (March, 2008).

studies on the male reproductive system.  The testing consisted of irradiating hundreds of black prisoners' testicles.[139]

1014. In 1962, the FDA began requiring pharmaceutical drugs to undergo three human clinical trials before approval; as a result, from 1962 to 1980, perhaps 85% of Phase 1 clinical trials were performed on disproportionately African-American prisoners.[140]

1015. From the 1950s through the 1970s, Dr. Albert Kligman, a dermatologist at the University of Pennsylvania, conducted various experiments on inmates.  His studies eventually led to the discovery and patent of Retin-A, an anti-acne cream.  In addition, he performed hundreds of experiments on prisoners for Johnson & Johnson, Dow Chemical, the U.S. Army and his own corporation, Ivy Research.[141]

1016. In 1967, sixty-four California prisoners were paralyzed with succinylcholine, a neuromuscular agent that restricts breathing.  Succinylcholine has since been used in lethal injection protocols.  When several of the prisoners refused to participate in the experiment, researchers were given permission to inject the recalcitrant prisoners against their will and thus in patent violation of the 1966 ICCPR, Article 7.[142]

1017. In 1997, Stanford University sponsored psychiatric drug tests on 61 juvenile prisoners at a California Youth Authority facility in Stockton. The test subjects were 14 to 18 years old and had committed violent crimes; they were given doses of Depakote, a drug used to control epileptic seizures.  The study was conducted without the knowledge of the CYA director or the agency's legal office, and may have violated a state law that barred most medical research involving prisoners.  Consent forms were mailed to the juveniles' parents; if the parents didn't respond within 30 days, the CYA

---

[139] Dober, Gregory, "*Cheaper Than Chimpanzees*," Prison Legal News (March, 2008).
[140] Dober, Gregory, "*Cheaper Than Chimpanzees*," Prison Legal News (March, 2008).
[141] Dober, Gregory, "*Cheaper Than Chimpanzees*," Prison Legal News (March, 2008).
[142] Washington, Harriet, "Medical Apartheid," First Anchor Books (2008), p. 259.

gave consent on their behalf.  The experiment had been approved by Stanford's Human Subjects Committee.

1018. All of this monstrous activity benefitted white-dominated industries or the US government itself, at the expense of African-Americans and/or African American prisoners, for which no compensation or nominal compensation was paid.

### D.     1980-2010 – Era of Mass Arrest and Incarceration – Racial Exploitation in the Modern US Law Enforcement System

1019. A feature of the 1984 international definition of torture, and the one relied on for purposes of certain allegations in this case, is its permission to infer torture as motivated by discrimination of any kind.

1020. In this regard, the colonial and incorporated United States, including its law enforcement system, has practiced, and has been pervaded by, racial exploitation for the last 400 years.

1021. The 2004-2014 cocci decisions by white prison officials in the California law enforcement system are in line with this 400-year window of similar business decisions against African Americans and their interests.

1022. Black people have been consistently and systematically exploited for their economic value to white people, in this instance and in the modern age through the California state incarceration business, in conjunction with a white-dominated surrounding medical business establishment.

1023. As a result, the particular set of decisions to not take any protective action toward minority inmates during the epidemic, and especially African-Americans, and to instead exploit them for their economic value at the expense of their health and constitutional rights, can be inferred to be another application of these racially discriminatory and historically exploitative attitudes and practices.

1024. Pervasive racial exploitation is revealed in the US law enforcement system, including in California, in a variety of situations, from discriminatory policing

PAVONE & FONNER, LLP

and racial profiling (thus resulting in a disproportionate number of arrests), to higher rates of conviction and longer sentences for similar crimes (thus resulting in more chance of being incarcerated during an epidemic), to a litany of smaller factors.

1025. Taken in conjunction, these factors place African-Americans at much higher risk of adverse consequences in the penal system, including longer and more severe exposure to its ill-effects, here, to the risk of being incarcerated at prisons that were subject to a disease epidemic and then exploited for their medical treatment value.

1026. According to the current Governor, Gavin Newsom, the official head of the State of California, in a forthright statement made on August 19, 2019 speaking about the California prison/justice system, he acknowledged this: "It's just incomprehensible to me that we have a system that is so biased, so random, so unbelievably racially biased."

1027. However, with appreciation for Governor Newsom's extraordinary candor (for a sitting head of state), it is far less incomprehensible when one understands the long history of racial exploitation in this country, which is summarized herein, especially in the law enforcement context.

1028. According to a report published by the United Nations in March 2018, the following realities exist in the larger American law enforcement system, including and especially, the California law enforcement system.[143]

1029. By the end of 2015, over 6.7 million individuals were under some form of correctional control in the United States, including 2.2 million incarcerated in

---

[143] United Nations Sentencing Project, "*Report of The Sentencing Project to the United Nations Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance*" (March, 2018), (hereafter "UN Report").

federal, state, or local prisons and jails. This country leads the world in its rate of incarceration, by dwarfing the rate of nearly every other nation.[144]

---

[144] UN Report, p. 3.

## Rise of Mass Incarceration[145]



---

[145] Delaney, R., "*American History, Race, and Prison,*" Vera Institute for Justice, Reimagining Prison, Internet Web Report, Website: www.vera.com (2016).

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

1030. Such broad statistics are explained in part by the quantum of racial discrimination that pervades the U.S. criminal justice system because it occurs at every step of the process.

1031. Consider:

African Americans are more likely than white Americans to be stopped;
Once stopped, they are more likely to be searched;
Once searched, they are more likely to be arrested;
Once arrested, they are more likely to be convicted; and
Once convicted, and they are more likely to experience lengthy prison sentences, all in disproportion to their comparative criminality.[146]

1032. They are 5.9 times as likely to be incarcerated than whites. As of 2001, one of every three African Americans born in that year could expect to be incarcerated in his lifetime compared to one of every seventeen Caucasians.[147]

1033. The United States in effect operates two distinct criminal justice systems: one for wealthy people and another for people of color/poor people. The wealthy can access a vigorous adversary system replete with constitutional protections. Yet the experience of African American defendants often reflects a necessary capitulation to the system which contributes to the overrepresentation of such individuals within it.[148]

1034. These double standards are not explicit; on the face of it, like virtually all facets of American society, the California Penal Code is itself color-blind. But in a sense, this only makes the problem more difficult, in that it obfuscates detection of

---

[146] UN Report, p. 3; Balko, Radley, "*There's Overwhelming Evidence that the Criminal-Justice System is Racist. Here's the Proof,*" Washington Post, (June 10, 2020) *citing multiple references, see* End Note 1.
[147] UN Report, p. 3.
[148] UN Report, p. 3.

PAVONE & FONNER, LLP

racist beliefs, decisions, and unspoken discriminatory and exploitative practices that act to determine outcomes in practice but are not transparent.[149]

1035. The policy position of the US criminal justice system conveys that our society protects everyone's constitutional rights, but in practice the rules assure that law enforcement priorities generally prevail over the rights of African Americans (and others). By affording criminal suspects substantial constitutional rights in theory, the Supreme Court validates the results of the criminal justice system as fair despite that in practice its powers are anything but evenhandedly applied.[150]

### 1. Racial Exploitation in Stops and Arrests.

1036. In 2016, African Americans comprised 27% of all individuals arrested in the United States, double their proportionate population. Black youth accounted for 15% of all U.S. children, yet made up 35% of juvenile arrests in that year.[151]

1037. In recent years, African Americans have been more likely to be stopped and have been far more likely to be searched and arrested, hence the popularly-accepted term "driving while black." There are staggering racial disparities in rates of police stops in certain localities.[152]

1038. In the controversial 2014 police shooting of African American Michael Brown in Ferguson, Missouri, the United States Department of Justice under the Obama Administration released two reports on the same day, on March 4, 2015.[153]

---

[149] Cole, David, <u>No Equal Justice: Race and Class in the American Criminal Justice System</u>, New Press; First Edition, pp. 8-9 (1999); UN Report, p. 3.

[150] UN Report, p. 1.

[151] Cole, David, <u>No Equal Justice: Race and Class in the American Criminal Justice System</u>, New Press; First Edition, pp. 8-9 (1999); UN Report, p. 3.

[152] UN Report, p. 5; US Department of Justice Report, "*Investigation of the Baltimore City Police Department*," Civil Rights Division, p. 24 (August 10, 2016).

[153] (1) "*Department of Justice Report Regarding the Criminal Investigation into The Shooting Death of Michael Brown by Ferguson, Missouri Police Officer Darren Wilson*," United States Department of Justice Memorandum (March 4, 2015) ("DoJ Wilson Report"); (2) "*Investigation of the Ferguson Police Department*," United

1039. In one report, they absolved Ferguson police officer Darren Wilson of federal criminal liability for shooting Brown.[154]

1040. In a second report, 105 pages long, the DoJ conducted a study about the Ferguson Police Department's law enforcement practices.  It revealed the same type of exploitative racist treatment alleged to be at work in this case (with respect to the 2004-2014 cocci decisions).  The summary of the report includes a list of systemic malfeasance:

- African Americans experience disparate impact in nearly every aspect of Ferguson's law enforcement system. Despite making up 67% of the population, African Americans accounted for 85% of Ferguson's traffic stops, 90% of its citations, and 93% of its arrests from 2012 to 2014.

- They were twice as likely to be searched during a vehicular stop but were 26% less likely to have contraband.  They were twice as likely to receive a citation and 2.4 times more likely to be arrested.

- African Americans had force used against them at disproportionately high rates, accounting for 88% of all cases from 2010 to August 2014. In all 14 canine uses for which race was known, the victim was African American.

- African Americans were more likely to receive multiple citations during a single incident, receiving four or more on 73 occasions, whereas non-African Americans received four or more citations only twice during that period.

- African Americans account for 95% of 'walking-while-black' charges; 94% of all compliance failure charges; 92% of all resisting charges; 92% of all disturbing-the-peace charges; and 89% of all failure-to-obey charges.

States Department of Justice Civil Rights Division (March 4, 2015) ("DoJ Ferguson Civil Rights Report").
[154] DoJ Wilson Report, p. 5.

PAVONE & FONNER, LLP

- African Americans were 68% less likely than others to have their cases dismissed by the local judge, and in 2013 African Americans accounted for 92% of cases in which an arrest warrant was issued.[155]

1041. A similar report was generated after the Freddie Gray shooting, this one 164 pages in length, which itemized the Baltimore Police Department's racially discriminatory practices across a large number of enforcement functions. "Statistical evidence shows that the Department intrudes disproportionately upon the lives of African Americans at every stage of its enforcement activities."[156]

1042. On the heels of this report, an elite Baltimore police unit was revealed to behave as criminally as the putative targets of their occupation: the police were essentially drug robbers.[157]

1043. DOJ concluded in the Ferguson case that the disparate impact and corresponding exploitation must be, and therefore is, driven in part by intentional racial discrimination, as reflected by the statistics themselves and code language used by the cops.[158]

1044. There is no reason to think that similar studies of law enforcement, in other places, throughout the states and in California, would not yield similar conclusions; indeed, it is assumed that when the head of the State of California makes such a similarly conclusive statement about California law enforcement, he did so after much careful thought, empirical study and professional input.[159]

---

[155] DoJ Ferguson Civil Rights Report, pp. 62-63.

[156] US Department of Justice Report, "*Investigation of the Baltimore City Police Department,*" Civil Rights Division, p. 47 (August 10, 2016).

[157] Balko, Radley, "*The Jaw-Dropping Fall of an Elite Baltimore Police Unit Validates the Need for Federal Oversight,*" Washington Post (February 1, 2018).

[158] DoJ Ferguson Civil Rights Report, p. 63.

[159] Bondgraham, Darwin, "*Black People in California are Stopped Far More Often by Police, Major Study Proves*," The Guardian Newspaper (January 3, 2020), *citing* 2015 Racial And Identity Profiling Act (RIPA); Queally, J., "*Beverly Hills Police Chief Retires after Lawsuits Alleging Racism, Anti-Semitism, Harassment,*" Los

1045. Beyond the representative examples of Ferguson and Baltimore, nationwide surveys conform to these racial disparities in law enforcement.  Once pulled over, African American were three times as likely as whites to be searched (6% versus 2%) and blacks were twice as likely to be arrested.  These disparate law enforcement patterns hold even though officers generally find contraband less frequently when they search African-Americans."[160]

## 2. Racial Exploitation in Pre-Trial Treatment and Detention

1046. State prosecutors are more likely to charge black defendants under habitual offender laws.[161]

1047. In 2016, African Americans were incarcerated 3.5 times as likely to be housed in local jails.  These disparities stem in part from "broken windows" type policies.  Given that 65% of people in jail were being held prior to trial, policies and decisions influencing bail play a key role in driving the disparity in the jail population.[162]

Angeles Times (April 25, 2020); Agarwal, S., *"Racist Drug Laws Lead to Racist Enforcement in Cities Across the Country,"* ACLU News and Commentary (February 21, 2020) (focusing on racism in policing in San Francisco); Williams, T., *"California Rebukes Rural Prison for Racism,"* New York Times (December 16, 2015); Clayton, A., *"92% Black or Latino,"* The Guardian Newspaper, Website: https://www.theguardian.com (November 26, 2019) (arguing that gang enhacements are a systematic method in California used to incarcerate more people of color, for longer, for non-criminal behavior).

[160] UN Report, p. 5, *citing* Harris, David, *"Hearing on Ending Racial Profiling in America,"* United States Senate Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights (Senator Richard Durbin, Chair, April 2012).

[161] UN Report, p. 8, *citing* Crawford, et al., *"Race, Racial Threat, and Sentencing of Habitual Offenders,"* Criminology, 36(3), 481-512 (1998).

[162] UN Report, p. 6, *citing* U.S. Bureau of Justice Statistics, *"Prisoners in 2016,"* (Feb. 2018).

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

1048.  Pretrial detention has been shown to increase the odds of conviction. Detained people are more likely to accept less favorable plea deals, to be sentenced to prison, and to receive longer sentences.[163]

1049.  Seventy percent of pretrial releases require a cash bond, a hurdle for low-income defendants, who are disproportionately African American.  Blacks are more likely to be denied bail, to have a higher bond set, and to be detained because they cannot pay their bond.[164]  They are often assessed to be higher safety and flight risks because they are more likely to experience socioeconomic disadvantage and to have criminal records.[165]

**3.  Racial Exploitation in Sentencing and Prison Committments**.

1050.  African Americans comprise 29% of the U.S. population, but they make up 57% of the U.S. prison population.  They are incarcerated 5.9 times more frequently than Caucasions.[166]

1051.  Over half (56%) of the people imprisoned nationwide for a drug offense are African American or Latino.[167]

1052.  Nearly half (48%) of the people serving life or effectively-for-life prison sentences are African American.[168]

---

[163] UN Report, p. 6, *citing* Jones, C. E., *"Give Us Free": Addressing Racial Disparities in Bail Determinations*, New York University Journal of Legislation and Public Policy, 16(4), 919-962 (2013).

[164] UN Report, p. 6, *citing* Jones, C. E., *"Give Us Free": Addressing Racial Disparities in Bail Determinations*, New York University Journal of Legislation and Public Policy, 16(4), 919-962 (2013)

[165] UN Report, p. 6.

[166] UN Report, pp. 6-7.

[167] UN Report, p. 7, *citing* U.S. Bureau of Justice Statistics, *"Prisoners in 2016,"* (Jan. 2018) *and* Nellis, A. *"The Color of Justice: Racial and Ethnic Disparity in State Prisons,"* Washington, D.C., The Sentencing Project (2016).

[168] UN Report, p. 7, *citing* Nellis, A., *"Still Life: America's Increasing Use of Life and Long-Term Sentences,"* Washington, D.C.: The Sentencing Project (2017).

1053. Drug-free school zone laws mandate sentencing enhancements for people caught selling drugs in designated school zones.  The expansive geographic range of these zones coupled with urban density has disproportionately affected these residents.[169]

1054. During the era of mass incarceration, an increasing proportion of the prison population faced a fixed-length sentence before consideration for parole.[170]

1055. For years, American law enforcement disproportionately sentenced African Americans in cases involving crack cocaine, as compared to the lesser sentences imposed for similar crimes committed by Caucasians.[171]

1056. Thus, in summary on this issue, in terms of whether Plaintiffs can state a plausible human rights violation for any given application of a seeming or potentially disparate racial outcome in the American law enforcement system, such as here the cocci epidemic, one that meets the gravity threshold of international torture or cruelty, the UN Report and its vast collection of supporting authorities establishing systemic racism in US law enforcement directly supports this proposition.

### E.  Racial Exploitation in Black Student Athletes

1057. From the mid-1970's to present, there has been an explosion of economic activity attributable to college sports, especially in football and basketball, of which the teams are composed of about half black athletes.[172]

---

[169] UN Report, p. 8, *citing* Porter, N., "*Drug-Free Zone Laws: An Overview of State Policies*," Washington, D.C.: The Sentencing Project (2013).

[170] UN Report, p. 8, *citing* Ghandnoosh, N., "*Delaying a Second Chance: The Declining Prospects for Parole on Life Sentences*," Washington, D.C.: The Sentencing Project (2017).

[171] *U.S. v. Williams*, 788 F.Supp.2d 847, 848 (N.D. Iowa 2011).

[172] Murty, *et al.*, "*Race and Class Exploitation: A Study of Black Male Student Athletes (BSAs) on White Campuses*," Race, Gender & Class: Volume 21, Number 3-4, pp. 159, 162 (2014).

PAVONE & FONNER, LLP

1058. Collegiate sports are not intrinsically subject to the Zimbardo/slave cruel custodial mindset[173] that makes any characterization of the treatment of African Americans in these arenas uniquely susceptible to the conclusion that racial discrimination and exploitation is at work.

1059. But a quick review of collegiate athletics does reflect white industries again exploiting African Americans under a set of rules that, by virtue of federal and intercollegiate legislation, leaves them without meaningful choice but to participate in these exploitative systems.

1060. One study (focused on a window of 1996-2013) in conjunction with incorporation of more recent data from 2014-2019 returns an economic revenue figure for this asset to the schools and universities that capitalize on it, from 1996-2019, at $15.4 billion.[174]

1061. Notably, this debt is particularly painful because the four-year college experience represents the lion's share of the income-generating potential of this pool of extremely talented labor.

1062. With only 1.6% of college players reaching the NFL (and perhaps 3% of basketball players),[175] and with the average lifespan of a pro-NFL player only being 3.3

---

[173] *See* Zimbardo, P.G., <u>The Lucifer Effect: Understanding How Good People Turn Evil</u> Random House Paperbacks, New York (2007) [including his first account of the famous 1971 Standard Prison Experiment].

[174] Murty, *et al.*, "*Race and Class Exploitation: A Study of Black Male Student Athletes (BSAs) on White Campuses*," Race, Gender & Class: Volume 21, Number 3-4, p. 163 (2014) [the authors provide a table of TV revenues from 1996-2013 that adds up to $7.7 billion while stating that this TV figure representes about 80% of the total revenue]; Statistica.com, "*Revenue of the NCAA from Television Broadcast Payments and Licensing Rights from 2010 to 2024*," Statistica, Website: http://statista.com (2020) (providing figures from 2014-2019).

[175] Ryan, Chris, "*What are the Odds of a High School Football Player Reaching the NFL?*," New Jersey High School Sports (August 24, 2019).

PAVONE & FONNER, LLP

years,[176] only a tiny sliver of this black labor talent pool ever actually reaches the point of monetizing their talent.

1063. Thus, in an overall amateur and professional football business that has generated several hundred billion in revenue,[177] the share that ends up in black pockets is flatly kneecapped at the collegiate level.

1064. Then, as (bad) luck would have it – not discriminatory intent, as in other industries detailed herein – the money that *is* made is distributed in a most brutally capitalistic fashion to only the most extremely talented of the already very talented, at the professional level, where the vast bulk of the total pool of money is made.

1065. Whereas professionals of much-varying skill can still make a living, the professional football industry treats talented black labor to the harshest aspects of American capitalism, with the unpaid collegiate aspect of the business (the only caveat being the opportunity for a free college education) existing somewhere in the neighborhood of sharecropper math.

1066. Professional football, while being as good as it gets in terms of compensatory non-discrimination in American business markets, unfortunately happens to be one of most unforgiving, winner-take-all national industries.

1067. This is not so different from other American industries that end up being dominated by a very small number of individuals (in some cases, literally one individual, for example, Rockefeller or the other "robber barons" or steel magnates of the 19th century).[178]

---

[176] Ninomiya, K., "*How Long Is the Average Career of an NFL Player?*" Career Trend, Website: careertrend.com (October 31, 2018).

[177] Eckstein, J., "*How the NFL Makes Money*," Investopedia, Website: Investopedia.com (August 24, 2019) (noting that NFL had made around $14B/yr in recent years; rough estimate of total revenue over last 40 years: several hundred billion).

[178] Interestingly, such aspiration for market dominance did not always turn out to be a rational business decision.  When John Rockefeller's Standard Oil company was

PAVONE & FONNER, LLP

1068. Apart from the inequity of collegiate sports, it is just a little bit unfortunate that wealth generated from a disproportionately talented black labor pool is then disproportionately concentrated in the winner-take-all arena of sports at the professional level.

1069. Regardless, given that African Americans compose about half, or perhaps more-than-half, of the labor pool for lucrative collegiate sports such as football and basketball, using simple metrics from the law firm business model (where the market value of the asset is divided into 1/3 labor value, 1/3 overhead and 1/3 owner capture), African American sports labor, representing half of that 1/3 labor force, has generated a kind of credit toward the white university industries they served in a figure of about $2.5B.

**F.  A Legacy of Never Getting Compensated**

1070. Throughout American colonial history, through the formation of the United States, to the modern age of mass incarceration (with the exception of modern day pro sports), the above summary touches the surface of a long campaign in which African Americans have been traditionally exploited for labor, either through slavery or its 13th Amendment exceptions, have been exploited for their medical value, or have been exploited in amateur sports for their fan value.

1071. Invariably, white interest groups captured the vast majority of all pecuniary benefits derived directly and llegally from exploiting black labor. Alternatively, in the examples of black prison labor, white industries have captured significant state or federal tax dollars to the point today where California state incarceration is a $13.4B business, 7% of the entire state's budget, and generates

broken up pursuant to the Sherman Anti-Trust Act in 1911, the resulting constellation of new entrant companies into the field made Rockefeller many times richer because of his collection of royalties for the accumulated, and then disseiminated, technology he owned.

PAVONE & FONNER, LLP

revenue for white businesses in the amount of approximately $80,000 per inmate per year.

1072. These estimates and figures are preliminary, but the labor value alone from the 240-year run of slavery, brought to current numbers, is in the trillions of dollars. Other industries have earned billions of dollars for white-dominated enterprises, while giving the black labor force either nothing, next-to-nothing, or a combination of nothing/next-to-nothing while also treating them to a litany of physical consequences and disabilities as a result of a veritable menu of torts and crimes.

### 1. Estimate of Uncompensated Torts under Then-Existing Legal Standards.

1073. There has been a laudable academic effort to quantify the amount of economic benefit, and the debt incurred, attributable to exploited black labor, generated as a product of American colonial and post-revolution slavery,[179] as well as various other labor-cost calculations.

1074. It is beyond this complaint, but would not be particularly hard to extrapolate, the less lucrative economic exploitation of sharecropping and prison labor, including its several historical varieties, up to and including modern prison labor based on the societal wrong of mass incarceration fueled by racial discrimination in law enforcement.

1075. Prison labor has historically been paid at zero or in the modern era at just a few pennies per hour; its market value was worth approximately $46/hr in the slave

---

[179] *See* Craemer, Thomas, "*Estimating Slavery Reparations: Present Value Comparisons of Historical Multigenerational Reparations Policies*," Social Science Quarterly, Vol. 96, Volume 96, Number 2, (2015), p. 640, *citing* America, Richard F., The Wealth of Races. The Present Value of Benefits from Past Injustices, pp. 107-123, Greenwood Press, Westport, CT (1990), *in turn citing* Marketti, James, "*Estimated Present Value of Income Diverted During Slavery*," *and* Ransom, R, "Who Pays for Slavery?", pp. 31-54, *and* Neal, Larry, "*A Calculation and Comparison of the Current Benefits of Slavery and an Analysis of Who Benefits*," pp. 91-105.

era, so it is safely worth at least $23/hr in the modern retail products and services industries.[180]

1076. These enterprises include food service, information technology, garment industries and at least 97 other American businesses whose bottom line is bolstered by prison labor.[181]

1077. As above, a non-economist attorney can generate an estimate of the market value of the contribution of black labor to collegiate sports; it is assumed that economists can, and may have, quantified that contribution with more precision.

1078. However, no one in Plaintiffs' research has attempted to account for the monetary value of the countless torts inflicted on African-Americans during these historical exercises in racial labor exploitation or outright racial animus, either by then-existing legal standards or by current legal standards.

1079. By then-existing legal standards, for the period of 250 years of colonial and incorporated slavery (1619-1865), in which slave owners committed all manner of tortious indignities on African Americans, workplace malpractice and a litany of

[180] Plaintiffs report that while they were incarcerated, they were paid for their work between 3 cents to $1 per hour. They were typically required to work 35-40 hours per week. Craemer estimates that production of cotton per slave had an average market value of $92,000 annually in 2016 dollars (or about $46/hr); however, slaves were worked longer and harder than modern conditions permit. Cotton businesses may also have been more comparatively profitable than today's more competitive business environment. Even if today's prison labor only produces output at half the market value, that is still a business that produces 230x as much hourly market value as its nominal hourly labor cost. For comparison sake, many law firms make a healthy living out of billing associates out at just 3x their internal hourly cost.

[181] Smith, Earl, "*Incarceration, A Tool for Racial Segregation and Labor Exploitation*," Race, Gender & Class, Vol. 15, No. 1-2, p. 88 (2008) [naming corporations such as McDonald's, Microsoft, Dell and Victoria's Secret]. Certain Plaintiffs worked for the "California Prison Industry Authority," (CALPIA) which according to Wikipedia, manages over 100 manufacturing, service, and consumable industries. According to CALPIA's 2020 fiscal plan, it is a $260M/year business and makes a $60M/year profit.

crimes, up to and including murder, slaves were considered to be chattel property and could be legally mistreated, mutilated or eliminated in the slave owner's discretion.

1080. Similarly, under then-existing legal standards for African American prison labor, including pretextual convictions to supply farming labor, related convict leasing, and chain gangs (for public projects)[182], this abuse was legal under then-existing "Black Codes" and similar oppressive state legislation, which was invalidated after the Civil War, although myriad forms of it were continued for at least another 100 years.

1081. Similarly, under collegiate sports laws and rules, amateur athletes were not, and are not, legally entitled to market value compensation for their participation in this enterprise.

1082. Consequently, under then-existing legal standards, there is no obvious or legally enforceable debt that has been created, even if one were to set aside statute of limitations and laches types problems.

### 2. Estimate of Uncompensated Torts under Modern Legal Standards.

1083. Applying *modern* legal standards to the torts committed then, the equation results in numbers that break calculators. Under modern legal standards, the going rate for a single day's (uncontroversial) forced labor is about $170/day; it increases to about $500/day when other torts such as rape or other sexual abuse occurs, in the roughly-comparable human trafficking context.[183]

---

[182] Delaney, R., "*American History, Race, and Prison,*" Vera Institute for Justice, Reimagining Prison, Internet Web Report, Website: www.vera.com (2016).

[183] *Carazani v. Zegarra*, 972 F.Supp.2d 1, 25 (D.C.Cir. 2013), *citing Doe v. Howard*, Case No. 1:11-cv-1105, 2012 U.S. Dist.Lexis 125414, 2012 WL 3834867, *6 (E.D. Va. 2012) *and Mazengo v. Mzengi,* Case No. 07-756 (RMC)(AK), 2007 U.S. Dist.Lexis 99377, 2007 WL 8026882, *7 (D.D.C. 2007)*; Gurung v. Malhotra*, 851 F.Supp.2d 583, 590 (S.D.N.Y. 2012).

PAVONE & FONNER, LLP

1084. American institutional slavery was categorically more brutal[184] and more morally repugnant.[185]  Calculation of any exact tortious figure is impossible without compiling a meticulous inventory of the torts/crimes, their individual severity, and then a quantification of a corresponding legal value, all of which is perceived as impossible by a lack of historical detail.

1085. Rather, for purposes of discussion, Plaintiffs take the $500/day figure as a ballpark starting point estimate for the tort value of the institution of slavery to account for everything that aggravating human trafficking victims suffer, while "calling it even" between two competing tort assets each pool possesses.

1086. To assign $500/day per slave assumes that each one was subjected to aggravated treatment every single day.  This seems unrealistic.  However, aggravating human traffic victims probably suffer the caliber of indignities that slavery sometimes entailed with less frequency: lynchings, other murders, vicious beatings, horrific whippings, breeding operations, and other profoundly severe torts inflicted on American slaves that go beyond even aggravated forms of human trafficking.

1087. This figure also does not account for the reality that slavery as an institution was from birth to death, as opposed to the comparatively short installments

---

[184] Stevenson, Bryan, "*Slavery Gave America a Fear of Black People…*," New York Times, 1619 Project (August 14, 2019); Rothbard, Murray, "*The Brutality of Slavery*," Mises Daily Articles (November 14, 2018); *see* Poland, "*Affairs in the Late Insurrectionary States*," U.S. Senate Report by the Joint Select Committee on the Condition of Affairs in the Late Insurrectionary States (February 19, 1872).

Under the theoretical assumption that slave plantations were operated strictly as a business enterprise, with preservation of slave capital viewed as as important as the preservation of any other capital asset (rather than as a forum for owners to engage in their worst appetites), a $1,000/day figure is also plausible.

[185] Conrad, A. and Meyer, J. "*The Economics of Slavery in the Ante Bellum South*," Journal of Political Economy, Vol. 66, No. 2, pp. 96, 100, 110 (1958) (analyzing slave breeding).

of human trafficking incidents.  This places the institution and its daily compensatory figure in a different category of wrong.

1088. That said, without trying to adjudicate the comparative misery between aggravated human trafficking and the daily reality of slavery, it is in Plaintiffs' thinking that a safe figure is the $500/day aggravated number across the board.

1089. An annual figure for one slave at $500/day returns a $182,000/yr tort claim.[186]  The average lifespan was about 35.[187]  Consequently, if an average slave worked 25 years,[188] he would accrue a roughly $4.5M claim under today's tort standards, distinct from the labor he or she produced.[189]

---

[186] "*The Origins and Nature of New World Slavery*," Digital History, Website: www.digitalhistory.uh.edu (2016) (claiming typical 6-day work weeks for slaves).

[187] *See* Conrad, A. and Meyer, J. "*The Economics of Slavery in the Ante Bellum South*," Journal of Political Economy, Vol. 66, No. 2, pp. 98-99 (1958).

[188] Conrad, A. and Meyer, J. "*The Economics of Slavery in the Ante Bellum South*," Journal of Political Economy, Vol. 66, No. 2, p. 101 (1958).

[189] This figure might be profoundly too low, when measured against contemporary methods and personal injury outcomes.  For example, in a supply-and-demand market analysis of people that would actually accept $4.5M in exchange for a lifetime of slavery, there may be near zero demand for such a trade-off. *See* Partnoy, F., "*The Cost of a Human Life, Statistically Speaking*," The Globalist, Website: www.theglobalist.com (2012); White, J, "*Victim Compensation and Wrongful Death Damages*," Cornell University Law School Social Science Dept., Website: www.cornell.edu (May, 2017).  A lifetime of slavery might be valued at a figure far higher than straight death, as is often the case with torts with debilitating permanent consequences.

The figures also do not assign a value to the full lifespan of 35 years, instead erring on the side of conservatism by not including the first ten years of childhood, even though a case can be made for compensation in this interval. *See* Cabrera, Gertrudis, "*A Day in the Life of an Enslaved Child*," Franklin Elementary School white paper (discussing and collecting relevant authorities, 2004).

Again, Plaintiffs are not seeking to have a moral debate.  The figures presented here represent a rough starting ballpark estimate, for purposes of beginning to understand the economic value of the magnitude of torts America inflicted on African

1090. If an average population of 2M slaves accrued a $182K/yr debt in current figures, the average annual tort credit accrued by the slaves is roughly equal to $364B/yr.

1091. If that figure is then multiplied across the 240-year slave window, you get $87T, or roughly 4 years of current, annual US GDP output.

1092. Craemer regards his analysis as most relevant in the 89 years from incorporation of the United States, from 1776 to 1865.  This changes the math in two ways, from a lower 89-year window but to a higher number of slaves, about $3M on average in this window.  Adjusting for these variables, a baseline tort calculation is around $49T, or 2.5 years of annual US GDP.

**Estimate of Slave Tort Debt**

| No | Tort Debt Per Diem | Days of Slavery/ Year | Tort Claim/ Year/ Slave | Slavery Range | Years of Slavery | No of Slaves (Avg) | Total Debt ($) |
|---|---|---|---|---|---|---|---|
| 1 | $170 | 365 | 62K | 1619-1861 | 240 | 2M | 30T |
| 2 | $500 | 365 | 182K | 1619-1861 | 240 | 2M | 87T |
| 3 | $1000 | 365 | 365K | 1619-1861 | 240 | 2M | 175T |
| 4 | $170 | 365 | 62K | 1776-1865 | 89 | 3M | 17T |
| 5 | $500 | 365 | 182K | 1776-1865 | 89 | 3M | 49T |
| 6 | $1000 | 365 | 365K | 1776-1865 | 89 | 3M | 97T |

1093. Because the instution of American slavery was so lengthy, more than half of this country's *de facto* existence, the magnitude of tort damage inflicted seems beyond realistic boundaries in terms of actual repayment.

1094. But this financial reality obviously cannot be an excuse to thereby ignore it.  Rather, the US government, the States and all associated systems, institutions and

Americans in service to the institution of slavery, for the purpose of contextualizing the 2004-2014 cocci decisions.

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

benefactors must keep this debt in mind in all going forward decisions made about African Americans (especially ones that propose further impediments), namely, that one of the pillars of this country's main economic pillars was supported by committing a mind-bending quantum of torts and crimes against African Americans.

1095. It inflicted an amount of pain and misery on African Americans such that it generated a debt of a magnitude that, for all its accrued economic power and wealth today, is beyond this country's ability to pay.  We are, in some ways, analogous to a person living in a beautiful renovated home, but whose original foundation was partially built with money we stole at slavepoint.

1096. As can be seen from the 2020 Covid-19 pandemic, widespread misery begins in just a few months of wealth loss and failure of income, from the loss of income for just 15% of the US population.

1097. It is difficult to conceive of a wealth transfer equivalent to 2.5 years of *total* domestic US output.  Realistically, the $49T 89-year post-declaration institution of slavery (at $500/day), along tort metrics, seems like a magnitude of social (or monetary) debt that simply cannot be repaid.

1098. Certain advocates have suggested advantageous policy changes, in a kind of system-wide adjustment to American business practices founded in something akin to affirmative action.[190]  This is surely more palatable than trying to rustle up $49T (about $1M per black person alive today), but given the resistance to just affirmative action in education, it would doubtless be a sustained political challenge.

1099. For purposes here, without bickering over the numbers or the assumptions that support them, a rough calculation of the tort debt from slavery according to modern legal and moral standards is of a magnitude that makes the Plaintiffs' human rights claim in this case utterly nominal, and one without the

---

[190]  Peck, Emily, "*Why the U.S. Needs to do Reparations Now*," Huffington Post (June 8, 2020), citing Baradaran, Mehrsa, "The Color of Money," Bellnap Press (2019).

complicating factor of a statute of limitations that, for slaves, expired about 150 years ago.[191]

1100. While the government is technically obligated to resist all claims against it, it seems almost a bit politically repugnant for California to so vigorously resist current legitimate disease claims made by African Americans at the hands of her institutions, given the quantum of torts US and California institutions have historically inflicted on African Americans and to date have completely avoided.

1101. An enslavement practice of this length and magnitude, founded in the basic paradigm of direct and intentional racial exploitation, does not just evaporate upon a single proclamation, even one 150 years old.  Such attitudes have been baked into the American foundation, as much as reverence for the Founding Fathers exists as an integral pillar of our national identity.

1102. American law enforcement still carries out its functions armed with these attitudes and practices.  Its history suggests that the logical way to look at the problem is to see if there is some reason for the practice to be excepted from the default American paradigm, which is racial exploitation, rather than subject to the exceedingly-difficult exercise of having to find it in overt, discriminatory acts or statements, which are treated today as a a career-ending taboo – and thus almost never actually verbalized – for any California state official who might be tempted to state his or her true motivations.

1103. Seeing no reason for exception, Plaintiffs respectfully assert that they have a valid case for intentional discrimination amounting to violation of international human rights.

### 3.   The Modern California Law Enforcement System Revives Convict Leasing.

1104. As detailed above, for 250 years, US law enforcement imposed a system of race-based enslavement so that white farming industries could profit off black labor

---

[191] Notably, Plaintiffs believe that claims were attempted but did not succeed.

in an amount, in today's dollars, roughly equal to $33T in profit, after accounting for the slave upkeep expenses.

1105. To do so, using the $500/day figure assigned for aggravated human trafficking today, it inflicted roughly $87T worth of torts, $49T of which occurred in post-declaration America when the slave business was in full swing.

1106. The period after 1865, to 1965, was better but not good. White exploitation existed in numerous industries, and across many sectors. The pecuniary benefit is harder to measure. Cultural attitudes and white supremacy in the South only receded somewhat as a result of the Civil War, and efforts to reinstitute slavery, or as close a system of institutional slavery as the resisting political forces could finagle, still reigned in many states.

1107. Various effects resulted: convict leasing is the most clearly exploitative example, but there was more subtle exploitation across housing, lending, construction and other industries.

1108. Historically, prison labor exploitation has always been on the table in America. It was common practice in Europe during the 1700's, it occurred throughout various states in the 1700-1800's, its ill effects became apparent around the turn of the century when it became disfavored for about 75 years, and then it re-emerged in the 1980's during mass incarceration.[192]

1109. Its resurgence in the 1980's was founded in "tough on crime" laws that put Mario Cuomo, the liberal father of New York's current liberal governor Andrew Cuomo, in an unfortunate political dilemma.

1110. In 1973, Cuomo's predecessor, conservative New York Governor Nelson Rockefeller, gave a State-of-the-State address demanding that every drug dealer be punished with a mandatory sentence of life without parole.[193]

[192] "*The Birth of Private Prisons*," Google History (website: www.sites.googles.com, 2020)

[193] Schlosser, E., "*The Prison-Industrial Complex*," The Atlantic (Dec. 1998).

1111. In 1981, unable to repeal the resulting Rockefeller drug laws, Mario settled on building more prisons. However, New York voters rejected a $500 million bond issue for new construction. Mario searched for an alternate source of financing. He settled on the state's Urban Development Corporation. This corporate entity was a viable alternative for financing Mario's prison construction idea because it had the authority to issue bonds without winning approval from the voters.[194]

1112. At the time, Robert Gangi, the head of the New York Correctional Association, observed that Mario was building altogether the wrong sort of housing for the poor, the sort of cynical note that would come to haunt an entire country later drenched in the ill-effects of mass incarceration.[195]

1113. And so, with the advent of New York's urban housing entity, a 40-year construction and prison blitz began in which involved corporations became behemoths and shareholder darlings, across New York and in California, exploiting prisoners and their labor for billions of dollars.

1114. To take one example, the Geo Group's stock price graph shows a steady increase from 1998-present:

_____

[194] Schlosser, E., "*The Prison-Industrial Complex*," The Atlantic (Dec. 1998).
[195] Schlosser, E., "*The Prison-Industrial Complex*," The Atlantic (Dec. 1998).

PAVONE & FONNER, LLP



1115. In 2001, Geo reported income of $562M and profit of $19M. At the time, it had operations in six California facilities.

1116. By 2017, its revenues had quadrupled to $2.26B and it made 21x more profit (at $419M), reporting 3% of that as originating in California.

1117. As for its appetite for exploitation, a Washington lawsuit by that State's attorney general claimed that, "Defendant pays detainees $1 per day," but in some cases, "do not pay detainees $1 per day, and instead 'pay' detainees in snack food such as chicken, potato chips, soda, and/or candy."[196]

1118. Meanwhile, it charges client states about $140/day to house each inmate.[197]

1119. Consequently, while Geo represents an example of prisoner exploitation, it is the combination of the era of excessive law enforcement through mass

---

[196] "*AG Ferguson Sues Operator of the Northwest Detention Center for Wage Violations*," Washington State Attorney General's Office, Press Release (Sep. 27, 2017); *State of Washington v. The Geo Group*, Pierce County Sup. Ct. Case No. 17-2-11422-2, Dkt. 1 (Wash. 2017).

[197] Jarvie, J., "*Private Prison Companies Likely to be Big Beneficiaries of Trump's Plan to Detain More Border-Crossers*," Los Angeles Times (Feb. 14, 2017).

PAVONE & FONNER, LLP

incarceration directed primarily at African Americans, in conjunction with the general practice of prisoner exploitation by companies like Geo, that creates a distinct similarity between today's landscape and the taboo practice of 19ᵗʰ century convict leasing, all of which point to a systemic practice of racial exploitation that explains the 2004-2014 cocci decisions.

1120. By 2019, as the grim realities became apparent in applying a capitalist profit model to a public function (as is often the case), the private prison industry lost its footing, at least in California.[198]

1121. California cut its ties with Geo.  During the shutdown of McFarland state prison, Governor Newsom, referring to Geo Group, commented that "[p]rivate, for-profit prisons have been used for many years to help the state overcome prison overcrowding challenges, but it is time to end our reliance on them."[199]

1122. When Geo tried to score one last batch of federal contracts for California-based (federal) immigration centers, critics were not so charitable.  One California legislator characterized its efforts as unsurprising from "a collapsing industry in its final death throes – a desperate attempt to buy another year of survival to pad its corporate profits, despite a nation's rejection for profiteering on the backs of humans/treating people as commodities."[200]

---

[198] In another exploitative installment, products inside prison are today sold to prisoners at above open market prices through CDCR commissary businesses, so that the prisoners' meager wages are gobbled up just for inmates to have basic items.  The prisoners only earn a tiny fraction in labor to pay for these products.  It can require several weeks for a prisoner to save up enough money just to buy a can of shaving cream.

[199] Strode, Maureen, "*CDCR Stops Housing Inmates at 700-bed Private Prison in McFarland*," Website: bakersfield.com (September 27, 2019).

[200] Walker, Taylor, "*Threatened With $4 Billion In Lost Profit, GEO Group Sues California Over Private Prison Ban*," Website: witnessla.com (January 3, 2020).

#### 4. Contrast to State Employee Compensation

1123. Today, California law enforcement still harbors essentially the same mindset of yesteryear. The California law enforcement system rationalizes forcible slave labor on the premise that work is productive in terms of helping inmates develop occupational skill and acquire job training.

1124. However, the vast majority of the work appears to be menial in nature. Plaintiff Chris Garner worked as a textile cutter; Michael Manning was a porter, cleaning and sweeping the prison grounds; Charles Robertson was on landscaping detail and worked in the kitchen; Aaron Tillis worked on building clean-up. "It's very cheap slave labor," according to Tillis' perception of the situation.

1125. CALPIA, the main in-house corporate prison labor entity is, amazingly, run as a business as a matter of statute.[201] Discussions in 2012 about some of its programs reveals a focused mentality on the bottom-line economics of the prison's various businesses and its relationship to law enforcement pensions.[202]

1126. In one discussion, exploitation of inmate labor is earning the State $114/hr.[203] Nowhere is anyone internalizing the fact that the larger enterprise is little different than yesteryear's convict leasing (except that the business is in-house), in terms of paying African Americans pennies for their work.

---

[201] *See* California Penal Code, §§ 2800-2801. CDCR apparently treated the code's requirement for prisoners to "earn funds" as a directive to do as much as possible to minimize those funds.

[202] State of California, Department of Corrections and Rehabilitation, "*Prison Industry Board Public Meeting*," pp. 12-13, 18-20, 46 (November 16, 2012) ("CALPIA Hearing"). The greed in California state pensions is simply beyond this comment. *See* Fellner, R., "*Nearly 900% Increase in CalPERS Benefits Dwarfs Economic Growth, Taxpayers' Ability to Pay*," Transparent California, Website: blog.transparentcalifornia.com (July 12, 2018).

[203] CALPIA Hearing, p. 27.

PAVONE & FONNER, LLP

1127. Indeed, advocates at one point tried to distance CALPIA's programs from a related program, called Inmate Day Labor, that was directly analogized to convict leasing.[204]

1128. While some of the occupational benefits were touted as reducing recidivism,[205] and this is good, it does not change the fact that African Americans are mostly being exploited as Tillis' "cheap slave labor," to mostly turn a profit, that mostly benefits white law enforcement.

1129. Over-arrest, over-sentence and over-incarceration are thus translated through a weighted salary system that inflates the compensation of law enforcement officers beyond their market value.

1130. Some police officers earn over $700,000 annually. A pool of over 100 of them earn over $350,000 annually. The average beat cop makes over $125,000 annually. Corrections officers earn a median salary of about $90,000, whereas the salaries in private industries for comparable work is one third to one half of this.

1131. Indeed, over the last decade to present, the employees of the State of California seem to have been engaged in an orgaistic excess of spending on themselves, with multiple firefighters making over $1.5M/year,[206] a janitor making $270K/yr,[207] and certain employees getting $50,000/yr medical care plans.[208]

---

[204] CALPIA Hearing, pp. 37-38, 48-49.

[205] CALPIA Hearing, p. 67.

[206] Fellner, R., "*How One LA firefighter Turned a $90,000 Salary into $1.6 Million over the Past Four Years*," Transparent California, Website: blog.transparentcalifornia.com (May 14, 2018); *see also* Firefighter Todd D. Milan, reported on the same site as earning $1.9M in total compensation for 2016).

[207] Fellner, R., "*BART Janitor Quadruples $57,000 Salary to Over $270,000 with OT, Benefits*," Transparent California, Website: blog.transparentcalifornia.com (November 1, 2016);

[208] Fellner, R. "*Wildly Inflated Health Costs Are Costing California Taxpayers $3.3 Billion Annually*," Transparent California, Website: blog.transparentcalifornia.com (September 9, 2019);

1132. To view it another way, judges of the federal district courts of the United States, an appointment that requires a level of personal and professional achievement and lifestyle discipline sufficient to withstand scrutiny *by the United States Senate*, earned a 2019 salary in the reported amount of $210K.  With benefits, this figure is perhaps $250K.

1133. In comparison, 5,811 California firefighters made more than this; 1,500 police officers made more; 1,600 professors, 40 teachers, and of course, Liang Zhao Zhang of San Francisco BART, who in 2015 cleaned his way as a California janitor to a higher income than every federal judge in the country, with enough left over to buy himself a pretty nice motorcycle.

1134. The CDCR leadership managing the epidemic, the key actors that infected the 63 plaintiffs before the Court, and about 3,000 other African American inmates by ignoring it, were compensated quite well for their astute leadership services:

| Name | Highest Salary |
| --- | --- |
| Beard, Jeffrey | $337,413.95 |
| Brazelton, Paul | $242,889.14 |
| Cate, Matthew | $215,471.25 |
| Hartley, James | $130,582.65 |
| Hubbard, Suzan | $62,296.00 |
| Hysen, Deborah | $226,746.26 |
| Igbinosa, Felix | $500,016.78 |
| Kelso, Clark | $408,326.85 |
| Kernan, Scott | $373,436.59 |
| Meyer, Chris | $194,560.54 |
| Rothchild, Tanya | $210,320.81 |
| Schwarzenegger, Arnold | 0[209] |
| Winslow, Dwight | $106,119.64 |

[209] Governor Schwarzenegger declined his salary as governor.

| Yates, James | $35,992.07[210] |
|---|---|

1135. Meanwhile, Plaintiffs were paid between 8 cents and a dollar for years of menial work that bolster these healthy figures.

1136. This disparity is particularly draconian because this disparate compensation system reflects, creates and incentivizes a retail law enforcement and corrections labor force that is barely any more skilled than the prisoners themselves.

1137. Simultaneously it extracts excessive salaries, double-paid careers, and obscene pensions while African Americans get pennies by the hour supporting this compensation system with slave labor.  The African Americans are often physically depleted by the point of being released as a result.

1138. California has been incarcerating a population of people that shouldn't be incarcerated, or shouldn't be incarcerated for as long as they are, and then exploiting them in a racial caste system in order to bolster the quality of life for their predominantly white jailers and other government benefactors.

1139. Law enforcement in particular collects tax revenue from an illusion of danger that often does not exist and employs a massive, highly-paid force that is financially incentivized to feed the system with new inventory.

1140. In the case of Plaintiffs especially, it topped it off with a final dose of incurable infection from special soil diseases in Central Valley prisons for the co-conspirator medical system, itself ratcheting up treatment per prisoner to $28,000 per person, whereas in the real world, health care only costs $5,000 per person.

1141. In some cases, Plaintiffs were turned into over a million dollars' worth of medical exploitation value.

1142. The situation is not quite as dire as yesteryear's Mississippi millionaires, but is still jarring in its magnitude, profitability and generosity for white-dominated industries, including state government, at the expense of African Americans.

---

[210] This is a strictly pension figure.

PAVONE & FONNER, LLP

1143. This is especially so for Plaintiffs, who won the trifecta of exploitation: excessive sentences for one racist reason or another, forced labor exploitation, and then medical exploitation from valley fever, to the treatment tune of at least $127M plus the lucrative in-house medical employment, with Dr. Igbinosa as the star of that show.

1144. Many plaintiffs report that transfer to PVSP or ASP was a form of extra-judicial punishment, with the known likely result being contraction of coccidioidomycosis, inflicted for perceived transgressions committed during incarceration.

1145. Of course, if this is proven true, racial discrimination, exploitation and violation of human rights is practically foregone, thereby satisfying on a systemic basis the element of discrimination inherent in Plaintiffs' claim for violation of human rights during the cocci epidemic.

1146. During the epidemic, key California officials effectively admitted they had no ambition to engage in preventative health care, another fact suggesting a systematic preference for racial exploitation.

1147. Dr. Felix Igbinosa was the chief physician at Pleasant Valley State Prison during the epidemic. He elected to limit his perceived function to treating the resulting infections rather than making any preventative effort, thus playing a pivotal role in the mass infection of the African American prison population.[211]

1148. For his good work maximizing medical revenue at Plaintiffs' expense, Dr. Igbinosa now makes over $500,000/year as an employee of the Receiver's office.

1149. The California Health Care Receiver did not actually possess authority to implement preventative health care, amazingly revealing that despite all these fat salaries, no one in the system was actually tasked with the job of preventing the epidemic in question.

1150. Preventing the epidemic was contrary to all of their economic interests.

[211] *See Moreno v. Yates*, Civ.No. 1:07-cv-01404-DGC, Dkt. 30-5, ¶¶ 21-26 (E.D.Cal.2007).

1151. The Receiver office's unlawful attempts were sporadic, ineffectual and counterproductive. It sputtered to help in 2007, then did nothing for six years, then renewed an effort in 2013 without successfully compelling CDCR to comply. Evacuation orders ended up being court ordered at the behest of the prisoners through PLO.

1152. The corrections leadership were relieved of any civil liability by being able to blame the Receiver's office for the many years of omitted directions, by treating that office as the health authority that failed to tell CDCR exactly what to do, on a qualified immunity basis.[212]

1153. In the wake of that decision, Plaintiffs sued the Receiver's office, which has claimed "judicial immunity" for its role in the epidemic,[213] sort of like Arjen Rudd in Lethal Weapon 2 claimed "diplomatic immunity."[214]

### G. Allegations against Individual Defendants

#### 1. Jeffrey Beard

1154. Defendant Jeffrey Beard is the former Secretary of the CDCR. He succeeded Defendant Matthew Cate in that position on or about December 27, 2012.

1155. As Secretary, Mr. Beard was responsible for all policies and practices of the organization as well as for its operational decisions and has direct supervisory authority over every CDCR employee.[215]

1156. On information and belief, as of December 2012, Beard knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and

---

[212] *See Abukar v. Kelso*, Case No. 4:20-0731, Dkt. 1:71 (N.D.Cal. 2020).

[213] *Abukar v. Kelso*, Case No. 4:20-0731, Dkt. 15 (N.D.Cal. 2020) (dismissed temporarily to complete administrative exhaustion).

[214] *"Lethal Weapon 2,"* Silver Pictures, Director Richard Donner, Wikipedia the Online Encyclopedia, Website: https://en.wikipedia.org (1989)

[215] CDCR Operations Manual, p. 1.

PAVONE & FONNER, LLP

other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.  Indeed, in light of the history of the Valley Fever epidemic, which had been ongoing at the hyper-endemic prisons for 6 years by the time he took office, the approximately $23 million in annual expenses paid by the CDCR for medical care for the victims, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

1157. The sources of his knowledge about the Valley Fever problem include the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians; the August 3, 2006 Valley Fever policy; the August 24, 2006 memorandum from John Dovey discussing inmate removal due to Valley Fever; a widely-circulated email on September 14, 2006 authored by Teri McDonald; the October 27, 2006 memo regarding the number of inmates adversely affected by VF in the state prisons written by Karen Durst; an August 24, 2006 memo regarding the ordered movement of certain susceptible inmates out of the hyperendemic area; an undated (around 2007) memo by Dr. Demetri Papaagianis entitled "Coccidioidomycosis in California Correctional State Institutions"; a January 10, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; a January 16, 2007 memorandum concerning VF identification and reporting

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

authored by Dr. Winslow; the January 11, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property; a May 21, 2007 memorandum written by Dr. Winslow addressing the VF problem; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California" report, which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; a July 20, 2007 memo written by Deborah Hysen discussing environmental mitigation and the costs and requirements associated with that program; an August 8, 2013 Valley Fever mitigation plan; a September 9, 2007 news article in the Sacramento Bee, which reflected Igbinosa's statement that experts had made it clear that it was not safe to engage in additional construction at PVSP; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations; a February 18, 2009 request by Dr. Winslow to reconsider the ground cover issue in light of unabating incidence rates; and the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the October 2012 CCHCS report which assembled various reports and studies to comprehensively publicize the extent of the Valley Fever problems; the June, 2013 detailed federal court order specifically directed at PVSP and ASP; and numerous other lawsuits, media reports and other public outlets from 2009 onward in which inmates of every color and creed filed suit, and protested in the media, their contraction of the disease at Avenal and PVSP, the two prisons with the highest incidence of the disease in California.

1158. Secretary Beard also had a great deal of documentary information available to him from other sources in the intervening years after 2007 and before his accession to his post in 2012, discussed herein.

1159. However, despite the multiple sources of information that he received, Beard, as head of CDCR, continued to implement the 2007 exclusion policy, which left hundreds of high-risk inmates exposed to the disease. He failed to act to otherwise protect inmates from this risk other than to acquiesce to the federal court's June, 2013 Order to evacuate additional inmates from two of the hyper-endemic prisons.

1160. Defendant Beard further failed to act to implement the recommended remedial measures. Beard knew at that time of his tenure as Secretary that remedial measures existed that could have been implemented at reasonable cost and that implementing those measures would reduce the risk to inmates who were housed at PVSP or any of the hyper-endemic prisons, as these recommendations had been formally tendered years before, but he continued the State's policy of inaction.

1161. Mr. Beard personally participated in the failure to protect inmates from Valley Fever despite having the ability and responsibility as Secretary of CDCR to protect inmates from the unacceptable risks. Beard personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of infection, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at any of the hyper-endemic prisons from December 27, 2012 onward, including Plaintiffs as specified below.

1162. Defendant Beard is liable to all Plaintiffs that contracted the disease in 2013 or later, as he took office in late 2012 and, as Secretary, became responsible for inmate well-being at all prisons as of this date.

## 2. Estate of Paul Brazelton

1163. Defendant Paul Brazelton was the warden of PVSP from early 2012 to the Fall of 2013. On information and belief, he occupied positions of authority at

PVSP in the five years before his tenure as warden and has worked at the prison since 1994.

1164. As Warden, Mr. Brazelton was responsible for the policies and practices of the prison as well as for its operational decisions, and had direct authority over every CDCR employee at PVSP.

1165. On information and belief, by 2007, Brazelton knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of his position and responsibilities at the time of his knowledge, including his own eyewitness observation of the problem occurring in front of him, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

1166. The sources of his knowledge about the Valley Fever problem include the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians; the August 3, 2006 Valley Fever policy; the August 24, 2006 memorandum from John Dovey discussing inmate removal due to Valley Fever; a widely-circulated email on September 14, 2006 authored by Teri McDonald; the October 27, 2006 memo regarding the number of inmates adversely

affected by VF in the state prisons written by Karen Durst; an August 24, 2006 memo regarding the ordered movement of certain susceptible inmates out of the hyperendemic area; an undated (around 2007) memo by Dr. Demetri Papaagianis entitled "Coccidioidomycosis in California Correctional State Institutions"; a January 10, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; a January 16, 2007 memorandum concerning VF identification and reporting authored by Dr. Winslow; the January 11, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property; a May 21, 2007 memorandum written by Dr. Winslow addressing the VF problem; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California" report, which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; a July 20, 2007 memo written by Deborah Hysen discussing environmental mitigation and the costs and requirements associated with that program; an August 8, 2013 Valley Fever mitigation plan; a September 9, 2007 news article in the Sacramento Bee, which reflected Igbinosa's statement that experts had made it clear that it was not safe to engage in additional construction at PVSP; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations; a February 18, 2009 request by Dr. Winslow to reconsider the ground cover issue in light of unabating incidence rates; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley

Fever"; and various lawsuits against Warden Brazelton personally from 2012 onward in which inmates described themselves as at high risk of infection due to risk factors.

1167. Defendant Brazelton at a minimum received copies of the Fresno Grand Jury reports of 2012-2013, and almost certainly received or was aware of the previous annual versions of those reports.

1168. However, despite the multiple sources of information that he received, Warden Brazelton, as head of PVSP, not only acquiesced to the state's narrow 2007 exclusion policy, which left hundreds of inmates exposed to the disease, he refused to exercise his independent authority as warden to transfer inmates out for their safety. Based on his independent power to transfer inmates out of PVSP, or prevent their transfer to PVSP, based on their safety needs pursuant to Title 15, sections 3379(a)(4), 3379(a)(9), 3379(a)(9)(F)(2) and 3379(a)(9)(G)(1), and to adopt policies and procedures to avoid threats to inmate safety, and his failure to implement such policies, he exhibited deliberate indifference to inmates' risk of contraction of Valley Fever.

1169. On information and belief, Warden Brazelton was aware of the Valley Fever problem before he assumed the position of Warden in 2012 and he was also aware that certain groups were at higher risk of suffering more serious complications from it.

1170. Warden Brazelton had the ability to exclude inmates as they were transferred to his facility and he personally participated in the decision not to do so during his tenure as Warden from 2012-2013.

1171. During this time, Warden Brazelton was named as a defendant in lawsuits by inmates, served on him personally, which further informed him that certain groups of inmates were especially susceptible Valley Fever.  Yet, he continued to fail to intervene to protect inmates from the known greater risk of infection.

1172. Warden Brazelton also personally participated in the decision not to install ground cover or other remedial measures at the prison.  Throughout his tenure as

PAVONE & FONNER, LLP

PVSP warden, he could have installed ground cover and implemented remedial measures.  He was given this power pursuant to the November 20, 2007 policy memorandum.  However, like his predecessor he failed to implement remedial measures which could have reduced the risk to all inmates at PVSP including those who contracted the disease after his tenure as warden.

1173.  Warden Brazelton personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at PVSP from early 2012 onward, including Plaintiffs as specified below.

1174.  Defendant Brazelton is liable to all Plaintiffs named herein that contracted Valley Fever at PVSP during his tenure from 2012-2013.

### 3.  Matthew Cate

1175.  Defendant Matthew Cate was the Secretary of the CDCR from 2008-2012.

1176.  As Secretary, Mr. Cate was responsible for the policies and practices of the organization as well as for its operational decisions, and had direct authority over every CDCR employee.[216]

1177.  On information and belief, as of 2007, Mr. Cate knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil

---

[216] CDCR Operations Manual, p. 1.

stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.  Indeed, in light of Cate's position and responsibilities at the time of his knowledge, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

1178. The sources of his knowledge about the Valley Fever problem include the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians; the August 3, 2006 Valley Fever policy; the August 24, 2006 memorandum from John Dovey discussing inmate removal due to Valley Fever; a widely-circulated email on September 14, 2006 authored by Teri McDonald; the October 27, 2006 memo regarding the number of inmates adversely affected by VF in the state prisons written by Karen Durst; an August 24, 2006 memo regarding the ordered movement of certain susceptible inmates out of the hyperendemic area; an undated (around 2007) memo by Dr. Demetri Papaagianis entitled "Coccidioidomycosis in California Correctional State Institutions"; a January 10, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; a January 16, 2007 memorandum concerning VF identification and reporting authored by Dr. Winslow; the January 11, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property; a May 21, 2007 memorandum written by Dr. Winslow addressing the VF problem; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California" report, which suggested the

diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; a July 20, 2007 memo written by Deborah Hysen discussing environmental mitigation and the costs and requirements associated with that program; an August 8, 2013 Valley Fever mitigation plan; a September 9, 2007 news article in the Sacramento Bee, which reflected Igbinosa's statement that experts had made it clear that it was not safe to engage in additional construction at PVSP; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations; a February 18, 2009 request by Dr. Winslow to reconsider the ground cover issue in light of unabating incidence rates; and the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley Fever."

1179. However, despite the multiple sources of information that he received, Mr. Cate, as head of CDCR, adopted and implemented only the narrow 2007 exclusion policy, which left hundreds of inmates exposed to the disease. He failed to act to otherwise protect inmates from this risk.

1180. Defendant Cate further failed to act to implement recommended remedial measures. Cate knew at that time of his tenure as Secretary that remedial measures existed that could have been implemented at reasonable cost and that implementing those measures would reduce the risk to inmates who were housed at PVSP or any of the hyper-endemic prisons.

1181. However, Mr. Cate declined to adopt this recommendation and disregarded the CDH's recommendation on ground cover and other remedial measures.

1182. Then-Governor Schwarzenegger, on information and belief with Cate's input, approval and consent, submitted state budgets that included line items for construction, renovation, and improvement projects at the hyper-endemic prisons,

specifically including extensive work at PVSP, but failed to request funds for the remedial measures recommended to address the Valley Fever epidemic.

1183. Cate was aware of the Valley Fever problem by his receipt at the time of the 2008-2009 Grand Jury report, among other things; he was also aware that certain groups were at higher risk of suffering more serious complications from it.

1184. On information and belief, Mr. Cate personally participated in the decision not to exclude inmates from hyper-endemic prisons throughout his tenure from 2008-2012. Indeed, during this interval, Mr. Cate had the authority as head of the Department of Adult Institutions to have excluded from hyper-endemic prisons all inmates at risk of infection, including the identified higher-risk groups. During this time, Mr. Cate was named as a defendant in numerous lawsuits by inmates in which they protested their contraction of Valley Fever.

1185. Cate, who had the authority and means to have ordered ground cover to be installed at the hyper-endemic prisons throughout his tenure, on information and belief, also personally participated in the decisions and policy not to install ground cover and other remedial measures that would have protected all inmates.

1186. Cate personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at any of the hyper-endemic prisons from 2008 onward, including Plaintiffs as specified below.

1187. Former Secretary Cate is liable to all named Plaintiffs that contracted the disease based on the inadequate policies and practices of the State from 2006 forward. All plaintiffs name Defendant Cate as a defendant.

### 4. James Hartley

1188. Defendant James Hartley was the warden of Avenal State Prison (ASP) from 2007 through part of 2014.

PAVONE & FONNER, LLP

1189. As Warden, Mr. Hartley was responsible for the policies and practices of the prison as well as for its operational decisions, and had direct authority over every employee at ASP.

1190. On information and belief, as of 2007, he knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.  Indeed, in light of his position and responsibilities at the time of his knowledge, including his own eyewitness observation of the mass contraction occurring at his place of work, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

1191. The sources of his knowledge about the Valley Fever problem include the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians; the August 3, 2006 Valley Fever policy; the August 24, 2006 memorandum from John Dovey discussing inmate removal due to Valley Fever; a widely-circulated email on September 14, 2006 authored by Teri McDonald; the October 27, 2006 memo regarding the number of inmates adversely affected by VF in the state prisons written by Karen Durst; an August 24, 2006 memo regarding the ordered movement of certain susceptible inmates out of the

PAVONE & FONNER, LLP

hyperendemic area; an undated (around 2007) memo by Dr. Demetri Papaagianis entitled "Coccidioidomycosis in California Correctional State Institutions"; a January 10, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; a January 16, 2007 memorandum concerning VF identification and reporting authored by Dr. Winslow; the January 11, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property; a May 21, 2007 memorandum written by Dr. Winslow addressing the VF problem; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California" report, which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; a July 20, 2007 memo written by Deborah Hysen discussing environmental mitigation and the costs and requirements associated with that program; an August 8, 2013 Valley Fever mitigation plan; a September 9, 2007 news article in the Sacramento Bee, which reflected Igbinosa's statement that experts had made it clear that it was not safe to engage in additional construction at PVSP; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations; a February 18, 2009 request by Dr. Winslow to reconsider the ground cover issue in light of unabating incidence rates; and the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the October 2012 CCHCS report which assembled various reports and studies to comprehensively publicize the extent of the Valley Fever problems; the June, 2013 detailed federal court order specifically directed at PVSP and ASP; numerous other

lawsuits, media reports and other public outlets from 2009 onward in which inmates of every color and creed filed suit, and protested in the media, their contraction of the disease at Avenal and PVSP, the two prisons with the highest incidence of the disease in California; and various lawsuits against Warden Hartley personally from 2007 onward in which inmates of every color and creed legitimately described themselves as at excessive risk of contraction.

1192. However, despite the multiple sources of information that he received, Warden Hartley, as head of ASP, not only acquiesced to the state's narrow 2007 exclusion policy, which left hundreds of inmates to catch the disease, he refused to exercise his independent authority as warden to transfer inmates for their safety. Based on his independent power to transfer inmates out of ASP, or prevent their transfer to ASP, based on their safety needs pursuant to Title 15, sections 3379(a)(4), 3379(a)(9), 3379(a)(9)(F)(2) and 3379(a)(9)(G)(1) and to adopt policies and procedures to avoid threats to inmate safety, and given Warden Hartley's failure to implement such policies, he failed to protect inmates, whether "high risk" or not, from the risk of contraction of Valley Fever.

1193. Consequently, Warden Hartley was aware of the Valley Fever problem in general when he assumed the position of Warden in 2007 and he was also aware that certain groups were at higher risk of suffering more serious complications from it.

1194. Warden Hartley personally participated in decisions not to exclude the vast majority of inmates. He oversaw and implemented the narrow exclusion policy for approximately 7 years, during his tenure from 2007-2014.

1195. Warden Hartley also personally participated in the decisions not to install ground cover and implement other remedial measures that would have protected inmates.

1196. Warden Hartley personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of

PAVONE & FONNER, LLP

contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at Avenal State Prison from 2007 onward, including Plaintiffs as specified below.

1197. Defendant Hartley is liable to all Plaintiffs named herein that contracted Valley Fever at ASP during his tenure from approximately 2004-2014.

### 5. Susan L. Hubbard

1198. Defendant Dr. Susan L. Hubbard is the former director of the Division of Adult Institutions, having served in that capacity at least through 2007 – 2009.

1199. As the former director of DAI, Dr. Hubbard was responsible for the policies and practices of the organization as well as for its operational decisions, and had authority over all employees in this Division.

1200. On information and belief, by 2007, Hubbard knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of Hubbard's position and responsibilities at the time of his knowledge, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that she would not have had this knowledge.

PAVONE & FONNER, LLP

1201. The sources of her knowledge about the Valley Fever problem include the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians; the August 3, 2006 Valley Fever policy; the August 24, 2006 memorandum from John Dovey discussing inmate removal due to Valley Fever; a widely-circulated email on September 14, 2006 authored by Teri McDonald; the October 27, 2006 memo regarding the number of inmates adversely affected by VF in the state prisons written by Karen Durst; an August 24, 2006 memo regarding the ordered movement of certain susceptible inmates out of the hyperendemic area; an undated (around 2007) memo by Dr. Demetri Papaagianis entitled "Coccidioidomycosis in California Correctional State Institutions"; a January 10, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; a January 16, 2007 memorandum concerning VF identification and reporting authored by Dr. Winslow; the January 11, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property; a May 21, 2007 memorandum written by Dr. Winslow addressing the VF problem; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California" report, which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; a July 20, 2007 memo written by Deborah Hysen discussing environmental mitigation and the costs and requirements associated with that program; an August 8, 2013 Valley Fever mitigation plan; a September 9, 2007 news article in the Sacramento Bee, which reflected Igbinosa's statement that experts had made it clear that it was not safe to engage in additional construction at PVSP; the November 11, 2007 policy memorandum she personally authored, which

PAVONE & FONNER, LLP

discusses the various CDHS recommendations from the January 2007 memorandum; a February 18, 2009 request by Dr. Winslow to reconsider the ground cover issue in light of unabating incidence rates; and the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the October 2012 CCHCS report which assembled various reports and studies to comprehensively publicize the extent of the Valley Fever problems; the June, 2013 detailed federal court order specifically directed at PVSP and ASP; and numerous other lawsuits, media reports and other public outlets from 2009 onward in which inmates of every color and creed filed suit, and protested in the media, their contraction of the disease at Avenal and PVSP, the two prisons with the highest incidence of the disease in California.

1202. However, despite her central role in the activity and recommendations that led up to her policy memorandum, Hubbard adopted the narrow 2007 exclusion policy, which left hundreds of susceptible inmates exposed to the disease at the hyper-endemic prisons.  She failed to act to otherwise protect all inmates from this risk.

1203. When, in 2007, Hubbard co-authored the CDCR policy, which on information and belief was approved by Defendant Kernan as head of DAI, that policy identified only a limited set of immune-compromised persons as high-risk.  Hubbard knowingly disregarded all of the reports, medical literature, findings, studies and general knowledge about Valley Fever showing that other groups were at high risk, such as African-Americans (Filipino, Latinos, Indians, and other races), and persons over 55 years old, and also ignored the incidence rates, which revealed that all inmates were facing an unacceptable risk of contraction.

1204. Dr. Hubbard was aware of the Valley Fever epidemic from the January, 2007 CDHS report, among other documents noted herein; she was aware that certain groups were at higher risk of suffering more serious complications from it; she

PAVONE & FONNER, LLP

personally participated in the decision not to protect these high risk inmates in the 2007 policy, which ignored the CDHS recommendation to exclude high-risk inmates; she also personally participated in the decision not to install ground cover, which would have protected all inmates, by not expressly mandating this protocol in the 2007 policy memorandum she authored.

1205. Hubbard's failure to establish in 2007 a policy excluding all inmates, or at least all higher-risk inmates, from the hyper-endemic prisons caused all such inmates subsequently housed at those facilities to face an increased risk of infection.

1206. Hubbard personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by all inmates who contracted Valley Fever at any of the hyper-endemic prisons from 2007 onward, including Plaintiffs as specified below.

1207. Ms. Hubbard is liable to all named Plaintiffs that contracted the disease based on the inadequate policies and practices of the State from 2007 forward. All plaintiffs name Defendant Hubbard.

### 6. Deborah Hysen

1208. Defendant Deborah Hysen is the current Director of CDCR's Office of Facility Planning, Construction and Management (FPCM). Hysen was the Chief Deputy Secretary of FPCM from at least 2006 until 2014.

1209. Hysen, first as the Deputy Chief and then as the senior executive of Facilities and Construction for CDCR, had the ability to act no later than 2007 to implement the recommended remedial measures at PVSP, ASP, or any of the hyper-endemic prisons but did not do so until 2013, when minimal soil-stabilization was finally attempted.

1210. On information and belief, by no later than 2007, Hysen knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the

serious risks to inmates from the disease; (2) the elevated risk of infection faced by all inmates, including ones in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever to all inmates, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.

1211. The sources of her knowledge about the Valley Fever problem include the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians; the August 3, 2006 Valley Fever policy; the August 24, 2006 memorandum from John Dovey discussing inmate removal due to Valley Fever; a widely-circulated email on September 14, 2006 authored by Teri McDonald; the October 27, 2006 memo regarding the number of inmates adversely affected by VF in the state prisons written by Karen Durst; an August 24, 2006 memo regarding the ordered movement of certain susceptible inmates out of the hyperendemic area; an undated (around 2007) memo by Dr. Demetri Papaagianis entitled "Coccidioidomycosis in California Correctional State Institutions"; a January 10, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; a January 16, 2007 memorandum concerning VF identification and reporting authored by Dr. Winslow; the January 11, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

prison property; a May 21, 2007 memorandum written by Dr. Winslow addressing the VF problem; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California" report, which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; a July 20, 2007 memo written by Deborah Hysen discussing environmental mitigation and the costs and requirements associated with that program; an August 8, 2013 Valley Fever mitigation plan; a September 9, 2007 news article in the Sacramento Bee, which reflected Igbinosa's statement that experts had made it clear that it was not safe to engage in additional construction at PVSP; the November 11, 2007 policy memorandum authored by Dr. Winslow and Dr. Hubbard, which discusses the various CDHS recommendations from the January 2007 memorandum; a February 18, 2009 request by Dr. Winslow to reconsider the ground cover issue in light of unabating incidence rates; and the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the October 2012 CCHCS report which assembled various reports and studies to comprehensively publicize the extent of the Valley Fever problems; the June, 2013 detailed federal court order specifically directed at PVSP and ASP; and numerous other lawsuits, media reports and other public outlets from 2009 onward in which inmates of every color and creed filed suit, and protested in the media, their contraction of the disease at Avenal and PVSP, the two prisons with the highest incidence of the disease in California.

1212. Defendant Hysen announced publically that her department was designing and implementing a full suite of remedial measures to protect all inmates at the hyper-endemic prisons including PVSP and ASP from infection by Valley Fever. Hysen was quoted in public news media regarding both the Valley Fever epidemic and her department's plans to address it. Hysen, however, along with Defendant Meyer,

failed to implement any of those remedial measures until at least 2013, after multiple court orders, and has yet to complete implementing the recommended measures.

1213. Hysen, knowing that all inmates were at elevated risk of infection, and that certain identified groups were at even more extraordinary risk, declined to implement the recommended remedial measures.

1214. Hysen personally participated in the failure to protect all inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at any of the hyper-endemic prisons from 2006 onward, including Plaintiffs as specified below.

1215. Ms. Hysen is liable to all named Plaintiffs that contracted the disease based on the inadequate policies and practices of the State from 2006 forward. All plaintiffs name Defendant Hubbard.

### 7. Dr. Felix Igbinosa

1216. Defendant Dr. Felix Igbinosa is the former medical director of Pleasant Valley State Prison and served in that capacity from approximately 2005-2013.

1217. On information and belief, as of 2005, Dr. Igbinosa knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever for all inmates, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or

PAVONE & FONNER, LLP

went out under adverse conditions.  Indeed, in light of Dr. Igbinosa's position and responsibilities at the time of his knowledge, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

1218.  In and before November 2007, but after the prevalence of Valley Fever was well known to officials of the CDCR, including Defendant Igbinosa, inmates were issued protective masks from medical staff at PVSP upon request.  However, by in or about late 2007, Defendant Igbinosa implemented a policy restricting the issuance of masks to a limited group of inmates, and denying masks, even to inmates who requested one, to inmates who did not meet certain criteria.  Thereafter, inmates who did not fit the stated criteria were not able to obtain protective masks, even for use in windy and dusty outdoor conditions at PVSP.   Dr. Igbinosa's decisions with respect to issuing masks reveals that he had the authority to take precautionary measures to prevent disease, although he did not exercise it for the benefit of inmates.

1219.  Defendant Igbinosa implemented this narrow policy for the issuance of protective masks even though the policy was in deliberate disregard of the significant medical needs of the ethnic, racial and immune-compromised groups identified by the California Department of Public Health and Safety as Valley Fever at-risk groups particularly susceptible to contracting coccidioidomycosis or suffering more severe consequences from it.

1220.  Upon information and belief, Defendant Igbinosa made weekly visits to PVSP's various facilities, as required by California Code of Regulations, Title 15, section 3384, and noticed the vast areas of open dirt, blowing dust, and inmates walking around without protective masks, including the named PVSP Plaintiffs.  Yet, Defendant Igbinosa deliberately failed to modify the PVSP policy denying protective masks to inmates upon request unless they satisfied the limited policy criteria, and he generally took no steps or measures to reduce what was a prison wide epidemic at

PVSP, as the person entrusted to look after the medical health and welfare of PVSP's entire population.

1221. Defendant Igbinosa was charged by Defendant Winslow on or about January 16, 2007, with "ensuring health care staff [at PVSP] are trained in and comply with DCHCS [Division of Correctional Health Care Services] policy for identifying, confirming, and reporting symptomatic or disseminated Coccidioidomycosis and be provided the reporting forms." [D. Winslow, January 16, 2007, Memo to, *inter alia*, Chief Medical Officers, entitled "Coccidioidomycosis (Valley Fever) Identification and Reporting," at p. 2.] Winslow further stated that the training was "mandatory," and required that the training "must be conducted by Thursday, February 16, 2007." [*Ibid*.] On information and belief, Defendant Igbinosa failed to adequately train PVSP staff in a timely fashion as directed.

1222. Defendant Igbinosa was personally involved in denying relief to inmates, including Plaintiffs, seeking relief (e.g., transfer out of PVSP) for Valley Fever. As the Medical Director at PVSP, he was the official who generally decided the Second Level Response to appeals from inmates, including ones relating to Valley Fever, and in particular requests for transfer out of PVSP, which were authorized to be granted pursuant to Title 15, section 3084.1(a), which permits relief for any condition that has a "material, adverse effect upon [an inmate's] health, safety or well being." As he had the general right to decide second level 602's, which had the effect of giving him authority over every inmate at PVSP (separate and apart from the authority granted to him as chief medical officer or any regulatory authority), he effectively had the right to set preventative or precautionary policies at PVSP to protect inmate health, safety and well-being, including but not limited to, excluding incoming inmates (in general based on the extraordinary risk at that prison or for particular susceptibility), excluding existing inmates generally or at least ones with particular susceptibility to Valley Fever, or taking other measures such as environmental remediation.

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

1223. The sources of Dr. Igbinosa's knowledge about the Valley Fever problem include the substance of the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians; the August 3, 2006 Valley Fever policy; the August 24, 2006 memorandum from John Dovey discussing inmate removal due to Valley Fever; a widely-circulated email on September 14, 2006 authored by Teri McDonald; the October 27, 2006 memo regarding the number of inmates adversely affected by VF in the state prisons written by Karen Durst; an August 24, 2006 memo regarding the ordered movement of certain susceptible inmates out of the hyperendemic area; an undated (around 2007) memo by Dr. Demetri Papaagianis entitled "Coccidioidomycosis in California Correctional State Institutions"; a January 10, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; a January 16, 2007 memorandum concerning VF identification and reporting authored by Dr. Winslow; the January 11, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property; a May 21, 2007 memorandum written by Dr. Winslow addressing the VF problem; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California" report, which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; a July 20, 2007 memo written by Deborah Hysen discussing environmental mitigation and the costs and requirements associated with that program; an August 8, 2013 Valley Fever mitigation plan; a September 9, 2007 news article in the Sacramento Bee, which reflected Igbinosa's statement that experts had made it clear that it was not safe to engage in additional construction at PVSP; the November 11, 2007 policy memorandum authored by Susan

Hubbard, which discussed the various CDHS recommendations; and over a dozen lawsuits against Dr. Igbinosa personally from 2007 forward in which inmates of every creed and color, high risk or not, documented their contraction of the disease and sought formal legal relief; a February 18, 2009 request by Dr. Winslow to reconsider the ground cover issue in light of unabating incidence rates; and the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley Fever."

1224. However, despite the multiple sources of information he received, Dr. Igbinosa, as head medical officer of PVSP, not only acquiesced to the state's narrow 2007 exclusion policy, which left hundreds of inmates of every type to catch the disease, he refused to exercise his authority as chief medical officer to transfer one or all for their safety. Based on his power to act to protect inmate health, safety and well-being, to adopt policies and procedures to avoid threats to inmate health, safety and well-being, and given Dr. Igbinosa's failure to implement such policies, he failed to protect all inmates from the risk of contraction of Valley Fever.

1225. Based on his independent power as PVSP's chief medical officer to act within the scope of his job to protect inmate health, safety and well-being, to adopt policies and procedures to avoid threats to inmate health, safety and well-being, and given Dr. Igbinosa's failure to implement such policies, he failed to protect all inmates from the risk of contraction of Valley Fever.

1226. Dr. Igbinosa further failed to act to implement recommended remedial measures. One of the recommendations that would have protected all inmates was for prison officials to implement ground cover throughout the affected institutions.

1227. Dr. Igbinosa knew at that time that remedial measures existed that could have been implemented at reasonable cost, and that implementing those measures would reduce the risk to inmates who were housed at PVSP or any of the hyper-

endemic prisons, as reflected for example by the observation that such cover had reduced the incidence rates from one-half to two-thirds when employed at a military base.

1228. Consequently, Dr. Igbinosa was acutely aware of the Valley Fever problem as witnessed before him at the institution where he practiced, and he was aware that certain groups were more susceptible to contracting it, and some were at higher risk of suffering serious complications from it.

1229. Dr. Igbinosa knew that hundreds of inmates were continuing to contract Valley Fever before and after the 2007 policy, and he had an obligation as a medical officer entrusted to him to minimize health threats.  He observed the 2007 policy to not work to stem the tide of Valley Fever infections, yet he failed to protest the policy, seek to change it, recommend the expansion of the exclusion criteria.  He also had an obligation to affirmatively refuse to obey it on the grounds that it was unconstitutional and constituted a derogation of his duties to adhere to it; he could not blindly follow an illegal policy that caused harm to inmates in contravention of his responsibilities as chief medical office of the prison.

1230. Dr. Igbinosa personally participated in decisions not to exclude these high-risk inmates despite his power and right, as chief medical officer over many years at PVSP, to take a variety of steps to ameliorate the problem.  During this long interval, Dr. Igbinosa was named as a defendant in numerous lawsuits by inmates in which they protested their contraction of Valley Fever.  Yet, he continued to neither intervene, nor review, nor reconsider the narrow exclusion policy, nor implement his own policies or protective measurs to minimize the health threat, such as by transfer inmates out under his various sources of authority as CMO of PVSP or under California regulations.  It did not require a medical license for him to have this authority, nor did he need to treat VF patients to take the precautionary steps noted herein; he had been entrusted by CDCR to maximize inmate health and health safety and this empowered him to take

PAVONE & FONNER, LLP

precautions, without regard (and excluding herein) any separate conduct he may have engaged in by actually treating patients once they did contract the disease.

1231. Dr. Igbinosa acquiesced in the failure to protect inmates from Valley Fever despite having the ability and responsibility as Chief Medical Officer of PVSP for many years to protect all inmates from the unacceptable Valley Fever risks that they faced.  Yet, he did not adopt protective or precautionary policy to interrupt the mass contraction of the disease suffered before his very eyes.  He did not authorize transfers on request, though it was within his power as chief medical officer.  And he failed to take sufficient steps, such as providing masks to all who needed or requested them, to reduce the incidence rate.  Accordingly, given all these facts and factors, he was deliberately indifferent to the health and safety of inmates in relation to the risk of contracting Valley Fever, including Plaintiffs as specified below.

1232. Dr. Igbinosa is named as a defendant with respect to all Plaintiffs that contracted Valley Fever at PVSP during his tenure, which was from approximately 2005-2013.  He is named by all PVSP plaintiffs infected during his tenure.

**8.  Scott Kernan**

1233. From 2007 to an unknown date, Defendant Scott Kernan was the Chief Deputy Secretary of Adult Institutions (DAI) for CDCR.  Before becoming Chief Deputy Secretary he was the Deputy Director and Acting Director of DAI.

1234.  DAI is responsible for the operation of California's adult prisons.

1235. On information and belief, by no later than 2007, Mr. Kernan knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to

PAVONE & FONNER, LLP

address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.  Indeed, in light of Kernan's position and responsibilities at the time of his knowledge, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

1236. The sources of his knowledge about the Valley Fever problem include the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians; the August 3, 2006 Valley Fever policy; the August 24, 2006 memorandum from John Dovey discussing inmate removal due to Valley Fever; a widely-circulated email on September 14, 2006 authored by Teri McDonald; the October 27, 2006 memo regarding the number of inmates adversely affected by VF in the state prisons written by Karen Durst; an August 24, 2006 memo regarding the ordered movement of certain susceptible inmates out of the hyperendemic area; an undated (around 2007) memo by Dr. Demetri Papaagianis entitled "Coccidioidomycosis in California Correctional State Institutions"; a January 10, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; a January 16, 2007 memorandum concerning VF identification and reporting authored by Dr. Winslow; the January 11, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property; a May 21, 2007 memorandum written by Dr. Winslow addressing the VF problem; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in

Prisons in the Hyperendemic Areas of California" report, which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; a July 20, 2007 memo written by Deborah Hysen discussing environmental mitigation and the costs and requirements associated with that program; an August 8, 2013 Valley Fever mitigation plan; a September 9, 2007 news article in the Sacramento Bee, which reflected Igbinosa's statement that experts had made it clear that it was not safe to engage in additional construction at PVSP; the November 11, 2007 policy memorandum authored by Drs. Winslow and Hubbard, which discusses the various CDHS recommendations from the January 2007 memorandum; a February 18, 2009 request by Dr. Winslow to reconsider the ground cover issue in light of unabating incidence rates; and the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the October 2012 CCHCS report which assembled various reports and studies to comprehensively publicize the extent of the Valley Fever problems; the June, 2013 detailed federal court order specifically directed at PVSP and ASP; and numerous other lawsuits, media reports and other public outlets from 2009 onward in which inmates of every color and creed filed suit, and protested in the media, their contraction of the disease at Avenal and PVSP, the two prisons with the highest incidence of the disease in California.

1237. Kernan was aware of the Valley Fever problem in general and was aware that certain groups were at greater risk of suffering more serious complications from the disease.

1238. Kernan was the direct superior of Hubbard, co-author of the 2007 policy, and knew that that policy was deficient, but Kernan failed to act to protect susceptible inmates from the known risk, and all inmates for that matter.

PAVONE & FONNER, LLP

1239. Kernan further failed to act to require the hyper-endemic prisons to implement recommended remedial measures. Kernan merely suggested wardens consider such steps, even though he knew at that time that the remedial measures could have been implemented at reasonable cost, that implementing those measures would reduce the risk to all inmates who were housed at PVSP or any of the hyper-endemic prisons, and that making those remedial measures optional for the prisons was unlikely to result in their implementation.

1240. When, in 2007, Kernan approved implementation of the policy to exclude from the hyper-endemic prisons only certain medically immune-compromised persons, he knowingly disregarded reports, medical literature, findings, studies and general knowledge about Valley Fever that all showed categorically that other groups such as African-American, Filipino, Latinos, Indians, and other races, persons over 55 years old, were also at increased risk, and further failed to implement any of the other recommendations to minimize the risks of infection for all inmates.

1241. Kernan personally participated in the decision not to exclude these high risk inmates by virtue of his central oversight role of the 2007 policy, which ignored the CDHS recommendation to exclude high-risk inmates. As Chief Deputy Secretary of DAI, he was in a position to directly influence and possibly dictate the policy governing inmate safety at the prisons. Kernan was listed as a lead official in the policy document itself; it is implausible that he was not directly involved in the policy decisions reflected by the document.

1242. Kernan also personally participated in the decision not to install ground cover, which would have protected all inmates, by not mandating this protocol in the 2007 policy memorandum he directly oversaw.

1243. Kernan therefore personally participated in and acquiesced in the failure to protect inmates from Valley Fever despite having central responsibility as the DAI representative directly overseeing the 2007 policy memorandum authored by Director

Hubbard, and as chief deputy secretary of the branch of CDCR tasked with safety of the operation of the prisons.  Kernan failed to carry out his duty to protect all inmates from the unacceptable Valley Fever risks that they faced.  Kernan was deliberately indifferent to the health and safety of inmates in relation to the risk of contracting Valley Fever, including plaintiffs identified herein.

1244.  Mr. Kernan is named as a defendant with respect to all plaintiffs that contracted Valley Fever as a result of the policies and practices implemented around 2007 and that subsequently governed the issue.  He is identified as a defendant by all plaintiffs.

### 9.  Chris Meyer

1245. Defendant Chris Meyer was the Senior Chief of Facility Planning, Construction and Management from 2009 to 2014.  In that capacity, Meyer had the authority, the ability and the means to have implemented remedial measures to reduce the risk of infection to all of the Plaintiffs, and could have required construction activities at the prisons to be carried out so as to minimize risks of Valley Fever exposure.  He failed to do either.

1246. Mr. Meyer was deliberately indifferent to the increased risk of serious harm to one or more named plaintiffs.

1247. Meyer knew that fully implemented environmental mitigation measures could have reduced the risk to all of the plaintiffs.

1248. On information and belief, by 2007, Meyer knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to all inmates from the disease; (2) the elevated risk of serious complications faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to

PAVONE & FONNER, LLP

address and reduce the risk of Valley Fever for all inmates, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.

1249. The sources of his knowledge about the Valley Fever problem include the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians; the August 3, 2006 Valley Fever policy; the August 24, 2006 memorandum from John Dovey discussing inmate removal due to Valley Fever; a widely-circulated email on September 14, 2006 authored by Teri McDonald; the October 27, 2006 memo regarding the number of inmates adversely affected by VF in the state prisons written by Karen Durst; an August 24, 2006 memo regarding the ordered movement of certain susceptible inmates out of the hyperendemic area; an undated (around 2007) memo by Dr. Demetri Papaagianis entitled "Coccidioidomycosis in California Correctional State Institutions"; a January 10, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; a January 16, 2007 memorandum concerning VF identification and reporting authored by Dr. Winslow; the January 11, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property; a May 21, 2007 memorandum written by Dr. Winslow addressing the VF problem; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California" report, which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; a July 20, 2007 memo written by Deborah

PAVONE & FONNER, LLP

Hysen discussing environmental mitigation and the costs and requirements associated with that program; an August 8, 2013 Valley Fever mitigation plan; a September 9, 2007 news article in the Sacramento Bee, which reflected Igbinosa's statement that experts had made it clear that it was not safe to engage in additional construction at PVSP; the November 11, 2007 policy memorandum authored by Drs. Winslow and Hubbard, which discusses the various CDHS recommendations from the January 2007 memorandum; a February 18, 2009 request by Dr. Winslow to reconsider the ground cover issue in light of unabating incidence rates; and the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the October 2012 CCHCS report which assembled various reports and studies to comprehensively publicize the extent of the Valley Fever problems; the June, 2013 detailed federal court order specifically directed at PVSP and ASP; and numerous other lawsuits, media reports and other public outlets from 2009 onward in which inmates of every color and creed filed suit, and protested in the media, their contraction of the disease at Avenal and PVSP, the two prisons with the highest incidence of the disease in California.

1250. Defendant Meyer supervised Hysen in announcing publically that the department was designing and implementing a full suite of remedial measures to protect all inmates at the hyper-endemic prisons including PVSP and ASP from infection by Valley Fever. Meyer, however, along with Defendant Hysen, decided not to implement any of the announced remedial measures.

1251. Meyer, knowing that all inmates were at elevated risk of infection, declined to implement the recommended remedial measures.

1252. Meyer was deliberately indifferent to the increased risk of serious harm to one or more named plaintiffs.

1253. Meyer personally participated in the failure to reduce the risk to all inmates.

1254. He had the means and the authority to implement those measures yet failed to do so and failed to adequately supervise Hysen who was also responsible for implementing those measures.

1255. Defendant Meyer knew of the increased risks to all inmates housed at the hyper-endemic prisons, and in particular to inmates of the identified higher-risk racial, ethnic and age groups.

1256. Meyer, as the senior executive of Facilities and Construction for CDCR, had the ability to act no later than 2007 to implement the recommended remedial measures at PVSP, ASP, or any of the hyper-endemic prisons but did not do so until 2013, when minimal soil-stabilization was finally attempted.

1257. Meyer had the authority and the means to implement these measures but failed to act to reduce the risks faced by plaintiffs specified below.

1258. Meyer was deliberately indifferent to the increased risk of harm these plaintiffs faced, which caused their constitutional injuries.

1259. Mr. Meyer is liable to all named plaintiffs that contracted the disease based on the inadequate policies and practices of the State from 2007 forward. All plaintiffs name Mr. Meyer.

### 10. Tanya Rothchild

1260. Defendant Tanya Rothchild is the former Chief of CDCR's Classification Services Unit (CSU) in a period of approximately 2008-2012.

1261. Rothchild was aware of the epidemic of Valley Fever because, on information and belief, she received August 3, 2006 and November 20, 2007 memoranda directed at all classification and parole representatives, which discussed the problem and set the exclusion policies.

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

1262. On information and belief, as of the beginning of her tenure at CSU, she knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to all inmates from the disease; (2) the elevated risk of serious consequences faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever for all inmates, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of Ms. Rothchild's position and responsibilities as the head transfer agent, and the policy memoranda that governed her job at the time, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that she would not have had this knowledge.

1263. The sources of her knowledge about the Valley Fever problem include the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians; the August 3, 2006 Valley Fever policy; the August 24, 2006 memorandum from John Dovey discussing inmate removal due to Valley Fever; a widely-circulated email on September 14, 2006 authored by Teri McDonald; the October 27, 2006 memo regarding the number of inmates adversely affected by VF in the state prisons written by Karen Durst; an August 24, 2006 memo regarding the ordered movement of certain susceptible inmates out of the hyperendemic area; an undated (around 2007) memo by Dr. Demetri Papaagianis entitled "Coccidioidomycosis in California Correctional State Institutions"; a January 10, 2007 memorandum written by former warden James Yates, the warden while he

was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; a January 16, 2007 memorandum concerning VF identification and reporting authored by Dr. Winslow; the January 11, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property; a May 21, 2007 memorandum written by Dr. Winslow addressing the VF problem; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California" report, which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; a July 20, 2007 memo written by Deborah Hysen discussing environmental mitigation and the costs and requirements associated with that program; an August 8, 2013 Valley Fever mitigation plan; a September 9, 2007 news article in the Sacramento Bee, which reflected Igbinosa's statement that experts had made it clear that it was not safe to engage in additional construction at PVSP; the November 11, 2007 policy memorandum authored by Drs. Winslow and Hubbard, which discusses the various CDHS recommendations from the January 2007 memorandum; a February 18, 2009 request by Dr. Winslow to reconsider the ground cover issue in light of unabating incidence rates; and the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the October 2012 CCHCS report which assembled various reports and studies to comprehensively publicize the extent of the Valley Fever problems; the June, 2013 detailed federal court order specifically directed at PVSP and ASP; and numerous other lawsuits, media reports and other public outlets from 2009 onward in which inmates of every color and creed

filed suit, and protested in the media, their contraction of the disease at Avenal and PVSP, the two prisons with the highest incidence of the disease in California.

1264. However, despite the multiple sources of information she received, Ms. Rothchild, as head of the CSU, not only acquiesced to the state's narrow 2007 exclusion policy, which left hundreds of inmates to catch the disease, she refused to exercise her independent authority as head of the classification services unit to significantly reduce the risk of Valley Fever. Based on her independent power to classify inmates to not be endorsed to dangerous prisons, based on their safety needs pursuant to Title 15, sections 3375(b) and to adopt policies and procedures to avoid such threats to inmate safety, and given Ms. Rothchild's failure to implement such policies, she failed to protect all inmates from the risk of contraction of Valley Fever.

1265. Ms. Rothchild was aware of the Valley Fever problem in general before she became the head of the CSU and she was also aware that certain groups were at even higher risk of suffering serious complications from it.

1266. Ms. Rothchild personally participated in decisions not to endorse inmates away from dangerous prisons by considering the dangerousness of the prisons with respect to all prisoners, or the high risk vulnerability to Valley Fever of certain inmates during the classification process during her tenure. During this interval, Ms. Rothchild at all times stood in a position of authority over the transfer process, and she had the legal right and power to reverse, adjust or expand the classification criteria so as to protect inmates from the contraction of lifelong diseases.

1267. She created and continued policies that authorized the transfer of high-risk and other inmates to the hyper-endemic prisons, without regard to those inmates' susceptibility to infection and without regard to the dangerousness of the prison she was sending them to.

PAVONE & FONNER, LLP

1268. She further failed to adequately supervise subordinates who were responsible for individual classification and transfer decisions that exposed inmates to the risk of infection by virtue of transfer to hyperendemic prisons.

1269. Consequently, Rothchild had the authority and the means to protect inmates by implementation of transfer policies that minimized exposure to dangerous prisons, but she failed to act to reduce the risks faced by plaintiffs specified below and was therefore deliberately indifferent to the increased risk of harm these plaintiffs faced, which caused their injuries.

1270. Ms. Rothchild is liable to all named plaintiffs that contracted the disease based on the inadequate transfer policies and practices of the State from 2008 forward. All plaintiffs name Rothchild.

**11.  Teresa Schwartz**

1271. Defendant Teresa Schwartz is the former Associate Director of Adult Institutions at CDCR and held this position as of January, 2007 when the recommendations and policy decisions about the Valley Fever epidemic were being made.  Before then, she was a warden at Vacaville in 2004 and an Associate Director of Reception at CDCR from 2005-2006.

1272. On information and belief, by January 2007, Schwartz knew about: (1) the elevated risk of infection faced by all inmates, including ones in various ethnic and racial groups such as African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (2) the need for remedial measures to address and reduce the risk of Valley Fever for all inmates, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.

Indeed, in light of Schwartz's position and responsibilities at the time of her knowledge, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that she would not have this knowledge.

1273. The sources of her knowledge about the Valley Fever problem include the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians; the August 3, 2006 Valley Fever policy; the August 24, 2006 memorandum from John Dovey discussing inmate removal due to Valley Fever; a widely-circulated email on September 14, 2006 authored by Teri McDonald; the October 27, 2006 memo regarding the number of inmates adversely affected by VF in the state prisons written by Karen Durst; an August 24, 2006 memo regarding the ordered movement of certain susceptible inmates out of the hyperendemic area; an undated (around 2007) memo by Dr. Demetri Papaagianis entitled "Coccidioidomycosis in California Correctional State Institutions"; a January 10, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; a January 16, 2007 memorandum concerning VF identification and reporting authored by Dr. Winslow; the January 11, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property; a May 21, 2007 memorandum written by Dr. Winslow addressing the VF problem; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California" report, which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; a July 20, 2007 memo written by Deborah Hysen discussing environmental mitigation and the costs and requirements associated

with that program; an August 8, 2013 Valley Fever mitigation plan; a September 9, 2007 news article in the Sacramento Bee, which reflected Igbinosa's statement that experts had made it clear that it was not safe to engage in additional construction at PVSP; the November 11, 2007 policy memorandum authored by Drs. Winslow and Hubbard, which discusses the various CDHS recommendations from the January 2007 memorandum; a February 18, 2009 request by Dr. Winslow to reconsider the ground cover issue in light of unabating incidence rates; and the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the October 2012 CCHCS report which assembled various reports and studies to comprehensively publicize the extent of the Valley Fever problems; the June, 2013 detailed federal court order specifically directed at PVSP and ASP; and numerous other lawsuits, media reports and other public outlets from 2009 onward in which inmates of every color and creed filed suit, and protested in the media, their contraction of the disease at Avenal and PVSP, the two prisons with the highest incidence of the disease in California.

1274. In Warden Yates' memo, Mr. Yates ignored CDH's request to exclude certain racial groups and instead only commented that "PVSP has identified inmates that are high risk due to pulmonary conditions and heavily immunosuppressed patients." Thus, although Ms. Schwartz was aware that CDH had made recommendations about exclusion for high risk inmates, and on information and belief, possessed its memo about it, she adopted Warden Yates' recommendation to only exclude based on certain medical criteria, which was a much narrower policy, and left hundreds of inmates at PVSP to catch the disease. She thus failed to act to protect all inmates from the disease by adopting the overly narrow policy.

1275. Defendant Schwartz further failed to act to implement recommended remedial measures by CDH. One of the recommendations that would have protected

all inmates was for Schwartz to implement ground cover throughout the prison property, CDH's recommendation number 3 in its January 2007 memorandum, as discussed in Warden Yates' January, 2007 memorandum to her.

1276. She knew at that time that remedial measures existed that could have been implemented at reasonable cost, and that implementing those measures could reduce the risk to inmates who were housed at PVSP or any of the hyper-endemic prisons, as reflected for example by the possible solutions in this memorandum.

1277. However, Ms. Schwartz declined to adopt this recommendation and disregarded the CDH's recommendation on ground cover and remedial measures, for the benefit of all inmates.

1278. Consequently, Schwartz was aware of the Valley Fever problem in general by her receipt of Yates' January 2007 memo; and she was aware that certain groups were at higher risk of suffering more serious complications from it based on its discussion of CDH's underlying recommendations at that time, as well as from other sources.

1279. Ms. Schwartz personally participated in the decision not to exclude high risk inmates by virtue of her decision to ignore the CDHS recommendation to exclude high-risk inmates and instead adopt Yates' recommendation which only addressed high-risk *medical* inmates.  As Associate Director of DAI, she was in a direct position to challenge Mr. Yates' decision that ignored exclusion criteria based on high risk categories tracing to race and national origin, and if she so desired, to overrule his decision in order to carry out her fundamental purpose to guarantee the safety of the prisons and all persons housed and employed within them.

1280. Ms. Schwartz similarly personally participated in the decision not to install ground cover, which would have protected all inmates and staff, by rejecting this option as did Mr. Yates.  As the party that Mr. Yates directly advised with his positions on the CDH recommendations, and as an Associate Director of DAI, she held a

PAVONE & FONNER, LLP

position and title to correct Mr. Yates' assertion that ground cover was not an option. She had the authority to overrule his decision. Yet, she acquiesced to his position in this regard, despite the encouraging statistics reported by CDHS about the effectiveness of ground cover at a military base, and thereby failed to protect all inmates from Valley Fever.

1281. As an Associate Director of the Department of Adult Institutions, she was given the ability, and charged with the responsibility, to protect all inmates from the unacceptable health risks that they faced. However, she did not act to intervene in this life threatening emergency, because, based on all of the above circumstances reflecting her knowledge of the problem, and her lack of action, to assure inmate safety, she was deliberately indifferent to the health and safety of inmates at PVSP, and all hyperendemic prisons, including plaintiffs as specified below.

1282. Ms. Schwartz is named as a defendant with respect to all plaintiffs that contracted Valley Fever as a result of the policies and practices implemented around 2007 and that subsequently governed the issue. She is identified as a defendant by all plaintiffs.

### 12.   Arnold Schwarzenegger

1283. Defendant Arnold Schwarzenegger is the former Governor of California, having acted in that position from 2003 through 2011.

1284. As Governor, Mr. Schwarzenegger was ultimately responsible for the policies and practices of the State of California, and had direct authority over every state employee.

1285. On information and belief, as of 2007, former Governor Schwarzenegger knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as

PAVONE & FONNER, LLP

elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, such as landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.  Indeed, in light of Gov. Schwarzenegger's position and responsibilities at the time of his knowledge, being the state's top leader and person with access to the most information and complete power to advance any safety measure, it is implausible that he would not have had this knowledge.

1286. The sources of his knowledge include, on information and belief, the substantive contents of the following documents: informational briefing from a 2005 prisoners' rights group, Prison Movement, sent directly to Governor Schwarzenegger that he would have received, describing the threat posed by Valley Fever to all inmates, and especially its threat to susceptible groups including African-Americans, Filipinos, elderly inmates and the immune-compromised; the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians; the August 3, 2006 Valley Fever policy; the August 24, 2006 memorandum from John Dovey discussing inmate removal due to Valley Fever; a widely-circulated email on September 14, 2006 authored by Teri McDonald; the October 27, 2006 memo regarding the number of inmates adversely affected by VF in the state prisons written by Karen Durst; an undated (around 2007) memo by Dr. Demetri Papaagianis entitled "Coccidioidomycosis in California Correctional State Institutions"; a January 10, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; a January 16, 2007 memorandum concerning VF identification and reporting authored by

PAVONE & FONNER, LLP

Dr. Winslow; the January 11, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property; a May 21, 2007 memorandum written by Dr. Winslow addressing the VF problem; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California" report, which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; a July 20, 2007 memo written by Deborah Hysen discussing environmental mitigation and the costs and requirements associated with that program; an August 8, 2013 Valley Fever mitigation plan; a September 9, 2007 news article in the Sacramento Bee, which reflected Igbinosa's statement that experts had made it clear that it was not safe to engage in additional construction at PVSP; the November 11, 2007 policy memorandum authored by Drs. Winslow and Hubbard, which discusses the various CDHS recommendations from the January 2007 memorandum; a February 18, 2009 request by Dr. Winslow to reconsider the ground cover issue in light of unabating incidence rates; and the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; and numerous other lawsuits, media reports and other public outlets from 2009 onward in which inmates of every color and creed filed suit, and protested in the media, their contraction of the disease at Avenal and PVSP, the two prisons with the highest incidence of the disease in California.

1287. In addition, Governor Schwarzenegger announced in a 2007 press conference that the State's policy and practice of transferring inmates to serve their sentences in Pleasant Valley State Prison would continue unabated, and that he intended to house even more inmates there in the future by increasing construction pursuant to AB900. He brushed off a specific question about inmate safety due to

Valley Fever when specifically asked about it by a reporter, a question phrased as: "there are a lot of experts who are saying that if you go ahead with the construction program at some of these prisons, the infill construction program, it's going to lead to more inmates and staff members getting sick and possibly dying. Do you need to adjust the infill component of AB 900?" Schwarzenegger responded: "We will go ahead and build."

1288. Thus, Schwarzenegger knew that construction presented particular danger to prisoners by acknowledging the reporter's question with an answer, and by overruling those concerns with an answer that dismissed the risks posed by the reporter's question in light of the desired construction. The risks and danger that Schwarzenegger knew about, and reflected his deliberate indifference to, were not just the general risk of Valley Fever at the prisons but the risk that more construction would increase exposure to Valley Fever – the very opposite of the remedial measures recommended by experts to avoid broadcasting the spores found in the soils in the hyperendemic region.

1289. However, despite the multiple sources of information he received, Gov. Schwarzenegger, as the chief executive of the State of California, adopted or acquiesced to a narrow 2007 exclusion policy, which left hundreds of inmates to catch the disease. He failed to act to otherwise protect inmates from this risk, including by acquiescing to the failure to install ground cover and remedial measures.

1290. Then-governor Schwarzenegger prepared and approved state budgets for 2006 through 2011. These budgets included bold new construction initiatives entailing massive expenditures at California prisons. Knowing that a Valley Fever epidemic was continuing in those prisons, and aware of the risks that construction posed as the very opposite of remedial measures, Schwarzenegger failed to request, budget or appropriate a single dollar for Valley Fever prevention and remedial measures at the prisons and instead pressed forward with construction projects that created an unacceptable risk to

PAVONE & FONNER, LLP

Plaintiffs.  These additional and continuing acts of deliberate indifference further increased the excessive risk faced by these Plaintiffs.

1291.  Thus, Schwarzenegger either personally ratified or personally acquiesced in the failure to protect inmates from Valley Fever despite having the ability and responsibility as Governor to protect state residents, including inmates, from the unacceptable health risks that they faced.  Accordingly, he was deliberately indifferent to the health and safety of inmates in relation to the risk of contracting Valley Fever, including Plaintiffs as specified below.

1292.  Former Governer Schwarzenegger is named as a defendant with respect to all Plaintiffs that contracted Valley Fever as a result of the policies and practices implemented around 2007 and that subsequently governed the issue until 2013.  He is identified by all plaintiffs as a defendant.

### 13. James Tilton

1293.  Defendant James Tilton was the Secretary of the CDCR from approximately 2003 to early, 2008, when he was succeeded by Matthew Cate.

1294.  As Secretary, Mr. Tilton was responsible for the policies and practices of the organization as well as for its operational decisions, and had direct authority over every CDCR employee.[217]

1295.  On information and belief, as of 2007, Mr. Tilton knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil

[217] CDCR Operations Manual, p. 1.

stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of Cate's position and responsibilities at the time of his knowledge, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

1296. The sources of his knowledge about the Valley Fever problem include the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians; the August 3, 2006 Valley Fever policy; the August 24, 2006 memorandum from John Dovey discussing inmate removal due to Valley Fever; a widely-circulated email on September 14, 2006 authored by Teri McDonald; the October 27, 2006 memo regarding the number of inmates adversely affected by VF in the state prisons written by Karen Durst; an August 24, 2006 memo regarding the ordered movement of certain susceptible inmates out of the hyperendemic area; an undated (around 2007) memo by Dr. Demetri Papaagianis entitled "Coccidioidomycosis in California Correctional State Institutions,"; a January 10, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; a January 16, 2007 memorandum concerning VF identification and reporting authored by Dr. Winslow; the January 11, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property; a May 21, 2007 memorandum written by Dr. Winslow addressing the VF problem; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California" report, which suggested the

diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; a July 20, 2007 memo written by Deborah Hysen discussing environmental mitigation and the costs and requirements associated with that program; an August 8, 2013 Valley Fever mitigation plan; a September 9, 2007 news article in the Sacramento Bee, which reflected Igbinosa's statement that experts had made it clear that it was not safe to engage in additional construction at PVSP; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations; a February 18, 2009 request by Dr. Winslow to reconsider the ground cover issue in light of unabating incidence rates; and the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley Fever."

1297. However, despite the multiple sources of information that he received, Mr. Tilton, as head of CDCR, adopted and implemented only the narrow 2007 exclusion policy, which left hundreds of inmates exposed to the disease.  He failed to act to otherwise protect inmates from this risk.

1298. Defendant Tilton further failed to act to implement recommended remedial measures.  Tilton knew at that time of his tenure as Secretary that remedial measures existed that could have been implemented at reasonable cost and that implementing those measures would reduce the risk to inmates who were housed at PVSP or any of the hyper-endemic prisons; in fact, he was specifically advised by Deborah Hysen of them in a memo from her to him, dated July 20, 2007.

1299. However, Mr. Tilton declined to adopt this recommendation and disregarded the CDH's recommendation on ground cover and other remedial measures.

1300. Then-Governor Schwarzenegger, on information and belief with Tilton's input, approval and consent, submitted state budgets that included line items for

PAVONE & FONNER, LLP

construction, renovation, and improvement projects at the hyper-endemic prisons, specifically including extensive work at PVSP, but failed to request funds for the remedial measures recommended to address the Valley Fever epidemic.

1301. On information and belief, Mr. Tilton personally participated in the decision not to exclude inmates from hyper-endemic prisons throughout his tenure from 2003-2008. Indeed, during this interval, Mr. Tilton had the authority as head of the Department of Adult Institutions to have excluded from hyper-endemic prisons all inmates at risk of infection, including the identified higher-risk groups. During this time, Mr. Tilton was named as a defendant in several lawsuits by inmates in which they protested their contraction of Valley Fever.

1302. Tilton, who had the authority and means to have ordered ground cover to be installed at the hyper-endemic prisons throughout his tenure, on information and belief, also personally participated in the decisions and policy not to install ground cover and other remedial measures that would have protected all inmates.

1303. Tilton personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at any of the hyper-endemic prisons based on policies that were adopted from 2006-2008 onward, including Plaintiffs as specified below.

1304. Former Secretary Tilton is liable to all named Plaintiffs that contracted the disease based on the inadequate policies and practices of the State from 2006 forward. All plaintiffs name Defendant Tilton as a defendant.

### 14. Dr. Dwight Winslow

1305. Defendant Dwight Winslow, M.D. was the former Chief Medical Director for CDCR from approximately 2005 through 2014.

PAVONE & FONNER, LLP

1306. On information and belief, Dr. Winslow received the 2004 Kanan Memo and was familiar with its conclusions that inmates of identified ethnic, racial, age, and medical status were at increased risk from Valley Fever.

1307. Dr. Winslow was informed of the epidemic outbreak at PVSP, at least 166 cases in that year alone including 4 deaths, through the California Department of Public Health information memorandum dated January 11, 2007, to "The Record," which was copied to him.   The report noted that this caused the rate at PVSP to be 600 times the rate of Fresno County and 38 times the rate in the City of Coalinga.  The report advised that 37 staff had been infected, among a pool of 1,200.  Along racial lines, 36% were Hispanic, 34% Black, and 41% White with symptoms of varying complexity and severity.  It cited age over 40 as a risk factor, as well as belonging to African-American race, though usually associated with greater rates for disseminated CM.  Facility C had the highest incidence rate, three times more likely than the next highest, and was low in terms of being locked down.  The study recommended that PVSP should consider relocating high risk inmates such as African-Americans or Filipinos and persons who are immunosuppressed.  It suggested increasing ground cover and advising inmates to stay indoors on windy days.

1308. Dr. Winslow knew of the January recommendations because he specifically referenced them when he wrote in the 2007 CDCR policy: "The California Department of Health Services (DHS) worked with California Department of Corrections and Rehabilitation (CDCR) staff in analyzing the problem and in assisting in designing an approach to mitigate the effects of the organism that causes cocci or 'Valley Fever.' "

1309. In June, 2007, a panel of experts, including Dr. Winslow, wrote a report called, "Recommendations for Coccidioidomycosis Mitigation in Prisons in Hyperendemic Areas of California."  It concluded with a series of recommendations including immediate environmental mitigation and relocating high risk inmates.  Thus,

PAVONE & FONNER, LLP

Dr. Winslow was intimately familiar with the importance of excluding susceptible inmates by virtue of his receipt, among other things, of the January, 2007 CDH memo and his authorship of the June, 2007 recommendations.

1310. Yet, when Dr. Winslow formed the 2007 CDCR policy, a copy of which is included herewith as Exhibit A, he decided to divert only a certain narrowly-defined subset of medically-compromised inmates from the hyper-endemic prisons, despite the several recommendations to divert high-risk inmates, and his own recognition that racial factors – Asian, Blacks and Hispanics, notably – increased the susceptibility of these inmates to more serious forms of the disease.

1311. If the 2007 policy required further steps to be adopted as policy, they are not evident from the face of the document, which acts as a mandatory directive to subordinates and sets immediate deadlines for its compliance.  It could possibly have been ratified by Winslow's superiors, but if so, such ratification was not apparent from the policy memorandum itself, and the most superior person it was noted as being copied to, Defendant Scott Kernan, was not a doctor.

1312. Dr. Winslow's 2007 policy continued to allow members of high-risk ethnic and racial groups to be housed at prisons where the risk of infection was known to be greatly increased, along with persons from the general inmate population, who also faced a dramatically increased risk of contraction.  Winslow had the authority and the power as state medical director to issue a definitive policy excluding all inmates from these locations, and insisting on implementation of the recommended environmental remedial measures to further reduce the risk for all inmates.  Yet his policy decision required neither of these critical precautionary steps.  Dr. Winslow did not adopt as policy the vast majority of his own recommendations from the June, 2007 report.

1313. Winslow knew that this policy would expose virtually all inmates including the plaintiffs in this action to an increased risk of harm, and he had the ability

and the means to have reduced or prevented that risk, but chose not to do so. Winslow was deliberately indifferent to inmate medical health and welfare, despite being the person specifically charged with it through his powers are prison medical director.

1314. Although Winslow knew and acknowledged that dust control measures would reduce Plaintiffs' risk of contracting Valley Fever, his 2007 policy suggested only that prisons "consider increasing ground cover throughout their property." Winslow, as co-author of the policy, could have made these measures mandatory and thereby reduced the risk of infection for all inmates, but he chose not to do so.

1315. Dr. Winslow personally participated in the decision not to mandate the installation of ground cover or other dust control measures at the prisons, measures which would have protected all inmates resident at those facilities from 2007 onward. Winslow was deliberately indifferent to the risks of infection faced by prisoners including plaintiffs as specified below.

1316. Furthermore, thereafter, Dr. Winslow only did one thing in the next 6 years in terms of adjusting his overly narrow exclusion policy, upon subsequent information that it had failed to stem the tide of new infection cases. In February 18, 2009, he wrote a memorandum to Dr. Hubbard requesting ground cover be installed in light of the continuing high rates. However, Winslow did not expand the exclusion criteria, despite incidence rates were still at epidemic proportions. At all times, he had the authority and position to adjust his policy to impose exclusion if CDCR would not install ground cover, but he declined to make any changes in spite of continuing evidence of its inefficacy, which further reflects his deliberate indifference to the significantly elevated risk of contraction of Valley Fever faced by the inmate population, including the Plaintiffs named herein.

1317. Former medical director Winslow is named as a defendant with respect to all plaintiffs that contracted Valley Fever as a result of the policies and practices implemented around 2007, his failure to correct them, and that subsequently governed

PAVONE & FONNER, LLP

the issue through at least 2013, when the federal court intervened.  (Today, there are exclusion criteria, but remediation of the grounds is not believed to have occurred in any meaningful way, thus continuing to expose inmates to the disease.)  Dr. Winslow is identified by all plaintiffs as a named defendant and the conduct alleged herein was a matter of his duties emanating as a prison administrator, not the treatment of patients.

### 15.  James A. Yates

1318. Defendant James A. Yates is the former warden of Pleasant Valley State Prison and is believed to have occupied that position from at least 2005 until 2011.

1319. Yates was aware of the epidemic of Valley Fever occurring at his prison throughout this time, or at least since August 2006 – and perhaps as early as 2003 when rates at PVSP started to spike -- because he was copied on and received at the time an August 3, 2006 memorandum directed at all wardens which discussed the problem and which set the original exclusion policy.

1320. Mr. Yates was minially and directly apprised of the need to exclude high risk inmates by virtue of his receipt of a January 12, 2007 California Department of Health memorandum, which recommended that high risk groups, such as African-Americans and Filipinos, be excluded from the area, because he responded to it.

1321. However, in responding to that memo, Mr. Yates ignored the request to exclude certain racial groups and instead only commented that "PVSP has identified inmates that are high risk due to pulmonary conditions and heavily immunosuppressed patients."  He ignored the issue of exclusion by other criteria, such as by racial composition.

1322. Despite knowing the susceptibility of high-risk inmates given his possession of the CDH memorandum, Yates failed to adopt policies or practices to avoid the transfer of inmates to the prison or to protect such inmates located there, during his tenure and afterward, though he had the power to do so pursuant to Title 15,

§ 3375(b), which allowed him to consider risk to an inmate's health, among other considerations, in accepting an inmate for transfer.

1323. Defendant Yates further failed to act to implement recommended remedial measures at PVSP. One of the recommendations that would have protected all such inmates was ground cover throughout the prison property,

1324. Yates failed to implement this recommendation.

1325. Yates was aware of the Valley Fever problem since the start of his tenure at Warden; he was aware that certain groups were at higher risk of suffering more serious complications from it no later than January 2007; he personally participated in the decision not to exclude these high risk inmates; he also personally participated in the decision not to install ground cover, which would have protected all inmates. Taken together, the facts show that he was deliberately indifferent to the health and safety of all inmates at PVSP, including the plaintiffs below.

1326. On information and belief, by 2013, Mr. Yates knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to all inmates from the disease; (2) the elevated risk of serious infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; (3) the significantly elevated risk to any inmate of contraction of this incurable virus given the incidence rates at PVSP; and (4) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, proper ventilation, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went outside under adverse conditions. Indeed, in light of his position and responsibilities at the time of his knowledge, and in

light of the widespread information known throughout the community of individuals who served as prison officials and prison medical staff/officials about the Valley Fever problem, it is impossible that he would not have had this knowledge.

1327. The sources of his knowledge include reports of the greatly increased number of infections at PVSP beginning in 2003; the 2005-2006 intervention of various third parties during the CSH construction; the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians; the August 3, 2006 Valley Fever policy; the August 24, 2006 memorandum from John Dovey discussing inmate removal due to Valley Fever; a widely-circulated email on September 14, 2006 authored by Teri McDonald; the October 27, 2006 memo regarding the number of inmates adversely affected by VF in the state prisons written by Karen Durst; an August 24, 2006 memo regarding the ordered movement of certain susceptible inmates out of the hyperendemic area; an undated (around 2007) memo by Dr. Demetri Papaagianis entitled "Coccidioidomycosis in California Correctional State Institutions,"; a January 10, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; a January 16, 2007 memorandum concerning VF identification and reporting authored by Dr. Winslow; the January 11, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property; a May 21, 2007 memorandum written by Dr. Winslow addressing the VF problem; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California" report, which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; a July 20, 2007 memo written by Deborah Hysen discussing environmental mitigation and the costs and requirements

PAVONE & FONNER, LLP

associated with that program; an August 8, 2013 Valley Fever mitigation plan; a September 9, 2007 news article in the Sacramento Bee, which reflected Igbinosa's statement that experts had made it clear that it was not safe to engage in additional construction at PVSP; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations; a February 18, 2009 request by Dr. Winslow to reconsider the ground cover issue in light of unabating incidence rates; and the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the October 2012 CCHCS report which assembled various reports and studies to comprehensively publicize the extent of the Valley Fever problems; numerous other lawsuits, media reports and other public outlets from 2009 onward in which inmates of every color and creed filed suit, and protested in the media, their contraction of the disease at Avenal and PVSP, the two prisons with the highest incidence of the disease in California; and various lawsuits against Warden Yates personally from 2006 onward in which inmates of every color and creed legitimately described themselves as at excessive risk of contraction.

1328. Despite the multiple sources of information that he received, Warden Yates, as head of PVSP, not only acquiesced to the state's narrow 2007 exclusion policy, which left hundreds of inmates to catch the disease, he refused to exercise his independent authority as warden to transfer inmates for their safety. Based on his independent power to transfer inmates out of ASP, or prevent their transfer to ASP, based on their safety needs pursuant to Title 15, such as sections 3379(a)(4), 3379(a)(9), 3379(a)(9)(F)(2) and 3379(a)(9)(G)(1) or other sections, and to adopt policies and procedures to avoid threats to inmate safety, and given Warden Yates' failure to implement such policies, he failed to protect inmates from the continuing risk of contraction of Valley Fever.

1329. Warden Yates personally participated in continuing decisions not to exclude all inmates, including ones not deemed high risk, even though they are equally likely on average to contract the virus and may have serious consequences from it.

1330. Warden Yates also personally participated in the continuing decisions not to install ground cover or implement other remedial measures that would have protected all inmates.

1331. Warden Yates personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at PVSP, including plaintiffs, during his tenure.

1332. Former PVSP Warden Yates is named as a defendant with respect to all Plaintiffs that contracted Valley Fever at PVSP from 2007 to the present, as his prison policies continue to affect inmates transferred to PVSP even after his departure in or about 2012.

## H. Application to Valley Fever Epidemic

1333. In terms of the decisions made during the 2004-2014 epidemic, even after (predominantly white) prison officials knew that valley fever was having a savage, disproportionate impact on African-Americans, they did not act to safeguard this population.

1334. They resisted making any changes to CDCR policy in terms of moving minorities out of harm's way, until they were compelled to do so by court order.  In this regard, just as an intentional decision to place minorities in harm's way can be seen as driven by racial animus.  An intentional decision not to take protective action (when obligated to do so) in light of serious harm that follows, allows for an inference of racial exploitation, which presupposes racial discrimination within the meaning of the contemporary definition of international human rights.

PAVONE & FONNER, LLP

1335. "As studies repeatedly demonstrate, the cumulative impact of racial disparity is experienced throughout the country's criminal justice system.  Beliefs that the current system is unaffected by centuries of an explicitly racist past is wishful thinking and potentially blinds decision makers to the implicit racial bias that orients the American consciousness and is embedded in its formal policies."[218]

1336. There is no reason to think that these historical attitudes and racist practices did not infiltrate the process when it came to the decisions during the 2004-2014 cocci epidemic, ones that fatefully caused thousands of preventable infections and untold consequent suffering with coccidioidomycosis, especially for African-Americans, and especially for the 62 African-Americans before the Court in this case.

1337. The 2006 and 2007 policy decisions to limit exclusion from the hyperendemic zone to only the most severely immune-compromised persons have never been satisfactorily explained, have never been the subject of discovery in any lawsuit, and have never been defended in any public statement.

1338. Dr. Dwight Winslow and Dr. Suzan Hubbard co-wrote the 2007 policy memo, and even after they were bombarded with scientific literature indicating the extraordinary vulnerability of African Americans to cocci, no changes to the policy were made.

1339. Meanwhile, Dr. Igbinosa invoked the disgraced Nuremberg defense – "just following orders" – in following the written policy directive authored by Hubbard and Winslow.  This is telling in two ways: it reflects a quantum of admission about the gravity of their misconduct by virtue of Igbinosa diverting blame from himself on to his colleagues, and it simultaneously reveals that Igbinosa actually believes he can successfully align himself with a white-supremacy-oriented legal defense and still prevail.

---

[218] UN Report, p. 11.

1340. As detailed above, Plaintiffs insist, maintain and contend that these decisions carried with them an element of racial exploitation, in line with historical decisions, this time allowing for medical exploitation, also consistent with historical decisions.

## XIII.
## POLITICAL PROBLEM #1:
## "NO ONE CARES ABOUT PRISONERS"

1341. There appears to be a series of political and/or cultural roadblocks to justice in this case. Rather than discuss these obstacles in the media or in some other non-legal forum, Plaintiffs would like to address them here, up front, within this case, as attitudes about prisoners are just as important in terms of driving outcomes as the legal theories governing them.

1342. The most common sentiment in this arena goes something like, 'prisoners have committed a crime, they were imprisoned for it so it must have been serious, they are generally a bunch of murderers and rapists, and why should we care about them, and especially, why should we spend our scarce tax resources on them when there are struggling teachers, needy students, orphans and veterans, old people that are sick, as well as roads in disrepair?'

1343. Like many positions in the world of societal debate, this sentiment has a superficial appeal. It has enough superficial appeal to satisfy a large sector of society who can safely dismiss prisoners and their grievances based on this syllogism.

1344. But like so many positions and attitudes that people harbor as their governing dynamic, this line of argument cannot survive real academic scrutiny.

1345. First, the entire paradigm misses the point. This case, and prisoner litigation in general, is not about "caring" about anyone, more or less than anyone else. Plaintiffs' argument does not require the decision maker to feel a certain way about prisoners, or to care more about them than teachers, orphans or saints.

PAVONE & FONNER, LLP

1346. We live in a society that is governed by a contract, a social compact – a set of rules. The rules are designed to remove emotion from the equation, because if emotion, or interpersonal affinity, were permitted to govern US policy, all manner of abuse would result – and to some degree has.

1347. We have a constitution; that constitution is implemented by laws. Those laws are enforced by an executive. The question of whether anyone cares about anyone else is not necessary, nor supposed, to enter the equation. This is a fundamental principle of a a rule-of-law society, so if we mean what we say when we decide to subscribe and embark on a such a societal structure, people in positions of power have to obey the rules, for people or groups they care about, for people or groups they don't care about, and for people they don't care to decide whether or not to care about.

1348. In our rule-of-law society, where everyone agrees on a set of rules in order for it to work, there are very specific rules that govern prisoners. The debate whether to prioritize prisoner needs over orphans or roads is a false choice. Like everyone, the State must obey a financial responsibility paradigm in which it honors the payments of its bills before it purchases discretionary items: we all must pay the utility bill before we start shopping at Bed, Bath & Beyond.

1349. Prisoners have a constitutional right to compensation in certain situations. There is no debate about this. The State cannot permissibly build additional roads or buy extra clothes for orphans – which are both discretionary expenditures – before it pays its bills, bills generated by not honoring the rules that govern the incarceration of inmates.

1350. In this case, Plaintiffs clearly had their constitutional rights violated when they were subject to a disease epidemic that wildly exceeded the permissible danger calculus governing them.

1351. The rules require prisoners to be housed safely. Period. Their punishment does not include or encompass an unsafe environment. Period. If they are

injured because the State has failed to provide a safe environment, they are entitled to compensation. Period.

1352. However, because prisoners do not traditionally possess political clout (although, notably, they seem to be accumulating political allies as time goes on, as libertarian groups, civil rights groups and political forces coalesce in advocating for them), the rules were not accurately enforced.

1353. The rules relied on to avoid that exercise in mandatory compensation are, upon study, legally inaccurate, historically untenable and were incorrectly applied in this case.

1354. This makes no sense, on every level of analysis.

1355. On a straight legal analysis, it is illegal. As above, prisoners are entitled to compensation when they are injured due to the prison environment not being as safe as the outside world. That clearly occurred here.

1356. The rules about qualified immunity and its deeply troubled application in this case, with a conservative judiciary bending over backwards to somehow find a way to avoid the government's basic compensatory obligations, constitutes a case study in political and legal irresponsibility.

1357. It also makes no sense in a larger rule-of-law society. The rule of law is intentionally blind. Justice is blind. All rules are enforceable. They must be respected, or else we don't really have a rule-of-law society, rather, we have one that selectively enforces the rules. Resort to this device makes us no different than any kangaroo third world country; in every such country, there is a rationalization for an illegal action taken, but what it really is is a selective enforcement of rules, which is actually just a display of power.

1358. America is dangerously close to acting like these types of countries.

1359. Selective enforcement of the rules also makes no sense in terms of what government policy should be toward prisoners. Historical government policy toward prisoners has been, basically, schizophrenic. Public safety has always been a priority,

but the intensity of the public's desire for public safety has vacillated wildly depending usually on anecdotal cases that drive a particular narrative: a pendulum between children who get kidnapped and murdered versus minority prisoners that get systematically abused and stretched out on thin legal grounds.

1360. In the past 40 years, the importance of public safety has been at a particular zenith, but most people at this stage think public safety has gone beyond its rational legitimacy. It has resulted in incarceration of people who are not actually dangerous. Harsher and harsher rules relating to conviction and sentencing dragnet non-dangerous people. Sentences exceed reasonable computations about a person's dangerousness. Convictions and sentences are manipulated by interest groups and in particular law enforcement. The process of sentence and conviction is fraught with racial bias.

1361. The system has been perverted to one where incarceration operates to further racial oppression, to benefit interest groups within the system at the expense of the population as a whole, and in particular at the expense of African Americans.

1362. The singular purpose of government policy should be to, as quickly as possible within the window of the debt to society incurred, make a prisoner into one that presents no more safety risk than other members of the free population, so that he or she can return to being a productive citizen: earning money, supporting others, paying taxes.

1363. To the extent we have constructed our quality of life around a capitalist model, this is what a capitalist would say: the societal-benefit maximizing governmental paradigm to govern this labor pool can't tolerate safety risks because that results in the loss of other assets; but nor should we turn incarcerated labor pool into a slave labor pool, because slavery is immoral and inhumane, and capitalism most operate within morally accepted norms, otherwise it breaks down as participants flee the system.

PAVONE & FONNER, LLP

1364. Nor should we deteriorate this labor pool's productivity with medical problems, just to treat them, because that is like growing weeds in our yard so that we can pull them.  Such policies may be beneficial, again, for certain interested groups, but on the whole, it is not productive as public policy for a government to harm Inmate Peter so that Doctor Paul can treat him, if we intend to maximize overall societal utility and GDP.

1365. Rather, public policy must be governed by optimizing output maximization, rather than policy driven by interest groups – and certainly not by groups that benefit by stocking prisoners as inventory and exploiting them as slave labor, and two, groups that benefit by infecting prisoners with diseases for their medical treatment value.

1366. In summary, one needn't care about prisoners to understand that respecting their rights, including their right to compensation in the event the system cannot live up to its contractual obligations to protect them, is a required part of honoring a rule-of-law system and must take priority over discretionary expenditures, including toys for ophans, and more realistically, inflated compensation packages for government employees.

## XIV.
## POLITICAL PROBLEM #2:
### THE RELUCATANCE OF A GOVERNMENT
### TO PAY FOR A MASS TORT

1367. Another unstated reluctance of the American federal judiciary to validation of the Plaintiffs' cause is the apparent perception of an unwieldy quantum of potential compensation in one action, or to one plaintiff law firm.

1368. As to the latter, the reality is that this litigation has been undergirded by the effort of some 20 different lawyers, a third of them in the 20-plus-year experience range, along with a litany of associates, clerks and various other support staff within at least 12 small law firms.  The cause is now in its eighth year.  The number of billable

hours is approaching 20,000 and its existence to date consists of almost 20 different individual lawsuits.  There is no windfall outcome in this action.

1369. Furthermore, the compensation seeks to rectify serious violations of the US Constitution as a result of CDCR's deliberate decision to ignore a viral epidemic at two prisons.  Profound governmental failures have profound consequences.   This action asks the government to pay its bills before it spends discretionary money, such as on its own salaries.

1370. Furthermore, the contention or vibration that the State of California can't afford to pay its debts to prisoners seems wildly inappropriate relative to some of its more fanciful exercises, such as its recent $50 billion "train to nowhere."[219]

1371. It is not unnoticed by Plaintiffs, who were paid in the range of 3 cents to $1/hr (or roughly 1/264th to 1/8th of the $8 minimum wage in effect during the epidemic) – that is, slave wages – that a long list of predominantly caucasion police officers earned a median salary of 125,000 and the top 40 highest paid police officers earned on average over $500,000 per year.

1372. It is also not unnoticed that the top 100 corrections officers earn over $170,000 on average per year, while the median for guards is over $90,000.  Apart from the diametric contrast that exists as these guards enforce slave labor and its attendant wages, a private bouncer earns about $16/hr in the larger competitive economy (about 1/3 of the correction officers' haul), though an unarmed bouncer probably faces about the same amount of danger as an armed guard in the former's more crowded and sometimes volatile open environment.

1373. This disparity can be explained by the political clout of the law enforcement community, which has dramatically steered the California compensation system to its collective benefit, to the point at which its remuneration levels have no relation to actual market forces.

_____

[219] Swain, Rachel, "*Train to Nowhere? Here's How High-Speed Project Went Off the Rails,*" San Francisco Chronicle (February 7, 2019).

PAVONE & FONNER, LLP

1374. This case, and these dynamics, simultaneously reinforce a darker reality about the State of California over the last decade – it doesn't pay its bills but it has been more than willing to go shopping for itself, in the form of salaries, benefits, early pensions and other discretionary perquisites for the persons holding power over its budget.

1375. Consequently, it cannot be reasonably maintained that the State of California, much less the economic behemoth United States, does not have the money to respect Plaintiffs' constitutional and human rights.

1376. It is instead a case of Plaintiffs being politically deprioritized and deprived of respect for their basic legal rights, and argued out of them by reliance on invalid doctrines and dubious legal logic, in order to prioritize the preferences of predominantly white interest groups over disfavored minority disease victims, victims infected by the mistakes, neglect, overreach and discrimination of the State itself, and entitled to compensation under both domestic and international principles.[220]

## XV.
## CAUSES OF ACTION

1377. Plaintiffs bring two causes of action, for torture and cruelty, each with different elements under international law.

1378. The strictures of international law also require signatories to various treaties to create a legal system that provides an effective form of recourse for the violation of human rights. This also is a cause of action seeking compensation.

1379. The qualified immunity doctrine, effectively a knot of domestic constitutional infirmity, internal contradiction and irresponsible application, negates this critical obligation of the US government to protect the integrity of the American legal system.

---

[220] *See* United Nations Treaty, "*Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,*" Article 14, New York (December 10, 1984); *Corfu Channel Case*, United Nations International Court of Justice (1948).

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

1380. This case to date represents a profound failure of these basic international obligations, ones fundamental to a world that has historically held the perception that the US was a leader in humanitarianism, that most actors in the United States have probably never thought of the US as remotely at risk for the type of arguments the US faces in this case.

1381. But the qualified immunity doctrine has veered governmental accountability so far off course from its natural parameters, that yes, it is time to have a serious conversation about the legitimacy of the American legal system as measured against its international obligations, in light of qualified immunity's continued existence and in light of an indisputable constant amount of racism injected at every step of the criminal justice and corrections systems.

## XVI.
### CAUSE OF ACTION #1
### CLAIM FOR RELIEF

### TORTURE, IN VIOLATION OF INTERNATIONAL LAW

1382. Plaintiffs incorporate the allegations of paragraphs 1-1381 into this cause of action, as if fully set forth herein.

### A. State Officials' Intentional, Knowing and Reckless Decisions During the Epidemic

1383. California state officials have been aware of the danger of valley fever since the 1940s, after several important studies involving the government were conducted in conjunction with World War II.[221]

---

[221] Smith, C.E., "*Epidemiology of Acute Coccidioidomycosis with Erythema Nodosum*," Am.J.Public Health, Vol. 30(6), p. 600 (1940); Smith and Pappagiannis, *et al.*, "*Human Coccidioidomycosis*," University of California, School of Public Health and Naval Biological Laboratory, Berkeley, California (1968); Schmelzer and Tabershaw, "*Exposure Factors in Occupational Coccidioidomycosis,* 58 American Journal of Public Health and the Nations Health 1, p. 111 (1968).

1384. California officials were specifically aware of the presence of valley fever spores when they built Coalinga State Hospital next to PVSP.[222]

1385. California officials were aware that inmates housed at the hyper-endemic prisons faced a significantly elevated risk of serious harm from infection by the coccidoides spores known to be present at elevated levels there, and knew that the risk at specific prisons and for specific groups was even greater.

1386. They had the authority, the ability and the means to reduce the risk of infection but each was deliberately indifferent to those risks and failed to take action to prevent or reduce the risk, causing Plaintiffs' injuries.

1387. California officials knew there was a serious, epidemic level of risk of harm to Plaintiffs and all prisoners that faced incarceration in hyper-endemic prisons.

1388. Their knowing, reckless, and unlawful construction decisions, transfer policies and prisoner exclusion policies created and maintained an unacceptably high risk to prisoners, especially to African Americans.

1389. Specifically, under these policies and practices, subordinate officials did not transfer inmates away from the most dangerous prisons, did not identify inmates at high risk in the classification process, and consequently, continued sending inmates including Plaintiffs to endemic and hyper-endemic prisons without regard to susceptibility or risk, either of the person or the prison.

1390. Furthermore, prison officials failed to authorize and implement measures to reduce the risk at these prisons by providing ground cover, implementing soil stabilization, installing protective ventilation systems and other measures, or even warning inmates about the danger they faced.

---

[222] California Department of Mental Health, "*Findings of Fact and Statement of Overriding Considerations*," New Mental Health Treatment Facility, Sch #1999061074, p. 17 (October 2000) ("excavation and grading is also a concern in the Coalinga area because of the potential presence of Valley Fever spores in local soils")

PAVONE & FONNER, LLP

1391. Prison officials as supervisors knew that these failures would cause inmates including Plaintiffs to contract valley fever, and that their failure to properly train and supervise subordinate prison authorities would cause the deprivation of Plaintiffs' rights to safety, whether founded in the Eighth Amendment or under international law.

1392. Defendants, as supervisors, did nothing to prevent subordinate prison authorities from causing Plaintiffs' greatly increased risk of contracting valley fever.

1393. Defendants' construction practices in 2000 failed when they built CSH, aware of the risk but without adequately protecting against it. They have engaged in a pattern and practice of conduct since at least 2005 in which they decided to place and keep California prison inmates including Plaintiffs incarcerated at locations of unreasonable risk of personal injury.

1394. Despite numerous, repeated and explicit warnings about the serious danger of valley fever to inmates at the hyper-endemic prisons, and most especially to those identified as high-risk persons with enhanced susceptibility for disseminated cocci disease such as African American prisoners, officials refused to take the most basic, reasonable, and obvious steps needed to protect those in their charge.

1395. California officials admitted in pleadings in *Plata* that they took no steps to mitigate the threat of harm posed to prisoners in the hyper-endemic prisons, apart from inadequate educational materials and a policy that protected only the most ultra-vulnerable inmates. They ignored the risk to high-risk racial and ethnic groups. They took no action to protect plaintiffs even though were aware "that valley fever presents a serious risk to inmate health."[223]

1396. Defendants declined to implement any kind of ground cover or other soil stabilization, as recommended by the California Department of Health, on the

---

[223] *Plata v. Newsom*, Case No. 4:01-cv-1351, Dkt. 2618:10 (N.D.Cal. 2013).

PAVONE & FONNER, LLP

purported basis that it was "too costly" even though ground cover was demonstrated to be effective at reducing airborne spores during World War II.[224]

1397. Instead they waited until compelled by court order in 2013.[225]

1398. Dr. Gil Chavez, California's State Epidemiologist and the Deputy Director of Infectious Diseases within California's Department of Public Health, stated, "[a] factor that probably contributed to the high rates in [PVSP and ASP] is housing populations of inmates at risk for severe cocci disease, such as African-Americans and persons with diabetes and other chronic diseases."[226]

1399. The rate of deaths due to cocci among African-American inmates was eight times the death rate among African-Americans in California generally, and twice the death rate due to cocci among non-African-American inmates in California.[227]

1400. The court-appointed Receiver managing the California State prison system's health care program issued his "*Recommendations for Immediate Response to Coccidioidomycosis in CDCR Prisons*" in November 2012, seven years too late.[228] Included among the Receiver's recommendations, formed in consultation with court-appointed medical experts, was the direction to cease transferring African-Americans, persons with diabetes and those with no HIV test results to PVSP and ASP.[229]

---

[224] *Plata v. Newsom*, Case No. 4:01-cv-1351, Docket 2661, p. 5:18-23 (June 24, 2013); *see also* Starr, "*Recommendations for Coccidioidomycosis Mitigation in Prisons in Hyperendemic Areas of California*," CDCR Memorandum (June, 2007) [internal page 1, recommendation 1].

[225] *See* Deborah Hysen, Declaration, ¶ 3.

[226] April 4, 2013 letter from Dr. Chavez to Acting CDCR Secretary for Operations Martin Hoshino, p. 1, ¶ 2.

[227] April 4, 2013 letter from Dr. Chavez to Acting CDCR Secretary for Operations Martin Hoshino, pp. 5-6 ("For the year 2006-2007, African-American inmates were eight times more likely … to die of coccidioidomycosis than African-American men in the California population").

[228] *Plata v. Newsom*, Case No. 4:01-cv-1351, Docket 2661:9 (June 24, 2013) (N.D.Cal. 2013).

[229] *Plata v. Newsom*, Case No. 4:01-cv-1351, Docket 2661:9 (June 24, 2013) (N.D.Cal. 2013).

PAVONE & FONNER, LLP

1401. On April 11, 2013, the Receiver's public health staff presented him with an analysis and report concerning the valley fever epidemic in the PVSP and ASP facilities.[230]

1402. This report found that African-Americans were at 90% higher risk for disseminated cocci disease than their fellow white inmates, and "other race" categories were at 100% increased risk; inmates over 55 years old bore an increased risk of at least 60%.

1403. With such analyses in hand, the Receiver still had to issue yet another directive to CDCR on April 29, 2013, amended on May 1, 2013, as the Defendants continued to refuse to exclude from the hyper-endemic prisons those inmates with clearly-identified high-risk attributes, including African-Americans.[231]

1404. In their May 23, 2013 report, the medical experts appointed by the District Court in the *Plata* case found that 36 inmate deaths were caused by Valley Fever between 2006 and 2011. Of those deaths, 70% were African-American.[232]

1405. Those same medical experts underscored the importance of excluding from PVSP and ASP "all populations that meet the American Thoracic Society criteria for increased risk of severe cocci disease (e.g., African-Americans, Filipinos) … [as well as] individuals whose HIV status is unknown[.]"[233]

1406. They also concluded that, "if measures taken do not reduce cocci rates to near local community rates, [CDCR] should close PVSP and ASP."

---

[230] *Plata v. Newsom*, Case No. 4:01-cv-1351, Dkt. 2601 (May 1, 2013) (Kelso "*Notice of Filing of Report and Response of Receiver Regarding Plaintiffs' Motion Re Valley Fever*").

[231] *See* Kelso Report, pp. 9-11.

[232] *See Plata v. Newsom*, Case No. 4:01-cv-1351, Dkt. 2661 (June 24, 2013) (N.D.Cal. 2013), *citing* Court Medical Expert Report, "*Cocci in California State Prisons*," p. 5.

[233] *Plata v. Newsom*, Case No. 4:01-cv-1351, Dkt. 2661:12 (N.D.Cal. 2013).

PAVONE & FONNER, LLP

1407. Despite the Receiver's specific instructions and the court-appointed medical experts' opinions, and evidencing the continuing deliberate indifference by prison officials, there was a continued "refus[al] to exclude the other inmates covered by the Receiver's policy – most notably, diabetics and African-American and Filipino inmates… ."[234]

1408. Officials continued to ignore the Receiver's policy suggestions, complaining that the policy was "vague" and "premature."[235]

1409. According to Dr. Galgiani, "[t]he incidence of Valley Fever at these two prisons is at a level indicating a public health emergency.…  and prison officials should be, but apparently are not, acting in a manner consistent with a situation where the lives of individuals are at substantial risk."[236]

1410. Galgiani concluded that, as a result of the California prison system's inadequate handling of the Valley Fever epidemic among inmates, "needless suffering and death were inflicted on these men."[237]

1411. In spite of repeated warnings, expert opinions including those of their own staff, and federal court orders, Defendants continued to send high-risk prisoners to

---

[234] *Plata v. Newsom*, Case No. 4:01-cv-1351, Dkt. 2661 (June 24, 2013) (N.D.Cal. 2013), *citing* Court Medical Expert Report, "*Cocci in California State Prisons*," p. 11.

[235] *Plata v. Newsom*, Case No. 4:01-cv-1351, Dkt. 2615 (N.D.Cal. 2013) (Declaration of Diana Toche, May 6, 2013, ¶¶ 11-14); Declaration of Warren George, pp. 5-6 [email thread with relevant commentary by Deputy Attorney General Benjamin Rice dated May 3, 2013]; May 8, 2013 letter from Dr. Diana Toche to J. Clark Kelso.

[236] *Plata v. Newsom*, Case No. 4:01-1351-JST, Dkt. 2598, ¶ 15 (N.D.Cal.2013) (Corrected Declaration of Dr. John Galgiana, M.D.).

[237] *Plata v. Newsom*, Case No. 4:01-1351-JST, Dkt. 2598, ¶ 19 (N.D.Cal.2013) (Corrected Declaration of Dr. John Galgiana, M.D.).

the hyper-endemic facilities and declined to implement at those facilities any of the recommended remedial measures to protect inmates.[238]

1412. In fact, Defendants not only failed to implement remedial measures to reduce Plaintiffs' risk of infection, they persisted in practices that increased that risk.

1413. Although Defendants knew that construction activities that disturbed the soil would mobilize cocci spores and increase the risk to those exposed, they continued to carry out such construction at the hyper-endemic prisons without taking commonly-known precautions to minimize infection, because fundamentally, infecting African Americans with diseases was part of a larger financial model to exploit them in every way possible, for their labor or if they became sick, for their medical value.

1414. Inmates and outside experts observed continuing construction, at PVSP and ASP at a minimum, taking place without any precautions to prevent inmates' exposure to cocci.

1415. Inmates including Bruce Koklich and observers from the Centers for Disease Control noted excavation and construction taking place in the D yard at PVSP, and other construction projects at PVSP and ASP including excavation, disking of bare soil, dust-producing grounds maintenance and other construction activities without any dust control or precautions to reduce soil disturbance or cocci mobilization, let alone all the remedial measures recommended years before.

1416. These ongoing construction activities at hyper-endemic prisons all exacerbated the risk of inmates' exposure to cocci spores and the increased risk of contracting falley fever and each of these projects serves as another reminder and

---

[238] *See, e.g.*, Dovey "*Inmate Patients at High Risk*," [CDCR Memo August 3, 2006]; Hubbard & Winslow, "*Exclusion of Inmate-Patients* [CDCR Memo November 20, 2007]; *Plata* order, p. 5, June 24, 2013, Docket 2661 ["Notably, although CDPH observed the increased risk for African-Americans and Filipinos, PVSP did not transfer these inmates out."]

another installment of the racist philosophy governing CDCR, by infecting inmates at will for their medical treatment value.

1417. The *Plata* Court found that: "The experts [all] agree that the factors for increased risk of severe cocci are well-known and undisputed, and that screening out high-risk inmates is an appropriate response. … Defendants are unwilling to exclude [certain] inmates whom they know are at an increased risk of severe disease, which may lead to death. Defendants have therefore clearly demonstrated their unwillingness to respond adequately to the health care needs of California's inmate population[.] In the absence of a court-ordered exclusionary policy, inmates will continue to suffer unnecessary and unreasonable harm, thus presenting the most recent example of how Defendants lack 'the will, capacity, and leadership to maintain a system of providing constitutionally adequate medical health care services . . . ."[239]

1418. The *Plata* Court noted that "the recommendation to exclude inmates at higher risk of severe cocci was first specifically made to Defendants over six years ago."[240] Remedial measures at the prisons and efforts to control soil disturbance and cocci mobilization were similarly recommended many years previously, but still not observed by these Defendants.

1419. The prison officials' deliberate failure to take any action to protect plaintiffs, who were known to be at elevated risk of contracting the severe, disseminated form of valley fever, in the face of a duty to act, constituted a pattern and practice of racist treatment of Plaintiffs by infecting them, marginalizing them and debilitating them, in violation of their international human rights, including the prohibition against torture.

---

[239] *Plata v. Newsom*, 427 F.Supp.3d 1211, 1229, Case No. 4:01-cv-1351, Dkt. 2661:24 (N.D.Cal. 2013).

[240] *Plata v. Newsom*, Case No. 4:01-cv-1351, Dkt. 2661:20 (June 24, 2013) (N.D.Cal. 2013).

PAVONE & FONNER, LLP

## B.  Theory of Torture Number One - Violation of Customs & Norms

1420. Separate from international treaties as the foundational basis for a torture cause of action, there is a body of law variously denominated as "customs and norms," "customary international law" or the "law of nations" which permits a private claim against government officials for committing torture, as defined by international law.

### 1.  Definition of Torture in a Customs-and-Norms Case.

1421. The concept of torture is traditionally associated with various gruesome, affirmative acts too numerous to list.[241]

1422. Generally speaking, most people think of it as some sort of bloody person tied to a chair in a dank room, while the torturer accesses various horrifying tools to inflict unimaginable pain on the victim's body.

1423. However, as the world has slowly become more civilized, the legal definition of torture has expanded incrementally, and in its totality, considerably.  It includes an intentional omission to subject a population of people to an incurable disease.

1424. The 1966 International Covenant on Civil and Political Rights ("ICCPR"), Article 7, still stands as a landmark piece of international legislation.  Its prohibition against torture is worded as follows: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.  In particular, no one shall be subjected without his free consent to medical or scientific experimentation," with a set of terms and conditions relating to each country's degree of consent to the treaty, called reservations, understandings and declarations.

1425. The 1966 definition is broad and does not specifically delineate a list of elements for the definition of torture.

---

[241] See *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C.Cir. 2003); *Doe I v. Qi*, 349 F.Supp.2d 1258, 1314-18 (N.D.Cal. 2004).

1426. At the time of the creation, the world was still reeling from the scars of the medical experimentation committed in Nazi Germany, and this led in part to the experimentation language being highlighted as one application of the definition.

1427. These dynamics underscore the fact that the definition of torture goes well beyond the pulling-fingernails genre of human torment, to include, for example, giving unproven US drugs without adequate warnings to foreign populations as a pharmaceutical test measure.[242]

1428. In 1984, the definition of torture was expanded in another treaty, the "Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment" ("CAT" or "1984 Treaty"), which the United States signed in 1988 and which the Senate ratified in 1994.

1429. Plaintiffs apply this definition here.[243]

1430. The definition of torture in the 1984 Treaty resides in Article 1, and is phrased as follows: "For the purposes of this Convention, the term 'torture' means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as

[1] obtaining from him or a third person information or a confession;

[2] punishing him for an act he or a third person has committed or is suspected of having committed or

[3] intimidating or coercing him or a third person,

[4] or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

---

[242] *See Abdullahi v. Pfizer*, 562 F.3d 163 (2nd Cir. 2009).

[243] *Aldana v. Del Monte,* 416 F.3d 1242, 1251 (11th Cir. 2005) ("("When courts seek to define torture in international law, they often look to the Convention Against Torture" … [Accordingly, we do too].)

.

1431. The first and third aspects of the definition are not alleged here. As to numbers two and four, it effectively reads that the current definition of torture is any act (or omission) in which severe pain or suffering is intentionally inflicted for a discriminatory purpose or for the purpose of punish the victim for some earlier act.

1432. As to the discriminatory purpose, the above allegations about the racist US law enforcement system, including its corrections aspect, are detailed.

1433. As to the punishment aspect, there is also allegation and detail in this complaint that transfer to PVSP in particular, and hyperendemic prisons in general, were utilized as a form of punishment toward minority populations for any perceived infraction toward their captors.

### 2. Severe Pain and Suffering Element

1434. Plaintiffs suffered various debilitating and painful effects of contracting valley fever satisfying the "severe pain and suffering" element of the 1984 definition, especially since they as African-Americans are especially susceptible to the disease's harshest effects.

1435. The following tabulation of information from the plaintiff pool chronicles their landscape of misery:

| No. | Name | Injuries Reported |
| --- | --- | --- |
| 1. | Mr. Abukar Abdulle | Loss of vision; severe/painful/continuous coughing. |
| 2. | Mr. Aubrey Derrico | Severe weight loss; rashes; difficulty breathing; severe/painful/continuous coughing. |
| 3. | Mr. Garland Baker | Disseminated coccidioidomycosis; lung damage; lesions; rashes; difficulty breathing; severe/painful/continuous coughing. Baker: 'My eyesight isn't clear. I became blind in one eye. When I speak, I slur. I have multiple pain[s] throughout my body. I stumble when I walk. I have problems getting out of a bed and sitting in a chair.' |
| 4. | Mr. Michael Blue | Difficulty breathing. |

PAVONE & FONNER, LLP

| | | |
|---|---|---|
| | | Michael: "I'm still on the medication to this day … I still suffer from joint pain and take pain meds (Tylenol) daily." |
| 5. | Mr. Floyd Boyd | Severe/painful/continuous coughing.  Floyd: 'It's getting harder and harder for me to breath and knowing that I have to live with disease for the rest of my life has taken a toll on me physically and mentally.' |
| 6. | Mr. Kevin Call | Cough up/vomit blood; damaged liver; severe weight loss; kidney failure; pneumonia; misdiagnosed/undiagnosed. |
| 7. | Mr. Charles Carter | Misdiagnosed/undiagnosed; rashes; pneumonia; difficulty breathing; severe/painful/continuous coughing.<br><br>Charles: 'This disease has completely destroyed my daily routine, I see my primary physician every 3-6 months, I am constantly using over the counter (OTC) medication to manage the pain that I endure on a daily and nightly basis. I'm constantly in pain and I have no other choice but to deal with it because they are doing everything they can to convince me that I'm fine when I know my own body.  This is a total nightmare. … My life is destroyed, my bones have gotten worse and I'm in constant pain all over. I can no longer do the physical exercise that I was able to do before contracting valley fever.  I have constant bone, neck, and headaches, and now I'm having dizziness due to low heart rate and breathing problems.  I have scaling skin, itching skin rashes and fatigue … I never had a problem with before this disease.' |
| 8. | Mr. Clifford Chaney | Disseminated coccidioidomycosis; hospitalized; pneumonia; difficulty breathing; severe/painful/continuous coughing. |
| 9. | Mr. Otha Clark | Disseminated coccidioidomycosis; cough up/vomit blood; severe weight loss; hospitalized (x2); spinal issues; difficulty breathing; severe/painful/continuous coughing.<br>Otha: 'I still suffer from shortness of breath, night sweats, running nose, and body aches.  I have experienced loss of weight, joint aches and pains; |

| | | |
|---|---|---|
| | | chest, neck and back problems and constant flu-like symptoms, as well as stress, anxiety and fear.' |
| 10. | Mr. Kenneth Corley | Hospitalized; difficulty breathing. Kenneth: 'My shortness of breath is still the same, I just manage to deal with it each day using my inhaler … I experience pain because of my lungs trying to function normally at times throughout each day and emotional suffering knowing I have to deal with my condition every day.' |
| 11. | Mr. Walter Cornethan | Difficulty breathing. |
| 12. | Mr. Orlando Creswell | Severe weight loss; diabetes. Orlando: "Since I acquired valley fever my diabetes has gotten worse … my joints hurt everyday (hip).' |
| 13. | Mr. Danny Dallas | Medication/severe side effects (too toxic for liver); liver damaged/failing; hospitalized; pneumonia; severe/painful/continuous coughing. |
| 14. | Mr. Gerald Dickson | Lung damage; difficulty breathing; severe/painful/continuous coughing. |
| 15. | Mr. Steve G. Franklin | Medication/severe side effects (infection in hands & feet); hospitalized; pneumonia; severe/painful/continuous coughing. |
| 16. | Mr. Aubrey Galloway | Severe weight loss; lesions; severe/painful/continuous coughing. |
| 17. | Mr. Chris Garner | Medication severe side effects (skin sores); loss of vision; difficulty breathing; severe/painful/continuous coughing. |
| 18. | Mr. John Gholar | Weight gain, shortness of breath, problems walking. |
| 19. | Mr. Robert Harris | Lesion on lung. Robert: 'Valley fever is affecting my eyes, back, skin and my organs including my liver.  I can't go out in the sun due to sensitivity in my eyes and sunburn on my back.  My eyes are going bad from 200 mg/daily of voriconazole and I suffer pain in my back. |
| 20. | Mr. Herman Haynes | cough up/vomit blood; severe weight loss; hospitalized; severe/painful/continuous coughing. |
| 21. | Mr. Clifford Hayter | Regular back pain and headaches. |
| 22. | Mr. Damor Hill | Severe/painful/continuous coughing. |
| 23. | Mr. Ellis Hollis | Misdiagnosed/undiagnosed; pneumonia; difficulty breathing. |

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

| | | |
|---|---|---|
| | | Ellis: 'I can no longer exercise the way I use to.  I have severe chest and back pain; suffer migraine headaches; suffering so much excruciating pain, I'm now dependent on pain medication.  My entire body stays in pain!  My titer level rose two tenths and I still have not seen a specialist.' |
| 24. | Mr. Infinity (NLN) | Disseminated coccidioidomycosis; can't afford needed medication; surgery (removal of cocci mass on left side & spine)<br>Infiniti: 'loss of appetite, night sweats and chills, coughing which brings on hot flashes.  Profuse sweating.  Most of the time I am not hungry, but I eat because I know I need to eat.  I force feed myself.' |
| 25. | Mr. Kenji Jackson | Severe weight loss; lung damage.<br>Kenji: 'shortness of breath as I have a nodule on my lung as a result of contracting this disease.  I also live in fear as this disease could affect my immune system, cause weight loss and even death.' |
| 26. | Mr. George Johnson | Difficulty breathing. |
| 27. | Mr. Anthony Jones | Disabled from it. |
| 28. | Mr. Edward Jones | Various symptoms.<br>Edward: 'you don't want to live the pain is so bad.' |
| 29. | Mr. Asad Lewis | Lesions. |
| 30. | Mr. Cleofas Lewis | Severe weight loss; severe/painful/continuous coughing.<br>Cleofas: 'Being a diabetic, it is preventing me from exercising like I need, affecting my sugar level, I'm always tired and can't work out.  I'm still getting headaches.  I'm just not the same anymore.' |
| 31. | Mr. George Lewis | Severe weight loss; rashes.<br>George: 'I now have something that the doctors are referring to as neutropenia, which is a condition where a certain type of white blood cell in my body becomes lower than normal.  This makes me at greater risk of getting severe infections, viruses and bacteria.' |
| 32. | Mr. Joe Lewis | Severe/painful/continuous coughing. |
| 33. | Mr. Robert Maeshack | Disseminated coccidioidomycosis; kidney failure; chronic kidney disease: nerve damage; pneumonia |

| | | |
|---|---|---|
| | | Robert: 'I'm experiencing constant chest pains, back pain. Shoulder pain, elbow pain, leg pains, and foot pains. There is pain through my body twenty-four hours per day.' |
| 34. | Mr. Michael Manning | Disseminated coccidioidomycosis; hospitalized; lesions; difficulty breathing; severe/painful/continuous coughing; pneumonia.<br>Michael: 'All through this terrible ordeal, I suffered chest sores, painful boils spread about the skin covering my chest, which had burst open. I had severe burning throughout my torso, bleeding. Every day, night and day, I believed I was dying. I certainly felt as if I were dying. My fever was high enough to cause severe dizziness, and I found sleep impossible. Depression, hopelessness, acute anxiety, and feelings of abandonment tore at me. I suffered from relentless vomiting, painful and debilitating.' |
| 35. | Mr. Ellis McCloud | Lung damage (diminished lung capacity, COPD); rashes; difficulty breathing; severe/painful/continuous coughing.<br>Ellis: 'I recently suffered a heart attack and was admitted to Moreno Valley Hospital, and while I was there, I caught a staph infection. My vision has been blurry. Malignant tumor growth on the back of my head and by my right eye. I walk with a cane, suffer from chronic joint pain, slurred speech, disfigurement of my face. |
| 36. | Mr. Jeffrey McDonald | Disseminated coccidioidomycosis; hospitalized; fluid in lungs; cold & pneumonia; seizures; heart problems; pneumonia; difficulty breathing; severe/painful/continuous coughing.<br>Jeffrey: extensive complications from VF. |
| 37. | Mr. Charles McQuarn | Restricted mobility (wheelchair). |
| 38. | Mr. Thomas Milford | Hospitalized; severe/painful/continuous coughing.<br>Thomas: 'the physical pain includes bone aches, severe headaches, lung and chest pain with difficulty breathing.' |
| 39. | Mr. Herschel Mitchell | Severe weight loss; nerve damage; severe/painful/continuous coughing. |

| | | Herschel: 'difficulty walking, falling/sustaining injuries.' |
|---|---|---|
| 40. | Mr. Grady Montgomery | Can't afford needed medication; cough up/vomit blood; fluid in lungs; was refused test: rash & scaling skin; severe/painful/continuous coughing. Grady: 'I am in and out of the hospital.' |
| 41. | Mr. Andre Moody | Experiences "painful coughing repeatedly that won't stop until you almost pass out," as well as many other issues |
| 42. | Mr. Freddy Neal | Severe weight loss (13 lbs in 2 weeks); severe/painful/continuous coughing; |
| 43. | Mr. Raymond Newson | Medication/severe side effects (pigmented macular eruptions); rashes. |
| 44. | Mr. Marvin Pierce | Severe weight loss; spot on lung, possible cancer; sores and rashes on face, hands, feet, legs; nerve damage; spinal issues (deteriorating discs); severe/painful/continuous coughing. |
| 45. | Mr. Harvey Rayburn | Cough up/vomit blood; severe weight loss; severe/painful/continuous coughing. Harvey: 'I can't sleep because of the severe pain to my joints and bones.' |
| 46. | Mr. Paul Richardson | Disseminated coccidioidomycosis; severe weight loss; rashes: |
| 47. | Mr. David Robinson | Urinating blood; spinal issues; difficulty breathing |
| 48. | Mr. Lorenzo Sams | Pneumonia in right lung; rashes on legs; pneumonia; spleen removed; severe/painful/continuous coughing. Lorenzo: 'difficulty breathing, getting short of breath while walking. I am now on three inhalers.' |
| 49. | Mr. Tyrone Sanders | Cough up/vomit blood; erratic heart beat; pneumonia; difficulty breathing; severe/painful/continuous coughing. Tyrone: 'I can't exercise property for fear of irritating my disease and losing breath. I can't take deep breaths due to the pain it causes.' |
| 50. | Mr. Albert Sherrod | Wasn't diagnosed till a year after symptoms; difficulty breathing; severe/painful/continuous coughing. Albert: 'I'm always submitting CDCR health care forms complaining about valley fever issues: |

PAVONE & FONNER, LLP

| | | depression, chronic arthritis pain, neutrogenic bone disease, nerve damage.' |
|---|---|---|
| 51. | Mr. Corey Smith | Told medication discontinued when he went to refill or his chart was lost: rashes; pneumonia; severe/painful/continuous coughing; |
| 52. | Mr. Willie Steels | Severe weight loss; pneumonia; difficulty breathing; severe/painful/continuous coughing; |
| 53. | Mr. Tracy Stewart | Disseminated coccidioidomycosis; medication/severe side effects (can't walk, three blood transfusions); hospitalized (four months); pneumonia; restricted mobility (can't walk); difficulty breathing; severe/painful/continuous coughing; |
| 54. | Mr. Maurice Thomas | Severe weight loss; hospitalized; difficulty breathing; severe/painful/continuous coughing.<br>Maurice: 'I still have chronic headaches, shortness of breath, aches in my shoulders and knees.  My energy and strength levels have gone down.  I'm not able to perform the exercise and work habits I used to.  It has altered my life.' |
| 55. | Mr. Tyrone Thompson | Hospitalized; didn't implement hospital treatment plan: wheelchair; severe/painful/continuous coughing; |
| 56. | Mr. Aaron Tillis | Rashes & lesions.<br>Aaron: Continuing bodily and joint pains, respiratory issues. |
| 57. | Mr. Patrick Wallace | Hospitalized (1 month, 3 surgeries); sores & blisters on legs; difficulty breathing |
| 58. | Mr. Ken Washington | Severe weight loss; scarred lungs; COPD |
| 59. | Mr. Byron West | Hospitalized (for emergency testing); upper lobe infiltrated with VF; pneumonia; difficulty breathing; severe/painful/continuous coughing; |
| 60. | Mr. Bertrum Westbrook | Disseminated coccidioidomycosis; hospitalized; possible cancer |
| 61. | Mr. Thomas Wiley | Medication/severe side effects (skin discoloration): black sores |
| 62 | Mr. Darren Williams | Medication/severe side effects: severe weight loss; not given any treatment for symptoms until diagnosed; difficulty breathing; severe/painful/continuous coughing. |

PAVONE & FONNER, LLP

| | | |
|---|---|---|
| | | Darren: 'Contracting Valley Fever has resulted in s severe respiratory issues (which now requires a breathing machine).  I have developed sleep apnea. I have muscle problems(pains/spasms) and trouble with my back. The Valley Fever caused severe mental anguish and distress. |
| 63. | Mr. Wayne Woods | Medication/severe side effects: severe weight loss; scar tissue on lung; rashes, black spots; difficulty breathing. Wayne: 'I suffered several side effects and the medication: skin rashes that have left scars on my body; bad vision and sensitivity to sunlight; shortness of breath; joint pain.' |

## C.  Analysis Governing Element of Intentionality

1436. For purposes of satisfying the element of the torture being intentional, the intentional refusal to do an act (such refusal known to cause disease and misery) can be inferred to be intentional within the meaning of the customary international definition of torture.

1437. It is established by the CDCR policy decisions that volitionally elected to only exclude a tiny subset of ultra-vulnerable inmates and ignore the Plaintiffs, who as African Americans, were well known to be especially susceptible.

1438. The omission to take protective action during an epidemic of disease, and including in particular exposure to valley fever, is established as a potential violation of international law.  "Omissions may also provide the requisite material element, provided that the mental or physical suffering caused meets the required level of severity and that the act or omission was intentional, that is an act which, judged objectively, is deliberate and not accidental."[244]

1439. In 1944, US military officials moved German prisoners of war out of the State of Arizona, based on concern that they would be accused of violating the 1929 Geneva Conventions by exposing them to valley fever.  Inherent in this decision is the

---

[244] *Prosecutor v. Mucic, et al.*, IT-96-21-T, Slp. Opn., p. 170 (1998).

PAVONE & FONNER, LLP

United States' recognition that infliction of disease constituted a valid legal basis for assertion of human rights violations.

1440. In *Mucic*, the United Nations criminal tribunal described Article 12 of the First and Second Geneva Conventions as prohibiting "any attempts upon life or violence to the person, in particular, murder, extermination, torture, biological experiments, wilfully being left without medical assistance or care, *or the creation of conditions which expose persons to contagion or infection.*"[245]

1441. *Mucic* also cited *Weisz v. Uruguay*,[246] as a human rights violation when a prisoner suffered an eye infection from neglectful conditions.

1442. California prison officials during the 2004-2014 epidemic made a volitional decision not to act by passing ineffectual and underinclusive exclusion and mitigation policies, and were obviously well-aware of the magnitude of the epidemic when they did so.

1443. California's refusal to help plaintiffs during the 2004-2014 cocci epidemic can be inferred to be an intentional act, premised on racial exploitation, as follows.

1444. Plaintiffs incorporate and reference a long list of decisions and positions papers by California health officials.  These papers alerted everyone touching these transactions to the greatly elevated dangers of an ongoing epidemic and to be apprised of the further aggravated risk to African Americans:

    (1)   2004/11 Kanan Memo;
    (2)   2005/12 Information packet sent to Governor Schwarzenegger;
    (3)   2006/03 DHS Letter to Bernard Henderson;
    (4)   2006/08 Policy Memo;
    (5)   2006/10 CDCR Memo noting cocci cases;
    (6)   2007/01 CDH Letter to "the record";
    (7)   2007/01 Memo by Dr. Winslow;

[245] *Prosecutor v. Mucic, et al*., IT-96-21-T, Slp. Opn., p. 188 (1998).
[246] *Weisz v. Uruguay* (28/1978), Report of Human Rights Committee, GAOR, 31st Session, ¶ 4, (1978).

(8)    2007/05 CDCR Memo to Robert Sillen;
(9)    2007/06 Cocci Recommendations by Dr. Winslow;
(10)   2007/02 Memo by Deborah Hysen
(11)   11/2007 CDCR Policy Memo, and other items.

1445. However, officials working for the State of California, and who are officers of the larger United States, nevertheless chose to ignore this information and these warnings.  An inference can be drawn that such omissions were intentional.

1446. On information and belief, the two major prisons, PVSP and ASP, were composed of a disproportionate number of African Americans.  Officials knew this, because they were punishing African Americans in disproportionate numbers by sending them there to be specially punished for perceived infractions or challenges to CDCR staff's Zimbardo appetites.[247]

1447. These decisions were even more strident because officials also knew that the impact of the epidemic was taking an even more severe toll on this particular minority population that the general prison population.

### D.    Racial Exploitation and Discrimination Experienced by Plaintiffs in the California Law Enforcement System.

1448. While detecting, combatting and remedying the systemic racial discrimination baked into the California criminal justice system and its prison system is impossible for any one plaintiff, plaintiffs as a group document their perceptions of such discrimination.

1449. This tends, as an overall matter, to support Plaintiffs' claim that a system that is racially discriminatory in its attitudes and practices can be inferred to have made particular decisions with that same basic discrimination in mind, for purposes of satisfying the common law international definition of torture.

---

[247] *See* Zimbardo, P.G., The Lucifer Effect: Understanding How Good People Turn Evil, Random House Paperbacks, New York (2007).

| NAME | OBSERVATIONS ABOUT RACISM |
|------|---------------------------|
| Blue, Michael | I have no doubt that CDCR deliberately tried to kill me by sending me into a highly endemic area knowing the area causes a life-threatening disease to those of a certain race. I am of that race being African-American. Each morning I wake up thinking about what CDCR criminal system has done to my health, every day. |
| Carter, Charles | I have experienced racism my whole life in regards to the US criminal justice system.  But as it pertains to my present status of incarceration, I have very much so experienced racism in from the date of my arrest August 29, 2003 and which excessive force was used against me after capture by a canine.  I was threatened when I refuse to talk to the deputies from the Los Angeles County Sheriffs department. I was asked what the fuck is my Nigger ass doing in Orange County all the way to the hospital to be treated for a dog bite.  I was threatened by the transferring officer if I say a word to anyone about the incident that had taken place that he will make sure that my county jail and my present stay will be unpleasant.  I was transferred to the high desert state prison in lassen county, Susanville CA, where racism was a serious problem. I was always threatened and reprised against for various and obvious reasons such as threats from correctional officers reading my legal mail addressed to various agencies. |
| Clark, Otha | [Racism exists] in Juvenile Hall, county jail, pelican bay, pleasent valley and dvi, at verde elementary school, adams middle school and Richmond high school |
| Creswell, Orlando | I was sentenced to an illegal or unauthorized sentence. This was deemed by the court of appeals however I was remanded back to the trial court. Where it held a second trial on my prior conviction that I was already placed in jeopardy of. Yet the DA failed to submit the verdict form for them in a non-bifurcated trial, the jury made no findings as to the prior convictions. Yet the court of appeal did not protect me from double jeopardy. |

PAVONE & FONNER, LLP

| Franklin, Steven | From 2000 to 2009, I was housed at Corcoran state prison. In 2008, I requested a transfer to California medical facility due to a medical condition. During the transfer I was re-routed to Pleasant Valley State Prison. I was told it was a medical facility that would be able to accommodate my medical condition. As a result, I contracted valley fever in 2010.<br><br>I feel that myself and other inmates of color were mistreated because we had difficult time receiving treatment for the disease. Although we are in prison, it's unjust to be mistreated by the correctional officers and medical personnel. |
|---|---|
| Garner, Christopher | CLaw enforcement viewed Chris' culpability with an eye to obtaining the harshest possible conviction and sentence, because that is how they uniformly handle African Americans.  They got it: a first-degree murder conviction for aiding/abetting, even though Garner was not present in the apartment, did not personally plan or commit any hostile action, and did little more than hold stolen pot, which is accessory not murder.  Chris Garner is no murderer, but the California law enforcement system made him into one. |
| Hollis, Ellis | In the current offense, I was not identified in a line up by the victim. There wasn't no DNA match to prove I was the perpetrator. I was tried with a prior but had no similar prior.  Prejudice is shown here with unfavorable opinions of the justice system.  They impose their racist beliefs and motives to set me apart from fairness and justice. |
| Harris, Robert | They made me transfer to ASP. |
| Infiniti | Racism is rampant all over CDCR. I have been to more than a few prisons. Pleasant Valley is one of the worst if not the worst. We the prisoners suffer from torture and mutilation, when this deadly disease is not getting the proper medical care. The prison was so slow and uncaring, as were the hospital sent me to. The physicians and nurses have a very low racist attitude towards all prisoners, especially their attitudes toward black prisoners. They |

| | |
|---|---|
| | were so slow and uncaring for me that I almost died.  The disease was less than a half an inch from my spinal cord. After 7 months I was taken back to Pleasant Valley. I had problems getting my medication. It is clear that they did not care. |
| Lavea, Titi | Because I was under the poverty level, I had to use a public defender who was ineffective on my behalf. Because I was ignorant of the law, I felt railroaded during the proceedings once I became state prison property, I had no say so in where to be housed. I was sent to Pleasant Valley State Prison where I contacted the cocci virus. |
| Maeshack, Robert | My public defender name is Weise and he talked me into taking a judge trial instead if a jury trial. Mr. Weise did not have my best interest at heart. He knew that if I had taken the jury trial than the witness who was my partner in the crime would have had to take the stand and therefore incriminate himself. I was subsequently railroaded. The murder was in accident but yet I received 25 to life plus two years for the gun. See attachment I suffer pain, racism, a pattern of medical neglect. |
| McCloud, Ellis | I was housed in a facility whose racial composition was 80% black, by being exposed to as many blacks as possible to the known bacteria valley fever since 1942. We were purposely allowed to suffer symptoms caused and effects of this disease. We were called many names, nigger dogs, less than human, monkeys etc. |
| McDonald, Jeffrey | My arrest was built on racialism and the racialistic views of the American law enforcement and their view against African American. My city Pittsburg, California is no different than the ones all across America. Two of my friends were killed by the same police that arrested me. I grew up afraid of the Pittsburg police. Ive been assaulted by the PPD and gun point views were our common meeting places. On every occasion I had been threatened by police gun point.  It was just for a simple traffic stop or a walk in an all white neighborhood.  I grew up with my working parents. For me personally growing up black at the mercy of law enforcement is red alert danger, or going to prison or dying at the hands of PPD.  Its torture too be |

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

| | |
|---|---|
| | afraid all your life, too be mistreated so badly you learn to see yourself as "less than." |
| Thomas, Maurice | I was sent to an institution where CDCR knew it had previous incidents of African-Americans contacting valley fever. It was not my choice to go there. I even stated I did not want to go there based on the above information. |
| Milford, Thomas | At the prison where I contracted valley fever (and pneumonia), they were sending a high percentage of the blacks and Hispanics. |
| Milton, William | Milton was 100% innocent of a (first) petty robbery in Illinois, but after a conviction for a second petty robbery, one he did commit, he was facing a possible (but not plausible) sentence of 30 years.  He was 19 years old and a naive black kid.  As to the first robbery (where he was not involved), law enforcement, exploiting his naivete, threatened him with another 30 years on top of that, if he did not plead guilty.  He pled guilty to a crime he did not commit in order to avoid that risk.<br><br>12 years later in California in 1998, he was convicted of a third petty robbery (the second one in which he was actually guilty).  This third petty robbery resulted in Milton being subjected to California's Three Strikes law because both Illinois robberies were deemed to be serious and therefore strikes in California.  But neither were.  This was legal error.  Nevertheless, he was sentenced to 25 to life and he was been in prison for the last 22 years as a result.<br><br>The accurate outcome should have been that the first robbery did not count since he was actually innocent; the second robbery was not a strike (nor was the first), and so he was never subject to the Three Strikes law.  There is litigation pending over these issues. |
| Sanders, Tyrone | I was wrongly accused of burglary (1st degree), had an all-white jury except for replacement juros, and I was falsely ID'd by a white witness who after cross examination by my attorney Genny Andrews recanted his statement. |

GARNER, *et al.* v. UNITED STATES, *et al* – 243
COMPLAINT FOR VIOLATIONS OF INTERNATIONAL LAW

PAVONE & FONNER, LLP

| | |
|---|---|
| | Judge Kenneth Gnoss was publicly and privately assisting the D.A.'s office in making a case against me according to my attorney Genny Andrews.  Also I had an original plea deal for (7) years in state prison which was overturned by Judge Gnoss, thus sending me to trial with the threat of 35 years in state prison hanging over my head at sentencing. I was given an out-of-state strike and a 5-year prison prior enhancement which is now illegal. (For some reason the new law doesn't apply to me even though a new law says that it is illegal to give a five-year enhancement; I'm still to this day doing time for it.)  I was given 16 years for a maximum of 7-year sentence in prison.  Correctional officers target black inmates for random searches. We are also targeted for "hole" sentences as a way to send a message to the black population after being given this fatal disease.  I have been targeted for random searches numerous of times of how sick I was. |
| Sherrod, Albert | I'm African-American.  The black experience, racial profiling is what the state prison system is about. Concrete fact: it was Solano state prison level 3 back in like 2012 when I was transferred to Pleasant Valley State prison due to my being level-terrain noted.  When inmates at Solano state prison told me that PVSP had VF, I filed a 602 at Solano to take level terrain off my ADA disability so I can stay at Solano. I was denied on my 602, sent to PVSP state prison.  That's when I tested positive for valley fever. |
| Williams, Darren | CDCR prison officials knew about the valley fever problem and how it was affected African American and meet as early as 1997. Yet still it appears their purposeful plan was made to send African-Americans (me) to Pleasant Valley prison where the problem was already out of control in 2011. Then I was sent it to additional prisons that officials knew inmates of my race were contracting valley fever (Wasco prison; Avenal prison).<br><br>In relation to my criminal conviction, I as many and or most other African-Americans, did not receive a fair trial. There was not a jury member of my peers of the community as jury consisted of primarily white members. |

| | |
|---|---|
| | I have also been tortured during this 30+ years that I have been incarcerated on a '15 to life' sentence.  I have been placed in ADSEG (the hole) for up to 18 months at a time with zero contact with others.  The investigations and hearings that resulted in the ADSEG placement we're always biased against me and most African-Americans. |
| Woods, Wayne | I experienced racism discrimination because before I was moved to Avenal State prison in late 2012 CDC already knew that African-American were at a much higher percentage of contracting the valley fever virus than any other race.  As an African-American I was transferred to Avenal without been told if the danger that awaited me or given anything to help protect me from contracting the cocci virus. Within 60 days of being at Avenal, I caught valley fever. |

### E.  Theory of Torture #2 – Enforcement of Article 7 of the 1966 Treaty

#### 1.  Background and Adoption of the 1966 Treaty.

1450. The United States has entered various treaties over the years that became part of the law of the United States, when ratified by the Senate pursuant to Article VI of the United States Constitution.

1451. One such treaty is the International Covenant for Civil and Political Rights ("ICCPR" or "1966 Treaty").

1452. The United States signed the ICCPR on October 5, 1977.

1453. On March 24, 1992, the United States Senate ratified the 1966 Treaty.

1454. The 1966 Treaty was ratified on a number of, loosely speaking, terms and conditions, referred to in international law as reservations, understandings and declarations (hereafter, "RUDs").

1455. The ones of interest here are:

> **Declaration (1)**:
> "That the United States declares that the provisions of Articles 1 through 27 of the Covenant are not self-executing."

PAVONE & FONNER, LLP

**Reservation (3):**

"That the United States considers itself bound by Article 7 to the extent that 'cruel, inhuman or degrading treatment or punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth and/or Fourteenth Amendments to the Constitution of the United States."

These are discussed in more detail, *infra*.

1456. In the report ratifying the 1966 Treaty, the US Senate observed that "[t]he Covenant guarantees a broad spectrum of civil and political rights, rooted in basic democratic values and freedoms, to all individuals within the territory or under the jurisdiction of the States Party without distinction of any kind, such as race, gender, ethnicity, et cetera. The Covenant obligates each State Party to respect and ensure these rights, to adopt legislative or other necessary measures to give effect to these rights, and to provide an effective remedy to those whose rights are violated."[248]

1457. Within this language are two important corollaries: first, the 1966 Treaty creates an obligatory set of duties on the United States toward the entire world including its own citizens, which under American law presupposes that there is a method to enforce said obligations[249]; secondarily, this obligation is complemented by the fact that the United States is obligated to itself provide an effective domestic remedy when those rights are violated. [250]

### 2.  ICCPR Definition of Torture

1458. There is no exact definition of torture within the 1966 Treaty.[251] Everyone seems to agree that it is no less restrictive than the one found in the 1984 Treaty, and possibly less restrictive, in light of the Bush I Administration's position, in providing input to the ratification process of the 1966 Treaty while aware of the

[248] U.S. Senate Executive Report 102-23, "*US Senate Report on Ratification of The International Covenant on Civil and Political Rights*," p. 1 (102d Cong., 2d Sess.).
[249] *See, e.g.*, CA Civil Code section 3523 ("For every wrong there is a remedy.")
[250] ICCPR, Art. 2, ¶ 3(a).
[251] *See* ICCPR, Art. 7, ¶ 1.

PAVONE & FONNER, LLP

definition of torture in the 1984 Treaty, which was signed by the United States on April 14, 1988.

1459. As stated during the process by the Bush I administration: "Since the United States is already proceeding toward ratification of the more detailed Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment on the basis of several carefully crafted reservations, declarations and understandings, it will be made clear in the record that we interpret our obligations under Article 7 of the Covenant consistently with those we have undertaken in the Torture Convention."[252] Consequently, the definition of torture is not alleged here to be different than the one utilized above in the customs-and-norms discussions among government leaders during ratification.

**3. Self-Execution: Limitations to Enforcement of the ICCPR were Memorialized in an Earlier Legal Landscape where Domestic Civil Rights were Enforceable.  Subsequent Erosion of Domestic Law should Result in more Robust Ability to Enforce International Law.**

1460. The question of whether Article 7 of the ICCPR is self-executing presents a complicated legal issue given the existence of the modern qualified immunity doctrine.

1461. There is no debate that several cases from the Supreme Court speak to the ICCPR's private enforceability in dicta, finding it privately unenforceable, and several Ninth Circuit cases have taken those cues to say that it is also not enforceable. However, dicta is not binding, even when it comes from the US Supreme Court.  Nor is *stare decisis* applicable when the controlling issue has been decided in dicta.[253]

[252] "*US Senate Report on Ratification of the International Covenant on Civil and Political Rights*," U.S. Senate Executive Report 102-23, p. 13 (102d Cong., 2d Sess. March 24, 1992) (memorializing input by Bush Administration)
[253] *Hertz v. Woodman*, 218 U.S. 205, 212 (1910).

1462. A court interested in true legal precision must almost discard the case law to date, as all of it sits in a world that predates the modern qualified immunity doctrine's profound impact on US domestic civil rights law.

1463. Such an endeavor is authorized by the many provisions of the ICCPR that repeatedly state the importance of respect for civil rights and expect an enforceable mechanism for compensation in the event of violations, as do the RUDs the United States imposed as a matter of ratifying it. This body of principles clearly created a set of expectations impacting the question of self-execution.

1464. This new factor, the modern qualified immunity doctrine, upsets the previously fixed canvas that prior decisions rested on, in terms of the necessity for Article 7 to be reconsidered as self-executing.

1465. The only way to honestly, and with enough intellectual rigor such that a conclusion can withstand sustained academic scrutiny, decide this issue with respect to Article 7 is to first take inventory of a series of (at least) 16 principles drawn from US domestic law, from the text of the ICCPR, and from the RUDs of the ICCPR's ratification, all of which touch upon the ultimate determination of the merits of self-execution.

1466. Consider six principles of US domestic law relating to qualified immunity:

(1) **Non-Existent Foundation for Qualified Immunity.**
There is no legislative, textual or historical support for executive immunity within 42 U.S.C. § 1983. The qualified immunity doctrine only exists by virtue of the Supreme Court's decision to abandon an examination of these three common pillars and instead create executive immunity out of wholecloth, by resort to "judicial policy," starting with *Pierson v. Ray*,[254] which allowed a limited good-faith-with-arrest-warrant immunity.

---

[254] *Pierson v. Ray,* 386 U.S. 547, 557 (1967).

PAVONE & FONNER, LLP

This presents a problem when it comes to interpreting the 1966 ICCPR, since *Pierson's* 1967 limitation on civil rights did not exist at the time. US law (section 1983, after *Monroe v. Pape*[255] was decided in 1961) at the time was applicable to vigorously protect civil rights against executive overreach. *Pierson* gave birth to a doctrine that adversely impacted that expectation, particularly in light of recent social events.[256]

(2)  **Qualified Immunity in 1992, at ICCPR Ratification**

The 1983 *Harlow*[257] decision violated *stare decisis* to change the doctrine to its modern formulation without a legitimate legal basis. *Harlow* requires every plaintiff to prove that officials violated "clearly established law." It twisted this term, first used in *Wood v. Strickland*.[258] *Wood* had employed it to describe situations when a victim could elect to prove the officer harbored bad faith, to impeach his *Pierson* good faith defense, by pointing to the fact that the officer violated clearly established law. This application did not justify *Harlow's* decision to rewrite section 1983 by requiring every case to then be premised on a violation of clearly established civil rights law. That is not what *Wood* stood for.

(3)  **Qualified Immunity after *Saucier* in 2001**

Qualified immunity is changed in multiple small incremental steps from 1983-2001, but in a major way in favor of law enforcement in *Saucier v. Katz*,[259] again in violation of *stare decisis*, to now address the issue in a two-step fashion. The first step is whether the alleged violation states a plausible constitutional claim and the second step is whether that right was clearly established. The law is "established" on a case-by-case basis, which normally means there must be a prior published appellate opinion.[260]

The ICCPR has already been ratified based on an earlier understanding of the doctrine, one far more generous in its respect

---

[255] *Monroe v. Pape,* 365 U.S. 167 (1961).

[256] *See* Carter, Zach, "*American Police Are at War with Democracy Itself,*" Huffington Post (June 7, 2020).

[257] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[258] *Wood v. Strickland*, 420 US 308, 322 (1975).

[259]  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

[260]  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

PAVONE & FONNER, LLP

for civil rights in terms of expecting an enforceable compensation system, not one founded on the happenstance inventory in a given nation's prior published civil rights library.

#### (4) **Qualified Immunity after *Pearson*, in 2009**

Courts may now skip the two-step analysis in *Saucier* and simply decide the second step. *Pearson* effectively negates civil rights law by creating a circular paradigm where the clearly established test is never previously satisfied, due to its requirement for previously-published hyper-specificity, and no new law becomes clearly established since courts can now skip the step in the analysis to declare it as established. The ICCPR was ratified 17 years earlier in 1992 on a profoundly different understanding of the balance between American civil rights and American executive power.

#### (5) **Modern Formulations of Qualified Immunity**

The constitutional right must be "beyond debate."[261]

Immunity is granted for all but "all but the plainly incompetent or those who knowingly violate the law."[262]

A right is only clearly established if it was "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[263]

As to valley fever in particular, a right to protection from cruel and unusual punishment is established but too broad to be enforceable,[264] as is a right to protection from environmental toxins and a right to protection from diseases, both established but not enforceable.[265]

Only a case holding that inmates have a right to protection specifically from valley fever spores specifically satisfies the

---

[261] *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018); *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016).

[262] *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011); *see* Bendlin, S., "*Qualified Immunity: Protecting All but the Plainly Incompetent (and Maybe Some of Them, Too)*," 45 J. Marshall L. Rev. 1023, fn. 1 (2012).

[263] *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

[264] *See* U.S. Const., Eighth Amendment.

[265] *See Helling v. McKinney*, 509 U.S. 25, 33 (1993).

PAVONE & FONNER, LLP

modern fomulation,[266] but even upon such a presentation, the Ninth Circuit repeatedly refuses to publish such a case.[267] *Pearson* did not require the courts to answer this question anyway.[268]

1467. Consequently, this case represents a stunning example of how modern US civil rights law has developed into an indefensible, circular "heads I win, tails you lose" paradigm, shattering the commitments by the United States in the 1966 ICCPR and the expectations of the rest of the world that the US would honor it, indeed, be a shining examples of its application.

1468. Notably, *Hines* never answered step one; it merely found that it had not yet been answered per step two. After 14 years of cocci litigation, there is unbelievably still no answer, possibly because poor people and black lives just don't matter to the government, except as bodies and labor to exploit.[269]

1469. It was apparently okay for cocci to infect the predominantly black population in state prison,[270] but not okay for it to infect the mostly white, white-collar criminals in federal prison.[271]

1470. Regardless, when the ICCPR was signed in 1966, qualified immunity did not exist. Even when it was ratified in 1992, it was more-or-less of a footnote in the balance of power between American civil rights and the executive branch. Therefore, Congress had no reason to implement redundant legislation in its wake.

---

[266] *Hines v. Youssef*, 914 F.3d 1218, 1229 (9th Cir. 2019).

[267] *Smith v. Schwarzenegger*, 393 Fed.Appx. 518 (9th Cir. 2010); *Gray v. Robinson*, 481 Fed.Appx. 380 (9th Cir. 2012); *Johnson v. Pleasant Valley*, 505 Fed.Appx. 631 (9th Cir. 2013); *Samuels v. Ahlin*, 584 Fed.Appx. 636 (9th Cir. 2014); *Gregge v. Cate*, 584 Fed.Appx. 421 (9th Cir. 2014).

[268] *Pearson v. Callahan*, 555 U.S. 223 (2009).

[269] Grossman, Sarah Ruiz, "*Anti-Racism Protests Held Coast o Coast Across U.S.*," Huffington Post (June 12, 2020).

[270] *Hines v. Youssef*, 914 F.3d 1218, 1229 (9th Cir. 2019).

[271] *Edison v. Geo*, 822 F.3d 510 (9th Cir. 2016).

1471. This sentiment was partially reflected by Understanding 1: "That the Constitution and laws of the United States guarantee all persons equal protection of the law and provide extensive protections against discrimination."[272]

1472. But what the 1992 Congress could not foresee is a rise in police unions[273] and conservative appointees on the Supreme Court, which would steadily chip away at US domestic civil rights law, to the point where a long list of questionable outcomes, including the questions raised about its application in this case, define the modern conversation.[274]

1473. Courts today seem to be so rattled by qualified immunity's Byzantine application that they cannot even see their way clear to ascribe felony theft by police officers – literally prohibited by a 1400 BC Biblical Commandment[275] as well as warranting a one-way ticket to prison if committed by anyone other than police[276] – as a constitutional violation under US civil rights law.[277]

1474. If Congress actually intended to foreclose any private enforcement of Article 7 based on Declaration 1, it only did so because American law was perceived to

---

[272] ICCPR, Understanding 1.

[273] Segura, Melissa, "*There's One Big Reason Why Police Brutality Is So Common in the US. And That's the Police Unions*," BuzzFeed News, Website: www.buzzfeednews.com (June 1, 2020); McCormick, Marsha, "*Our Uneasiness with Police Unions: Power and Voice for the Powerful?*" 35 Saint Louis University Public Law Review 47, p. 52 (2015).

[274] *See Corbit v. Vickers*, Cato Institute, Amicus Brief to US Supreme Court Petition, Case No. 19-679, "*Brief of Cross-Ideological Groups Dedicated to Ensuring Official Accountability, Restoring the Public's Trust in Law Enforcement, and Promoting the Rule of Law as Amici Curiae in Support of Petitioner*," Cato Institute, pp. 7-10 (December 20, 2019).

[275] *See* Exodus 20:15; Leviticus 11 ("You shall not steal."); *Pacelli Transportation v. Pacelli*, 189 Conn. 401, 407 (Conn. 2015) ("'Thou Shall not Steal' is basic.")

[276] *See* California Penal Code, § 489, subd. (a).  A prediction about the length of the sentence would depend on whether prosecutors attempted to splice the theft into multiple counts. *See, e.g., People v. Whitmer*, 59 Cal.4th 733, 740-741 (2014).

[277] *Jessop v. Fresno*, 918 F.3d 1031, 1036 (9th Cir. 2019).

be sufficient to protect civil rights at the time. Since then, those rights have been profoundly eroded. It is debatable whether Congress would coronate Declaration 1 as an actual limitation of civil rights law in light of the modern application of the qualified immunity doctrine.

1475. Because of these serious doubts, other lines thought to be fixed about the nature of the ICCPR's non-self-executing status must be re-examined.

### 4. RUDs Creating those Limitations Cannot Measure up to Actual US legislation and Should not be Coronated As Such.

1476. The text of the ICCPR contains five additional principles relevant here that speak to the expectations about the relationship between the ICCPR and US domestic civil rights law, in a 1966 landscape that predated the existence of the modern qualified immunity doctrine:

(7) **Preface, ¶ 3**: "Recognizing that, in accordance with the Universal Declaration of Human Rights, the ideal of free human beings enjoying civil and political freedom and freedom from fear and want can only be achieved if conditions are created whereby everyone may enjoy his civil and political rights, as well as his economic, social and cultural rights."

(8) **Article 2, ¶ 1**: "Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its Jurisdiction the rights recognized in the present Covenant…"

(9) **Article 2, ¶ 2**: "Where not already provided for by existing legislative or other measures, each State Party to the present Covenant undertakes to take the necessary steps, in accordance with its constitutional processes and with the provisions of the present Covenant, to adopt such legislative or other measures as may be necessary to give effect to the rights recognized in the present Covenant."

(10) **Article 2, ¶ 3(a)**: "Each State Party to the present Covenant undertakes: (a) To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy,

notwithstanding that the violation has been committed by persons acting in an official capacity."

(11) **Article 9, ¶ 5**: "5. Anyone who has been the victim of unlawful arrest or detention shall have an enforceable right to compensation."

1477. These principles within the ICCPR create a clear expectation that US domestic civil rights law should be, and is, available to remedy instances of executive misconduct, including actions that fit the definition of cruelty or torture.

1478. However, with the application of the modern qualified immunity doctrine, all manner of serious civil rights violations continues to occur, in part because civil liability is unlikely. Current law removes accountability, eliminates effective enforcement and rebukes just compensation,[278] just one example of which is the mass tort described in this case.

1479. The RUDs upon which the 1966 ICCPR were ratified are also not as clear as current observations about them would leave one to initially believe. As relevant here, the text of them includes the following additional five principles:

(12) **Declaration (1)**: "That the United States declares that the provisions of articles 1 through 27 of the Covenant are not self-executing."

(13) **Declaration (2)**: "That it is the view of the United States that States Party to the Covenant should wherever possible refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant, even when such restrictions and limitations are permissible under the terms of the Covenant."

---

[278] *Corbit v. Vickers*, Cato Institute, Amicus Brief to US Supreme Court Petition, Case No. 19-679, "*Brief of Cross-Ideological Groups Dedicated to Ensuring Official Accountability, Restoring the Public's Trust in Law Enforcement, and Promoting the Rule of Law as Amici Curiae in Support of Petitioner,*" pp. 7-10 (December 20, 2019) (collecting examples, articles and authority of qualified immunity's reach).

PAVONE & FONNER, LLP

(14) **Understanding (1)**: "That the Constitution and laws of the United States guarantee all persons equal protection of the law and provide extensive protections against discrimination."

(15) **Understanding (2)**: "That the United States understands the right to compensation referred to in articles 9 (5) and 14 (6) to require the provision of effective and enforceable mechanisms by which a victim of an unlawful arrest or detention or a miscarriage of justice may seek and, where justified, obtain compensation from either the responsible individual or the appropriate governmental entity. Entitlement to compensation may be subject to the reasonable requirements of domestic law."

(16) **Reservation (3)**: "That the United States considers itself bound by article 7 to the extent that `cruel, inhuman or degrading treatment or punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States."

1480. An effort to harmonize and respect this total pool of 16 principles reveals that Declaration 1 of the ICCPR should be re-examined as a binding condition limiting the enforcement of the ICCPR, perhaps to earlier, more flexible versions.[279]

1481. *First*, if concepts of domestic law enforcement ("qualified") immunity are permitted to be radically expanded, without historical, legal, textual or empirical justification, and on a constantly changing "policy" basis – in other words, on a *political* basis – the ICCPR's self-execution provision can certainly be examined in such a way too, so as to preserve the important policy principles it stands for, namely, its repeated and clearly stated expectation for the United States to respect the enforceability of domestic civil rights.

1482. This respect is memorialized in numerous provisions of the ICCPR Treaty, which expect each nation's system to provide domestic law to rectify violations and provide enforceable compensation.

---

[279] *Saipan v. United States*, 502 F.2d 90, 96-97 (9th Cir. 1974), cert. denied, 420 U.S. 1003, 43 L. Ed. 2d 761, 95 S. Ct. 1445 (1975).

1483. As a matter of proper interpretation, the actual terms of a treaty would seem to take precedence over what are basically footnotes to it, such as RUDs.[280] RUDs have no underlying constitutional validity; they do not appear in the text of our founding document.[281]

1484. The actual text of the ICCPR *requires* an enforceable mechanism within US domestic law to rectify civil rights violations.[282] The US has shattered its promises it made to the world to expand qualified immunity in the way that it has done.

1485. **_Second_**, in *Sosa v. Alvaraez-Machain*, the Supreme Court observed "although the [ICCPR] does bind the United States as a matter of international law, the United States ratified the Covenant on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts."[283]

1486. Four years later, in *Medellín v. Texas*, 552 U.S. 491 (2008), Justice Roberts penned an opinion that held that a judgment from the International Court of Justice (ICJ) was not binding on US domestic courts. Within that discussion, he noted that the terms of ratification by the Senate were important: "…while treaties may comprise international commitments . . . they are not domestic law unless Congress has

---

[280] Friedman, Michelle, "*Note: The Uneasy U.S. Relationship with Human Rights Treaties: The Constitutional Treaty System and Nonself-Execution Declarations,*" 17 Fla.J.Int'l L. 187, 196 (2005), *citing* Damrosch, L., "*The Role of the United States Senate Concerning 'Self-Executing' and 'Non-Self-Executing' Treaties,*" 67 Chi.-Kent L. Rev. 515, 516 (1991) ("Article VI of the Constitution does not use these categories or suggest that these distinctions can be made. The concept is essentially a judicial one, created by the courts to govern their own role with respect to treaties."); Paust, J., "*Self-Executing Treaties,*" 82 Am. J. Int'l L. 760, 760 (1988) ("The distinction found in certain cases between 'self- executing' and 'non-self-executing' treaties is a judicially invented notion that is patently inconsistent with the express language in the Constitution affirming that 'all Treaties . . . shall be the supreme Law of the Land.")
[281] *Ibid.*
[282] *See* Article 2, ¶ 1; Article 2, ¶ 2; Article 2, ¶ 3(a); Article 9, ¶ 5.
[283] *Sosa v. Alvaraez-Machain*, 542 U.S. 692, 735 (2004).

either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms."

1487. Based on this logic, the Senate's language in Declaration 1 of the ICCPR, that Articles 1-27 are not self-executing, undergirds the Supreme Court's view that the ICCPR is not enforceable in US federal district courts as suggested in *Sosa* and *Medellin*.

1488. The Supreme Court's pronouncement about the issue would normally end the inquiry as a legal matter, but for the fact that both of these observations were made in dicta. They are only valuable as statements of the Supreme Court's *intention* to directly decide the issue. Its signals are clear enough, but it has never been directly presented with the issue, nor in the context of attempting to reconcile its controversial positions about qualified immunity against the canvas of the ICCPR.

1489. ***Third***, Declaration 1 of the ICCPR simply cannot be read as the kind of careful, analytical determination that has been attributed to it as if through a scrutinized legislative process. It does not merit the kind of coronation the US Supreme Court has attributed to it, as assumed in *Sosa* and *Medellin*.

1490. Indeed, for 38 years after the ICCPR's creation in 1966 through the *Sosa* opinion in 2004, the rights documented in the ICCPR (at least in this, the Ninth, Circuit) were subject to case-by-case consideration under *Saipan*,[284] with Declaration 1 basically serving merely as *evidence* of whether to grant standing in American federal district court to any given enforcement of human rights.

1491. Furthermore, any attempt to build out Declaration 1's logical application, by applying its concept of non-self-execution to the set of Articles 1-27 of the ICCPR, that is, to read the articles in such a way as to accept that they are not enforceable in US courts because the US did not ratisfy them as such, results in innumerable incongruities.

---

[284] *Saipan v. United States*, 502 F.2d 90, 97 (9th Cir. 1974).

PAVONE & FONNER, LLP

1492. There are approximately 77 legal principles associated with Articles 1-27.

1493. To take a first example, Article 5, paragraph 2 states:

> There shall be no restriction upon or derogation from any of the fundamental human rights recognized or existing in any State Party to the present Covenant pursuant to law, conventions, regulations or custom on the pretext that the present Covenant does not recognize such rights or that it recognizes them to a lesser extent.

1494. Applying ICCPR Declaration 1, the non-self-execution provision to Article 5, paragraph 2, the resulting principle is that it is not a binding commitment by the United States (enforceable in her domestic courts) to be able to invalidate pretextual restrictions of the fundamental human rights recognized by the United States in the ICCPR (the pretext being that the ICCPR does not actually recognize them).

1495. In other words, the US is disclaiming the ability for a private litigant to sue the US in federal district court to invalidate a pretextual restriction on human rights by virtue of its existence in domestic legislation, legislation that states that the ICCPR does not actually recognize those human rights.

1496. Plaintiffs are unaware of any US legislation that directly implements the ICCPR. Plaintiffs do not believe there are any US laws that would constitute pretextual legislation restricting human rights. They do not exist. If they did, it would hardly make sense for the US to disclaim an ability for someone to sue in federal district court to invalidate them.

1497. To Plaintiffs' knowledge, the closest thing the US has ever had to such pretextual legislation, the Southern States' (state-based) Black Codes, was repealed after the Civil War in the 1866 legislation. Today, such legislation would never make it out of its originating committee. The idea of imposing a limitation on the ability to invalidate pretextual legislation (like the Black Codes) is contrary to established principles and practice in US law.

1498. Another absurdity is Article 4, paragraph 1, which allows nation states to deviate from their respect for human rights as stated in the ICCPR in situations where the life of the nation is threatened. Does the US really need to make sure that no private party can sue it in federal district court contending that, yes, admittedly, the life of the nation is in fact threatened, but no, the US cannot temporarily set aside her international commitments to save its *existence*? Does that seem like a remotely viable lawsuit, for which we should be grateful that Declaration 1 is there to make sure that this hypothetical lawsuit does not have gain momentum?

1499. A third example is Article 6, paragraph 2. This provides that in countries like the US, which have not abolished the death penalty, a death sentence can only be carried out for serious crimes according to domestic law, after a judgment. It is with great relief that Declaration 1 is there for officials in those situations. Wasn't Massachusetts just trying to execute a petty thief, at the scene?

1500. Article 8 of the ICCPR bans slavery. It seems like a profoundly poor choice for US international relations and global moral standing to declare that private litigants cannot enforce Article 8's anti-slavery provision in federal court, should such enforcement be somehow unavailable under US domestic law, especially given this country's extended history of slavery noted above.

1501. Similar arguments, objections and absurdities can be generated for many of the 77 principles included within Articles 1-27, when a non-self-execution microscope is pointed at it.

1502. Plaintiffs' point is that when Justice Souter authored *Sosa* and Justice Roberts penned *Medellin*, they possibly read more into the United States' ICCPR Declaration 1 than respect for US law and her guiding principles actually and reasonably would contemplate.

1503. The 1966 Treaty's RUDs, including especially Declaration 1, simply cannot be compared to actual US legislation, as if they represent true "terms and

PAVONE & FONNER, LLP

conditions" by statute, upon which the subject law (here, a Treaty, ratified as US law under Article VI) is unenforceable.

1504. ***Fourth***, what is an RUD, exactly?  It's not a law.[285]  They have no constitutional foundation.  (Nor does qualified immunity.)  Article VI of the Constitution states simply that the law of the United States consists of three things (and three things only): the US Constitution, the laws of the United States, and treaties.

1505. The "negotiations" surrounding a treaty are not law.  Commentary about a law is not law.  Of course, comments or negotiations about a law cannot change a law.

1506. Comments or negotiations about a law also cannot negate a law.  RUDs are not enforceable as laws.  They cannot supplant what the law of a treaty states.  The 1966 ICCPR is a treaty.  It is the law.  There is nothing about the ICCPR that legally invalidates its terms as the law; it has never been repudiated.

1507. RUDs were born in cryptic comments by Justice John Marshall in 1829 in positing, without authority, that in those treaties that are viewed as contracts, Congress must "execute" the Treaty by passing legislation.[286]  But that's not what the

[285] Article 2 of the Vienna Convention defines a reservation as a "unilateral statement, however phrased or named, made by a State, when signing, ratifying, accepting, approving or acceding to a treaty, whereby it purports to exclude or to modify the legal effect of certain provisions of the treaty in their application to that State," with the term "purport" framing the operative dispute. *See* White & Case, LLP, "*A Critical Assessment of the U.S. Commitment to Civil and Political Rights*," Lawyers' Committee for Civil Rights under Law, Website: lawyerscommittee.org, p. 21 (July, 2006).

[286] *Foster v. Neilson*, 27 U.S. 253, 314 (1829) ("In the United States a different principle is established. Our Constitution declares a treaty to be the law of the land. It is consequently to be regarded in courts of justice as equivalent to an Act of the Legislature, whenever it operates of itself without the aid of any legislative provision. But when the terms of the stipulation import a contract, when either of the parties engage to perform a paricular act, the treaty addresses itself to the political, not the judicial department; and the Legislature must execute the contract before it can become a rule for the court.")

Constitution says.  The Constitution requires the Senate to consent to the Treaty, only. It then becomes US law.

1508. There is no foundation for the contention that Congress must both consent to the Treaty, and then as a secondary process, undertake a legislative process to give meaning to its terms (except where the terms themselves contemplate domestic legislation), with the consequences that if those legislative measures don't materialize, or as here, there is a perception that such legislation is unnecessary given existing domestic law, the Treaty is not actually enforceable as US law – even though it is US law and by definition enforceable as US law.

1509. Indeed, various critics have called out US hypocrisy when it comes to its position about international treaties.[287]

1510. Its refusal to permit enforcement of the entire set of substantive provisions (Articles 1-27) within one of its RUDs, by sweepingly declaring the entire treaty to be unenforceable in American courts, exists as a perfect contradiction to a different RUD, Understanding 2, which admonishes the rest of the world to not put restrictions or limitations on the rights stated within the ICCPR.  Why shouldn't Understanding 1 apply to invalidate Declaration 1?

1511. Plaintiffs are unaware of the United States being sued, or filing suit, in international forums for any ICCPR violations, due apparently to its political clout.  If it is never used internationally, and Articles 1-27 are not enforceable, and Articles 28-53 are basically about UN procedure, what good is this 162-country contract?  Did the United States sign a treaty committing to various promises and then simultaneously disavow it?  Is that official US policy?

1512. Why should the People of the United States stand for a government that not only fails to respect US domestic law by inventing immunity for itself but which

[287] *See, e.g.*, White & Case, LLP, "*A Critical Assessment of the U.S. Commitment to Civil and Political Rights*," Lawyers' Committee for Civil Rights under Law, Website: lawyerscommittee.org, p. 23 (July, 2006)

PAVONE & FONNER, LLP

then breaks fundamental promises it made to the rest of the world, promises that created civil rights protections for US citizens from that government?

1513. Regardless, the logical implications in US law for the putatively non-self-executing nature of Articles 1-27 were obviously not thought through with the kind of serious intellectual discipline that guide the evolution of normal US laws, including their internal statutory exceptions, conditions, and limitations, as well as the second process of their implementing regulations.

1514. Declaration 1 would not survive five minutes as a regular bill in the US Congress. Given its inexplicable application to the ICCPR's actual provisions, it cannot be taken as a kind of legislative gospel, on par with regular US laws.

### 5. Senate Reservation Three – Inapplicable to Torture Claims

1515. Article 7 prohibits both torture and cruel treatment. Reservation Three creates a textual limitation to the effect that Article 7 is only as enforceable as US domestic law permits. However, that limitation is expressly applicable only to a cruelty claim and is thus not applicable to a torture cause of action based on Article 7.

### F. Theory of Torture #3 – 1984 Treaty

1516. That, using the same analytical arguments developed with respect to the 1966 ICCPR, the 1984 Treaty's RUDs suffer from the same infirmities, problems, concerns, internal inconsisteny, incongruent application, and lack of historical foundation. As such, its self-executing disclaimer as expressed in Declaration 1 must be re-examined against the current canvas of domestic civil rights, including qualified immunity's imprimatur on it.

# XVII.
## CAUSE OF ACTION #2
## CLAIM FOR RELIEF

## CRUELTY, IN VIOLATION OF
## INTERNATIONAL LAW

1517. Plaintiffs incorporate the allegations of paragraphs 1-1516 into this cause of action, as if fully set forth herein, especially in terms of all the factual evidence and argument that supports the elements of a claim for torture.

**A.  Origin and Definition of Cruelty**.

1518. The concept of cruelty exists in the international sphere as a sort of "lesser included offense" – all cases of torture will constitute cruelty, but not all cases of cruelty will rise to the level of torture.

1519. Whereas torture has clearly been recognized as a customs-and-norms violation,[288] it is unsettled whether claims for cruelty have reached that same station.

1520. The definition of cruelty under international law tracks its definition under domestic law, in that Reservation Three under Article 7 of the 1966 ICCPR defined cruelty as equivalent to the manner in which it is defined under US domestic law.

1521. Under US law, cruelty generally consists of deliberate indifference to the unnecessary infliction of pain and suffering, misery which can be inflicted in a variety of ways and circumstances.[289]

---

[288] *See, e.g.*, *Mousa v. Trump*, 2019 U.S.Dist.Lex. 198709, *22-23 (E.D.Cal. 2019) *citing Siderman de Blake v. Argentina*, 965 F.2d 699, 717 (9th Cir. 1992) ("the right to be free from official torture is fundamental and universal, a right deserving of the highest status under international law, a norm of jus cogens").

[289] *Estelle v. Gamble*, 429 U.S. 97, 102-106 (1976); *Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *see Healy v. Yasmeen*, 2020 U.S. Dist.Lex. 104300, *11-12 (E.D.Cal. 2020), *citing McGuckin v. Smith,* 974 F.2d 1050, 1059 (9th Cir. 1992) *and Lopez v. Smith,* 203 F.3d 1122, 1131-32 (9th Cir. 2000).

PAVONE & FONNER, LLP

### B.  Theory #1 - Customs-and-Norms.

#### 1.  Introduction

1522. In 2004, in *Sosa*, it was clear that Justice Souter battled with Justice Scalia to retain a federal common law opening for the US to recognize privately-enforceable customs-and-norms violations, while in that case limiting that recognition to one claim: torture.[290]

1523. Given the erosion of domestic civil rights under section 1983 after the 2004 *Sosa* opinion, in cases like *Pearson v. Callahan* in 2009[291], *Ashcroft v. al-Kidd* in 2011[292], *Reichle v. Howards* in 2012[293], *Taylor v. Barkes* in 2015[294], *Kisela v. Hughes*[295] in 2018 and as directly applicable here, *Hines v. Youssef* in 2019[296] (a body of case law that collectively place the the United States in violation of its promise to the world that it would create and maintain a domestic legal system that includes an

---

[290] *Sosa v. Alvaraez-Machain*, 542 U.S. 692, 729 (2004); *see* Stephens, Beth, "*Sosa v. Alvarez-Machain: "The Door Is Still Ajar" for Human Rights Litigation in U.S. Courts*," 70 Brook. L. Rev. 533, 558 (2004); *see also Siderman de Blake v. Argentina*, 965 F.2d 699, 717 (9th Cir. 1992), *cert. denied*, 507 U.S. 1017 (1993); *Urritia v. Guatemala*, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 103, 1 92 (Nov. 27, 2003); *Al-Adsani v. United Kingdom*, 2001-XI Eur. Ct. H.R. 80, 100-03 (2001); *Prosecutor v. Furundzija*, Case No. IT-95-17/I-T, Judgment, 144, Int'l Crim. Trib. for the Former Yugoslavia (Dec. 10, 1998).

[291] *Pearson v. Callahan*, 555 U.S. 223 (2009).

[292] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

[293] *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

[294] *Taylor v. Barkes*, 575 U.S. 822, --, 135 S. Ct. 2042, 2044 (2015).

[295] *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

[296] *Hines v. Youseff,* 914 F.3d 1218 (9th Cir.)*, cert. denied sub nom. Smith v. Schwarzenegger,* 140 S.Ct. 159 (2019).  As explained above, *Hines* is an even more draconian application of qualified immunity because not only does it apply the harsh standards from the various Supreme Court pronouncements from 2009-2018, it goes a step further in the valley fever context by setting up a "heads I win, tails you lose" unconstitutional application of the doctrine by holding that a published case specific to valley fever was necessary, after refusing to publish a valley fever case.

*enforceable* right to compensation), a corresponding expansion of the customs-and-norm theory to include cruelty, tethered to the corresponding right in international law respecting compensation, is warranted under the rules governing the recognition of such claims.

1524. This is especially relevant given the American's public's seeming exhaustion of further patience for law enforcement's inability to stop these recurring police killings, which except for the high-profile cases, result in near-zero accountability.  This is further underscored by ones in particular involving the loss of African American lives, a path of unaccountability no doubt paved by the expansion of qualified immunity.

1525. The latest murder, of Mr. George Floyd, itself reflects a horrifying violation by Minneapolis law enforcement officers of his 1983 civil rights and surely his international human rights.

1526. But under today's US qualified immunity doctrine, if the defense were applied as vigorously as it is regularly applied, where *every* reasonable officer must agree that there was a constitutional violation, the doctrine would succeed if just one reasonable official might dissent.  One hypothetical reasonable official surely exists for every incident, even if he is probably wrong.[297]  By definition, the Floyd murder should theoretically result in a dismissal on qualified immunity because a strict application of the rules of qualified immunity are pretty much undefeatable.

1527. The only reason it will not come out this way, and be vigorously applied in civil defense litigation like so many low profile cases, is that city bureaucrats will make an easy cost benefit calculation, as between a single case payment of $5-10 million dollars versus the potential cost to the City of Minneapolis from continued

[297] *See, e.g.*, Dunphy, Jack, *"The George Floyd Killing: A Police Officer's View,"* National Review, Website: nationalreviewonline.com (June 4, 2020).

rioting, a no-brainer cost calculation etched into every city's institutional memory after the Rodney King riots in Los Angeles.[298]

1528. This festering and unsolved problem of diminished or non-existent law enforcement accountability has had global consequences for US prestige and international standing.[299]

1529. If qualified immunity is not otherwise abolished,[300] one solution to restore balance to the law and bring the United States within its international obligations is for a cruelty claim to be recognized under international law by opening *Sosa's* ajar door a little further.[301]

### 2. "Specific, Universal and Obligatory" Standard for Recognition of Customs-and-Norms Causes of Action

1530. In order for a cause of action to qualify as a norm of customary international law, it must be viewed as a specific, universal, and obligatory duty within the international community; in addition, the practical consequences must be considering in terms of opening the door to federal court for such claims.[302]

1531. The general prohibition against committing cruelty (and torture and other degrading treatment or punishment) is now a customary principle of international

---

[298] "*The 10 Most-Costly Riots in the U.S.*," Chicago Tribune (November 26, 2014) (offering table with the King riots tallied as the most expensive at $1.3B, or roughly 130 times more costly than would be a $10M payment to settle Floyd's civil case).

[299] *See generally* Hernandez, Javier, "*Global Anger Grows Over George Floyd Death*," New York Times (June 1, 2020); Schweikert, Jay., "*Police Immunity Highlighted by George Floyd Protesters Must End, and Officers Must Pay*," Cato Institute, Website: www.cato.org (June 4, 2020).

[300] Harrison, Thomas, "*New House Bill Would Revoke 'Qualified Immunity' for Police*," Courthouse News, Website: www.courthousenews.com (June 4, 2020); Reilly, Ryan, "*A Shocking Dereliction Of Duty': Supreme Court Brushes Off Police Immunity Cases*," Huffington Post (June 15, 2020).

[301] *Sosa v. Alvaraez-Machain*, 542 U.S. 692, 729 (2004).

[302] *Hereros v. Deutsche Afrika-Linien*, 232 Fed.Appx. 90, 95 (3d Cir. 2007).

law, as reflected by the world's treaty positions, the United States' own historical positions, and several case examples in international law.

### a. Treaty Evidence

1532. The prohibition against cruelty was memorialized as Article 7 of the 1966 ICCPR. Of the 178 countries that participated in the process, 172 ratified the treaty with Article 7 included.

1533. The six exceptions were China, Comoros, Cuba, Nauru, Palau and St. Lucia. Only China and Cuba have any significant voice in shaping world opinion. The other four are microscopic island countries.

1534. Over the next 35 years, through the turn of the 21st century, the vast majority of countries ratified the ICCPR, including Article 7. A few countries ratified it after the 2004-2014 cocci epidemic: Sao Tome in 2017 and Fiji, Marshall Islands, and Qatar all in 2018, but relative to the larger pool of about 170 nations, they represent at most a footnote to larger world opinion.

1535. Of the 172 countries that have ratified Article 7, 171 of them did so without expressing any limitations to the effect that Article 7 was simply not self-executing, with the sole exception being the United States.

1536. Of the 172 countries that have ratified Article 7, 169 of them ratified it without any significant RUDs: the United States, Botswana and Qatar.

1537. Botswana (similar to the United States' reservation three) stated that Article 7 was only enforceable to the extent of its Constitution.

1538. Four countries – France, Ireland, Portugal and Spain – objected to Botswana's 1966 reservation stating essentially that Botswana was illegally conditioning its treaty commitment on the contours of its domestic national law, which is a legal position prohibited by international law.

PAVONE & FONNER, LLP

1539. Nevertheless, within Botswana's 1966 Constitution, it states that, "No person shall be subjected to torture or to inhuman or degrading punishment or other treatment."[303]

1540. On information and belief, Plaintiffs doubt (and thereby deny) that Botswana has any sweeping immunities for public officials comparable to the modern US qualified immunity doctrine.

1541. Consequently, despite its reservation, Botswana appears to have complied with its commitment to pass enforceable domestic (constitutional) legislation that respects the international prohibition against cruelty.  This eliminates Botswana as a possible dissenter from Article 7 as a norm of international law.

1542.  A second country to subject its Article 7 commitment to some form of domestic restriction was Qatar.  Qatar's reservation conditioned a number of its international commitments on "applicable legislation of Qatar and the Islamic Sharia."[304]

1543. This also drew a number of objections, 10 in total (from the Czech Republic, Estonia, Finland, Hungary, Ireland, Netherlands, Norway, Poland, Romania, and the United Kingdom, respectively), all to the effect that Qatar was governed by Sharia law and it was unclear what that implied in terms of respect for the prohibition against permissible punishments.

1544. Clearly, developed countries were concerned that Sharia law contemplates severe and barbaric punishments.  Regardless, objections to the ICCPR are only noted for the record and Qatar does not appear to respect Article 7 in the way the international community expects.[305]

---

[303] *See Constitution of the Republic of Botswana*, Chapter 2, section 7 (September 30, 1966).

[304] *See "Declarations and Reservations,"* ICCPR (December 16, 1966).

[305] *See "Human Rights in Qatar,"* Wikipedia the Free Encyclopedia, Website: www.wikipedia.org (June 17, 2020) (reflecting possible death penalty for divorce,

1545. Regardless, in total, it appears that of the 178 countries that participated in the formation of the 1966 ICCPR:

    (i) 172/178 ratified Article 7;

    (ii) 169/178 regarded Article 7 as an international commitment without reservation (Qatar and the US excepted); and

    (iii) 170 countries expressed no ultimate limitations to such a commitment after review of their domestic law.

1546. Assuming that this pool of 170 countries honored their Article 2(3) commitment to follow up with domestic legislation (or treated Article 7 as directly enforceable or passed such legislation before ratification), and on information and belief these countries did do this, this overwhelming support for Article 7 represents the first of five satisfying bases to say that Article 7's cruelty provision has been universally accepted and it can be recognized as a customs-and-norm of international law in the present lawsuit.

### b. Historical Evidence – US World War II Prisoners.

1547. A second analysis of the issue proceeds by looking at the specific window in which the wrongs alleged occurred[306] (here, 2004-2014) and asking whether at this time it was specifically and universally prohibited as a matter of the international law to commit the specific wrongs in question (here, ignoring a disease epidemic in a prison or custodial setting).

1548. Looking at the specific wrong is a debatable basis for a dispositive determination about a customs-and-norms cause of action under US federal common law because the United States has already validated torture as a customs-and-norms cause of action, without reference to any specific form of it that must be inflicted.

and lashings for various minor transgressions such as alcohol consumption); *see also* "*Filipino Woman Gets 100 Lashes for Giving Birth in Qatar*," GMA News Online, Website: www.gmanetwork.com (June 30, 2006).

[306] *Al Shimari v. CACI*, 119 F.Supp.3d 434, 450 (E.D.Va. 2015), citing *Vietnam Vets v. Dow Chemical*, 517 F.3d 104, 119 (2d Cir. 2008).

PAVONE & FONNER, LLP

1549. In addition, if we have learned anything from the intellectual incongruity of qualified immunity, especially here where the US government through its judicial rules is accused of proactively preventing satisfaction of the very specificity it proposes to require, the idea of going too far down the specificity road seems from experience to perhaps represent a departure from normative US principles rather than a refinement of them.

1550. Regardless, the answer to that question, even when viewed through the lens of domestic US law, is yes – yes, ignoring an epidemic of a serious disease like cocci would be widely regarded in 2004-2014 as a violation of Article 7's prohibition against cruelty.

1551. This can be deduced from two subsets of evidentiary dynamics.

1552. _**First**_, after the surrender of Germany General Erwin Rommel's Afrika Korps in April 1943 during World War II, the US held about 1.4M enemy prisoners, roughly 1.35M Germans, but also 50,000 Italians and 5,000 Japanese people.[307]

1553. Approximately 13,000 of these prisoners were held on a former military reservation in Florence, Arizona. The area naturally harbored a dramatically elevated risk of contraction of cocci. When Dr. Charles Smith visited the detention center in early 1944, he discovered that infection with acute coccidioidomycosis was rampant among the prisoners. He estimated that two-thirds to three-quarters of new arrivals would additionally become infected.[308]

---

[307] Hirschman, Jan,_"The Early History of Coccidioidomycosis: 1892-1945,"_ 44 Clinical Infectious Diseases 1202, 1206 (2007), _citing_ Lewis GG, _et al._, "_History of Prisoner of War Utilization by the United States Army 1776–1945,_" Dept. Army Pamphlet 20–213, pp 66–173, Washington, DC: Department of the Army (1955).

[308] Hirschman, Jan,_"The Early History of Coccidioidomycosis: 1892-1945,"_ 44 Clinical Infectious Diseases 1202, 1206 (2007); Coates JB, _et al._,"_Preventive Medicine in World War II: Communicable Diseases Transmitted Chiefly through Respiratory and Alimentary Tracts,_" 4 Washington, DC: Office of the Surgeon General, Department of the Army, Chapter 11, pp. 296–298 (1958).

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

1554. Of 89 patients suffering from pre-existing tuberculosis who were routed to Arizona for the ameliorative weather, 10 had become infected with cocci and 2 had died. Although these prisoners did not seem especially injured (perhaps because they were not biologically ultra-vulnerable like Plaintiffs), the US military decided to transfer them out of Arizona to avoid criticism about potential violation the 1929 Geneva Conventions.[309]

1555. Article 2 of the Geneva Conventions requires countries at war to treat prisoners humanely and to keep them safe.[310]

1556. This episode of World War II history is telling in three smaller ways as it pertains to the question of whether exposure to diseases as defined in American and international law was universally and specifically regarded as prohibited.

1557. *One*, some 80 years ago, the US basically acknowledged that subjecting prisoners to a needless risk of contraction of coccidioidomycosis constitutes a plausible basis for a claim of violation of international law.

1558. *Two*, it implies that the United States not only recognized that such prohibitions applied to the United States, but that the international community might bring an actual case against it for committing such violations, even though the United States had not itself actively committed any personal act of brutality or classic form of torture.

1559. *Three*, the mere fact of exposing prisoners to diseases, regardless of the original beneficent intent or the naturally-occurring circumstances, was viewed by the US as nevertheless risking international condemnation by the world – which itself is

---

[309] Hirschman, Jan, *"The Early History of Coccidioidomycosis: 1892-1945,"* 44 Clinical Infectious Diseases 1202, 1206 (2007).

[310] Article 2 states: "Prisoners of war are in the power of the hostile Government, but not of the individuals or formation which captured them. They shall at all times be humanely treated and protected, particularly against acts of violence, from insults and from public curiosity. Measures of reprisal against them are forbidden."

evidence of world opinion at the time about exposure to coccidioidomycosis – apart from the US's own decision to act on that concern.

1560. This sits in contrast to the somewhat casual attitude about contraction of coccidioidomycosis expressed at times in this litigation, to the effect that it is something that millions of residents of the San Joaquin Valley voluntarily choose to face. The critical difference is of course one of degree – the incidence rates.

1561. Remote chances of contracting cocci are generally regarded as an acceptable risk, the same as many remote risks of danger. Whenever those risks begin to magnify, either by the existence of natural cocci hotspots like Florence, Arizona in 1944 or through the government's own construction mistakes (such as digging up the soil to build Coalinga State Hospital next to PVSP without adequate dust suppression), the relevant scientific and public policy literature reflects that the affected population is credited with a legitimate objection.

1562. In summary, the general public, local governments, and the United States' own historical military positions confirm what ought to be self-evident: inaction in the face of an epidemic of any serious disease risks contravening human rights standards recognized and adopted by the international community.

### c. International Case Law

1563. ***Second***, although international law has not been developed with the same speed and intensity as law in the United States, even within its comparatively smaller library of authority, there is a solid body of literature recognizing that exposure to elevated risks of diseases constitutes cruelty, torture or similar human rights violation.[311]

---

[311] *See Prosecutor v. Mucic, et al.*, IT-96-21-T, Slp. Opn., p. 188 (1998);
*see also Weisz v. Uruguay*, Case No. 28/1978, Report of Human Rights Committee, GAOR, 31st Session, ¶ 4 (1978);
*see* Lines, Rick, "*The Right to Health of Prisoners in International Human Rights Law*," 4 International Journal of Prisoner Health 1, p. 11, 24-26, 30-34 (April 2008)

PAVONE & FONNER, LLP

1564. This case evidence establishes a plausible basis to argue that leaving prisoners to be infected with diseases, including cocci in particular, constitutes a valid US cause of action for violation of international law.  The WWII example and these authorities recognize exposure to diseases and cocci in particular as a potential international violation.

### d.  Practical Consequences of Recognizing Cruelty.

1565. As to the practical consequences mentioned in US law, they can be settled fairly easily: practically speaking, it would restore the enforceability of the

<hr>

(provisions of the ICCPR have "often been interpreted to require government authorities to take action to safeguard the health of prisoners … [the obligation to provide preventative medical care] "found throughout the non-binding [international] instruments is also reflected *as a legal norm in the international case law, one which obligates states to take measures to prevent the spread of disease within prisons*" [italics added]);

*see also* "*Concluding Observations: Russian Federation*' Committee on Economic, Social and Cultural Rights, UN Doc E/2004/22, ¶ 61 (2003) *and* "*Concluding Observations: Moldova,*" Committee on Economic, Social and Cultural Rights, UN Doc E/C.12/1/Add. 9 ¶¶ 25, 47 (2003) (both reflecting obligation under the Covenant on Economic, Social and Cultural Rights to implement preventative health measures in prisons to combat elevated incidence rates of tuberculosis);

*see* "*Concluding Observations: Republic of Moldova*," Human Rights Committee UN Doc A/57/40, vol I 76, ¶ 84(9) (2002);

*see also Melnik v. Ukraine*, Eur. Ct. H.R., App. No. 72286/01, ¶¶ 2, 103(b), 106 (March 28, 2006) (finding Article 3 violation of the European Convention for failure to prevent contraction of TB);

*see also Nevmerzhitsky v. Ukraine*, Eur. Ct. H.R., App. No. 54825/00, ¶ 87 (April 5, 2005) (contraction of scabies and eczema in prison ''demonstrate[s] that he was detained in an unsanitary environment, with no respect for basic hygiene');

*see also* Lines, R., *supra*, p. 32, *citing* Nigel, Rodley, "*Report of the Special Rapporteur*," Commission on Human Rights, sub'd pursuant to Resolution 1994/37, Addendum: "*Visit by the Special Rapporteur to the Russian Federation*," UN Doc E/CN.4/1995/34/Add.1 ¶¶ 41, 85 ("The Special Rapporteur on Torture has noted the impact of overcrowding … makes it difficult to prevent the spread of infectious diseases").

PAVONE & FONNER, LLP

rights stated in the Eighth Amendment, as implemented by 42 U.S.C. § 1983, unshackled from the doctrine of qualified immunity.

1566. The international definition of cruelty overlaps with the US definition per the United States' reservation three, so there would be no questionable or controversial addition of claims fitting an international definition that do not already fit within existing US law.

1567. Furthermore, as qualified immunity has eroded the enforceability of section 1983, on a journey fraught with *stare decisis* and other legal violations, application of an international definition would restore a constitutional protection for US citizens that the US government has itself removed by interjection of, as one conservative critic puts it, '"three inappropriate words" – clearly established law.'[312]

### e.  Article 7 is Viewed by a Number of Countries to be Non-Derogable.

1568. Within the ICCPR, obligations exist within a hierarchy.  The most fundamental obligations are considered to be "non-derogable," meaning that countries may not disclaim or limit them through RUDs.  Article 7 is considered to be non-derogable, by virtue of Article 4, paragraph 2.

1569.  Article 4 generally addresses itself to emergency situations, ones that "threaten the life of the nation."  In such circumstances, the participating countries agreed that there may be a temporary suspension of certain human rights while domestic strife is worked out.  In other words, they may suspend their international commitments and participation to save the country.

---

[312] Will, George, "*This Doctrine Has Nullifiled Accountability for Police. The Supreme Court Can Rethink It,*" Washington Post (May 13, 2020); Schweikert, J., "*Supreme Court Will Soon Decide Whether To Reconsider Qualified Immunity,*" CATO Institute Press Release (April 28, 2020) (calling the doctrine, "an atextual, ahistorical judicial doctrine that shields state officials from liability, even when they violate people's constitutional rights").

PAVONE & FONNER, LLP

1570. However, paragraph 2 prohibits derogation of certain human rights, by stating that, "No derogation from articles 6, 7, 8 (paragraphs 1 and 2), 11, 15, l6 and l8 may be made under this provision."

1571. Five countries (Denmark, the Netherlands, Norway, Spain and Sweden) – all major international actors who objected specifically to US reservation three that limits Article 7 to US domestic law – argue that the US may not deviate from Article 7 in this fashion.  Ireland lodged the same objection as to Qatar, while Spain lobbed it at Botswana.

1572. Regardless of whether Article 7 is non-derogable, the fact that important countries believe it is, and formally objected 50 years ago to the US attempt to treat Article 7 as something it could dispense with via reservation, is further evidence that Article 7 occupies the highest station in international law, that of a custom and norm.

1573. In summary, the overall body of evidence, consisting of treaty evidence, historical WWII evidence, various case examples, and Article 7's non-derogable status raise the issue of Article 7's cruelty as a currently recognized custom and norm of international law, past the *Iqbal-Twombly* pleading standard,[313] for purposes of allowing further debate and investigation about the matter.

### 3.  The Erosion of Domestic Civil Rights Warrants Renewed Scrutiny of RUDs the Expansion of Customs-and-Norms Theories to Include International Causes of Action

1574. As another reason to recognize cruelty as a custom-and-norm violation, as it stands under 2010-forward case law, the right to compensation has all been but removed from domestic US civil rights law.  However, it largely still existed at the time of Congress' ratification of the ICCPR.  The interpretation of international rights, and their relationship to then-governing US law – when those international rights are recognized – should remain in relative harmony.

---

[313] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007).

PAVONE & FONNER, LLP

1575. If international law did not contemplate direct enforcement because it was believed that domestic law was sufficient, then rulings and positions that created law under that assumption must be revisited when it is removed.

1576. No state is obligated to respect the full panoply of human rights itemized in the ICCPR by passing implementing domestic legislation.  But if a nation does elect to recognize a given human right, it is expected to respect that right by having a compensable mechanism to enforce it.[314]

1577. Indeed, regardless of under what exact circumstances a treaty-based international right can be enforced, these are the applicable promissory commitments the United States made to the world in 1966 and ratified 1992:

> "The States Parties to the present Covenant … [a]gree upon the following articles …
>
> **Article 7** ….
>
> No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."[315]
>
> **Article 2**
>
> To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy…[316]

1578. The US thus **promised** the world it would not subject its citizens to torture or cruelty.[317]

1579. The US further **promised** the world it would provide an effective remedy for any violations.[318]

1580. The US has broken both of these promises in this case.

---

[314] *See* ICCPR, Preface ¶ 3; Article 2, § 1; Article 2, § 2; Article 2, § 3(a); Article 9, ¶ 5; Article 14, ¶ 6; Declaration (2); Understanding (1); Understanding (2); Reservation (3).
[315] ICCPR, Preface and Article 7.
[316] ICCPR, Article 2.
[317] ICCPR, Article 7.
[318] ICCPR, Article 2.

1581. If the United States is to respect these international promises – is our word no longer our bond? – and restore the deterioration of US international standing[319], courts that find themselves frustrated or trapped by the Supreme Court's qualified immunity jurisprudence[320] can legitimately resort to expanded recognition of international human rights claims because numerous countries have ratified and recognized their legitimacy and enforceability since the ICCPR's 1966 execution.

---

[319] The delay in ratification from 1966 to 1992 was viewed during the Congressional debates as a problem.  As stated by Senator Pell (D RI) on April 4, 1992: "The United States plays a leading role in the international struggle to promote and protect human rights.  However, failure to ratify the covenant has blemished our record and cast doubt, in some quarters, about the seriousness of our commitment to human rights." Congressional Record, 102nd Congress, 2nd Sess. (1991-1992), p. S4781, Website: www.congresss.gov (1992).

*More recently, see*, Rothkopf, David, "*America is Losing the High Moral Ground*," Foreign Policy, Website: https://foreignpolicy.com (July 14, 2016) ([US domestic tensions] have "also regularly enabled nations that America has criticized in the past – from the Persian Gulf to the South China Sea – to point to the headlines coming out of the United States and say, 'Who are you to judge us?'"); *see also* White & Case, LLP, "*A Critical Assessment of the U.S. Commitment to Civil and Political Rights*," Lawyers' Committee for Civil Rights under Law, Website: lawyerscommittee.org, p. 21 (July, 2006) ("at worst, the extensiveness of these RUDs portrays the U.S. as a reluctant participant in the modern multilateral humans rights regime").

*Very recently, see,* Editorial Board, "*America's Battered Moral Standing*," Financial Times, Website: https://www.ft.com (June 5, 2020) ("America's state department last weekend called on 'freedom-loving people' to hold China to account for its vow to impose a national security law on Hong Kong. A Chinese official instantly tweeted: 'I can't breathe'. The riposte was no less stinging for its sarcasm.")

[320] *See, e.g., Jessop v. Fresno*, 918 F.3d 1031, 1036 (9th Cir. 2019) ("The allegation of any theft by police officers – most certainly the theft of over $225,000 – is undoubtedly deeply disturbing. Whether that conduct violates the Fourth Amendment's prohibition on unreasonable searches and seizures, however, is not obvious."); *see also* Wynn, James, "*As a Judge, I Have to Follow the Supreme Court. It Should Fix this Mistake*," Washington Post (June 12, 2020).

PAVONE & FONNER, LLP

1582. Its mechanism for compensation is not only reflected by various provisions in the ICCPR itself, but by other international treaties, commentaries, cases, and positions.[321]

1583. Given the erosion in US civil rights law, the right to enforceable mechanisms to respect civil rights should be updated to reflect the current reality of international law; an international customs-and-norms theory may compensate for qualified immunity.  And why not?  The Supreme Court in *Harlow* famously "compensated" for *Monroe v. Pape – in error*.[322]

1584. Causes of action under domestic law that are barred from damages because of qualified immunity can and should be recognized as international customs-and-norms claims, enforceable under *Sosa*, per the arguments above.

## C.   Theory of Cruelty #2 – Direct Enforcement of 1966 Treaty

1585.  In the alternative to recognizing the infliction of cruelty as a customs-and-norms common law cause of action, Plaintiffs seek to directly enforce Article 7 as a non-derogable international commitment.

---

[321] *See, e.g., Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1011 (9th Cir. 2000) (The 1984 Treaty "includes provisions aimed at preventing torture, prosecuting torturers, and compensating victims of torture"); 1984 Treaty, Preface, Article 14, ¶¶ 1-2, Reservation II(e)(3); "*Convention Relative to the Treatment of Prisoners of War*," Article 27 (1929); "*Optional Protocol to the Convention on the Rights of the Child*…" Article 8(1)(g), Article 9, ¶ 4 (2002); United Nations General Assembly, "*Declaration of Basic Principles of Justice for Victims of Crime and Abuse of Power*," 96th Plenary Meeting, ¶¶ 12, 18 (November 29, 1985) ("States should consider incorporating into the national law norms proscribing abuses of power and providing remedies to victims of such abuses").

[322] Baude, W., "*Is Qualified Immunity Unlawful?*," 106 Calif.L.Rev. 45, 63 (2018), *citing* Vermeule, A., "*Hume's Second-Best Constitutionalism*, 70 U.Chi.L.Rev.421, 421-22 (2003); Young, E.A., "*Making Federalism Doctrine: Fidelity, Institutional Competence, and Compensating Adjustments*," 46 Wm.& Mary.L.Rev. 1733, 1739 (2005); Kerr, O., "*An Equilibrium-Adjustment Theory of the Fourth Amendment*," 125 Harv.L.Rev. 476, 478 (2011).

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

1586.  To this end, they incorporate the arguments and allegations above criticizing the RUDs that limit them, that suggest such RUDs are not enforceable as to fundamental international commitments, and that the US may not RUD its way out of a Article 7.

**D.   Theory of Cruelty #3 – Direct Enforcement of 1984 Treaty**

1587. Similarly, Plaintiffs incorporate the arguments and allegations above in support of a theory that the 1984 Treaty, including Articles 14 and 16, are directly enforceable as non-derogable commitments.

## XVIII.
## CAUSE OF ACTION #3
## CLAIM FOR RELIEF

## INSTITUTIONAL FAILURE TO PROVIDE
## AN EFFECTIVE REMEDY
## FOR VIOLATION OF DOMESTIC CIVIL RIGHTS

1588. Plaintiffs incorporate paragraphs 1-1587 as if fully set forth into this cause of action.

**A.   The United States' Various Committments to Create and Provide a Legal System that Provides an Effective Remedy for the Violation of Civil Rights.**

1589. In 1899, the United States signed the Hague Convention, in which the United States promised the world in Article 8 that prisoners (of war) would enjoy the protection of the laws of the body that captured them.[323]

1590. In 1929, the United States signed the Geneva Accords, in which it promised the world that it would undertake to have in place legislation to ensure "all

---

[323] "*Convention (II) with Respect to the Laws and Customs of War on Land and its Annex: Regulations concerning the Laws and Customs of War on Land,*" Article 8, The Hague (July 29, 1899).

proper measures for the equitable compensation" for work injuries sustained by captured prisoners.[324]

1591. In 1966, the United States promised the world in the ICCPR Treaty (ratified in 1992) that it would "ensure that any person whose rights or freedoms as herein recognized are violated, shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity."[325]

1592. The "rights and freedoms" referenced in the ICCPR track Plaintiffs' Eighth Amendment rights: freedom from cruel and unusual punishment, essentially.

1593. In 1984, the United States again promised the world in the Convention against Torture that it would "take effective legislative, administrative, judicial or other measures to prevent acts of torture in any territory under its jurisdiction."[326]

1594. Consequently, for 120 years the United States has in one treaty or another recognized the obligation to have domestic laws in place that provide an enforceable remedy for violation of fundamental human rights.

1595. Furthermore, international law has repeatedly expressed the notion that it should not matter whether the violation occurs at the hands of private individuals of government officials.  ICCPR Article 2 states this expressly.[327]  Therefore, it is inexcusable for the US to develop a doctrine in qualified immunity that immunizes government officials for civil rights violations; this dynamic sits in direct contradiction to its written international promises.[328]

---

[324] *"Convention Relative to the Treatment of Prisoners of War,"* Article 27, Geneva (July 27, 1929)

[325] ICCPR, Article 2, paragraph 3.

[326] "*Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,*" Article 2, paragraph 1 (December 10, 1984).

[327] ICCPR, Article 2, paragraph 3.

[328] *See also* (European) Convention for the Protection of Human Rights, United Nations Treaty, Article 13 (1950) ("Everyone whose rights and freedoms as set forth in this Convention are violated shall have an effective remedy before a

**B.  The American Legal System's Failure to Provide an Effective Remedy in this Case Given Qualified Immunity.**

1596.  The US Constitution's Eighth Amendment forbids excessive bail, excessive fines, and cruel and unusual punishment.

1597.  Pursuant to 42 U.S.C. § 1983, litigants have a federal statutory right to enforce the Eighth Amendment, which provides a right to compensation in the event of violations of the US Constitution.

1598.  There are no limitations or immunities in the text of the statute, no doubt because the legislative history of the era indicates that Congress was targeting the Southern States' law enforcement system when it passed these laws.

1599.  As detailed above, the qualified immunity doctrine rendered Plaintiffs' Eighth Amendment civil rights unenforceable, due to a series of legal violations relating to proper intrerpretative originalism (aka judicial activism), *stare decisis*, separation of powers, judicial independence, and other significant paradigmatic deviations from traditional and accurate analytical methods expected of the American legal system, in the following bill of particulars:

(1)  the doctrine of immunity was unlawfully invented in the wake of legislation that had purposefully done the opposite: the 1866 and 1871 civil rights laws had created liability for all three branches of government, including and of course, the executive branch because all three branches (in the Southern States) were involved in committing, facilitating or failing to rectify gruesome violations of African Americans civil rights during the post-Civil-War Reconstruction Era[329];

(2)  in 1951, immunity was granted to legislators in *Tenney v. Brandhove*,[330] in contravention of the purpose of the statute, and then expanded to judges in 1967, again unlawfully, and in the same opinion, expanded to

national authority *notwithstanding that the violation has been committed by persons acting in an official capacity.*")

[329]  Poland, Senate Report, "*Affairs in the Late Insurrectionary States,*" pp. 1-29 (February 19, 1872); *Monroe v. Pape*, 365 U.S. 167, 173-176 (1961).

[330]  *Tenney v. Brandhove*, 341 U.S. 367, 372-376 (1951).

police officers issuing good faith (but inaccurate) arrest warrants, in *Pierson v. Ray*,[331] also unlawfully;

(3)   in 1974, as to the executive, immunity expanded from a limited exception for police officers in *Pierson* to protecting everyone in the executive, again unlawfully, in *Wood v. Strickland*[332];

(4)   in 1982, immunity mutated from *Pierson* and *Wood* in *Harlow v. Fitzgerald*[333] to an entirely different policy-based paradigm, again unlawfully and without empirical support, to require clearly established law in a so-called balancing test;

(5)   from 1982 through 2001, the immunity doctrine mutated and expanded and mutated some more after *Harlow* in various formulations of the qualified immunity test to the point of *Saucier v. Katz*,[334] in 2001, where it completely changed again, into a two-step analysis rule that required clearly established law *as evidenced* by a *prior*, *published* case, all without any legal foundation or precedent for such a paradigm and thus again unlawfully, in violation of *stare decisis*;

(6)   in 2009, qualified immunity mutated again in *Pearson v. Callahan*,[335] when the doctrine became a circular "heads I win, tails you lose" game by removing the obligation for the federal judiciary to establish the law, while at the same time requiring victims to cite established law;

(7)   *Pearson's* trap was made harsher still in 2011[336], 2012[337], 2015[338], and 2018[339] where additional language was tacked on to the *Saucier/Pearson* paradigm to make it virtually impossible to satisfy (requiring its application if even one reasonable official might view the situation at hand as justifiable), all of which sits in perfect contradiction to Congress' legislative intentions in 1866 and 1871 in rejecting all immunity;

[331]   *Pierson v. Ray*, 386 U.S. 547, 557 (1967).
[332]   *Wood v. Strickland*, 420 US 308, 322 (1975).
[333]   *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).
[334]   *Saucier v. Katz*, 533 U.S. 194, 201 (2001).
[335]   *Pearson v. Callahan*, 555 U.S. 223, 234 (2009).
[336]   *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).
[337]   *Reichle v. Howards*, 566 U.S. 658, 664 (2012).
[338]   *Taylor v. Barkes*, 575 U.S. 822, --, 135 S. Ct. 2042, 2044 (2015).
[339]   *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

(8)   in 2019, it was applied in the penultimate absurdity when the Supreme Court implicitly validated the right of government agents to steal from the citizenry, in *Jessop v. Fresno,*[340] in contravention of 3,400 years of law throughout the world based on the 7th Commandment to the Catholic Bible, which states "thou shalt not steal."

(9)   in October 2019, it was applied to become the ultimate absurdity, in this case, by virtue of utilizing *Pearson's* circular paradigm: from 2010-2014, the courts repeatedly declined to publish a valley fever case and then it 2019 the courts faulted Plaintiffs for being unable to cite a published valley fever case.[341]

1600. This last permutation of qualified immunity represents a profound violation of federal due process.

1601. It signals a breakdown in institutional integrity.

1602. It also reflects a troubling injection of the judiciary into the substantive merits of case disputes.  The courts are now active participants in the merits of a legal dispute, personally committing key actions that remove accountability and enable immunity, by taking on a role that could itself create liability in terms of publication decisions that could be viewed as tortious.

1603. For example, if a federal judge were to knowingly and intentionally refuse to publish a case in derogation of the normal guidelines, knowing that a larger batch of identical cases were in the litigation pipeline, he could be personally liable for

---

[340]  *Jessop v. Fresno*, 918 F.3d 1031, 1036 (9th Cir. 2019), *withdrawn* 936 F.3d 937 (2019), *cert. denied* U.S.S.C. Case No. 19-1021 (May 18, 2020).

[341]  *Hines v. Youseff,* 914 F.3d 1218 (9th Cir.)*, cert. denied sub nom. Smith v. Schwarzenegger,* 140 S.Ct. 159 (2019) (granting qualified immunity because no case specific to valley fever had been previously published);
*see  Smith v. Schwarzenegger*, 393 Fed.Appx. 518 (9th Cir. 2010);
*Gray v. Robinson*, 481 Fed.Appx. 380 (9th Cir. 2012);
*Johnson v. Pleasant Valley*, 505 Fed.Appx. 631 (9th Cir. 2013);
*Samuels v. Ahlin*, 584 Fed.Appx. 636 (9th Cir. 2014);
*Gregge v. Cate*, 584 Fed.Appx. 421 (9th Cir. 2014)
(refusing to previously publish case specific to valley fever)

injecting himself into the substantive merits of a legal dispute and purposefully subverting access to the legal system for the cases in tow.

1604. An argument could be made that this dynamic occurred in this case, as outlined above.

1605. An argument could be made that it happened in a second case involving Plaintiffs. Valley fever is a lung disease. It makes Plaintiffs ultra-vulnerable to Covid-19, also a lung disease. In *Plata v. Newsom*, valley fever-stricken plaintiffs moved to intervene and join in litigation brought by PLO plaintiffs (Messr. Plata, *et al*.) to combat the spread of Covid-19 in California prisons.

1606. Plaintiffs candidly announced that they wished to intervene to secure an appellate ruling that would provide the requisite cognizability to the State's handling of the Covid-19 epidemic (in order to defeat qualified immunity) and thus trigger potential liability in the event the State mishandled the Covid crisis.

1607. But the court in that case cleverly denied the motion to intervene a day early (on April 3, 2020), before ruling on PLO's substantive Covid motion (on April 4, 2020), thereby thwarting the Valley Fever Plaintiffs' ability to appeal PLO's substantive ruling about Covid as a joined party, and their ability to at least potentially secure the necessary appellate ruling recognizing that the mishandling of Covid-19 might state a cognizable constitutional claim under section 1983.[342]

1608. At the time of Plaintiffs' effort to intervene, around March 30, 2020, there were 207 confirmed cases. As of June 21, 2020, there were 2,154 cases. Unless some other plaintiff secured an appellate ruling that recognized exposure to Covid-19 as a potential constitutional violation (to overcome the qualified immunity doctrine), the "chess master" moves of the federal court system insulated the government from potential damage claims for 2,000 Covid-19 victims by preventing the ability to secure an (emergency) published appellate case.

[342] *Plata v. Newsom,* Case No. 01-cv-1351, Dkts. 3219, 3224, 3226, 3246, 3253, 3254, 3256, 3261, 3308 (N.D.Cal. 2020).

PAVONE & FONNER, LLP

1609. This personal injection of the courts into the outcome of legal disputes is unprecedented. In this case, the judiciary has itself becomes an actor in the dispute through the publication aspect of qualified immunity – declining to publish a valley fever case and then circularly requiring publication of a valley fever case – rather than sitting in its normally detached role as an aerial <u>bystander</u> to disputes and an interpreter from afar of the law that governs them.

1610. Worse, this possible judicial cheating has been in service to a larger effort to shield the government from accountability for committing the worst mass tort in American penological history in terms of ignoring an epidemic.

1611. The underlying case, with 270 plaintiffs, represented a quantum of exposure that prompted federal judges to reverse their own prior legal positions once they realized the magnitude of it, which is the least valid reason of all to shred basic due process and Eighth Amendment principles.

1612. These dynamics also shatter the intent of the nation's premiere civil rights law under section 1983 and rewrite the judiciary's role as a personal actor within disputes of our constitutional republic, dynamics not formerly even conceivable to a traditionally-trained constitutional advocate.

1613. As if the legal dynamics in this situation could be any more surreal, when directly faced with the formal argument that the courts have implemented *Pearson's* circular paradigm in this case, the California Attorney General's office simply declined to address the argument.[343]

1614. It apparently contends it does not need to address it given other rules, but it is still shocking to see allegations of this magnitude left unaddressed for any reason by the agency responsible for the defense of the government.

1615. Frankly, this type of unprecedented criticism can normally only be plausibly leveled at third world legal systems, ones where the executive and the

---

[343] *Bates, et al. v. Schwarzenegger, et al.*, Ninth Circuit Case Number 19-17094, Dkt. 30 (9th Cir. 2019).

PAVONE & FONNER, LLP

judiciary are effectively merged, such as for example the "astonishing hubris" displayed by Iraq's former president Saddam Hussein when he reportedly said, "Don't tell me about the law.  The law is anything I write on a scrap of paper."[344]

1616. Based on these dynamics, there is a disturbing intellectual hole blown through the mortar wall of the intellectual consistency of the American legal system in this case by the application of the qualified immunity doctrine vis-à-vis the ability to enforce the civil rights provided for in US domestic legislation, rights that are expected to provide an effective remedy pursuant to the international commitments made by the United States some 50 years ago.

### C.   The Commitment to Provide an Effective Legal System is a Custom and Norm of the International Community.

1617.  Article 2, paragraphs 2 and 3 of the 1966 ICCPR, representing the obligation of each country to implement domestic legislation to provide an effective remedy for violation of civil rights, have become a custom and norm of international law and therefore must be recognized as an enforceable common law right in the district courts of the United States.

1618. Of the 178 countries that participated in the ICCPR process, 172 ultimately ratified it, with six exceptions noted above.

1619. Of the 172 countries that ratified it, only four commented in their RUDs with potential limitations on the enforcement of the "effective remedy" provisions of Article 2, paragraphs 2 and 3: France, Monaco, Turkey and the United States.[345]

---

[344] Press Office, '*House of Saddam, A Compelling Drama…*," British Broadcasting Company, Website: www.bbc.co.uk (October 29, 2014); Boucher, Katie, "*House of Saddam,*" The National, Website: https://www.thenational.ae (July 6, 2010).

[345] ICCPR, Article 2, paragraph 2 states: "Where not already provided for by existing legislative or other measures, each State Party to the present Covenant undertakes to take the necessary steps, in accordance with its constitutional processes and with the provisions of the present Covenant, to adopt such legislative or other measures as may be necessary to give effect to the rights recognized in the present Covenant."

PAVONE & FONNER, LLP

1620. Between these two provisions, each ratifying country committed to either already possess, or alternatively to create and implement, domestic legislation that would respect the rights documented in the ICCPR Treaty, including within that legislation to permit an effective remedy that includes compensation in the event of violations of those rights.[346]

1621. France clarified that, since it was a party to the 1945 United Nations Charter, it had pre-existing duties under that commitment. Article 103 of the Charter states that it prevails over any other treaties a country might make. France confirmed this in its reservation as to Articles 1 and 2 of the ICCPR, which is hardly controversial, and does not reflect any real limitation on France's willingness to respect its obligation to put in place domestic legislation respecting civil rights with enforceable remedies consistent with Article 2.

1622. Turkey did the same thing as France vis-à-vis Article 103, also functionally irrelevant. But Turkey also claimed that it would only respect the ICCPR with respect to countries that it had diplomatic relations with and in those places within Turkey where its laws are applied (some subset of the entire country, apparently).

1623. This drew several objections (from Germany, Cyprus, Greece) and does represents a kind of limitation on Article 2. It would prevent certain countries and certain citizens under Turkey's control from enforcing the ICCPR. It does not mean however that Turkey did not otherwise implement Article 2 with domestic legislation as to the countries and citizens it agreed to permit enforcement.

1624. Monaco's government is a constitutional monarchy. It mentioned Article 2, paragraph 2, as not interfering with its method of succession. Monaco's RUD does not represent any real limitation of Article 2 of the ICCPR.

1625. Accordingly, other than the United States, the six countries that did not ratify the ICCPR, Turkey's limitation, and perhaps doubt over the general

---

[346] *See* ICCPR, Articles 2, paragraphs 2 and 3(a); *see also* ICCPR, Article 9(5).

unenforceablitity of civil rights in a few countries governed by Sharia law, it does not appear that the world in general resisted or skirted the promise to create domestic legal systems containing an enforceable remedy for compensation in the event of violation of ICCPR civil rights.

1626. It is therefore plausible that the United States stands alone as virtually the only modern country that does not have a domestic system in place for the compensable enforcement of civil rights, by virtue of its immunity for government officials: in a practically automatic fashion after *Tenney*[347] and *Pierson*[348] for judges and legislators.

1627. As to the executive, qualified immunity covers everyone in that branch except in the exceedingly rare situation where *(i)* the exact same wrong previously occurred and was litigated *(ii)* to the point of an appellate opinion, *(iii)* one in which the judiciary in its subjective discretion elected to publish *(iv)* and within that publication, the judiciary recognized that the wrong asserted represents a cognizable constitutional violation, and then even if so, *(v)* that all reasonable government officials would theoretically agree that this wrong constitutes a constitutional violation such that the matter is beyond debate.[349]

1628. Considering that the Supreme Court has seemingly agreed that theft by government officials of money belonging to the citizenry does not constitute a constitutional violation, with such latitude, there is virtually no wrong that some reasonable official could not debate.[350]

---

[347] *Tenney v. Brandhove*, 341 U.S. 367, 372-376 (1951).
[348] *Pierson v. Ray*, 386 U.S. 547, 557 (1967).
[349] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012); *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).
[350] *Jessop v. Fresno*, 918 F.3d 1031, 1036 (9th Cir. 2019), *withdrawn* 936 F.3d 937 (2019), *cert. denied* U.S.S.C. Case No. 19-1021 (May 18, 2020).

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

1629.  Consequently, if not immediately foreclosed as a legislative or judicial act, there is a good argument under qualified immunity that the executive officials of the United States are now immune from virtually every given wrong they commit, as long as it is not exactly like some prior, previously litigated wrong.

1630. To this end, the United States' broad governmental immunity provisions reflect its violation of the ICCPR's commitment to possess and implement appropriate domestic legislation to provide effective remedies for violations of civil rights.

1631. More importantly, an inventory of the countries that agreed to implement such legislation, as compared to the few expressing restrictions, reveals that world opinion is sufficiently unanimous about Article 2 that it has become a custom and norm of international law.

### D.  The Court Has a Measure of Doctrinal Flexibility to Fashion a Remedy for Violation of Article 2.

1632. If the court finds that the US failed to provide an effective remedy for violation of civil rights via domestic law in this case, what then?

1633. It does not appear that a district court could simply invalidate qualified immunity, as if international law could simply superimpose itself over the existing domestic landscape.[351]

1634. It is also not the case that Plaintiffs' remedy lies exclusively within the UN's Human Rights Committee.[352]  As a customs-and-norms violation, Plaintiffs are entitled to sue in US district court and seek a judicial remedy with the kind of validity associated with American court judgments.

1635. A basic logic to such a breach is to give to Plaintiffs what they were denied: an effective remedy for the violation of their Eighth Amendment rights.  This is not an assertion, or re-assertion, of Plaintiffs' Eighth Amendment claim.  Nor is it an

---

[351] *Igartúa v. United States*, 626 F.3d 592, 602 (1st Cir. 2010).
[352] *See* Weissbrodt, David, "*Defining Torture and Cruel, Inhuman, and Degrading Treatment*," 29 Law & Ineq. 343, 352 (2011).

PAVONE & FONNER, LLP

assertion of an ICCPR Article 2 claim.  Rather, this claim requires Plaintiffs to prove their customs-and-norms international law claim, one closely related to Article 2 but not technically originating from the ICCPR.

1636. It would be litigated in sort of the way a malpractice case is litigated: first the plaintiff proves that there was "malpractice" (here, a violation of the common law international norm expressed in Article 2), then the plaintiff must prove that but for the malpractice, Plaintiff would have prevailed (by proving the underlying case alleging violation of domestic civil rights, here, cruel and unusual punishment under the Eighth Amendment without the feature that prompted the Article 2 violation, qualified immunity).  This would represent a plaintiff's burden to establish liability.  If he proves these things, then he moves on to causation and damages in traditional tort fashion.

1637. The United Nations suggests a flexible approach to enforcement of Article 2 under domestic law.  As explained by the Human Rights Committee of the United Nations in General Comment 31, "[t]he … rights recognized under the Covenant can be effectively assured by the judiciary in many different ways, including direct applicability of the Covenant, application of comparable constitutional or other provisions of law, or the interpretive effect of the Covenant in the application of national law."[353]

1638. In writing this advisory document, the UN made clear: "Article 2, paragraph 3, requires that States Parties make reparation to individuals whose Covenant rights have been violated. Without [such] reparation, the obligation to provide an effective remedy, which is central to the efficacy of article 2, paragraph 3, is not discharged."

---

[353]  Human Rights Committee, "*The Nature of the General Legal Obligation Imposed on States Parties to the Covenant*," United Nations, International Covenant on Civil and Political Rights," General Comment 31, ¶ 15 (May 26, 2004).

1639. By declining self-execution, the United States did not adopt Article 2, paragraph 3 as directly enforceable, but this observation by the UN, in 2004 at the start of the cocci epidemic, lends further support to Plaintiffs' contention that this principle of domestic enforceability was universally accepted in the international community in time to govern California officials handling the cocci epidemic.

1640. If accepted, it warrants recognition by the United States as a federal common law cause of action, especially in the context of a doctrine that is universally reviled as unlawful and unfounded by a near-unanimous cross-ideological coalition of scholars, and undoubtedly by the larger potentially-affected victim class, the People of the United States.

### E. Qualified Immunity is not a Reasonable Requirement of Domestic Law.

1641. If a court were to conclude that qualified immunity compromises a US custom-and-norm international commitment to provide the US citizenry with an effective domestic remedy, then it would by definition foreclose a finding that application of qualified immunity is a reasonable requirement of domestic law, pursuant to Understanding 2 of the United States' RUDs to the ICCPR.

1642. Overcoming this understanding is not technically an element of Plaintiffs' claim, as this aspect of the cause of action is not a direct enforcement of the ICCPR, but for the record, validation of the plausibility of the claim eliminates this potential defense.

1643. However, for preservation sake, Plaintiffs incorporate all of their prior arguments in support of a contention that the ICCPR is directly enforceable, and thus Article 2 is enforceable, and as an alternative to that, that the CAT is directly enforceable and that its effective remedy provision, also Article 2, is actionable in US district court despite all of their respective RUDs.

PAVONE & FONNER, LLP

# XIX.

# PRAYER FOR RELIEF

*Wherefore*, **Plaintiffs request on the First Claim for Relief for Torture in Violation of International Law, the following**:

(1)    economic damages in an amount to be proven at trial to compensate plaintiffs for the ongoing cost of antifungal medical care (estimated at $10,000/year) and medical monitoring of the disease (estimated at $1,000/year), for the expected cost of periodic hospitalizations due to its flare-ups (estimated to cost about $100,000 per hospitalization)[354] to cover the cost of severe illness brought upon by dissemination or other aggravation of the disease (which ranges from the tens of thousands to hundreds of thousands dollars in medical care, depending on the severity of the injuries), and the resulting loss in the inmate's ability to work and earn money upon his release, which varies depending on the degree of debilitation of a given inmate;

(2)    non-economic damages in an amount to be proven at trial for the pain, suffering and misery associated with the experience of the disease and its associated management, the loss of health and enjoyment of life attributable to management of a serious disease, the fear, depression and demoralization associated with the consequences of having a life-long disease, and the risk, and reality, of its disseminated form resulting in severe health consequences up to and including an early and painful death[355];

(3)    punitive damages, including but not limited to, the reality that American corrections officials from 2004-2014 volitionally ignored an epidemic of a serious disease and caused thousands of people, mostly minorities, to contract an incurable and

---

[354] Amaro, Yesenia, "*Valley Fever Costs Mount for Patients and Taxpayers*," University of Southern California, USC Annenberg (November 2, 2014).

[355] *See* Hinton Alfert & Kahn LLP Press Release, "*Jury Returns Nearly $12 Million Verdict against Caltrans in Valley Fever Exposure Suit Brought by Five Employees of Independent Contractor*," PRN Newswire, Website: https://www.prnewswire.com (January 21, 2016).

PAVONE & FONNER, LLP

debilitating ailment in a decision process founded in racism and that such racist attitudes and policy decisions trace back to unhealed atrocities from slavery, through the Civil War, to the modern age[356];

(4)     reasonable attorney's fees to the extent any cause of action permits them.

(5)     costs of suit including the expense of experts;

(6)     interest; and

(7)     such other relief as the Court deems just and proper.

**Plaintiffs request on the Second Claim for Relief**
**for Cruelty in Violation of International Law, the following**:

(8)     economic damages, same as above;

(9)     non-economic damages, same as above;

(10)    punitive damages, same as above;

(11)    reasonable attorney's fees to the extent any cause of action permits them;

(12)    costs of suit including the expense of experts;

(13)    interest; and

(14)    such other relief as the Court deems just and proper.

**Plaintiffs request on the Third Claim for Relief for Violation of the**
**International Norm to Provide an Effective Remedy, the following**:

(15)    economic damages, same as above;

(14)    non-economic damages, same as above;

(15)    reasonable attorney's fees to the extent any cause of action permits them;

(16)    costs of suit including the expense of experts;

(17)    interest; and

---

[356] *Frost v. Iran*, 419 F.Supp.3d 112, 116-117 (D.D.C. 2020); *Hekmati v. Iran*, 278 F.Supp.3d 145, 166 (D.D.C. 2017) (awarding double compensatory as punitive damages in international torture claim because "Iran's provision of material support to militant groups for the purpose of harming U.S. citizens is "*part of a longstanding pattern and policy, making the need for deterrence clear*" (italics added); *Bluth v. Iran*, 203 F.Supp.3d 1, 25 (D.D.C. 2016) ("Iran is a sovereign and has substantial wealth").

(18)   such other relief as the Court deems just and proper.

Date: June 26, 2020                                PAVONE & FONNER, LLP

                                                   Benjamin Pavone, Esq.
                                                   Attorneys for Plaintiffs


## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby respectfully request trial by jury.


Date: June 26, 2020                                PAVONE & FONNER, LLP

                                                    /s/ Benjamin Pavone
                                                   Benjamin Pavone, Esq.
                                                   Attorneys for Plaintiffs

PAVONE & FONNER, LLP

## XX
## END NOTES

### End Note 1

Balko, Radley, "*There's Overwhelming Evidence that the Criminal-Justice System is Racist. Here's the Proof,*" Washington Post (June 10, 2020), *citing*:

Baumgarter, Frank, *et al.*, "Suspect Citizens, What 20 Million Traffic Stops Tells Us about Policing and Race," Cambridge University Press (2018)

Baumgarter, Frank, "*What Data on 20 Million Traffic Stops…,*" Washington Post (July 7, 2018)

"*Black, Brown & Targeted, a Report on Boston Police Department Street Encounters from 2007-2010,*" ACLU Report (October 2014)

Bruner, Bethany, "*Columbus Police Use Force Disproportionately against Minorities, Study Finds,*" Columbus Dispatch (August 21, 2019);

Chanin, Joshua, *et al.*, "*Traffic Enforcement in San Diego, an Analysis of SDPD Vehicle Stops in 2014 and 2015,*" San Diego State University (November, 2016)

Crank, Spencer, "*Analysis of the Austin Police Department's Racial Profiling Report,*" City of Austin Memorandum (January 3, 2020)

Denbeaux, Mark, *et al.*, "*Racial Profiling Report: Bloomfield Police and Bloomfield Municipal Court,*" Seton Hall University School of Law, Center for Policy and Research (April 9, 2016)

Duggan, P., "*A Disproportionate Number of D.C. Police Stops involved African Americans,*" Washington Post (September 9, 2019)

"*Ending the War on Drugs in Travis County,*" Texas Criminal Justice Coalition (February, 2020); Rodriguez, Dennis,

Fagan & Geller, "*Police, Race, and the Production of Capital Homicides,*" 23 Berkeley J. Crim. L. 262 (2018)

Hammel, Tyler, "*Report Finds Racial Disparity at Almost Every Level of Local Criminal Justice System,*" The Daily Progress (Website: thedailyprogress.com, January 29, 2020)

Ingraham, Christopher, "*You Really Can Get Pulled Over for Driving While Black, Federal Statistics Show,*" Washington Post (September 9, 2014);

Lowery, Wesley, "*Where Killings Go Unsolved,*" Washington Post (June 6, 2018)

Lyons, Kelan, "*Racial Disparities in Traffic Stops Down, but Minority Drivers Often Treated Differently,*" The Connecticut Mirror (Website: ctmirror.com, June 25, 2019)

Manley, Brian, "*2018 Racial Profiling Report,*" Austin Police Department Memorandum (February 27, 2019)

Marquis, BR, "*Were California's Decarceration Efforts Smart? a Quasi-Experimental Examination of Racial, Ethnic, and Gender Disparities*," Society for Social Work and Research, Website: www.sswr.org (January 19, 2020).

Monk, Ellis, "*The Color of Punishment: African Americans, Skin Tone, and the Criminal Justice System*," 42 Journal Ethnic and Racial Studies 10 (2019)

Poston, B. "*LAPD Searches Blacks and Latinos More. ButThey're Less Likely to Have Contraband than Whites*," LA Times (October 8, 2019)

Pierson, E., *et al.*, "*A Large-Scale Analysis of Racial Disparities in Police Stops across the United States*," Nature Human Behaviour (Website: www.nature.com) (May, 2020) ("Our results indicate that police stops and search decisions suffer from persistent racial bias and point to the value of policy interventions to mitigate these disparities.")

"…*Police Ticketing Black Drivers at Higher Rate*," I-Team 8 Investigation, WISH-TV8 (Website: wishtv.com) (December 4, 2019)

Pryor, William, et al., "*Demographic Differences in Sentencing: An Update to the 2012 Booker Report,*" United States Sentencing Commission (November 2017)

Quigley, Aidan, "*Racial Disparities, Search Rates Decline in Burlington Police Traffic Stops*," Vermont Digger, Website: VTDigger.org (June 30, 2019)

"*Racial Bias Audit of the Charleston, South Carolina, Police Department,*" CNA Audit Team (September 30, 2019)

Ross, Cody, "*A Multi-Level Bayesian Analysis of Racial Bias in Police Shootings at the County-Level in the United States,2011–2014*," PLOS Research Publisher (Website: https://plos.org) (November 5, 2015)

Ross, Matthew, et al., "*Traffic Stop Data Analysis and Findings, 2016*," State of Rhode Island Comprehensive Police-Community Relationship Act Of 2015 (CCPRA) (March, 2018)

Stevenson, Bryan, "*Illegal Racial Discrimination in Jury Selection*," Equal Justice Initiative Report (August, 2010)

Stevenson, Megan, "*The Scale of Misdemeanor Justice,*" 98 Boston University Law Review 731 (2018)

Stout, Mike, "*Racial and Ethnic Disparities in Traffic Stops and Stop Outcomes in Springfield, Missouri: 2012-2016*," Springfield Police Department (by Chief Paul Williams) (August 8, 2017)

Thompson, Don, "*Report: California Cops More Likely to Stop Black Drivers*," Associated Press, US News & World Report (January 2, 2020).

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

## XXI
## BIBLIOGRAPHY

## Cases

*Abdullahi v. Pfizer*
    562 F.3d 163 (2nd Cir. 2009)

*Abukar, et al. v. Schwarzenegger, et al.*,
    Case No. 1:14-cv-816 (E.D.Cal. 2014)

*Abukar v. Kelso*
    Case No. 4:20-0731 (N.D.Cal. 2020)

*Adams, et al. v. Schwarzenegger, et al.*
    Case No. 1:14-cv-1226 (E.D.Cal. 2014)

*Al-Adsani v. United Kingdom*
    2001-XI Eur. Ct. H.R. 80, 100-03 (2001)

*Aldana v. Del Monte,*
    416 F.3d 1242, 1251 (11th Cir. 2005)

*Al Shimari v. CACI*
    119 F.Supp.3d 434, 450 (E.D.Va. 2015)

*Alaniz, et al. v. Schwarzenegger, et al.*
    Case No. 1:15-cv-1063-LJO-SAB (E.D.Cal. 2015)

*Altamirano, et al. v. Schwarzenegger, et al.*
    Case No. 1:15-cv-0607-LJO-SAB (E.D.Cal. 2015)

*Aparicio, et al. v. Schwarzenegger, et al.*
    Case No. 1:15-cv-1369-LJO-SAB (E.D.Cal. 2015)

*Ashby v. White*
    1 Bro.P.C. 62, 1 Eng.Rep. 417 (H.L.1704), *reversing*
    6 Mod. 45, 87 Eng.Rep. 808 (Q.B.1703)

*Ashcroft v. al-Kidd*
    563 U.S. 731 (2011)

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009)

*Barr v. Gatteo*
    360 U.S. 564

79 S.Ct. 1335
3 L.Ed.2d 1434 (1959)

*Bates, et al. v. Schwarzenegger, et al.*
Case No. 19-17049 (9th Cir. 2019)

*Bates, et al. v. Schwarzenegger, et al.*
Case No. 1:14-cv-2085-LJO-SAB (E.D.Cal. 2015)

*Beagle, et al. v. Schwarzenegger, et al.*,
Case No. 1:14-cv−430 (E.D.Cal. 2014).

*Birge, et al. v. Schwarzenegger, et al.*
Case No. 1:15-cv-1901-LJO-SAB (E.D.Cal. 2015)

*Bell Atlantic v. Twombly*
550 U.S. 544 (2007)

*Bluth v. Iran*
203 F.Supp.3d 1 (D.D.C. 2016)

*Campbell, et al. v. Schwarzenegger, et al.*
Case No. 1:14-cv-01559 (E.D.Cal. 2014)

*Carazani v. Zegarra*
972 F.Supp.2d 1 (D.C.Cir. 2013)

*Corfu Channel Case*,
United Nations International Court of Justice (1948)

*Cornejo-Barreto v. Seifert*
218 F.3d 1004 (9th Cir. 2000)

*Dalehite v. United States*
346 U.S. 15 (1953)

*Doe v. Howard*
Case No. 1:11-cv-1105
2012 U.S. Dist.Lexis 125414

*Doe I v. Qi*
349 F.Supp.2d 1258 (N.D.Cal. 2004)
2012 WL 3834867 (E.D. Va. 2012)

*Edison v. Geo*
822 F.3d 510 (9th Cir. 2016)

PAVONE & FONNER, LLP

*Estelle v. Gamble*
    429 U.S. 97 (1976)

*Floyd v. Barker*
    12 Co.Rep. 23
    77 Eng.Rep. 1305 (K.B.1607)

*Foster v. Neilson*
    27 U.S. 253 (1829)

*Frost v. Iran*
    419 F.Supp.3d 112 (D.D.C. 2020)

*Hekmati v. Iran*
    278 F.Supp.3d 145, 166 (D.D.C. 2017)

*Gray v. Robinson*
    481 Fed.Appx. 380 (9th Cir. 2012)

*Gregge v. Cate*
    584 Fed.Appx. 421 (9th Cir. 2014)

*Gurung v. Malhotra*
    851 F.Supp.2d 583 (S.D.N.Y. 2012)

*Hamby v. Hammond*
    821 F.3d 1085 (9th Cir. 2016)

*Harlow v. Fitzgeralddf*
    457 U.S. 800 (1982)

*Healy v. Yasmeen*
    2020 U.S. Dist.Lex. 104300 (E.D.Cal. 2020)

*Helling v. McKinney*
    509 U.S. 25 (1993)

*Hereros v. Deutsche Afrika-Linien*
    232 Fed.Appx. 90, 95 (3d Cir. 2007).

*Hertz v. Woodman*
    218 U.S. 205 (1910)

*Hines v. Youseff*, 914 F.3d 1218 (9th Cir.), *cert. denied sub nom. Smith v. Schwarzenegger*, 140 S.Ct. 159 (2019)

*Hines v. Youssef*
  Case No. 15-17155 (9th Cir. 2019)

*Hope v. Pelzer*
  536 U.S. 730 (2002)

*Igartúa v. United States*
  626 F.3d 592 (1st Cir. 2010)

*Jessop v. Fresno*
  918 F.3d 1031 (9th Cir. 2019)

*Johnson v. Pleasant Valley*
  505 Fed.Appx. 631 (9th Cir. 2013)

*Lopez v. Smith*
  203 F.3d 1122 (9th Cir. 2000)

*Kisela v. Hughes*
  138 S. Ct. 1148 (2018)

*Mazengo v. Mzengi*
  Case No. 07-756 (RMC)(AK)
  2007 U.S. Dist.Lexis 99377
  2007 WL 8026882 (D.D.C. 2007)

*McGuckin v. Smith*
  974 F.2d 1050, 1059 (9th Cir. 1992)

*Miller v. Horton*
  26 N.E. 100 (Mass. 1891)

*Monroe v. Pape*
  365 U.S. 167 (1961)

*Moreno v. Yates*
  Civ.No. 1:07-cv-01404-DGC (E.D.Cal.2007).

*Morrow, et al. v. Schwarzenegger, et al.*,
  Case No. 1:14-cv-01395 (E.D.Cal. 2014)

*Mousa v. Trump*
  2019 U.S.Dist.Lex. 198709 (E.D.Cal. 2019)

*Myers v. Anderson*
  238 U.S. 368 (1915)

PAVONE & FONNER, LLP

*Pauly v. White*,
  USSC Case No. 17-1078, Cato Institute Amicus Brief.

*Pacelli Transportation v. Pacelli*
  189 Conn. 401 (Conn. 2015)

*Pearson v. Callahan*
  555 U.S. 223 (2009)

*People v. Whitmer*
  59 Cal.4th 733 (2014)

*Pierson v. Ray*
  386 U.S. 547 (1967)

*Plata v. Brown*
  427 F.Supp.3d 1211
  Case No. 01-cv-1351, 2013 WL 3200587 (N.D.Cal. 2013)

*Plata v. Newsom*
  Case No. 4:01-cv-1351, (N.D.Cal. 2013)

*Prosecutor v. Furundzija*
  Case No. IT-95-17/I-T, Judgment
  144 Int'l Crim. Trib. for the Former Yugoslavia (Dec. 10, 1998)

*Prosecutor v. Mucic, et al.*
  IT-96-21-T (1998)

*Reichle v. Howards*
  566 U.S. 658
  132 S.Ct. 2088
  182 L.Ed.2d 985 (2012)

*Saipan v. United States*
  502 F.2d 90, 96-97 (9th Cir. 1974)
  *cert. denied*, 420 U.S. 1003
  43 L.Ed.2d 761
  95 S.Ct. 1445 (1975)

*Samuels v. Ahlin*
  584 Fed.Appx. 636 (9th Cir. 2014)

*Saucier v. Katz*
  533 U.S. 194 (2001)

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

*Scheuer v. Rhodes*
    416 U.S. 232 (1974)

*Siderman de Blake v. Argentina*
    965 F.2d 699 (9th Cir. 1992)
    *cert. denied* 507 U.S. 1017 (1993)

*Simpson v. Socialist People's Libyan Arab Jamahiriya*
    326 F.3d 230, 234 (D.C.Cir. 2003)

*Smith, et al. v. Schwarzenegger, et al.*
    393 Fed.Appx. 518 (9th Cir. 2010)

*Smith, et al. v. Schwarzenegger, et al.*
    2:13-at-01236 (E.D.Cal. 2013)

*Smith, et al. v. Schwarzenegger, et al.*
    1:14-cv-00060 (E.D.Cal. 2013)

*Smith v. Schwarzenegger*,
    137 F.Supp.3d 1233 (E.D.Cal. 2015)\

*Sosa v. Alvarez-Machain*
    542 U.S. 692
    124 S.Ct. 2739
    159 L.Ed.2d 718 (2004)

*Spalding v. Vilas*
    161 U.S. 483 (1896)

*State of Washington v. The Geo Group*
    Pierce County Sup. Ct.
    Case No. 17-2-11422-2, Dkt. 1 (Wash. 2017)

*Taylor v. Barkes*
    575 U.S. 822
    135 S. Ct. 2042 (2015).

*Tenney v. Brandhove*
    341 U.S. 367 (1951)

*Urritia v. Guatemala*
    Judgment, Inter-Am. Ct. H.R. (ser. C)
    No. 103, 1 92 (Nov. 27, 2003)

*U.S. v. Williams*
    788 F.Supp.2d 847 (N.D. Iowa 2011)

*Vietnam Vets v. Dow Chemical*
    517 F.3d 104 (2d Cir. 2008)

*Walker v. United States*
    Case No. CV-F-02-5801-AWI-LJO (E.D.Cal. 2006)

*Ward v. Fidelity*
    179 F.2d 327 (8th Cir. 1950)

*Weisz v. Uruguay*
    United Nations Case No. (28/1978) (1978)

*Wood v. Strickland*
    420 US 308 (1975)

**Statutes, Treaties and Other Authority**

42 U.S.C., § 1997e

2015 Racial and Identity Profiling Act (RIPA)

"*A Day in the Life of an Enslaved Child,*" Franklin Elementary School, White paper (2004)

"*AG Ferguson Sues Operator of the Northwest Detention Center for Wage Violations,*" Washington State Attorney General's Office, Press Release (Sep. 27, 2017)

Agarwal, S., "*Racist Drug Laws Lead to Racist Enforcement in Cities Across the Country,*" ACLU News and Commentary (February 21, 2020)

Amaro, Yesenia, "*Valley Fever Costs Mount for Patients and Taxpayers,*" University of Southern California, USC Annenberg (November 2, 2014).

America, Richard F., The Wealth of Races. The Present Value of Benefits from Past Injustices, Greenwood Press, Westport, CT (1990)

American Thoracic Society, "*Patient Information Series,*" American Journal of Respiratory Care Medicine, Vol. 184.

Astor, Maggie, "*What to Know about the Tulsa Greenwood Massacre,*" New York Times (June 20, 2020)

Balko, Radley, "*There's Overwhelming Evidence that the Criminal-Justice System is Racist. Here's the Proof,*" Washington Post, (June 10, 2020)

Balko, Radley, "*The Jaw-Dropping Fall of an Elite Baltimore Police Unit Validates the Need for Federal Oversight*," Washington Post (February 1, 2018)

Banach, D. "*Infection Control & Hospital Epidemiology, Outbreak Response and Incident Management, etc.*," Vol. 38, No. 12, 1393-1402 (2017)

Baradaran, Mehrsa, "The Color of Money," Bellnap Press (2019)

Baude, W., "*Sovereign Immunity and the Constitutional Text,*" 103 Virg.L.Rev. 1 (2017)

Baude, W. "*Is Qualified Immunity Unlawful?*," 106 Calif. L. Rev. 45 (2018)

Baumgarter, Frank, *et al.*, "Suspect Citizens, What 20 Million Traffic Stops Tells Us about Policing and Race," Cambridge University Press (2018)

Baumgarter, Frank, "*What Data on 20 Million Traffic Stops…*," Washington Post (July 7, 2018)

Bendlin, S., "*Qualified Immunity: Protecting All but the Plainly Incompetent (and Maybe Some of Them, Too)*," 45 J. Marshall L. Rev. 1023, fn. 1 (2012)

"*Black, Brown & Targeted, a Report on Boston Police Department Street Encounters from 2007-2010*," ACLU Report (October 2014)

"*Biosafety in Microbiological and Biomedical Laboratories*," U.S. Department of Health and Human Services Public Health Service Centers for Disease Control and Prevention National Institutes of Health (2009, 5th Edition)

Boucher, Katie, "*House of Saddam*," The National, Website: https://www.thenational.ae (July 6, 2010).

Bondgraham, Darwin, "*Black People in California are Stopped Far More Often by Police, Major Study Proves*," The Guardian Newspaper (January 3, 2020),

Cahalan, M., "*Trends in Incarceration in the United States Since 1880: A Summary of Reported Rates and the Distribution of Offenses*," 25 Crime & Delinquency 1, pp. 9-41 (1979)

California Civil Code section 3523

California Correctional Health Care Services, "*Coccidioidomycosis in California's Adult Prisons 2006-2010,*" Report (April 16, 2012)

California Department of Health, Letter for "*The Record*," Infectious Disease Branch (January 11, 2007).

PAVONE & FONNER, LLP

California Department of Mental Health, "*Findings of Fact and Statement of Overriding Considerations,*" New Mental Health Treatment Facility, Sch #1999061074, p. 17 (October 2000)

California Department of Public Health, "*Operational Plan for Emergency, Response to Mosquito-Borne Disease Outbreaks,*" pp. 3-14 (2013); California CDCP Public Health Emergency Preparedness Cooperative Agreement (PHEP) Program, (2018)

California Dept. of Public Health, "*Occupational Health Branch, Preventing Work-Related Valley Fever (Coccidioidomycosis),*" Bulletin (2019).

California Dept. of Public Health, Department of Industrial Relations, "*Preventing Work-Related Valley Fever (Coccidioidomycosis),*" Bulletin (2013).

California Office of Emergency Services, "*Emergency Plan,*" Ch. 6.3.13 (2017)

California Penal Code, §§ 2800-2801

"*Carmel's own data supports I-Team 8 investigation into Police Ticketing Black Drivers at Higher Rate,*" I-Team 8 Investigation, WISH-TV8 (Website: wishtv.com) (December 4, 2019)

Carter, Zach, "*American Police Are at War with Democracy Itself,*" Huffington Post (June 7, 2020)

Catholic Bible, Exodus 20:15

Catholic Bible, Leviticus 11

CDCR Memo, "*Coccidioidomycosis (Cocci) Report,*" (October 27, 2006)

Chanin, Joshua, *et al.*, "*Traffic Enforcement in San Diego, an Analysis of SDPD Vehicle Stops in 2014 and 2015,*" San Diego State University (November, 2016)

Chung, *et al.*, "*For Cops who Kill, Special Supreme Court Protection,*" Reuters News Website ("Reuters Investigates"): www.reuters.com (May 8, 2020)

Clayton, A., "*92% Black or Latino,*" The Guardian Newspaper, Website: https://www.theguardian.com (November 26, 2019)

Clinical Infectious Diseases Journal 1:32(5), 708-15 (March 2001)

Coates JB, *et al.*, "*Preventive Medicine in World War II: Communicable Diseases Transmitted Chiefly through Respiratory and Alimentary Tracts,*" 4 Washington, DC: Office of the Surgeon General, Department of the Army, Chapter 11 (1958).

Cole, David, No Equal Justice: Race and Class in the American Criminal Justice System, New Press; First Edition, pp. 8-9 (1999)

PAVONE & FONNER, LLP

Conrad, A. and Meyer, J. "*The Economics of Slavery in the Ante Bellum South*," Journal of Political Economy, Vol. 66, No. 2, pp. 96, 100, 110 (1958) (analyzing slave breeding)

*Constitution of the Republic of Botswana*, Chapter 2, section 7 (September 30, 1966).

"*Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*," United Nations Treaty (December 10, 1984)

Committee on Use of Appellate Court Energies, Advisory Council for Appellate Justice, "*Standards for Publication of Judicial Opinions*," (1973)

*Concluding Observations: Russian Federation*' Committee on Economic, Social and Cultural Rights, UN Doc E/2004/22, ¶ 61 (2003)

"*Concluding Observations: Moldova,*" Committee on Economic, Social and Cultural Rights, UN Doc E/C.12/1/Add. 9 ¶¶ 25, 47 (2003)

*Concluding Observations: Republic of Moldova*," Human Rights Committee UN Doc A/57/40, vol I 76, ¶ 84(9) (2002);

Congressional Record, 102nd Congress, 2nd Sess. (1991-1992), p. S4781, Website: www.congresss.gov (1992)

Conrad, A. and Meyer, J. "*The Economics of Slavery in the Ante Bellum South*," Journal of Political Economy, Vol. 66, No. 2, p. 121 (1958)

Convention Against Torture, Treaty (1984)

"*Convention (II) with Respect to the Laws and Customs of War on Land and its Annex: Regulations concerning the Laws and Customs of War on Land*," Article 8, The Hague (July 29, 1899)

"*Convention Relative to the Treatment of Prisoners of War,*" Article 27, Geneva (July 27, 1929)

"*Convention Relative to the Treatment of Prisoners of War*," Article 27 (1929); Article 9, ¶ 4 (2002); United Nations General Assembly, "*Declaration of Basic Principles of Justice for Victims of Crime and Abuse of Power*," 96th Plenary Meeting, ¶¶ 12, 18 (November 29, 1985)

*Corbit v. Vickers*, Cato Institute, Amicus Brief to US Supreme Court Petition, Case No. 19-679, "*Brief of Cross-Ideological Groups Dedicated to Ensuring Official Accountability, Restoring the Public's Trust in Law Enforcement, and Promoting the Rule of Law as Amici Curiae in Support of Petitioner*," Cato Institute (December 20, 2019).

PAVONE & FONNER, LLP

County of San Diego, "*Hepatitis Outbreak A, After Action Report*," (2018)

Craemer, Thomas, "*Estimating Slavery Reparations: Present Value Comparisons of Historical Multigenerational Reparations Policies*," Social Science Quarterly, Vol. 96, Number 2 (2015)

Crank, Spencer, "*Analysis of the Austin Police Department's Racial Profiling Report,"* City of Austin Memorandum (January 3, 2020)

Crawford, et al., "*Race, Racial Threat, and Sentencing of Habitual Offenders*," Criminology, 36(3), 481-512 (1998).

Crum NF, Lederman ER, Hale BR, Lim ML, Wallace MR. "*A Cluster of Disseminated Coccidioidomycosis Cases at a US Military Hospital*," 168 Mil Med. 6, pp. 460-464 (June 2003)

Damrosch, L., "*The Role of the United States Senate Concerning 'Self-Executing' and 'Non-Self-Executing' Treaties*," 67 Chi.-Kent L. Rev. 515, 516 (1991)

"*Declarations and Reservations*," ICCPR (December 16, 1966).

Delaney, R., "*American History, Race, and Prison*," Vera Institute for Justice, Reimagining Prison, Internet Web Report, Website: www.vera.com (2016)

Department of Defense's Senate Select Committee on Health and Scientific Research, "*Biological Testing Involving Human Testing*" (1970s).

Dicey, A., The Law of the Constitution 193-194 (10th ed. 1959)

Dixon, "*Coccidioides Immitis as a Select Agent of Bioterrorism*," Journal of Applied Microbiology, 91(4):602-5 (October 2001)

Denbeaux, Mark, *et al.*, "*Racial Profiling Report: Bloomfield Police and Bloomfield Municipal Court*," Seton Hall University School of Law, Center for Policy and Research (April 9, 2016)

Dober, Gregory, "*Cheaper Than Chimpanzees*," Prison Legal News (March, 2008).

Dovey, J, "Inmate-Patients at High Risk of Valley Fever Excluded from Specific Central Valley Institutions," CDCR Policy Memorandum (August 3, 2006)

Duggan, P., "*A Disproportionate Number of D.C. Police Stops involved African Americans*," Washington Post (September 9, 2019)

Dunphy, Jack, *"The George Floyd Killing: A Police Officer's View*," National Review, Website: nationalreviewonline.com (June 4, 2020).

PAVONE & FONNER, LLP

Eckstein, J., "*How the NFL Makes Money*," Investopedia, Website: Investopedia.com (August 24, 2019)

Editorial Board, "*America's Battered Moral Standing*," Financial Times, Website: https://www.ft.com (June 5, 2020)

"*Ending the War on Drugs in Travis County*," Texas Criminal Justice Coalition (February, 2020);

European Convention for the Protection of Human Rights, United Nations Treaty, Article 13 (1950)

Fagan & Geller, "*Police, Race, and the Production of Capital Homicides*," 23 Berkeley J. Crim. L. 262 (2018)

Fellner, R., "*BART Janitor Quadruples $57,000 Salary to Over $270,000 with OT, Benefits*," Transparent California, Website: blog.transparentcalifornia.com (November 1, 2016);

Fellner, R., "*How One LA firefighter Turned a $90,000 Salary into $1.6 Million over the Past Four Years*," Transparent California, Website: blog.transparentcalifornia.com (May 14, 2018)

Fellner, R., "*Nearly 900% Increase in CalPERS Benefits Dwarfs Economic Growth, Taxpayers' Ability to Pay*," Transparent California, Website: blog.transparentcalifornia.com (July 12, 2018)

Fellner, R. "*Wildly Inflated Health Costs Are Costing California Taxpayers $3.3 Billion Annually*," Transparent California, Website: blog.transparentcalifornia.com (September 9, 2019)

Fiese M, "*Epidemiology of Coccidioidomycosis*," (1958).

Filip & Filip, Valley Fever Epidemic, Golden Phoenix Books (2008)

*Filipino Woman Gets 100 Lashes for Giving Birth in Qatar*," GMA News Online, Website: www.gmanetwork.com (June 30, 2006).

Forde, K., "*Exploiting Black Labor after the Abolition of Slavery*," The Conversation, (February 6, 2017)

Freedman, "*Coccidioidomycosis Outbreaks, United States and Worldwide, 1940–2015*," Emerging Infectious Diseases, Vol. 24, No. 3 (March 2018).

PAVONE & FONNER, LLP

Friedman, Michelle, "*Note: The Uneasy U.S. Relationship with Human Rights Treaties: The Constitutional Treaty System and Nonself-Execution Declarations*," 17 Fla.J.Int'l L. 187, 196 (2005)

Fuchs, Hailey,*"Qualified Immunity Protection for Police Emerges as FlashPoint Amid Protests,"* New York Times (June 23, 2020)

Galgiani, John *et al.*, *Coccidioidomycosis*, 41 Clinical Infectious Diseases Journal 1217-1218 (2005)

Galgiani, John, "*Practice Guidelines for the Treatment of Coccidioidomycosis,*" Infectious Diseases Society of America, Clinical Infectious Diseases 658, 659 (June 1999).

Genovese, E.D., The Political Economy of Slavery, Wesleyan University Press, (1989)

Ghandnoosh, N., "*Delaying a Second Chance: The Declining Prospects for Parole on Life Sentences*," Washington, D.C.: The Sentencing Project (2017)

Goodyear, Dana, "*Death Dust,*" The New Yorker (January 12, 2014)

Grossman, Sarah Ruiz, "*Anti-Racism Protests Held Coast o Coast Across U.S.,*" Huffington Post (June 12, 2020).

Hammel, Tyler, "*Report Finds Racial Disparity at Almost Every Level of Local Criminal Justice System,*" The Daily Progress (Website: thedailyprogress.com, January 29, 2020)

Hernandez, Javier, "*Global Anger Grows Over George Floyd Death,*" New York Times (June 1, 2020)

Hinton Alfert & Kahn LLP Press Release, "*Jury Returns Nearly $12 Million Verdict against Caltrans in Valley Fever Exposure Suit Brought by Five Employees of Independent Contractor,*" PRN Newswire, Website: https://www.prnewswire.com (January 21, 2016).

*"Human Rights in Qatar,"* Wikipedia the Free Encyclopedia, Website: www.wikipedia.org (June 17, 2020)

Jaffe, "*Suits Against Governments and Officers: Sovereign Immunity,*" 77 Harv.L.Rev. 1 (1963)

Jarvie, J., "*Private Prison Companies Likely to be Big Beneficiaries of Trump's Plan to Detain More Border-Crossers,*" Los Angeles Times (Feb. 14, 2017)

Harper & James, The Law of Torts (1956)

PAVONE & FONNER, LLP

Harrison, Thomas, "*New House Bill Would Revoke 'Qualified Immunity' for Police*," Courthouse News, Website: www.courthousenews.com (June 4, 2020)

Harris, David, "*Hearing on Ending Racial Profiling in America*," United States Senate Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights (Senator Richard Durbin, Chair, April 2012)

Hirschman, Jan,*"The Early History of Coccidioidomycosis: 1892-1945,"* 44 Clinical Infectious Diseases 1202, 1206 (2007)

Hornblum, Allen, Sentenced to Science: One Black Man's Story of Imprisonment in America, The Pennsylvania State University Press (2007)

Human Rights Committee, "*The Nature of the General Legal Obligation Imposed on States Parties to the Covenant*," United Nations, International Covenant on Civil and Political Rights," General Comment 31, ¶ 15 (May 26, 2004)

Iger M, *et al.*, "*Review of 135 Cases of Bone and Joint Coccidioidomycosis*," Proceedings of the 4th International Conference on Coccidioidomycosis, Washington, DC. National Foundation for Infectious Diseases (1985)

Ingraham, Christopher, "*You Really Can Get Pulled Over for Driving While Black, Federal Statistics Show*," Washington Post (September 9, 2014);

International Covenant on Civil and Political Rights, United Nations Treaty, (1966)

Jones, C. E., "*Give Us Free": Addressing Racial Disparities in Bail Determinations*, New York University Journal of Legislation and Public Policy, 16(4), 919-962 (2013).

Kanan, Renee, M.D., "*Valley Fever,*" Dept of Corrections Memo to Health Care Managers (November 5, 2004).

Kerr, O., "*An Equilibrium-Adjustment Theory of the Fourth Amendment*," 125 Harv.L.Rev. 476, 478 (2011).

Kirkland, Theo, M.D., et al., "*Coccidioidomycosis: A Reemerging Infectious Disease*," Emerging Infectious Diseases, Vol. 2, No. 3 (1996)

*"Lethal Weapon 2,"* Silver Pictures, Director Richard Donner, Wikipedia the Online Encyclopedia, Website: https://en.wikipedia.org (1989)

Lewis GG, *et al.*, "*History of Prisoner of War Utilization by the United States Army 1776–1945*," Dept. Army Pamphlet 20–213, Washington, DC: Department of the Army (1955)

PAVONE & FONNER, LLP

Lines, Rick, "*The Right to Health of Prisoners in International Human Rights Law*," 4 International Journal of Prisoner Health 1, p. 11, 24-26, 30-34 (April 2008)

*Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804)

Lowery, Wesley, "*Where Killings Go Unsolved*," Washington Post (June 6, 2018)

Lyons, Kelan, "*Racial Disparities in Traffic Stops Down, but Minority Drivers Often Treated Differently*," The Connecticut Mirror (Website: ctmirror.com, June 25, 2019)

Manley, Brian, "*2018 Racial Profiling Report*," Austin Police Department Memorandum (February 27, 2019)

Marquis, BR, "*Were California's Decarceration Efforts Smart? a Quasi-Experimental Examination of Racial, Ethnic, and Gender Disparities*," Society for Social Work and Research, Website:  www.sswr.org (January 19, 2020).

Martineau, Robert, "*Restrictions on Publication and Citation of Judicial Opinions: A Reassessment*," 28 U. Mich. J. L. Reform 119 (1994);

Marois, M.B., "*Deadly Spore in California Dirt Menaces Prison Expansion Plan*, Bloomberg News (October 19, 2007)

"*The Matrix*," Village Roadshow Pictures (Joel Silver, Director), Website: https://en.wikipedia.org (1999)

McCormick, Marsha, "*Our Uneasiness with Police Unions: Power and Voice for the Powerful?*" 35 Saint Louis University Public Law Review 47 (2015)

McKinley, J., "*Infection Hits a California Prison Hard*," New York Times (December 30, 2007)

*Melnik v. Ukraine*, Eur. Ct. H.R., App. No. 72286/01, ¶¶ 2, 103(b), 106 (March 28, 2006)

Miller, J, *et al.*, Germs: Biological Weapons and America's Secret War, Simon & Schuster, New York (2001)

Monk, Ellis, "*The Color of Punishment: African Americans, Skin Tone, and the Criminal Justice System*," 42 Journal Ethnic and Racial Studies 10 (2019)

Murty, *et al.*, "*Race and Class Exploitation: A Study of Black Male Student Athletes (BSAs) on White Campuses*," Race, Gender & Class: Volume 21, Number 3-4 (2014)

"*Nancy Feldman, Her Legacy as an Educator…*" Voices of Oklahoma, Interview of Feldman, Website: https://m.voicesofoklahoma.com (2020).

PAVONE & FONNER, LLP

Ninomiya, K., "*How Long Is the Average Career of an NFL Player?*" Career Trend, Website: careertrend.com (October 31, 2018).

Owen, T., "*Meet the Inmates Risking their Lives to Fight California Wildfires,*" Vice News, Website: https://www.vice.com (October 13, 2017).

Nellis, A. "*The Color of Justice: Racial and Ethnic Disparity in State Prisons,*" Washington, D.C., The Sentencing Project (2016)

Nellis, A., "*Still Life: America's Increasing Use of Life and Long-Term Sentences,*" Washington, D.C.: The Sentencing Project (2017)

Nigel, Rodley, "*Report of the Special Rapporteur,*" Commission on Human Rights, sub'd pursuant to Resolution 1994/37, Addendum: "*Visit by the Special Rapporteur to the Russian Federation,*" UN Doc E/CN.4/1995/34/Add.1 ¶¶ 41, 85

*Nevmerzhitsky v. Ukraine*, Eur. Ct. H.R., App. No. 54825/00, ¶ 87 (April 5, 2005)
 "*Optional Protocol to the Convention on the Rights of the Child… *" United Nations Treaty, Article 8(1)(g), Article 9, ¶ 4 (2002)

Oshinsky, D., "Worse than Slavery: Parchman Farm and the Order of Jim Crow Justice, New York: The Free Press (1997)

Partnoy, F., "*The Cost of a Human Life, Statistically Speaking,*" The Globalist, Website: www.theglobalist.com (2012)

Paust, J., "*Self-Executing Treaties,*" 82 Am. J. Int'l L. 760, 760 (1988)

Peck, Emily, "*Why the U.S. Needs to do Reparations Now,*" Huffington Post (June 8, 2020)

Perry, M., "*No Pensions for Ex-Slaves: How Federal Agencies Suppressed Movement to Aid Freedpeople,*" Prologue Magazine, Vol. 42, No. 2 (2010).

Pierson, E., *et al.*, "*A Large-Scale Analysis of Racial Disparities in Police Stops across the United States,*" Nature Human Behaviour (Website: www.nature.com) (May, 2020)

Poland, Senate Report, "*Affairs in the Late Insurrectionary States,*" pp. 1-29 (February 19, 1872)

Porter, N., "*Drug-Free Zone Laws: An Overview of State Policies,*" Washington, D.C.: The Sentencing Project (2013)

Poston, B. "*LAPD Searches Blacks and Latinos More. ButThey're Less Likely to Have Contraband than Whites,*" LA Times (October 8, 2019)

PAVONE & FONNER, LLP

Press Office, '*House of Saddam, A Compelling Drama…,*" British Broadcasting Company, Website: www.bbc.co.uk (October 29, 2014)

Pryor, William, et al., "*Demographic Differences in Sentencing: An Update to the 2012 Booker Report,*" United States Sentencing Commission (November 2017)

Public Officers Protection Act, 7 Jac. 1, c. 5 (1609)

Queally, J., "*Beverly Hills Police Chief Retires after Lawsuits Alleging Racism, Anti-Semitism, Harassment,*" Los Angeles Times (April 25, 2020)

Quigley, Aidan, "*Racial Disparities, Search Rates Decline in Burlington Police Traffic Stops,*" Vermont Digger, Website: VTDigger.org (June 30, 2019)

"*Racial Bias Audit of the Charleston, South Carolina, Police Department,*" CNA Audit Team (September 30, 2019)

Rapacz, M., "*Protection of Officers Who Act Under Unconstitutional Statutes,*" 11 Minn. L. Rev. 585, 585 (1927)

Reilly, Ryan, "*A Shocking Dereliction Of Duty': Supreme Court Brushes Off Police Immunity Cases,*" Huffington Post (June 15, 2020).

Report of Human Rights Committee, GAOR, 31st Session, ¶ 4, (1978).

Restatement Second, Torts § 121 (1965)

Richardson, Theresa, "*Acres of Skin: Human Experiments at Holmesburg Prison,*" Canadian Journal of History (2001).

Rosenstein, N., "*Risk Factors for Severe Pulmonary and Disseminated Coccidioidomycosis,*" Kern County Dept. of Health, California (1995–1996)

Ross, Cody, "*A Multi-Level Bayesian Analysis of Racial Bias in Police Shootings at the County-Level in the United States,2011–2014,*" PLOS Research Publisher (Website: https://plos.org) (November 5, 2015)

Ross, Matthew, et al., "*Traffic Stop Data Analysis and Findings, 2016,*" State of Rhode Island Comprehensive Police-Community Relationship Act Of 2015 (CCPRA) (March, 2018)

Rothbard, Murray, "*The Brutality of Slavery,*" Mises Daily Articles (November 14, 2018)

Rothkopf, David, "*America is Losing the High Moral Ground,*" Foreign Policy, Website: https://foreignpolicy.com (July 14, 2016)

PAVONE & FONNER, LLP

Ryan, Chris, "*What are the Odds of a High School Football Player Reaching the NFL?*," New Jersey High School Sports (August 24, 2019)

Schlosser, E., "*The Prison-Industrial Complex*," The Atlantic (Dec. 1998)

Schmelzer and Tabershaw, "*Exposure Factors in Occupational Coccidioidomycosis,* 58 American Journal of Public Health 1 (1968)

Schweikert, Jay., "*Police Immunity Highlighted by George Floyd Protesters Must End, and Officers Must Pay*," Cato Institute, Website: www.cato.org (June 4, 2020).

Schweikert, J., "*Supreme Court Will Soon Decide Whether To Reconsider Qualified Immunity*," CATO Institute Press Release (April 28, 2020)

Segura, Melissa, "*There's One Big Reason Why Police Brutality Is So Common in the US. And That's the Police Unions*," BuzzFeed News, Website: www.buzzfeednews.com (June 1, 2020)

Sillen, Robert, "*Prevention and Treatment of Coccidioidomycosis at Pleasant Valley State Prison – Background and Status Report*," CDCR Memo, Office of the California Prison Health Care Receivership (May 21, 2007).

Smith, C.E., "*Epidemiology of Acute Coccidioidomycosis with Erythema Nodosum*," Am.J.Public Health, Vol. 30(6): 600, 602 (1940)

Smith, CE, Pappagianis, *et al,*, "*Human Coccidioidomycosis*," Bacteriology Reviews, 25(3) (1961)

Smith, Earl, "*Incarceration, A Tool for Racial Segregation and Labor Exploitation*," Race, Gender & Class, Vol. 15, No. 1-2 (2008),

Solomon, Danyell, "*Systematic Inequality and Economic Opportunity*," p. 3, Center for American Progress (August 7, 2019)

Starr, "*Recommendations for Coccidioidomycosis Mitigation in Prisons in Hyperendemic Areas of California*," CDCR Memorandum (June, 2007 )

State of California, Department of Corrections and Rehabilitation, "*Prison Industry Board Public Meeting*," pp. 12-13, 18-20, 46 (November 16, 2012)

Statistica.com, "*Revenue of the NCAA from Television Broadcast Payments and Licensing Rights from 2010 to 2024*," Statistica, Website: http://statista.com (2020)

Statute of Westminster I, 3 Edw. 1, c. 24 (1275)

Statute of Westminster II, 13 Edw. 1, c. 13 (1285)

Stephens, Beth, "*Sosa v. Alvarez-Machain: "The Door Is Still Ajar" for Human Rights Litigation in U.S. Courts*," 70 Brook. L. Rev. 533, 558 (2004)

Stevenson, Bryan, "*Illegal Racial Discrimination in Jury Selection*," Equal Justice Initiative Report (August, 2010)

Stevenson, Bryan, "*Slavery Gave America a Fear of Black People…*," New York Times, 1619 Project (August 14, 2019)

Stevenson, Megan, "*The Scale of Misdemeanor Justice,*" 98 Boston University Law Review 731 (2018)

Stout, Mike, "*Racial and Ethnic Disparities in Traffic Stops and Stop Outcomes in Springfield, Missouri: 2012-2016,*" Springfield Police Department (by Chief Paul Williams) (August 8, 2017)

Strode, Maureen, "*CDCR Stops Housing Inmates at 700-bed Private Prison in McFarland,*" Website: bakersfield.com (September 27, 2019)

Swain, Rachel, "*Train to Nowhere? Here's How High-Speed Project Went Off the Rails,*" San Francisco Chronicle (February 7, 2019).

"*The Birth of Private Prisons,*" Google History (website: www.sites.googles.com, 2020)

"*The Origins and Nature of New World Slavery,*" Digital History, Website: www.digitalhistory.uh.edu (2016)

"*The 10 Most-Costly Riots in the U.S.*," Chicago Tribune (November 26, 2014)

Thompson, Don, "*Report: California Cops More Likely to Stop Black Drivers,*" Associated Press, US News & World Report (January 2, 2020).

Timmons, Greg, "*How Slavery Became the Economic Engine of the South,*" p. 2 History.Com (November 19, 2018).

United Nations General Assembly, "*Declaration of Basic Principles of Justice for Victims of Crime and Abuse of Power,*" 96th Plenary Meeting, ¶¶ 12, 18 (November 29, 1985)

United Nations Sentencing Project, "*Report of The Sentencing Project to the United Nations Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance,*" (March, 2018)

United Nations Treaty, "*Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,*" Article 14, New York (December 10, 1984)

United Nations Treaty, International Covenant on Civil and Political Rights, (1966)

United States Bureau of Justice Statistics, *"Prisoners in 2016,"* (Feb. 2018)

United States Constitution, Article 1, Section 10

United States Const., Eighth Amendment.

United States Department of Justice Memorandum, "*Department of Justice Report Regarding the Criminal Investigation into The Shooting Death of Michael Brown by Ferguson, Missouri Police Officer Darren Wilson,*" (March 4, 2015)

United States Department of Justice Report, "*Investigation of the Baltimore City Police Department,*" Civil Rights Division, p. 24 (August 10, 2016)

United States Department of Justice Civil Rights Division, "*Investigation of the Ferguson Police Department,*" (March 4, 2015)

United States Senate Executive Report 102-23, "*US Senate Report on Ratification of The International Covenant on Civil and Political Rights,*" p. 1 (102d Cong., 2d Sess.).

Vermeule, A., "*Hume's Second-Best Constitutionalism,* 70 U.Chi.L.Rev.421, 421-22 (2003)

Young, E.A., "*Making Federalism Doctrine: Fidelity, Institutional Competence, and Compensating Adjustments,*" 46 Wm.& Mary.L.Rev. 1733, 1739 (2005);

Walker, Taylor, "*Threatened With $4 Billion In Lost Profit, GEO Group Sues California Over Private Prison Ban,*" Website: witnessla.com (January 3, 2020).

Washington, Harriet, Medical Apartheid, First Anchor Books (2008)

Weissbrodt, David, "*Defining Torture and Cruel, Inhuman, and Degrading Treatment,*" 29 Law & Ineq. 343, 352 (2011).

White, J, "*Victim Compensation and Wrongful Death Damages,*" Cornell University Law School Social Science Dept., Website: www.cornell.edu (May, 2017).

White & Case, LLP, "*A Critical Assessment of the U.S. Commitment to Civil and Political Rights,*" Lawyers' Committee for Civil Rights under Law, Website: lawyerscommittee.org, p. 21 (July, 2006)

Will, George, "*This Doctrine Has Nullifiled Accountability for Police. The Supreme Court Can Rethink It,*" Washington Post (May 13, 2020)

Williamson, Samuel, "*Measuring Slavery in 2016 Dollars,*" MeasuringWorth, p. 5, Website: www.measuringworth.com (2020).

PAVONE & FONNER, LLP

Winslow D, Khoury N, Snyder N, Bick J, Hawthorne K, Chapnick R, et al., 2007; "*Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California*,"  (June, 2007)

Winter, S., "*The Meaning of 'Under Color Of' Law*," 91 Mich.L.Rev. 323, 325 (1991)

Williams, T., "*California Rebukes Rural Prison for Racism*," New York Times (December 16, 2015)

Wynn, James, "*As a Judge, I Have to Follow the Supreme Court. It Should Fix this Mistake*," Washington Post (June 12, 2020).

Zimbardo, P.G., The Lucifer Effect: Understanding How Good People Turn Evil, Random House Trade Paperbacks, New York (2007).

PAVONE & FONNER, LLP